**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **MICHELLE JAMES, as mother and next friend of MATTHEW OSBORNE, a Minor Child and TEAGAN OSBORNE, a Minor Child** | |
| **Plaintiff,** | **Case No.  3:15-CV-01305-VLB** |
| **vs.** | |
| **WORLD WRESTLING ENTERTAINMENT, INC.,** | **September 11, 2015** |
| **Defendant.** | |

# EXHIBIT 1

# TO DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MOTION FOR SANCTIONS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| MICHELLE JAMES, as mother and next friend of MATTHEW OSBORNE, a Minor Child and TEAGAN OSBORNE, a Minor Child<br><br>                    Plaintiff,<br><br>vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>                    Defendant. | Case No. 3:15-cv-02146-L |

---

## DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MOTION FOR SANCTIONS PURSUANT TO RULE 11

---

Defendant World Wrestling Entertainment, Inc. ("WWE") hereby moves this Court for an order imposing sanctions on Plaintiff's counsel for violating Rule 11 of the Federal Rules of Civil Procedure.  In support of this Motion, WWE states as follows:

## I.   INTRODUCTION AND SUMMARY

1.   Plaintiff's counsel Konstantine Kyros ("Kyros") and Erica Mirabella ("Mirabella"), among others, have abused the privilege of access to the Federal Courts by filing duplicative actions against WWE in six jurisdictions across the United States, including multiple class actions covering the identical class of plaintiffs, for substantially identical, stale and fraudulent claims by current or former WWE performers.

2.   In each case filed to date, the Complaints have been drafted with salacious, impertinent allegations designed more for media consumption than true legal merit, and contain multiple violations of Rules 8, 9, and 11 of the Rules of Civil Procedure.

3.   In multiple cases, after filing such improper Complaints, Kyros and Mirabella then amend the complaint to delete some of the false and improper allegations, but only after such allegations have drawn the desired media attention.

4.   As recently as June 8, 2015, a federal judge, specifically the Honorable Vanessa Bryant of the District Court of Connecticut, lectured Kyros on the improper pleadings he had filed in *LoGrasso and Singleton v. World Wrestling Entertainment, Inc.*, 3:15-cv-00425-VLB (D. Conn.) (the "LoGrasso/Singleton Action") and issued specific corrective instructions.  *See* Declaration of Paul R. Genender ("Genender Decl.") attached hereto as Exhibit 1 and incorporated herein by reference [App. at pp. 1-5], Ex. A, [App. at pp. 50-70].  Mirabella is co-counsel in that case and knew of those admonitions.

5.     Despite the recent admonition of a federal judge regarding their studied indifference to complying with the basic tenets of federal pleading requirements, Kyros, Mirabella and the other counsel here filed this case consistent with past complaints replete with false, scandalous, and inflammatory opinions instead of the clear and concise pleadings required by Rule 8.

6.     The Complaint here opens with the false allegation that the decedent, Matthew Osborne ("Osborne"), wrestled for WWE "beginning in 1985 and ending in 2007." Complt. ¶ 1. Consistent with the false allegation that Osborne had performed for WWE for over 20 years, the Complaint later alleges that in supposed reliance on WWE agents, he "continued to fight and receive sustained head trauma repeatedly over twenty years." *Id.* at ¶ 153.

7.     In actual fact, as all of Plaintiff's counsel have been advised, Osborne did not perform for WWE for over 20 years as described in the Complaint or until 2007. *See* Genender Decl., Ex. B [App. at pp. 75-78].  He performed between 1985-86; from October 1992 to October 1993; and made a one-time appearance for a few minutes at a special anniversary show in 2007. *See* Genender Decl., Ex. C, [App. at pp. 81-108].

8.     Having falsely alleged that Osborne performed for over 20 years from 1985-2007, the Complaint alleges that WWE did not disclose and/or somehow fraudulently concealed various scientific studies from Osborne.  Complt. at ¶¶ 35, 60, 62.  These accusations lack any basis in fact, as much of the alleged science listed in the Complaint did not even exist during Osborne's actual tenure with WWE.

9.     In addition to making factual allegations that are false, as above, the Complaint alleges fraudulent concoctions to falsely suggest a "cover-up" by WWE.  Specifically, the Complaint conceals, distorts and fabricates the actual testimony of Stephanie McMahon before a

Congressional Committee in 2007 to make it appear as if she lied to Congress about the risks of concussions facing performers and whether concussions had occurred at WWE.

10.     The fraudulent allegations asserted by Plaintiff's counsel in this case mimic identical fabrications made in the LoGrasso/Singleton Action before the federal court in Connecticut, and in every Complaint filed to date by Kyros and Mirabella.  Those fraudulent fabrications were set forth in WWE's motion to dismiss briefing and in a Rule 11 motion served on counsel of record in that case.  Despite being aware of the fraudulent nature of those fabrications, those allegations were repeated in this action.

11.     Kyros and Mirabella also continue to assert scandalous and impertinent allegations regarding wrestlers who have died but which have no relevance or connection to the place, time, or events surrounding the death of Osborne despite direct instructions from the Honorable Judge Bryant that such allegations do not comport with the Federal Rules.  *See* Complt. at ¶¶ 91-130; Genender Decl., Ex. A [App. at pp. 66-67].

12.     In filing time-barred lawsuits across the United States, Kyros, Mirabella and their affiliated lawyers have consistently disregarded the mandatory forum-selection clauses agreed to by their clients that require their claims to be filed in Connecticut, in violation of controlling precedent of the United States Supreme Court.  *See Atl. Marine Constr. Co. v. United States Dist. Ct. for W. Dist. Of Tex.*, 134 S. Ct. 568 (2013).

13.     Indeed, **the day before Plaintiff's counsel filed the Complaint in this action,** the District Court for the District of Oregon, where Kyros and Mirabella filed their first class action against WWE styled *Haynes, et al. v. World Wrestling Entertainment, Inc.*, 3:14-CV-01689-ST (D. Or.) (the "Haynes Class Action") (and which covers Osborne as a class member),

granted WWE's Motion to Transfer that class action to the District Court of Connecticut because, among other things:

    a.   the evidence of record established "**that many of the putative class members are subject to mandatory forum selection clauses requiring disputes to be resolved in the District of Connecticut**;"

    b.   "the content and timing of the[] multi-jurisdictional filings [by Kyros] constitute **evidence of forum shopping**;" and

    c.   Kyros appears to have "a **hit-list** of potential venues" for the claims against WWE.

*See* Genender Decl., Ex. D [App. 116-117] (the "Oregon Transfer Order") (emphasis added).

14.    Rather than recognizing the significance of the Oregon District Court's indicting findings and legal conclusions regarding their improper forum shopping, Kyros, Mirabella and their co-counsel in this case ignored those findings and added this Court to their ever-growing "hit-list" of forum shopping venues.

15.    Plaintiff's counsel filed this duplicative brain injury case on behalf of the "mother and next friend of" the alleged children and successors-in-interest of Osborne, who Plaintiffs readily admit died of an "accidental overdose and arterio-sclerotic and hypertensive cardiovascular disease" long after last performing for WWE.  *E.g.*, Complt. at ¶¶ 157, 161.  As alleged in the Complaint, Plaintiffs are **all residents of Pennsylvania, not Texas**.  *Id.* at ¶¶ 16-18.

16.    Just as the Oregon District Court found in its Order transferring the Haynes Class Action to Connecticut, the contract that Osborne and WWE signed contains a mandatory forum-selection clause that requires Plaintiff's claims to be brought in Connecticut.

17.    Plaintiff's counsel knew before filing the Complaint that the contract Osborne and WWE signed in connection with Osborne's wrestling performances contained such a mandatory

forum-selection clause. WWE had filed affidavits in other cases demonstrating when such clauses came to be included in WWE contracts. *See* Genender Decl., Ex. E [App. at pp. 119-124].

18.     WWE's counsel requested by email on July 2, 2015, that Plaintiff's counsel transfer this case to the District Court of Connecticut in light of the mandatory forum-selection clause and the Oregon Transfer Order, and that counsel correct the Rule 11 pleading falsehoods. *See* Genender Decl., Ex. B [App. at pp. 75-79]. Continuing their vexatious conduct, Plaintiff's counsel would not agree to transfer this case, would not explain the legal bases for their refusal to honor the forum-selection clause in Osborne's contract, and did not seek to amend the Complaint. *Id.*

19.     On July 13, 2015, the United States District Court for the Central District of California issued an Opinion and Order in the matter of *McCullough, et al. v. World Wrestling Entertainment, Inc.*, 2:15-CV-2662-ABJEM (C.D. Cal.) (the "McCullough Class Action"), enforcing forum-selection clauses between the three former performers acting as individual plaintiffs **and** representative class action plaintiffs and ordering the case to be transferred to Connecticut (the "California Transfer Order"). *See* Genender Decl., Ex. F [App. at pp. 125-133]. In so doing, the court rejected all of the arguments Kyros and his affiliated lawyers have asserted in refusing to honor the mandatory forum-selection clauses. *Id.* This is the third federal court to issue a transfer order due in whole or in part to forum-selection clauses.

20.     On July 13 and 14, 2015, as a result of the California Transfer Order and in the spirit of the meet and confer requirements in the Local Rules, WWE's counsel again requested by e-mail that Plaintiff's counsel transfer this case to the District Court of Connecticut. *See* Genender Decl., Ex. G [App. at pp. 134-137]. Once again, Plaintiff's counsel refused and

without any substantive reason for doing so.  Instead, Plaintiff's counsel asserted that they could not agree to transfer this case because they had to see whether a **fourth** court, the District Court for the Western District of Tennessee where another copycat case filed by Kyros and Mirabella is pending, would enforce the forum-selection clause.  *Id.*  Such gamesmanship is a clear abuse of the Federal Court system to generate potentially inconsistent results among Federal Courts, and is improper and should not be countenanced by this Court.

21.     Because the Complaint contains false, misleading and impertinent allegations and the filing of this suit in a court outside of Connecticut is objectively unreasonable and frivolous in light of the mandatory forum-selection clause in Osborne's contract, Plaintiff's counsel have violated Rule 11(b) of the Federal Rules of Civil Procedure and should be sanctioned.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     Kyros' Vexatious Filing of Multiple, Duplicative Actions Against WWE

22.     On October 23, 2014, Kyros and Mirabella filed the Haynes Class Action as the first of the five currently pending, duplicative cases against WWE for substantively identical claims including brain injuries allegedly sustained by WWE performers.

23.     The Haynes Class Action was filed as a class action and, by Plaintiff's counsel own allegations, covers a putative plaintiff class of any current or former WWE wrestlers (which expressly includes Osborne) and asserts claims and theories of legal liability substantively identical to those asserted by Plaintiffs in this case.

24.     As noted above, **just one day before Kyros and Mirabella filed this action**, the District Court of Oregon granted WWE's Motion to Transfer the Haynes Class Action to Connecticut.  *See* Genender Decl., Ex. D [App. at pp. 109-118].  Significantly, a key factor in the court's decision to transfer the Haynes Class Action to Connecticut was the "evidence in the

record that many of the putative class members are subject to mandatory forum selection clauses requiring disputes to be resolved in the District of Connecticut." *Id.* [App. at p. 115].

25.     Less than three months after filing the Haynes Class Action, Kyros filed a substantively identical class action lawsuit for the identical class of putative plaintiffs in the District Court for the Eastern District of Pennsylvania styled *LoGrasso, et al. v. World Wrestling Entertainment, Inc.*, 5:15-cv-00223-LS (E.D. Pa.) (the "LoGrasso/Singleton Class Action"). Mirabella is also counsel of record in that case.

26.     In the LoGrasso/Singleton Class Action, Kyros named Vito LoGrasso and Evan Singleton as representative plaintiffs.  Both LoGrasso and Singleton signed mandatory forum-selection clauses that require any claims arising out of or relating to their contracts with WWE to be brought in Connecticut.  *See* Genender Decl., Ex. H [App. at pp. 138-238].

27.     After a series of evasive email responses to WWE's counsel bringing the forum-selection clauses to Kyros' attention, Kyros ultimately conceded, through co-counsel, that transfer to the District of Connecticut was appropriate.  *Id.*  In the course of those email exchanges, neither Kyros nor his co-counsel challenged the validity or enforceability of the forum-selection clauses.

28.     Kyros did not file any opposition to WWE's Motion to Transfer the LoGrasso/Singleton Class Action to Connecticut and the District Court for the Eastern District of Pennsylvania granted WWE's Motion to Transfer by order dated March 23, 2015.  *See* Genender Decl., Ex. I [App. at pp. 239-241].

29.     Before the original LoGrasso/Singleton Class Action was transferred to Connecticut, Kyros, Mirabella, and R. Christopher Gilreath, another of Plaintiff's co-counsel in this case, filed yet another suit against WWE, this time in Tennessee, asserting substantively

identical claims and theories of liability for one former wrestler, Nelson Frazier, who was already a member of the same exact class of plaintiffs whom Kyros already had filed on behalf of in the Haynes Class Action and, again, the original duplicative LoGrasso/Singleton Class Action. WWE removed this third duplicative suit to the District Court for the Western District of Tennessee on March 24, 2015 which is now styled *Frazier v. World Wrestling Entertainment, Inc.*, 2:15-cv-02198-JPM (W.D. Tn.) (the "Frazier Action"). Despite knowledge that at least three of the contracts signed by Frazier contain mandatory forum-selection clauses nearly identical to those signed by LoGrasso and Singleton and even though Kyros already consented to the transfer of the LoGrasso/Singleton Class Action to Connecticut in March 2015, Kyros, Gilreath, and Mirabella refused to transfer the Frazier Action to Connecticut. WWE has filed a Motion to Transfer which is currently pending before the Western District of Tennessee. *See* Genender Decl., Ex. J [App. at pp. 242-464].

30. After the original LoGrasso/Singleton Class Action was transferred to Connecticut and assigned to the Honorable Federal District Judge Vanessa Bryant, Kyros caused to be filed yet a third duplicative class action in the District Court for the Central District of California, the McCullough Class Action. Significant for the Court's analysis, the McCullough Class Action covers the exact same putative class plaintiffs as the prior class actions filed by Kyros -- which includes Osborne -- and asserts substantively identical claims against WWE.

31. Although Kyros did not sign the McCullough Class Action, WWE asserts on information and belief that Kyros is involved in the case and concealed his involvement in an attempt to disavow any significance to his prior agreement to litigate the identical class action in Connecticut. WWE's counsel has repeatedly requested of California counsel in the McCullough

Class Action and Kyros directly that they acknowledge Kyros' role and involvement in the McCullough Class Action, but both have tellingly refused to admit or deny that involvement.

32.     Kyros' attempt to conceal his involvement in the McCullough Class Action, however, has not gone unnoticed by the Federal Courts.  In the Oregon Transfer Order, the District Court for Oregon observed: "Kyros is not listed as counsel in that case [the McCullough Action], and WWE attorneys have been unable to confirm whether he represents the plaintiffs. However, the pleadings in the McCullough action incorporate many of the identical allegations and photographs and seek the identical relief alleged in the FAC in this case."  *See* Genender Decl., Ex. D [App. at p. 117].

33.     As noted above, the McCullough Class Action has also been ordered transferred to the District Court of Connecticut for many of the same reasons WWE has presented in its Motion to Transfer this duplicative suit to Connecticut.  *See* Genender Decl., Ex. F [App. at pp. 125-133].

**B.     Osborne Agreed to a Connecticut Mandatory Forum-Selection Clause in His Contract with WWE**

34.     Contrary to the misleading allegations in the Complaint that falsely imply Osborne performed continuously for WWE from 1985-2007 (*see*, *e.g.*, Complt. at ¶ 1 (alleging Osborne "wrestled for WWE beginning in 1985 and ending in 2007")), Osborne, in fact, regularly performed for WWE **only** from 1985-1986 and from October 1992-1993.  *See* Genender Decl., Ex. C [App. at p. 82].  He also made one brief appearance at a WWE anniversary show in 2007. *Id.*

35.     In connection with wrestling for WWE, Osborne signed two contracts: one dated January 1, 1985 and another dated October 31, 1992. *See* Genender Decl., Ex. C [App. at pp. 80-108].

DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S
MOTION FOR SANCTIONS PURSUANT TO RULE 11 - Page 10 of 24

36.     Both the 1985 and 1992 contracts contain Connecticut choice of law provisions which provide that Connecticut law exclusively governs the contracts.  *Id.* [App. at p. 88 (§ 20) and p. 106 (§13.7)].  The 1992 contract also contains the following mandatory forum-selection clause:

> In the event that there is any claim, dispute, or other matter in question **arising out of or relating to this Agreement … it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of Connecticut.**  This provision to submit all claims, disputes or other matters in question to the Federal or state courts in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

*Id.* [App. at p. 106 (§ 13.8)] (emphasis added).[1]

37.     As this Court has recognized, there are many reasons why it is reasonable for a multi-jurisdictional company like WWE to include forum-selection clauses in contracts including, "the desire to limit the fora in which it may be subject to suit, the salutary effects of dispelling confusion about where suits must be brought and defended, and the existence of benefits passed on to third parties as a result of the savings generated by limiting the fora in which it may be sued."  *Pugh v. Arrow Elecs., Inc.*, 304 F. Supp. 2d 890, 895 (N.D. Tex. 2003), *citing Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-94 (1991).

38.     Kyros, Mirabella and their co-counsel still chose to file suit in this Court despite: (1) the mandatory forum-selection clause in Osborne's 1992 contract that directly covers

---

[1]     Forum-selection clauses are binding on non-signatories who stand in the shoes of a decedent, including representatives of a decedent's estate such as Plaintiffs purport to represent in this case. *See Tellez v. Chios Sea Ship. & Trading S A*, 247 F.3d 241 at *1 (5th Cir. 2001) (affirming  ruling that "next-of-kin of a deceased Nicaraguan seaman is bound by the foreign forum selection clause contained in the seaman's contract of employment when bringing a wrongful death action against the seaman's employer."); *Brenner v. National Outdoor L'ship Sch.*, 20 F.Supp.3d 709, 716, 719 (D. Minn. 2014) (holding that forum-selection clause in a contract involving the decedent was binding on the trustee of the decedent's heirs in a wrongful death action).

Plaintiff's claims in this case; (2) Kyros not objecting to transfer of the original LoGrasso/Singleton Class Action to Connecticut after WWE informed him of the mandatory forum-selection clause in LoGrasso's and Singleton's contracts with WWE; (3) Plaintiffs not living in Texas but in Pennsylvania, the state from where Kyros already had voluntarily agreed to transfer the original LoGrasso/Singleton Class Action to Connecticut; and (4) the Oregon District Court's order transferring the Haynes Class Action to the District Court of Connecticut in significant part because of the mandatory forum-selection clauses,.

39.     Even now, after the issuance of the decision in the McCullough Class Action where the Federal Court in California enforced such forum-selection clauses, Plaintiff's counsel have, nevertheless, refused to dismiss this case without prejudice or consent to transfer it to Connecticut.

## III.   ARGUMENT

### A.     Rule 11 Standard

40.     By its terms, Rule 11 sanctions may be properly assessed against (1) any attorney who "present[s] to the court a pleading, written motion, or other paper **-** __**whether by signing, filing, submitting, or later advocating it**__ **-**" that violates the requirements of Rule 11, or (2) any attorney who is responsible for such violation.  *See* Fed. R. Civ. P. 11(b) and (c) (emphasis added); *see also Business Guides, Inc. v. Chromatic Commcn's Enters., Inc.*, 488 U.S. 533, 542-43 (1991).

41.     The standard for determining whether an attorney has violated Rule 11 is "measured by an objective, not subjective, standard of reasonableness" that is evaluated at the moment the pleading or paper is filed with the Court.  *Thomas v. Capital Security Servs., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988).

42.     As the Court of Appeals for the Fifth Circuit has explained:

> [w]hether sanctions are viewed as a form of cost-shifting, compensating opposing parties injured by the vexatious or frivolous litigation forbidden by Rule 11, or as a form of punishment imposed on those who violate the rule, **the imposition of sanctions pursuant to Rule 11 is meant to deter attorneys from violating the rule**.

*Id.* at 877 (emphasis in original) (citation omitted); *see also Cappa Fund III, L.L.C. v. Actherm Holdings, A.S.*, 3:10-cv-897-L, 2011 WL 817384 at *2 (N.D. Tex. Feb. 21, 2011) (the purpose of Rule 11 is to "deter baseless filings in district court, [citation omitted]" and "**to spare innocent parties and overburdened courts** from the filing of frivolous lawsuits [citation omitted].) (emphasis added).

**B.      Kyros and His Co-Counsel Purposefully Plead False, Misleading and Impertinent Allegations in Violation of Rule 11**

43.     An attorney violates Rule 11(b) by making false and misleading allegations and asserting impertinent, immaterial and scandalous allegations. *See, e.g., Marceaux v. Lafayette City-Parish Consol. Gov't*, Nos. 14-31043, 14-31213, 2015 WL 3544648 at *1-3 (5th Cir. June 8, 2015) (affirming grant of sanctions under Rule 11 because "by reasserting [in an amended complaint] the same impertinent, immaterial, and scandalous allegations - against which they had been warned" by the court to not include in the amended complaint, "the plaintiffs force further filings from the defendants and increased the cost and effort required by the court to comb through the complaint); *In re Motion for Sanctions Against Scott Meyers*, 12-MC-015-A, 2014 WL 1494099 at *2-9 (N.D. Tex. April 16, 2014) (finding violation of Rule 11(b)(3) and imposing sanctions for filing complaint with false allegations and continuing to advocate the false allegations after being put on notice of their falsity); *Valdez v. Kreso, Inc.*, 144 F. Supp. 2d 663, 668-70 (N.D. Tex. 2001) (holding attorney violated Rule 11(b) by making false allegations of fact in complaint); *Devine v. Wal-Mart Stores, Inc.*, 52 F. Supp. 2d 741, 746 (S.D.

Miss. 1999) ("Primary among the concerns of Rule 11 is the deterrence of untruthfulness in pressing lawsuits.").

44.     Here, Kyros and his co-counsel have engaged in at least three separate instances of asserting fabricated allegations that violate Rule 11.

45.     **First**, Plaintiff's counsel never assert the specific dates when Osborne wrestled for WWE so as to purposefully misrepresent that he wrestled for WWE for over twenty years. For example, Plaintiff's counsel allege:

- Osborne wrestled for WWE "beginning in 1985 and ending in 2007."  Complt. at ¶ 1.

- "Plaintiff believes Matthew Osborne was substantially more likely than the general population to develop [brain] diseases as a result of WWE's misconduct **throughout his approximately twenty-two year career** and until his untimely death."  *Id.* at ¶ 2 (emphasis added).

- "Matthew Osborne reasonably relied on WWE's medical personnel, trainers, agents, and documents when he continued to fight and receive sustained head trauma repeatedly **over twenty years** . . . ."  *Id.* at ¶ 153 (emphasis added).

46.     Osborne, however, only performed for WWE between 1985-86 and from October 1992 to October 1993, and he made a one-time appearance for a few minutes at a special anniversary show in 2007, facts that Kyros and his co-counsel knew.  *See* Genender Decl., Exs. B and C [App. at pp. 75-108].

47.     Further, Kyros and his co-counsel engage in purposefully misrepresenting the facts to the Court so as to give the false impression that they have support for their claim that WWE did not disclose and/or somehow fraudulently concealed various scientific studies from Osborne.  Complt. at ¶¶ 35, 60, 62.

48.     Indeed, as the basis for that false claim, Plaintiff's counsel allege that WWE purportedly "was aware **in 2005** and beyond that wrestling for the WWE and suffering head

trauma would result in long-term injuries" and cite to purported publications from 2006-2009 that it claims WWE should have known about. *Id.* at ¶¶ 60-61 (emphasis added). Those purported facts have no import if Plaintiff's counsel would have truthfully alleged when Osborne wrestled for WWE.

49.    The purposeful pleading of such misleading facts by Plaintiff's counsel clearly violates Rule 11 and warrant sanctions by the Court. *See In re Motion for Sanctions Against Scott Meyers*, 2014 WL 1494099 at *2-9; *Valdez v. Kreso, Inc.*, 144 F. Supp. 2d at 668-70.

50.    **Second**, Plaintiff's counsel make false and misleading allegations in an attempt to make it appear as if WWE knew about the risks of concussions in professional wrestling and then tried to cover up that knowledge by lying to a Congressional Committee about those risks. **No such thing ever happened**.

51.    Plaintiff's counsel start their scheme with an allegation that an unnamed "WWE executive" on an unspecified date in 2007 "admitted that 'WWE wrestlers are at risk for concussions because of the nature of their work.'" Complt. at ¶ 59.

52.    Then, just 9 paragraphs later in the Complaint, Plaintiff's counsel allege specifically that WWE executive Stephanie McMahon-Levesque testified to a Congressional Committee in December 2007 that "there were no documented concussions in **WWE's history**." *Id.* at ¶ 68 (emphasis added).

53.    Having first pled that an unnamed WWE executive admitted to risks of concussions and then specifically alleging that Ms. McMahon-Levesque supposedly denied such risks while under oath before a Congressional Committee, Plaintiff's counsel make the sensational claim that Ms. McMahon-Levesque committed perjury - a knowingly false claim that

is compounded by the fact that Kyros and his co-counsel make such a claim by purposefully omitting meaningful details in their allegations.

54.     Plaintiff's counsel undoubtedly have the transcript of the Congressional hearing where Ms. McMahon-Levesque testified because they cite to it in footnote 22 of the Complaint. Yet, they did not provide it to this Court as an exhibit and have not provided it to any of the other courts where they have made the same false allegations.  Plaintiff's counsel also fail to provide any citation for the 2007 quote from the unnamed "WWE executive" about the risks of concussions in professional wrestling.  In so doing, Plaintiff's counsel have prevented the Court from knowing when that supposed admission actually occurred, who made it, and in what context.  And the reason for Plaintiff's counsels' decision to withhold that information from the Court could not be any clearer.

55.     The unnamed WWE executive they quote in Paragraph 59 of the Complaint **is the very Stephanie McMahon-Levesque they accuse in Paragraphs 64-65 of concealing the risks of concussions.**  *See* Genender Decl., Ex. K [App. at pp. 479-483].   Moreover, the statement acknowledging the risk of concussions alleged in Paragraph 59 of the Complaint occurred **in the very same Congressional hearing where Plaintiff's counsel attempt to portray Ms. McMahon-Levesque as lying to Congress to conceal the admission by the unnamed "WWE executive**."  *Id.*

56.     Plaintiff's counsel did not stop there in their misrepresentations to the Court. They purposefully omitted the testimony from Ms. McMahon-Levesque that objectively disproves the allegation that Ms. McMahon-Levesque denied concussion risks when testifying to the Congressional Committee.  As Plaintiff's counsel know, Ms. McMahon-Levesque testified specifically as the same hearing about a talent that "suffered a number of concussions and has

wound up, I think, forming a foundation to look into concussions." *Id.* [App. at p. 580]. She further discussed a woman wrestler who "fell from the top rope and was knocked unconscious," and although Ms. McMahon-Levesque, who is not a doctor, was not sure whether the wrestler was diagnosed with a concussion, she noted that "[s]he was unconscious … so if that warrants a concussion, then - but I don't recall." *Id.* [App. at pp. 592-594].

57.     Thus, in clear violation of Rule 11, not only did Plaintiff's counsel attempt to mislead the Court as to Ms. McMahon-Levesque's testimony by failing to identify her as the WWE executive who acknowledged the risk of concussions, they purposefully omitted from their allegations that she specifically recounted instances of unconsciousness and concussions in the same testimony.

58.     **<u>Third and finally</u>**, Kyros and Mirabella continued assertion of scandalous and impertinent allegations for which the District Court of Connecticut has already admonished them is another violation of Rule 11.

59.     In a Status Conference in the LoGrasso/Singleton Action, Judge Bryant admonished Kyros that there was no basis to "reference every wrestler that's dead" or other "superfluous, inflammatory, hyperbolic allegations" under the pleading standards in Federal Court and that he should "read and get a better grip on the pleading standard" before filing another complaint. Genender Decl., Ex. A [App. at pp. 66-67].

60.     Ignoring those clear instructions from the court, Kyros and Mirabella have included 39 paragraphs of allegations and color pictures of wrestlers who have died but which have no reference or connection to the place, time, or events surrounding Plaintiff's claims in this action. *See* Complt. at ¶¶ 91-130.  Indeed, they even devote a paragraph to the late Owen Hart who Plaintiff's counsel allege "fell to his death while performing a stunt during a live WWE

event." *Id.* at ¶ 113.  Plaintiff's counsels' blatant disregard of Judge Bryant's admonition can only be seen as a scheme by them to place their own self-interest in drumming up media attention for themselves above their duties as officers of the court to follow the Federal pleading rules and the clear direction from a Federal judge.

61.    Plaintiff's counsels' impertinent allegations, in fact, did successfully stir up the media attention they sought as the Houston Chronical ran a story about this lawsuit that leads with a parade of color photos of many of the dead wrestlers identified in the Complaint.  *See* Genender Decl., Ex. L [App. at pp. 603-606] (showing image 1 of 29 with each additional image being of wrestlers who have died).

62.    Filing scandalous, impertinent allegations that have no legitimate purpose, including for media buzz is, as a matter of law, an improper purpose.  *See Marceaux*, 2015 WL 3544648 at *1-3; *see also Galonsky v. Williams*, 96 CIV. 6207, 1997 WL 759445 at *6 (S.D.N.Y. Dec. 10, 1997) ("baseless claims as part of a public relations campaign in order to embarrass the defendants and thereby coerce a settlement" is evidence of bad faith and improper purpose); *Bryant v. Brooklyn Barbeque Corp.*, 130 F.R.D. 665, 670 (W.D. Mo. 1990), *aff'd sub nom.*, 932 F.2d 697 (8th Cir. 1991) (awarding sanctions where "the court can reasonably conclude that the complaint was filed solely to attract publicity to plaintiff's claims and to harass defendants, and not because plaintiff's attorney had conducted an inquiry revealing that the claims had a reasonable basis in law or in fact").

### C.    Kyros and His Co-Counsel Violated Rule 11 By Filing This Action in Violation of the Mandatory Forum-Selection Clause that Osborne Agreed To and They Should Be Sanctioned

63.    An attorney violates Rule 11 and sanctions are appropriate when he or she files a pleading in violation of a mandatory forum-selection clause.  *See, e.g., Brigadoon Assocs. Ltd.*

*P'Ship v. Fed. Nat'l Mortgage Assoc.*, Civ. No. H-10-4687, 2011 WL 3106938 at *3-5 (S.D. Tex. July 25, 2011) (filing motion to remove case despite agreed upon forum-selection clause precluding removal "was not objectively reasonable" and violated Rule 11(b)); *Freeman v. Bianco*, 02 Civ. 7525, 2003 WL 179777 at *5-6 (S.D.N.Y. Jan. 24, 2003) (holding complaint filed in violation of presumptively valid choice of forum clause was frivolous and violated Rule 11(b)); *Smith v. Martin*, 02-1624, 2004 WL 5577682 at *4 (D.D.C. Jan. 28, 2004) (imposing Rule 11 sanctions on plaintiffs and their counsel for filing "patently frivolous" claims that were barred by forum-selection and arbitration clauses); *Jayhawk Investments, L.P. v. Jet USA Airlines, Inc.*, 98-2153, 1999 WL 588195 at *1 (D. Kan. June 8, 1999) (sanctions under Rule 11 warranted where plaintiffs and their counsel filed suit in Kansas where the parties' contract contained a presumptively valid forum-selection clause requiring actions to be brought in New York).

64.    Kyros, Mirabella and their co-counsel instituted this case in violation of the valid, enforceable mandatory forum-selection clause that Osborne agreed to in his 1992 contract, and therefore, the filing was vexatious and frivolous, not supported by the facts or the law and in violation of Rule 11.

65.    Forum-selection clauses, like the one Osborne agreed to, are presumed valid and should be enforced.  *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12-13 (1972); *Mendoza v. Microsoft, Inc.*, 1 F. Supp. 3d 533, 543 (W.D. Tex. 2014) ("such clauses 'are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances.'"), *citing Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 Fed. Appx. 612, 616-17 (5th Cir. 2007).

66.     As the United States Supreme Court recently observed in *Atlantic Marine*, "[t]he enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system."  134 S. Ct. at 579.

67.     The forum-selection clause Osborne and WWE agreed to is mandatory - the parties agreed that venue would be "**only** in the State of Connecticut," dictating an exclusive venue in Connecticut, and specifically consented to jurisdiction in Connecticut while waiving all objections to the forum.  *See Ensco Int'l, Inc. v. Certain Underwriters at Lloyd's*, 579 F.3d 442, 448 (5th Cir. 2009) (forum-selection clause was mandatory because it dictated that agreed-upon forum would be exclusive); *Argyll Equities LLC v. Paolino*, 211 F. App'x 317, 318 (5th Cir. 2006) (parties' use of phrase "exclusive jurisdiction" and waiver of venue objections demonstrated the parties' intent to make the forum-selection clause mandatory).

68.     When a forum-selection clause is mandatory, it is controlling in all cases, save for certain exceptions not applicable here.  *See Atl. Marine*, 134 S. Ct. at 581 (holding that for motions to transfer venue based on a forum-selection clause, "a proper application of § 1404(a) requires that a forum-selection clause be 'given controlling weight in all but the most exceptional cases.'").

69.     The mandatory forum-selection clause in Osborne's 1992 contract also undeniably covers Plaintiff's claims in this action.  The 1992 Contract comprehensively addressed the parties' respective rights and obligations with respect to Osborne's professional wrestling services for WWE; the risks assumed by Osborne; and the responsibilities of the parties in the event of injury.[2]  There is no question that the dispute raised by Plaintiffs here

---

[2]     These provisions included, for example: (i) Section 9.2 (decedent agreed to be responsible for his own conditioning); (ii) Section 9.2(a) (decedent agreed to be responsible for his own training and pattern of exercise); (iii) Section 9.2(b) (decedent agreed to be responsible for his own method of

involves a determination of who bears the responsibility for bodily injury allegedly sustained by the decedent while wrestling for WWE pursuant to the 1992 contract.  Accordingly, the forum-selection clause, which provides that "any claim, dispute, or other matter in question arising out of or relating to this Agreement" must be litigated only in Connecticut, unquestionably covers the claims and contractual defenses at issue in this case arising out of alleged injuries the decedent sustained while performing as a professional wrestler for WWE.  *See National Cabinet & Millwork Installation, LLC v. Zepsa Indus.,* CV146048332S, 2014 WL 7739249, at *6 (Conn. Super. Ct. Dec. 31, 2014) ("[w]hen 'arising out of,' 'relating to,' or similar words appear in a forum-selection clause, such language is regularly construed to encompass . . . tort claims associated with the underlying contract."), *quoting BioCapital, LLC v. BioSystem Solutions, Inc.,* FSTCV085009331S, 2009 WL 1815056, at *6 (Conn. Super. Ct. June 1, 2009).

70.     After this case was filed, the court in the California action issued a full decision on all of the aforementioned points in the California Transfer Order, finding the forum-selection clauses to be mandatory and covering the kind of claims asserted here.  *See* Genender Decl., Ex. F [App. at pp. 128-132].  In the face of such a decision, Plaintiff's counsel still refused to honor the clauses herein.  *See* Genender Decl., Ex. G [App. at pp. 134-137].

71.     Accordingly, Kyros, Mirabella and their co-counsel's filing of the Complaint in knowing violation of the mandatory forum-selection clause in Osborne's 1992 contract, and refusing to withdraw it after the California decision, was objectively unreasonable, vexatious and

---

physical conditioning and diet); (iv) Section 9.9 (decedent agreed to indemnify and defend WWE against any claims incurred by reason of breach of any undertaking by them); (v) Section 9.12(a) (decedent promised to obtain health and life insurance and disavowed any responsibility of WWE in the event of physical injury); (vi) Section 9.12(b) (decedent  promised to make no claim against WWE in the event of injury); (vii) Section 12.4 (decedent promised not to seek punitive damages against WWE under any circumstances); and (viii) various provisions acknowledging and assuming the risk of injury.  *See* Genender Decl., Ex. C [App. at pp. 100-105].

frivolous, violated Rule 11, and warrants sanctions. *See, e.g., Brigadoon Assocs.*, 2011 WL 3106938 at *3-5; *Freeman*, 2003 WL 179777 at *5-6 (S.D.N.Y. Jan. 24, 2003); *Smith*, 2004 WL 5577682 at *4; *Jayhawk Investments*, 1999 WL 588195 at *1.

### D.   Rule 11 Sanctions Are Warranted Here

72.   As sanctions for their violations of Rule 11, Plaintiff's counsel should be ordered to pay WWE's reasonable attorneys' fees for bringing this Motion and the Motion to Transfer WWE had to file to obtain relief. *See, e.g., Brigadoon Assocs.*, 2011 WL 3106938 at *3-5 (awarding attorneys' fees for violation of Rule 11(b) because filing motion to remove case despite agreed upon forum-selection clause precluding removal "was not objectively reasonable"); *In re Motion for Sanctions Against Scott Meyers*, 2014 WL 1494099 at *12 (awarding reasonable expenses incurred as a result of Rule 11 violations).

73.   In addition, Rule 11(c)(4) provides that the Court also can impose nonmonetary directives as a sanction for a Rule 11 violation. Given counsel's continued assertion and publication of the demonstrably false and impertinent allegations set forth herein, WWE further requests that the Court strike the Complaint and if the Court permits Plaintiff's counsel to refile, order that they do so in Connecticut so as to comply with the mandatory forum-selection clause and that they do so without such false allegations or any claims or arguments based on those false allegations. *See* Fed.R.Civ.P. 11 advisory committee's notes to 1993 amendments (sanctions may include "striking the offending paper"); *Cooper v. City of Plano*, 4:10-cv-689, 2011 WL 489997 at *2 (E.D. Tex. Sept. 22, 2011) (sanctions may include striking the offending pleading or dismissal of a claim or defense); *Whisenhunt v. Cornyn*, 2:01-cv-0014, 2003 WL 22081388 at *1 (N.D. Tex. Sept. 9, 2003) (warning that sanctions for Rule 11 violations include "the striking of the offending pleading").

WHEREFORE, WWE respectfully requests that this Court grant its Motion for Sanctions and grant it such other and further relief, at law or in equity, to which it is justly entitled.

Respectfully submitted,

By: _____ */s/ Paul R. Genender*_____
Paul R. Genender
Texas State Bar no. 00790758
K&L GATES LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: (214) 939-5660
Fax: (214) 939-5839
Email: paul.genender@klgates.com

Jerry S. McDevitt (pro hac vice)
Curtis B. Krasik (pro hac vice)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: curtis.krasik@klgates.com

***COUNSEL FOR DEFENDANT,***
***WORLD   WRESTLING   ENTERTAINMENT,***
***INC.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 17, 2015, a copy of foregoing was served on all counsel of record via first-class mail and email.


Dr. Shezad A. Malik
TX Bar No. 24053337
DR. SHEZAD MALIK LAW FIRM
4925 Greenville Avenue #320
Dallas, Texas 75206
Telephone: (214) 390-3189
Facsimile: (888) 210-9693
DrMalik@ShezadMalik.com

R. Christopher Gilreath (BPR #018667)
GILREATH & ASSOCIATES
200 Jefferson Avenue, Suite 711
Memphis, TN 38103
Telephone: (901) 527-0511
Facsimile: (901) 527-0514
chrisgil@sidgilreath.com


Konstantine W. Kyros
KYROS LAW OFFICES
17 Miles Rd. Hingham, MA 02043
Telephone: (800) 934-2921
Facsimile: 617-583-1905
kon@kyroslaw.com

Erica Mirabella
CT Fed. Bar #: phv07432
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: 617-580-8270
Facsimile: 617-580-8270
Erica@mirabellaLLC.com


____/s/ Paul R. Genender_____
Paul R. Genender

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| MICHELLE JAMES, as mother and next friend of MATTHEW OSBORNE, a Minor Child and TEAGAN OSBORN, a Minor Child<br><br>Plaintiff,<br><br>vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>Defendant. | Case No. 3:15-cv-02146-L |

---

**APPENDIX OF EXHIBITS TO DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MOTION FOR SANCTIONS PURSUANT TO RULE 11**

---

Pursuant to Local Rule 7.1(i), Defendant World Wrestling Entertainment, Inc. ("WWE")

submits this Appendix of Exhibits to Its Motion for Sanctions Pursuant to Rule 11 ("Motion"):

| EXHIBIT NO. | DESCRIPTION | DATE | APP. PAGE |
|---|---|---|---|
| 1. | Declaration of Paul R. Genender | 07/16/15 | 1-5 |
| A. | Transcript of Hearing in *LoGrasso and Singleton v. World Wrestling Entertainment, Inc.*, 3:15-cv-00425-VLB (D. Conn.) | 06/08/15 | 6-74 |
| B. | Email exchange between Jerry McDevitt to Konstantine Kyros, Erica Mirabella, Chris Gilreath and Shezad A. Malik | 07/02/15 | 75-79 |
| C. | Declaration of James W. Langham filed in connection with WWE's Motion to Transfer in this case at Dkt. 12 | 07/10/15 | 80-108 |

| EXHIBIT NO. | DESCRIPTION | DATE | APP. PAGE |
|---|---|---|---|
| D. | Order and Opinion granting WWE's Motion to Transfer in *Haynes, et al. v. World Wrestling Entertainment, Inc.*, 3:14-CV-01689-ST (D. Or.) | 06/25/15 | 109-118 |
| E. | Affidavit of James W. Langham filed in *Haynes, et al. v. World Wrestling Entertainment, Inc.*, 3:14-CV-01689-ST (D. Or.) | 03/23/15 | 119-124 |
| F. | Order granting WWE's Motion to Transfer Venue in *McCullough, et al. v. World Wrestling Entertainment, Inc.*, 2:15-CV-2662-ABJEM (C.D. Cal.) | 07/10/15 | 125-133 |
| G. | July 13, 2015 Email from Jerry McDevitt to Konstantine Kyros, Erica Mirabella, Chris Gilreath and Charles LaDuca and responses thereto | 07/13/15 | 134-137 |
| H. | WWE's Motion to Transfer Venue in *LoGrasso, et al. v. World Wrestling Entertainment, Inc.*, 5:15-cv-00223-LS (E.D. Pa.) | 02/27/15 | 138-238 |
| I. | Order granting WWE's Motion to Transfer Venue in *LoGrasso, et al. v. World Wrestling Entertainment, Inc.*, 5:15-cv-00223-LS (E.D. Pa.) | 03/23/15 | 239-241 |
| J. | WWE's Motion to Transfer Venue in *Frazier v. World Wrestling Entertainment, Inc.*, 2:15-cv-02198-JPM (W.D. Tn.) | 03/27/15 | 242-464 |
| K. | Transcript of Stephanie McMahon-Levesque's testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives | 12/14/07 | 465-602 |
| L. | Houston Chronicle online article titled "Mother of wrestler's children sues WWE, claims it concealed head trauma risks" | 06/30/15 | 603-606 |

Dated: July 17, 2015                    Respectfully submitted,

                                        By: _____/s/ Jerry S. McDevitt_____
                                        Jerry S. McDevitt (pro hac vice)
                                        Curtis B. Krasik (pro hac vice)
                                        K&L GATES LLP
                                        K&L Gates Center
                                        210 Sixth Avenue
                                        Pittsburgh, PA 15222
                                        Phone: (412) 355-6500
                                        Fax: (412) 355-6501
                                        Email: jerry.mcdevitt@klgates.com
                                        Email: curtis.krasik@klgates.com

                                        Paul R. Genender
                                        Texas State Bar No. 00790758
                                        K&L GATES LLP
                                        1717 Main Street, Suite 2800
                                        Dallas, Texas 75201
                                        Phone: (214) 939-5660
                                        Fax: (214) 939-5839
                                        Email: paul.genender@klgates.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 17, 2015, a copy of foregoing was served on all counsel of record via first-class mail and email.


Dr. Shezad A. Malik
TX Bar No. 24053337
DR. SHEZAD MALIK LAW FIRM
4925 Greenville Avenue #320
Dallas, Texas 75206
Telephone: (214) 390-3189
Facsimile: (888) 210-9693
DrMalik@ShezadMalik.com

R. Christopher Gilreath (BPR #018667)
GILREATH & ASSOCIATES
200 Jefferson Avenue, Suite 711
Memphis, TN 38103
Telephone: (901) 527-0511
Facsimile: (901) 527-0514
chrisgil@sidgilreath.com


Konstantine W. Kyros
KYROS LAW OFFICES
17 Miles Rd. Hingham, MA 02043
Telephone: (800) 934-2921
Facsimile: 617-583-1905
kon@kyroslaw.com

Erica Mirabella
CT Fed. Bar #: phv07432
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: 617-580-8270
Facsimile: 617-580-8270
Erica@mirabellaLLC.com


By: _____/s/ Jerry S. McDevitt_____
         Jerry S. McDevitt

# *EXHIBIT 1*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| MICHELLE JAMES, as mother and next friend of MATTHEW OSBORNE, a Minor Child and TEAGAN OSBORN, a Minor Child<br><br>           Plaintiffs,<br><br>vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>           Defendant. | Case No. 3:15-cv-02146-L |

---

**DECLARATION OF PAUL R. GENENDER**

---

I, Paul R. Genender, being first duly sworn, hereby depose and say:

1.       I am over eighteen (18) years of age.  I have personal knowledge of the matters set forth herein.

2.       I am an attorney duly authorized and admitted to practice law before the courts of the State of Texas and before this Court.  I am a partner with the law firm K&L Gates LLP and one of the attorneys of record for the Defendant in this Action, World Wrestling Entertainment, Inc. ("WWE").

3.       Attached hereto as Exhibit A is a true and accurate copy of the transcript of the June 8, 2015 scheduling conference held in *Singleton, et al. v. World Wrestling Entertainment, Inc.*, Civil Action No. 3:15-cv-00425-VLB (D. Conn.) ("Singleton Action").

4.       Attached hereto as Exhibit B is a true and accurate copy of an email exchange beginning on July 2, 2015 between WWE's counsel and Plaintiff's counsel.

5.       Attached hereto as Exhibit C is a true and accurate copy of the July 10, 2015 Affidavit of James W. Langham filed in this action at Dkt. 12-5.

6.       Attached hereto as Exhibit D is a true and accurate copy of the Opinion and Order dated June 25, 2015, issued by the Honorable Janice M. Steward of the U.S. District Court for the District of Oregon in *William Albert Haynes II. v. World Wrestling Entertainment, Inc.*, Civil Action No. 3:14-cv-01689-ST (D. Or.) ("Haynes Action").  (Dkt. 59 in Haynes Action).

7.       Attached hereto as Exhibit E is a true and accurate copy of the March 23, 2015 Affidavit of James W. Langham filed in the Haynes Action.  (Dkt. 46 in Haynes Action).

8.       Attached hereto as Exhibit F is a true and accurate copy of the Minute Order entered on July 10, 2015 in *McCullough, et al. v. World Wrestling Entertainment, Inc.*, Civil

Action No. 2:15-cv-2662-ABJEM (C.D. Cal.) ("McCullough Action").  (Dkt. 24 in McCullough Action).

9.      Attached hereto as Exhibit G is a true and accurate copy of an email exchange beginning on July 13, 2015 between WWE's counsel and Plaintiff's counsel.

10.      Attached hereto as Exhibit H is a true and accurate copy of the motion to transfer (and accompanying papers) that WWE filed in the Singleton Action.  (Dkt. 6 in Singleton Action).

11.      Attached hereto as Exhibit I is a true and accurate copy of an Order dated March 23, 2015 issued by the Honorable Lawrence F. Stengel of the U.S. District Court for the Eastern District of Pennsylvania in the Singleton Action.  (Dkt. 11 in the Singleton Action).

12.      Attached hereto as Exhibit J is a true and accurate copy of the motion to transfer (and accompanying papers) that WWE filed in *Cassandra Frazier v. World Wrestling Entertainment, Inc.* ("Frazier Action") (Dkt. 5 through 5-4 in Frazier Action).  The Frazier Action was initially filed in Tennessee state court and was subsequently removed to the U.S. District Court for the Western District of Tennessee, Civil Action No. 2:15-cv-02198-JPM-cgc (W.D. Tenn.).

13.      Attached hereto as Exhibit K is a true and accurate copy of the transcript of the December 14, 2007 testimony from Stephanie McMahon-Levesque before the Committee on Oversight and Government Reform of the U.S. House of Representatives.

14.      Attached hereto as Exhibit L is a true and accurate copy of a June 30, 2015 article available online from the Houston Chronicle at http://www.chron.com/news/houston-texas/texas/article/Mother-of-wrestler-s-children-sues-WWE-claims-it-6358266.php#photo-

2

6164688, titled "Mother of wrestler's children sues WWE, claims it concealed head trauma risks."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of July, 2015 in Dallas, Texas.

Paul R. Genender

3

# *EXHIBIT A*

```
               UNITED STATES DISTRICT COURT

                  DISTRICT OF CONNECTICUT




------------------------------ x
                               :
SINGLETON, ET AL,              :
               Plaintiffs      :  CRIMINAL NO.
v.                             :  #3:15-CV-00425(VLB)
                               :
WORLD WRESTLING                :  June 8, 2015
ENTERTAINMENT, INC.,           :
               Defendants      :
                               :
------------------------------ x
```

                              Federal Building
                              450 Main Street
                              Hartford, Connecticut



                          HEARING


        (Transcription from Electronic Recording)


Held Before:


                THE HON. VANESSA L. BRYANT
                 United States District Judge



                 Transcription Services of
              FALZARANO COURT REPORTERS, LLC
                    4 Somerset Lane
                  Simsbury, CT  06070
                     860.651.0258

A P P E A R A N C E S :

    For the Plaintiffs:

        WILLIAM BLOSS, ESQ.
        Koskoff, Koskoff & Bieder, P.C.
        350 Fairfield Avenue
        Bridgeport, CT  06604

    and

        KONSTANTINE KYROS, ESQ.
        Kyros Law Offices
        17 Miles Road
        Hingham, MA  02043

    For the Defendants, Admitted Pro Hac Vice:

        THOMAS D. GOLDBERG, ESQ.
        Day Pitney, LLP
        One Canterbury Green
        Stamford, CT  06901

    and
        JEFFREY MUELLER, ESQ.
        Day Pitney, LLP
        242 Trumbull Street
        Hartford, CT  06103-1212

    and
        JERRY S. McDEVITT, ESQ.
        K & L Gates, LLP
        K & L Gates Center
        210 Sixth Avenue
        Pittsburgh, PA  15222-2613

    and

        CURT KRASIK, ESQ.
        K & L Gates, LLP
        K & L Gates Center
        210 Sixth Avenue
        Pittsburgh, PA  15222-2613

    Also Present:

        ANTHONY NORRIS, ESQ.

1          COURT CLERK:  The Court is now open

2     after recess in the matter of -- in the matter of

3     Singleton v. WWE, case no. 3:15-cv-425-VLB.

4          THE COURT:  Good afternoon.

5          MULTIPLE VOICES:  Good afternoon, Your

6     Honor.

7          THE COURT:  Okay, can we have the

8     appearances of the parties for the record please.

9          MR. BLOSS:  William Bloss, Your Honor

10    of Koskoff, Koskoff & Bieder for the plaintiffs.

11    With me is Konstantine Kyros who has been

12    admitted by the Court as visiting counsel and

13    Anthony Norris (phonetic) of Mr. Kyros' firm is

14    here - is not expected to participate, but I did

15    want to note his attendance, Your Honor.

16          THE COURT:  And who will be

17    participating today?

18          MR. BLOSS:  I will be Your Honor,

19    William Bloss and Mr. Kyros may as needed,

20    depending on the Court's questions.

21          THE COURT:  Alrighty.  Yes.  And for

22    the defense?

23          MR. GOLDBERG:  Good afternoon, Your

24    Honor, Tom Goldberg.  And I'm here with Jeff

25    Mueller from Day Pitney for the defendants World

```
 1        Wrestling Entertainment, Inc.  And I'd also like
 2        to introduce to the Court Jerry McDevitt and Curt
 3        Krasik of K & L Gates who have been admitted pro
 4        hac vice.
 5                  THE COURT:  Wonderful.  Welcome.
 6                  UNIDENTIFIED MALE:  Good afternoon,
 7        Your Honor.
 8                  THE COURT:  Please be seated.  The
 9        defense requests that a pre-filing conference in
10        this case or pre-scheduling conference before the
11        Court entered a scheduling order.  And we're
12        convened for the Court to hear the parties on the
13        issues preceded to that entry.
14                  MR. BLOSS:  I believe it, Your Honor,
15        to the defense – it's the defense's request if
16        the Court please, I will present the position on
17        behalf of the plaintiffs, but it might be
18        fruitful to start with the defense – defendant.
19                  THE COURT:  Yes.
20                  MR. McDEVITT:  Good afternoon Your
21        Honor, Jerry McDevitt from K & L Gates in
22        Pittsburgh.
23                  Thank you for having the conference
24        Your Honor.  We requested it because there's been
25        a lot of what I'll say is irregular things going
```

5

1        on in this case that has made it hard or did make

2        it hard time to frame an intelligent schedule.

3        They have continued since the date we submitted

4        our report and I'd just like to bring the Court

5        up to date if I could on the fact as we think

6        makes it hard to have a meaningful scheduling

7        conference or schedule at this time and leads to

8        our request that discovery be stayed until such

9        time as the Court decides from dispositive

10       motions that we're going to present.

11                   THE COURT:  Yes.

12                   MR. McDEVITT:  To update the Court on

13       some of the recent activities that have occurred.

14       This Court may know on May 22nd, the plaintiff

15       worked to amend the complaint.  Largely, frankly

16       the threat from false allegations that we pointed

17       out for them in January of this year came in

18       original complaint.  The day before they were to

19       file the amended complaint, one of the

20       plaintiffs, Vito Lograsso, posted on Facebook the

21       latest in a long line of frankless (sic)

22       solicitations looking for people to join this

23       class action case, soliciting people if you will,

24       telling them that there was benefits to be gained

25       by doing that.

1          The very next day after Mr. Lograsso made

2     that plea for more people to come in and join

3     this class action case, the amended complaint was

4     filed.  The amended complaint dropped all class

5     action allegations inexplicably while Mr. Kyros,

6     lead counsel here, continues two other class

7     action cases that are identical: one in Oregon

8     and one in California and refuses to explain why

9     they were dropped here.  We contend it was to

10    circumvent this Court's jurisdiction.

11          They dropped other claims and to show

12    you, Your Honor, the kind of looseness in

13    allegations that we have been facing and this is

14    now the sixth version of a complaint that has

15    been filed against WWE by Mr. Kyros or his

16    affiliates, none of which have yet been sustained

17    by a Court of law.

18          But to give you an example, in the

19    amended complaint – the one that they filed to

20    correct errors – in paragraph 146 of a claim that

21    was added here, the allegation is made, "As a

22    direct and proximate result of WWE's

23    misrepresentations, plaintiffs experience pain

24    and suffering and suffered serious permanent and

25    debilitating injuries, including but not limited

1           to, neurological damage and CTE which caused

2           and/or contributed to his untimely death."  These

3           people are alive; the plaintiffs are alive in

4           this case, Your Honor.

5                   I don't know what lawyer could have

6           written that passage in an amended complaint and

7           there are seven lawyers from five different law

8           firms whose name appears on this complaint

9           alleging that somebody's dead, when in fact

10          they're alive.  And that's just the most obvious

11          example of what we have been facing in this case.

12                  We have had an inordinate amount of

13          expense the defense would incur, Your Honor.  The

14          first case was filed in Oregon was filed in

15          October of 2014 and the pattern began to emerge

16          there.  The original complaint was chock full of

17          frankly Rule 11 violations which we pointed out

18          to them, designed for immediate attention to get

19          people to join in this endeavor to bring a class

20          action case against the WWE brought on behalf of

21          a fellow who hadn't performed for the WWE since

22          1988, not even in this century.  Against the

23          statute repose in Oregon, it's ten years from the

24          date of the occurrence complained of, time barred

25          for decades this claim.

1        We – they amended the complaint there after

2    we went through the expense of drafting original

3    motions to dismiss and whatnot, amend the

4    complaint there, didn't fix anything, did drop

5    any of the claims.  That's currently scheduled

6    for oral argument before the Judge there on June

7    30th to dismiss it and if any claim survived, to

8    transfer it back here to Connecticut.

9        That case, Your Honor, is so old that

10   that particular plaintiff did not sign a contact

11   with a 'form of selection' clause.  So we

12   couldn't move to have it transferred back here on

13   the basis of a 'form of selection' clause, but

14   just did a traditional 1404 motion.

15       When they saw what was going on in

16   Oregon, with the class action case being time

17   barred, they brought this case.  They brought

18   this case originally in Philadelphia on behalf of

19   Mr. Lograsso and Mr. Singleton.  And in that

20   case, they flat out ignored 'form of selection'

21   clauses in a 9 – nothing Supreme Court Case,

22   *Atlantic Marine* that directs District Courts to

23   routinely enforce 'form of selection' clauses,

24   absent extraordinary circumstances unrelated to

25   the convenience of the party.  We raised that

1          issue with them there.  We had eventually

2          incurred the cost of filing a brief before the

3          Judge there.  They didn't oppose it; they didn't

4          file anything.  And the Judge eventually

5          transferred the case up here.

6                    The same pattern repeated itself here

7          as in Oregon.  We advised them of problems in the

8          original complaint, specifically false

9          allegations about Mr. Singleton's medical

10         treatment after he sustained an injury.  We

11         advised them specifically why it was false in

12         January.  They only recently got around to

13         changing that and they changed it with more false

14         allegations which we've again had to point out to

15         them.  So we had to incur all that kind of cost.

16                   And they realized I think after they

17         filed -- or after they aggrieved this Your Honor,

18         that Connecticut has some very strong repose

19         policies, statutes of limitations and repose

20         which prohibit claims that are brought more than

21         three per claim - that are brought more than

22         three years from the act or omission complained

23         of.  Mr. Lograsso's clearly time barred under

24         that.  Mr. Singleton's claim has some other

25         defects which we're going to point out to you.

```
 1                    Every other claim they have
 2       brought, whether here, Oregon, California, time
 3       barred under Connecticut law.  But whenever they
 4       saw that, so then after they agreed to the
 5       jurisdiction of this Court and the Judge in
 6       Philadelphia, Federal Judge Singleton,
 7       acknowledged that they had agreed to the
 8       jurisdiction of this Court.  Then the shenanigans
 9       really began.
10                    Then they brought out in California
11       with Mr. Kyros and he refused to acknowledge his
12       role in this; we've asked him several times to
13       confirm his involvement.  He refuses to admit it
14       or deny it.  Brings another lawsuit identical to
15       this one – same class allegations and everything
16       else – in California on behalf of three
17       particular plaintiffs who again would be time
18       barred, who had signed identical form selection
19       clauses for the ones that were involved in this
20       case, and yet now they're refusing to have that
21       transferred back.  So we've had to go through
22       time and expense there of moving to have it
23       transferred back.  We've filed our briefs.
24       Theirs are about to be filed pretty soon.  That's
25       scheduled for argument in California before the
```

```
 1        Federal Judge out there on July 13th.

 2              They also brought another case - same

 3        kind of case on behalf of somebody who would be a

 4        member of the class here, a fellow by the name of

 5        Nelson Fraser in Tennessee.  We had to go through

 6        the cost of removing that to Federal Court.  We

 7        had to again - he had the same identical form of

 8        selection clause as they agreed here, resulted in

 9        transfer to this Court.  But for whatever reason

10        now, they refuse again in Tennessee to transfer

11        so we've had to brief that.  That's fully briefed

12        and we're awaiting the Federal Judge's decision

13        down here on a transfer motion.

14              THE COURT:  Did you say that the *Fraser*

15        case was transferred to this district?

16              MR. McDEVITT:  Not yet, Your Honor.

17              THE COURT:  Not yet.

18              MR. McDEVITT:  It's fully briefed and

19        we're waiting for the Judge to decide on that.

20        He's heard oral argument, got the briefing, he

21        could be deciding any moment, Your Honor.

22              THE COURT:  Okay.

23              MR. McDEVITT:  Based on the clarity of

24        the Supreme Court decision in *Atlantic Marine*

25        which is rare that the Supreme Court's unanimous
```

1     on anything -- 9 - nothing, I think it would be

2     extraordinary if it wasn't transferred frankly.

3     But they've done, like I say, everything they can

4     to make it as expensive as possible to litigate

5     this case here, even though they admit it that

6     this was the appropriate jurisdiction and had

7     consented essentially to the case coming here.

8     They've done everything since then to defeat Your

9     Honor's jurisdiction.

10          Now, then you come up from last week,

11    this act of now all of a sudden this is not a

12    class action case now.  It was done I suspect

13    because they don't want us to be able to go out

14    to California and indicate to the Federal Judge

15    out there that this case was already under way

16    and a class action case is already under way here

17    and that they had stipulated to it being done

18    here in Connecticut which is why Mr. Kyros is

19    concealing frankly, his role out in the

20    California case and won't reveal that he's

21    involved.

22          So for all those reasons, Your Honor,

23    what we want to submit to Your Honor is having

24    read their amended complaint, they have six

25    counts in it.  We are pretty close to finalizing

     1          our brief.  It's due I think on the 23rd of this

     2          month.

     3                  As I indicated, Mr. Lograsso's claim

     4          are all subject to the statute proposed; I think

     5          he's time barred.  And there are multiple reasons

     6          why the remaining claim of Mr. Singleton is

     7          defective.

     8                  What we would hope the Court would do

     9          would be to take a brief on that, issue your

    10          ruling on that and your guidance, if you will, on

    11          the statute or repose.  By that time hopefully,

    12          these other collateral proceedings that we

    13          unfortunately have to engage in, will be

    14          resolved. And of course guidance on what the

    15          repose statute means will presumably then be

    16          taken into account by then in deciding whether

    17          they want to pursue claims that would be utterly

    18          time barred under Connecticut law.

    19                  For those reasons that we thought we

    20          wanted to propose to Your Honor, that there be a

    21          stay of discovery until you can decide the

    22          motions to dismiss.

    23                  THE COURT:  Are you --

    24                  MR. McDEVITT:  Thank you.

    25                  THE COURT:  Are you saying that there

```
1          are no claims that could be brought that would

2          not be time barred?

3                  MR. McDEVITT:  The only - of all the

4          potential claims that they have Your Honor, the

5          ones in California are all well past - I think

6          the earliest one of them was early 2000.  They're

7          all time barred by the previous statute.

8                  THE COURT:  What about Mr. Singleton?

9                  MR. McDEVITT:  Mr. Singleton, as I

10         said, I think - he's the only one -

11                 THE COURT:  He's not --

12                 MR. McDEVITT:   -- of all the

13         plaintiffs whose claim's not time barred.  But

14         it's substantively defective for numerous reasons

15         that we're going to claim in our motions to

16         dismiss.

17                 So -

18                 THE COURT:  Well --

19                 MR. McDEVITT:   -- of all the seven, I

20         think they have seven plaintiffs; six of them are

21         time barred with Mr. Singleton being the only one

22         that's not time barred, but his claim is

23         completely defective under Connecticut law Your

24         Honor and the law that this Court's applied.

25         There's a Connecticut Supreme Court case called
```

```
 1        Daworski (phonetic) that talks about whether
 2        negligence concepts even work and concepts of
 3        injuries or – that occur by people involved in
 4        sporting type activities.  And the Connecticut
 5        Supreme Court in Daworski, ruled that negligence
 6        concepts don't come into play when you're talking
 7        about sporting type activities where injury is a
 8        foreseeable consequence of it.  And they apply
 9        that concept in soccer where if the injury was
10        from accidental contact.  There have been two
11        cases in Federal Court here before Judge Hall
12        where she's taken that opinion and applied it to
13        other cases, including one where a high school
14        girl got a concussion.
15                  THE COURT:  But weren't – weren't those
16        all accidental injuries?  The complaint alleges
17        that the wrestling matches are scripted.
18                  MR. McDEVITT:  They are, Your Honor,
19        but --
20                  THE COURT:  And part --
21                  MR. McDEVITT:  – I think --
22                  THE COURT:  They are?
23                  MR. McDEVITT:  Well, in large part.
24        It's not an athletic contest in the sense of the
25        outcome.  It's not a contest of who's the best
```

1          fighter.  It's scripted entertainment.  But they

2          all understand the inherent risk of what they're

3          involved in.  And the essence of these cases that

4          we're going to bring to Your Honor's attention is

5          that you assume the inherent risk of the

6          activities that you engage in.  And there's a

7          gradient, if you will, under the duties

8          Connecticut Supreme Court's talked about where if

9          you're in - for example, if you're in a case

10         (inaudible) where contact is not an expected part

11         of the game, in those instances what the

12         Connecticut Supreme Court has said is negligence

13         is not going to get you anywhere.  We're going to

14         require there be something different than that, a

15         standard of recklessness, which Connecticut law

16         defines to be something more than negligence,

17         more than gross negligence, but intentional both

18         to the conduct and intentional as to the injury.

19         And at the same time as indicated, that when you

20         apply this rule, you look to the activity.  If

21         it's an activity for example, where contact is

22         not accidental but expected, for example in like

23         boxing, football, wrestling, that doesn't even

24         apply there because they know what they're

25         getting into.  All this complaint says and what

```
 1        Mr. Singleton says is he went into a wrestling
 2        ring and got injured by doing the very thing he
 3        said he was going to do – wrestle.  He got a
 4        concussion; that's what he claimed.  Nothing
 5        else.  There's no allegation of any kind of
 6        recklessness on the part of the WWE in the
 7        complaint.  It's subject to dismissal on its face
 8        because of that because it's not subject to
 9        Connecticut law.
10             Beyond that, the other claims that they
11        have Your Honor, are these fraud claims which are
12        totally inadequate, which we pledge we're going
13        to demonstrate to you.  They don't comply with
14        any of the second circuit guidance that you have
15        to say who, what, when or where of any kind of
16        fraudulent misrepresentation.  They don't – they
17        don't even attempt to comply with any of those
18        kind of fraud standards in this complaint.
19             And again, we – our brief is pretty far
20        along 'cause it was pretty far along the first
21        time, Your Honor.  In fact, we might even be able
22        to accelerate when we file it.  But I think
23        you'll find it's a fairly persuasive brief that
24        they have no claim here; not Mr. Singleton and
25        certainly not Mr. Lograsso who's time barred.
```

```
 1                  THE COURT:  Have you discussed these
 2          asserted defects with the plaintiff's counsel?
 3                  MR. McDEVITT:  In this case, I sent
 4          them a long email after this second -- these type
 5          of complaints.
 6                  For example Your Honor, the first
 7          complaint.  If you don't mind if I just have a
 8          drink real quick?
 9                  THE COURT:  Sure.
10                  MR. McDEVITT:  When Mr. Singleton - Mr.
11          Singleton got injured during the match Your
12          Honor, where he did a -- I don't know if Your
13          Honor ever watches professional wrestling or is
14          familiar with it, but he did a move called a
15          power slam or a choke slam, I'm sorry.  Where
16          when your opponent puts their hand on your neck -
17          think about - no man could lift another man up
18          against his will.  It requires Mr. Singleton to
19          jump up to simulate the move to be thrown on his
20          back.  That's the move he did.  It's a
21          conventional wrestling move.  And he was injured
22          - he claims he was injured.
23                  Thereafter, the WWE sends him through
24          the next I don't know - year and a half to eight
25          different specialists, two different
```

```
 1        neurologists, did everything they could to find
 2        out what was wrong with this kid.
 3                He filed a complaint - his original
 4        complaint and he never went back in the ring -
 5        never.
 6                THE COURT:  And when did this happen?
 7                MR. McDEVITT:  September -- September
 8        27, 2012.  He never went back in the ring because
 9        of this.
10                The original complaint, however,
11        alleges falsely that the WWE discouraged him and
12        wouldn't even send him to any neurologists, when
13        in fact they sent him to multiple neurologists.
14        And we told them about this in January of this
15        year.  We said, "That's just categorically
16        false."  We told them who he went to, the names
17        the doctors were, everything.  So they amended to
18        delete that.  But now what they do is now they
19        allege in the complaint against Mr. Singleton
20        that ten months after this event, he was
21        diagnosed with having intracranial hemorrhage.
22        Well again, that's categorically false, Your
23        Honor, and I've told him this.  I mean I've given
24        him the name of the place he went to where he was
25        diagnosed as not having an intracranial
```

1    hemorrhage.  And you know, I've told him this in

2    writing; I've sent him an email telling him a

3    couple of weeks ago.  No response.  None

4    whatsoever.  I've told him about other false

5    things that they've alleged in their complaint.

6    This has been a pattern Your Honor; it's not just

7    limited to this one.  And nothing gets done about

8    it.  They just substitute additional false

9    allegations.  For example here – footnote #1 on

10    the complaint Your Honor, just to give you

11    another example --

12            THE COURT:  I'm sorry, does Mr.

13    Singleton allege that he was diagnosed by one of

14    the doctors that the WWE sent him to?

15            MR. McDEVITT:  No, Your Honor.  All he

16    --

17            THE COURT:  Then why – then how can you

18    say that it's a false allegation?  Just because

19    the doctors WWE sent him to didn't diagnose him

20    with that condition, why would that preclude some

21    other doctor from diagnosing --

22            MR. McDEVITT:  He didn't go to any

23    other doctor.  He's talking about the time period

24    he was under treatment from the WWE – he remained

25    under treatment --

```
 1              THE COURT:  So --
 2              MR. McDEVITT:  - from WWE doctors until
 3      he was recruited to be a plaintiff in this case,
 4      at which point he dropped the workmens comp.
 5      claim that he had completely and joined in this
 6      lawsuit. But the time period he's talking about
 7      Your Honor, I guarantee he didn't go to any other
 8      doctor that told him he had intracranial
 9      hemorrhaging.
10              THE COURT:  How do you - how do you --
11              MR. McDEVITT:  He had the medical
12      records that show you --
13              THE COURT:  How do you guarantee he
14      didn't do that?
15              MR. McDEVITT:  I just know he didn't
16      Your Honor, 'cause he was under treatment - well,
17      if I'm wrong, they'll tell me - they can tell me
18      that.
19              THE COURT:  But you don't -- I mean how
20      do you know?  You assume it, but you don't know
21      it it sounds like.
22              MR. McDEVITT:  Your Honor, I guess know
23      it in the sense that this is what they allege,
24      paragraph 96, "It was not until more than ten
25      months later that he was diagnosed with traumatic
```

1    brain injury, including an intracranial

2    hemorrhage."  We know that from the time he was

3    injured for more than ten months, he remained

4    under the WWE's medical supervision and care.  We

5    know every doctor he went to in that time period.

6    He didn't, to our knowledge, go to any other

7    doctor, nor did he ever tell us he went to any

8    other doctor.

9              THE COURT:  Well, I can -- I can

10   appreciate that, but I mean he's not in

11   indentured servant.  I mean he's not a person

12   who's whereabouts you're in control of, are you?

13   Is he?

14              MR. McDEVITT:  Well if you're asking,

15   Your Honor, is it possible that he went to

16   another doctor somewhere?

17              THE COURT:  Yes, yes.

18              MR. McDEVITT:  It's certain – it's

19   certainly possible.  Do I think that that's what

20   he did?  No, because we have the medical records

21   ten months after that they're talking about that

22   show he had no intracranial hemorrhage.  It says

23   it right in the medical – I'll give you the exact

24   quote if you will, from the medical records that

25   I sent them.

```
1                    THE COURT:  But you don't - you don't

2         contend that two different doctors examining a

3         person could come to different conclusions, do

4         you?

5                    MR. McDEVITT:  Your Honor --

6                    THE COURT:  You don't contest that --

7                    MR. McDEVITT:  I guess I can answer --

8                    THE COURT:  -- proposition?

9                    MR. McDEVITT:  -- your question.  If

10        they - if they have another doctor that they say

11        told them that I am wrong -- I'll bet you they

12        don't.  All I have to do is stand up and say they

13        do.  I don't think they do.

14                   THE COURT:  Well --

15                   MR. McDEVITT:  What has happened is Mr.

16        - Mr. --

17                   THE COURT:  But isn't that what

18        discovery is for?

19                   MR. McDEVITT:  I think if there's a

20        legitimate fact issue, Your Honor, yes.  If

21        there's no - if they don't have -- if in fact

22        there is no other doctor that's looked at him and

23        said you have an intracranial hemorrhage than

24        there's a false allegation here.

25                   THE COURT:  But it would be very easy
```

```
 1        for you to find out, wouldn't it, through an

 2        interrogatory or request to admit?

 3               MR. McDEVITT:  Well sure, Your Honor,

 4        and that's what we would do.  But what I hope to

 5        - I think I'm right, but again they could stand

 6        up and say what we did is wrong, we sent him to

 7        another doctor, and this is Dr. so and so and he

 8        diagnosed him as having intracranial hemorrhage -

 9        -  they do, they do.

10               THE COURT:  So - so --

11               MR. McDEVITT:  What the doctor said

12        Your Honor --

13               THE COURT:  - what are - what are the

14        legal basis upon which you would seek to have Mr.

15        Singleton's claims dismissed?

16               MR. McDEVITT:  Well the preview of the

17        allegations Your Honor, they have a couple of

18        negligence based counts which are subject to what

19        I indicated to you, the *Daworski* decision and the

20        Connecticut Supreme Court and *Trajilla* (phonetic)

21        decision and I think it's *Mercier Academy* that

22        Judge Hall here decided that are the principal

23        theory - or cases that indicate negligence-based

24        theory.

25               THE COURT:  And those cases are not
```

```
 1        distinguishable on the basis that those injuries
 2        were accidental or as this injury or the - these
 3        injuries were the result of defendant scripted
 4        and directed conduct --
 5                  MR. McDEVITT:  Your Honor --
 6                  THE COURT:  That was - even in your
 7        complaint - even in the complaint it alleges that
 8        the WWE taught the wrestlers how to fall --
 9        taught --
10                  MR. McDEVITT:  They're --
11                  THE COURT:  - taught them how to fall.
12        So I mean is - can those cases be distinguished
13        in that those case involve sporting activities
14        where the participants assume the risk that they
15        could be injured versus entertainment activities
16        where the participants are told or - or - it is
17        suggested that they cannot get hurt because of
18        the manner in which they are taught to perform
19        these feats?
20                  MR. McDEVITT:  Your Honor, they're
21        never told they can't get hurt.  And anybody who
22        watches professional wrestling or engages in it,
23        knows people can get hurt.  In fact, during the
24        pendency of this case, in Mexico a man was killed
25        in the middle of the ring - within the wrestling
```

```
 1        match – died.
 2                  THE COURT:  Well that really --
 3                  MR. McDEVITT:  But I --
 4                  THE COURT:  -- that really wasn't my
 5        question.  I mean in one case you're assuming the
 6        risk of being hurt and in another case you're
 7        being taught how not to get hurt, thereby
 8        mitigating the risk of injury.
 9                  MR. McDEVITT:  Well Your Honor, I'm
10        trying to answer your question.  I mean certainly
11        --
12                  THE COURT:  Are there any – are there
13        any cases involving scripted activity where --
14        wherein the participant is instructed how to
15        perform the moves so that they don't get injured?
16                  MR. McDEVITT:  One of the cases we're
17        going to cite to Your Honor is a professional
18        wrestling case.
19                  THE COURT:  Uh hm.
20                  MR. McDEVITT:  And numerous amateur
21        wrestling cases.  The Daworski decision goes off
22        on this idea Your Honor.  What's within the
23        normal expectation of the people who engage in
24        the activity?  If it's within the normal
25        expectations of the people who engage in the
```

1      activity, that there's an inherent risk of an

2      injury, then that's within the scope of the

3      duties that they assume.  And it's kind of – in

4      a certain kind of way Your Honor, I think a

5      certain kind of common sense if a boxer walks in

6      a ring, he can't sue the promoter getting a

7      concussion because he knows that's part of what's

8      going to happen.

9              The complaint in this case --

10             THE COURT:  But – but if you – if you

11     have some kind of head apparatus that is

12     advertised as protecting you against or

13     significantly mitigating the risk of a certain

14     type of injury and you have that injury, then

15     that's called "products liability", right?

16             MR. McDEVITT:  We don't – there's no

17     products claim in the case, Your Honor.

18             THE COURT:  Oh, I understand there's no

19     products case, but there's a parallel there in

20     the sense that the complaint alleges that the WWE

21     taught, instructed, trained, the wrestlers how to

22     hit, how to fall, so that they would not get

23     injured.

24             MR. McDEVITT:  Well they do, but that

25     doesn't mean that they will always execute the

1      move right.  It doesn't mean that mistakes aren't

2      made.  In fact, what they allege Your Honor, if

3      you read the complaint completely, they're –

4      they're constantly alleging that the risk of

5      concussion –– the theory is they take hundreds,

6      "thousands" I think is their term, of concussive

7      and sub concussive blows in the normal course of

8      performing what they do.  And if that allege –

9      that allegedly is something that they all know.

10             THE COURT:  So what happens if – if a

11     wrestler is injured in the – in the ring?  Who

12     treats them?  Under what contractual provision or

13     duty does the WWE provide medical treatment?

14             MR. McDEVITT:  Well there's –– WWE like

15     many companies Your Honor, has a history to it

16     too and its evolved.  Today –– I can answer your

17     question as of today what happens.  And it's

18     different today than what happened say 10, 15

19     years ago when they were ––

20             THE COURT:  Well what did it do in 2012

21     and 2013?

22             MR. McDEVITT:  Well now we have what's

23     called "total wellness program".  We have Dr.

24     Chris Hamen (phonetic) who was an Olympic doctor.

25     It's one of the ringside positions he's present.

1        We have another doctor present.  We have a

2    medical director above all that -- a fellow by

3    the name of Dr. Joseph Maroon (phonetic), who's a

4    prominent neurologist in Pittsburgh who devised,

5    together with some other people at the University

6    of Pittsburgh Medical Center, the state of the

7    art test that everybody uses now in college and

8    NFL for concussion diagnostic testing and whatnot

9    – called "impact".  So we have now got a medical

10   staff that's there for most of our main event –

11   the main roster events.  Now Mr. Singleton I

12   should add, never made it main roster.  Mr.

13   Singleton was performing – for lack of a better

14   description – the minor leagues down in Florida

15   when he allegedly got injured.

16        But in terms of the main roster we have

17   these doctors.  Now – so if something happens –

18   if there's an injury in the ring today, the WWE

19   takes care of it.  They basically try to -- it

20   only makes sense that they're talent – they want

21   them to be healthy 'cause they can't perform if

22   they're not healthy, so they want them to be

23   healthy and able to perform.  That's what we do

24   today.

25        Back in the long ago past Your Honor,

```
1        back -- I started representing the WWE roughly

2        1987.  They were a privately owned company at the

3        time; they were not a public company.  They - you

4        know, were subject to all the vagaries of

5        competition at that point in time.  Back then in

6        the early 80s when they had an event, the only

7        doctors who were present at the time were the

8        arena EMT people.  If something happened to

9        somebody in the ring, if it was a serious injury

10       or something, they would take them to the

11       hospital for treatment.  That's essentially what

12       happened.

13                 So we've sort of evolved through the

14       years.

15                 THE COURT:  And then if - if someone is

16       - doesn't perceive themselves to have been

17       injured in the ring or you know, is treated at

18       the ring and subsequently has symptoms, does the

19       wellness program provide treatment for those

20       individuals?

21                 MR. McDEVITT:  When you say - it's not

22       so much the wellness program -- what the wellness

23       program does for individuals that are no longer

24       affiliated with us, if that's your --

25                 THE COURT:  Oh, no I - I was
```

```
 1        questioning well why it was that Mr. Singleton
 2        continued to receive treatment from doctors paid
 3        for and directed by WWE after his fight injury.
 4                 MR. McDEVITT:  Well, he's under
 5        contract with us first of all.  And so he's still
 6        --
 7                 THE COURT:  So under the contract
 8        you're obligated to provided ongoing medical
 9        care, not just --
10                 MR. McDEVITT:  No.
11                 THE COURT:  -- ringside medical care?
12                 MR. McDEVITT:  No.  He - the reason -
13        he's under contract with us, so our interest is
14        trying to get him better so he can perform.  So
15        he's -- his medical care is kind of supervised if
16        you will.  They sent him to neurologists to try
17        to figure out what was wrong with him.  They sent
18        him to sports psychologists --
19                 THE COURT:  Pursuant --
20                 MR. McDEVITT:  -- I mean there's a
21        different version frankly of whether Mr.
22        Singleton is injured or not as I'm sure you can -
23        Your Honor can imagine.
24                 THE COURT:  But pursuant to what?  Is
25        there a contract that requires it?
```

```
1            MR. McDEVITT:  Well no, he's free – if
2      he wanted to go to another doctor and pay for it
3      himself, he's free to do that.
4            THE COURT:  Is there a contract that
5      requires that WWE do it?
6            MR. McDEVITT:  No, actually the
7      contracts are the other way around, Your Honor.
8      The contracts indicate that talent are
9      responsible for their own medical care.  If you
10     want to draw a line for it, it's probably the
11     best way to think of it is, for their medical
12     care, independent of whether they get hurt in the
13     ring or something like that, that's their
14     responsibility; they have to take care of that.
15     If they got hurt performing for us, the WWE takes
16     care of it.
17            THE COURT:  Okay.
18            MR. McDEVITT:  I mean that's basically
19     what we do.
20            Now, what's different about these cases
21     is their claiming – and these are people that are
22     coming in six, seven years after they left
23     performing for us.  I mean we haven't heard a
24     word from Mr. Lograsso since he last performed in
25     2007, coming in and making these claims now that
```

1     they – they claim that they have some residual

2     impact of alleged concussions that they claim

3     they had when they performed for the WWE.  That's

4     the essence of what they're claiming.

5              Now the only other thing we do that may

6     be responsive to what Your Honor was asking is

7     years ago on its own volition, what the company

8     decided to do was for any performer -- former

9     performer who had a drug or alcohol problem and

10    was struggling with life because of that, the

11    company volunteers to help them and puts them

12    through rehab at company expense and has done so

13    frankly for some people more than one time and

14    has saved some lives in doing so.  And part of

15    the program I'm particularly proud of.  I mean if

16    you save one life, well that's a worthwhile

17    enterprise to do and they do that kind of stuff.

18             But I should point out Your Honor,

19    wrestlers are independent contractors; they're

20    not employees and they sign contracts in which

21    they agree they're independent contractors, in

22    which they agree they assume certain risks – ones

23    that are inherent to their profession and there's

24    no claim here that they're not.  They're not

25    claiming they're employees here.  'Cause if they

1    did, they'd have to go to workmen's comp for

2    remedy.  So they're not claiming that.  No

3    dispute.  These are independent contractors.  Big

4    boys who sign big boy contracts, if you will.

5    They understand exactly what they're getting

6    into.  They know the risks that are involved in

7    this.  And nobody tells them that you're not

8    going to get injured and you're not going to get

9    hurt.  You can't do what these people do without

10   consent from the other people.  It would be an

11   intentional tort to do what they do to each

12   other, but for their consent to participate in

13   it.

14            In Mr. Singleton's case for example

15   Your Honor, once he climbs in the ring, we say

16   it's a dance in a sense because they're safety

17   really depends on each other taking care of it.

18   There's nothing anybody can do once you get in

19   the ring with another opponent.  If they don't

20   execute the move right or you don't execute the

21   move right, there's a risk you're going to get

22   hurt.  And nobody – nobody tries to hide that;

23   it's a reality of this business that they all

24   know about.

25            And so I think when Your Honor reads

```
1          the brief – for example there's a famous New York
2          case you'll read about involving the fate of
3          Jockey Ron Turca; it went to the New York Supreme
4          Court.  He was paralyzed in a race down in New
5          York and brought a lawsuit alleging negligent
6          concepts and whatnot.  In this case actually –
7          the New York was relied upon by the Connecticut
8          Supreme Court case and one we're going to point
9          out to you.  And they went through the whole duty
10         analysis.  What kind of duty do you owe? And they
11         made a distinction between you know, amateurs and
12         professionals.  Professionals understand the risk
13         they're taking.  These are professionals.  These
14         people are compensated to do what they do.
15         Between amateurs and professionals I suppose –
16         and compensated people.  And the notion that –
17         the risk becomes more obvious, the lesser the
18         duty to the point where there is no duty in
19         certain circumstances.  I mean for example, Your
20         Honor, there would be no duty on the part of a
21         boxing promoter to prevent a boxer from getting a
22         concussion.  That's the whole point of the sport.
23         You know that the minute you walk in there.  So
24         you could never apply negligence concepts to
25         stuff like that.
```

```
 1              So that's what I think you'll see in

 2     these cases that we're going to point out to you

 3     is the courts look at the activity that they're

 4     person's engaged in, what were the normal

 5     expectations of that person, did they know what

 6     was going to happen, did they know what risk they

 7     were taking?  And if they did, then it's the end

 8     of the inquiry.

 9              And that's the case here I think with –

10     with respect to the negligence counts of Mr.

11     Singleton and the fraud counts are just

12     inadequate -- they're like these kind of

13     allegations that people are dead when they're not

14     even dead.  They're that flimsy.

15              So it's for those reasons Your Honor,

16     we were hoping that you know, you would receive

17     our briefs.  Maybe we would have a further oral

18     argument on the point and get the benefit of your

19     rulings.

20              If, for example, you sustain the

21     Singleton case, I think those four -- rule out

22     the repose – on reposed matters, all the other

23     claims, then we're dealing with a very narrow

24     case about one wrestler, as opposed to all these

25     other claims that aren't even back there yet.
```

1          That's why we were suggesting to take the

2          briefing first, Your Honor, and make a decision

3          then.

4                    THE COURT:  But now you're taking the

5          position that the complaint should be amended

6          again? Are you?

7                    MR. McDEVITT:  I don't think they can

8          amend it again, now without leave Your Honor.  I

9          mean I don't know what they're going to do.  I

10         mean I sent them an email ten days ago with these

11         – whatever it was with the problems in this

12         complaint, other than that one.  I didn't even

13         mention that one to them.  There's other things I

14         mentioned to them.  I don't know what they're

15         going to do.  They haven't responded.  That's

16         part of the problem.  We bring these things up

17         and we get no response from them.

18                    And I submit Your Honor, they won't --

19         well maybe they'll tell you, but we've asked them

20         repeatedly, "Are you involved in that California

21         class action or not?  Why are you bringing – why

22         are you bringing a parallel class action case in

23         California on behalf of the same class, same

24         claim, save everything as you have before the

25         Connecticut court?  What is your reason for doing

 1      that?"  We've not been able to get an answer.

 2                  THE COURT:  So --

 3                  MR. McDEVITT:  They won't answer us, so

 4      maybe they'll answer you, Your Honor.  I don't

 5      know.

 6                  THE COURT:  Are you saying that the

 7      attorneys involved in this case and the law firms

 8      involved in this case on behalf of the

 9      plaintiffs, do not have appearances in those

10      other cases?

11                  MR. McDEVITT:  That's right.  Mr. Kyros

12      -- we think what happened is Mr. Kyros, not local

13      counsel, Mr. Kyros is the one that recruits all

14      these plaintiffs through the internet, eluding to

15      the NFL settlement and the notion that there's a

16      lot of money involved in these cases.  And we

17      think what he did - we know he was dealing with

18      those plaintiffs; we know that.  I've been in

19      this business for 30 years; I have a lot of

20      people talk to me.  I know what goes on usually.

21                  So to file the case out in California,

22      they knew the minute they filed the case out in

23      California, that would we point out to the

24      Federal Judge in California:  Wait a minute.

25      They just agreed to transfer a case in

1          Pennsylvania to the Court in Connecticut for the

2          same form of selection clause as these three guys

3          have.  So I don't think he wanted to run into

4          that.  So he didn't put his name on the

5          complaint.  And asked California lawyers – he

6          lined up to file the complaint – file the

7          complaint without his name on it to give him

8          deniability.  We then call on both the California

9          lawyers and Mr. Kyros saying:  come on, that's

10         not going to work, we know you're involved in it.

11         Why are you doing this?  Why are you bringing the

12         second action out in California, it's identical

13         to the one you have in Connecticut that you just

14         consented to?  You're just trying to end run the

15         Connecticut Court's jurisdiction.  And I've asked

16         them that several times and they've refused to

17         answer.  Yes or no – they won't say 'yes' or 'no'

18         and we know they are.

19              So I mean that's the kind of stuff

20         we've been dealing with.  We're – we're doing

21         everything we can to get the claim brought before

22         Your Honor and keep them here.  They're doing

23         everything they can to make sure they've done

24         that.  And it's largely I think, driven by

25         Connecticut law not being to their liking.

```
 1                    THE COURT:  Thank you.

 2                    MR. McDEVITT:  Thank you, Your Honor.

 3                    MR. BLOSS:  May it please the Court,

 4        William Bloss, Your Honor, on behalf of the

 5        plaintiffs.

 6                    THE COURT:  Yes.

 7                    MR. BLOSS:  I would like to - I do

 8        think it would be prudent Your Honor and would be

 9        useful to actually talk for just a minute about

10        what the standard is that Your Honor is to apply

11        in deciding a motion for stay, that is after all

12        why we're here.

13                    The relief that the defendant is asking

14        for in this proceeding is an extraordinary

15        remedy. There has not been a scheduling order

16        entered, Your Honor, obviously.  There's not been

17        a Rule 26 report filed.  We've given Your Honor

18        some alternative proposals, some dates that we

19        think would be reasonable under the circumstances

20        and under the - under the allegations of the

21        amended complaint to set some deadlines and to

22        get - and to get some milestones moving and get

23        some - some schedule in place.

24                    The - we didn't hear in the last - the

25        last bit of time Your Honor, we didn't really
```

1          hear what the standard is for granting a stay of

2          discovery.  Fortunately, Your Honor has written

3          extensively on that and – and I would note that

4          Your Honor has written even a dispositive motion

5          which might obviate the need to conduct any

6          discovery altogether as ordinarily not a basis to

7          stay or refuse to produce discovery, absent

8          extraordinary circumstances and that's Your Honor

9          writing in *The Country Club of Fairfield* case,

10         Civil –– 13 CV509, Your Honor's decision was

11         August 8, 2014.

12              The defendant has the burden of showing

13         good cause Your Honor.  Filing a motion in itself

14         as Your Honor has written is not good cause.

15         Judge – Magistrate Judge Smith recently wrote in

16         the *Lithgow* case, 247 Federal Rules decision at

17         61, that where there is no motion pending, it's

18         very hard to establish good cause because you

19         really are forced to just take counsel at his or

20         her word that there is going to be a motion

21         coming that is going to be dispositive and has a

22         high level of likelihood of success.  You really

23         aren't in a position to make that finding today.

24         But yet, that's one of the findings that the

25         defense asks you to make.

1          Another factor Your Honor, is Your

2     Honor wrote in the *The Country Club of Fairfield*

3     case, was how reasonable is the discovery sought?

4     In other words, is this – is this burdensome?  Is

5     it moderate?  Is it sensible?  Is it limited?

6     What – how burdensome is the discovery?  We don't

7     know that either.  'Cause there's no Rule 26(f)

8     report in place.  We haven't served any

9     discovery.  We can't until the – until the report

10    is in place.

11          You're asked to – Your Honor, I think

12    you're asked to consider the possibility that

13    there may be other cases that are sent here I

14    guess.  I don't know how your – how you can

15    really weigh that either in the calculus.  You

16    don't know what the Judge in California is going

17    to do.  You don't know what the Judge in –– I

18    forget where the other – Tennessee or wherever

19    else it was.  If the –– if the Court enters a

20    scheduling order, it does happen from time to

21    time that scheduling orders get amended because

22    things change.  However, it is no basis to refuse

23    to enter a scheduling order at all or to

24    participate in no discovery whatsoever because of

25    the possibility that something else may happen

```
 1          down the road.

 2                    Your Honor, I'm not going to argue the

 3          merits of this -- to the filed motion to dismiss.

 4          I'm not going to argue the choice of law issues.

 5          I'm not going to argue any of those.  That's not

 6          why we're here Your Honor.  We're here because

 7          they've asked for a complete stay of all

 8          discovery which under - which under Rule 26(c) -

 9          we agree that Your Honor has the power - no

10          question about that - Your Honor has the

11          discretion to order a complete stay of discovery.

12          But as Your Honor has written, it really is only

13          permitted in compelling circumstances -

14          extraordinary circumstances and they just - on

15          this record, they haven't established that.

16                    Now I'm going to suggest Your Honor

17          that this - this request that they've made should

18          have been filed after the discovery - the Rule 26

19          report was filed with deadlines when you could

20          have assessed the motion in the light of all of

21          the circumstances and you could have addressed

22          the discovery issue in light of the all of the

23          circumstances.

24                    A moderate position Your Honor, would

25          be to enter the dates that we have in our - in
```

1     our Rule 26(f) report.  None of those dates

2     require any activity at all I think before the

3     end of July.  So if the Court entered that as –

4     as the scheduling order, they file their motion,

5     I'm not inviting them to come back and file

6     another motion for stay, but that is a remedy

7     that's available to them under the circumstances,

8     Your Honor, and there's no – there's no

9     prejudice.  There's no prejudice to anybody by

10    that.

11          But we think that Your Honor ought –

12    ought to just enter reasonable dates.  If the

13    dates in our report don't fit for Your Honor's –

14    if you don't think they're reasonable, fine.

15    We're flexible Your Honor.  We just want to get

16    an order entered so that – that at least the

17    deadlines are in place.  And then if something

18    changes, okay, then we'll revisit that with the

19    Court's cooperation or attention at the

20    appropriate time.

21          THE COURT:  Have the parties exchanged

22    initial discovery?

23          MR. BLOSS:  No.  Under the Rule 26

24    report Your Honor, the proposal was to exchange

25    the initial disclosures on July 31st.  That is

```
 1        what's built into the request, Your Honor.  But
 2        obviously this case has been pending for a fair
 3        amount of time without any initial disclosures.
 4        I think it was filed in Pennsylvania in January
 5        and transferred up here in March.
 6                So I think answering your – answering
 7        Your Honor's question, no there has been no
 8        initial disclosures.
 9                THE COURT:  What is your response to
10        the asserted deficiencies in the complaint?
11                MR. BLOSS:  Well I don't –
12        substantively Your Honor, we haven't seen their
13        motion to dismiss.  So I don't know whether the
14        complaint is deficient at all.
15                THE COURT:  Well factually.  Do you
16        allege that the defendant – that the plaintiff
17        died?  Is the plaintiff still alive?
18                MR. BLOSS:  There may -- Your Honor,
19        there may have been a typo carrying over.
20        Neither Mr. Singleton, nor Mr. Lograsso are dead.
21        I absolutely agree with that.  But --
22                THE COURT:  Do you – do you –
23                MR. BLOSS:  – there is nothing --
24                THE COURT:  -- do you assert that --
25                MR. BLOSS:  --material to any of the –
```

1          I'm sorry, Your Honor.  There is nothing material

2          to any other causes of action that as they plead

3          that is effected by any kind of a pleading issue.

4                    THE COURT:  Why do you think Mr.

5          Lograsso's claims are not barred by the statute

6          of limitations?

7                    MR. BLOSS:  I can't really comment on

8          that standing here today, Your Honor.  I'm not

9          sure it is controlled by Connecticut law first of

10         all.  I'm not sure if it's controlled by

11         Pennsylvania law.  I'm – I'm – there is obviously

12         a well established principle in Connecticut law

13         relating to tolling of the statue of limitations

14         due to fraudulent concealment.  And that is as

15         the Connecticut courts apply on a substantive law

16         issue, as a matter of fact.  It is not something

17         that can be decided on a motion to dismiss.

18                   THE COURT:  Well the complaint says

19         that Mr. Lograsso last fought for the defendant

20         in 2007 and it cites reports on traumatic brain

21         injuries prior to 2007.

22                   MR. BLOSS:  Okay.

23                   THE COURT:  So where – where would be

24         the fraudulent concealment?

25                   MR. BLOSS:  With --

```
1              THE COURT:  I mean do you have – do you
2        have a legal theory for the maintenance of this –
3        this individual's claims?
4              MR. BLOSS:  Again Your Honor, I think
5        it depends on –– the assumption that the defense
6        is making is that this is controlled by Connecti
7        –– first of all, controlled substantively by
8        Connecticut law.  Second of all, the limitations
9        period is controlled by Connecticut law.  And
10       third of all, there's no way to plead a
11       fraudulent concealment tolling of the – of
12       whatever the applicable limitations period is
13       under either Connecticut law or whatever
14       substantive law applies.  So that –
15             THE COURT:  Well, but – I mean you've
16       got to have a good faith belief in the claim that
17       you file at the time you filed it ––
18             MR. BLOSS:  I understand.
19             THE COURT:  –– not –– so what is your
20       good faith belief that this is a viable claim
21       since the last time you fought was in 2007 and
22       there was within the public domain considerable
23       literature at the very least, of the dangers of
24       this kind of activity?
25             MR. BLOSS:  I think it goes back to
```

 1           what the information was that was conveyed by the

 2           defendant to the plaintiff, Your Honor.

 3                     THE COURT:  And what information do you

 4           contend was conveyed by the defendant to the

 5           plaintiff?

 6                     MR. BLOSS:  Or was not conveyed in this

 7           particular case.

 8                     THE COURT:  Or not -- not conveyed.

 9                     MR. BLOSS:  I defer to Mr. Kyros on

10           that specifically.  But I think that it goes to

11           whether -- what the risks were to Mr. Lograsso

12           and what actually the impact on his particular

13           health was by these moves.  That they had some

14           information relating to other wrestlers and – I'm

15           not personally as familiar with Mr. Lograsso's

16           medical records; I will defer to Mr. Kyros on

17           that.

18                     THE COURT:  Mr. Kyros?

19                     MR. KYROS:  Yes, Your Honor.  Thank

20           you.  There are a number of theories that the

21           plaintiffs have as to why the statute of

22           limitations is tolled or doesn't apply to their

23           claims.

24                     I wasn't prepared to argue that, but

25           generally I've talked quite a bit about it.

```
 1              THE COURT:  Well, I mean you should
 2    have been.  The question is whether or not the
 3    Court should stay the case.  And if there are no
 4    viable claims, then – and it's --
 5              MR. KYROS:  I understand.
 6              THE COURT:  -- it's apparent on the
 7    face, then let's – you know, let's cut to the
 8    chase.
 9              MR. KYROS:  Yeah, well the theory --
10              THE COURT:  The defendant shouldn't
11    have to write a motion to dismiss, nor should the
12    Court have to read, research, and write a
13    decision on a motion to dismiss when it's
14    patently clear to the parties prior to the filing
15    of the motion, that the claim should be
16    dismissed.  This is – this is – you know, this
17    isn't a (inaudible) institution here; this is a
18    Court of law.
19              MR. KYROS:  Yes, Your Honor.  The – we
20    don't believe that the statute of limitations
21    applies to Mr. Lograsso –
22              THE COURT:  Because?
23              MR. KYROS:  Because we argue that the –
24    – the injury that he's sustaining right now is
25    due in fact to their continuing campaign of
```

```
 1         misinformation to the wrestler.  He has currently
 2         actually just received an email from the WWE.
 3         They offer and continue to relate to all their
 4         former talent, by sending them letters and
 5         continuing to update them about their wellness
 6         program and other programs that they have in
 7         place.  And we believe that the WWE's voluntarily
 8         assumed a duty to these folks to take care of
 9         them and educate them about the nature of these
10         long term degenerative brain injuries that they
11         receive.
12                   The fundamental premise of the case --
13                   THE COURT:  Aren't you saying that Mr.
14         Lograsso is under the care of another physician
15         who's diagnosed him with this condition?
16                   MR. KYROS:  Yes, Your Honor.  He is
17         under the care of a physician that's diagnosed
18         him with neurological issues.
19                   THE COURT:  And is he being treated for
20         those neurological issues?
21                   MR. KYROS:  Yes, he is.  I believe he
22         is, Your Honor.
23                   THE COURT:  And when was he diagnosed?
24                   MR. KYROS:  He's currently seeing a
25         neurologist as -- as --
```

1            THE COURT:  When was he diagnosed is my

2      question?

3            MR. KYROS:  He was – actually I believe

4      he was diagnosed currently.  He's under the care

5      of a physician who's diagnosed him within the

6      past month.

7            THE COURT:  Mr. Kyros, I asked a very

8      simple question.  Let me try it again.  On what

9      date was Mr. Lograsso diagnosed with a traumatic

10     brain injury by his private physician, not the

11     WWE?  When did that occur?

12            MR. KYROS:  I believe within the past

13     month, Your Honor.  But I know he's under the

14     care of a doctor as --

15            THE COURT:  Within the past month.

16            MR. KYROS:  Yes, Your Honor.

17            THE COURT:  And when did you make the

18     allegation in the complaint?  Certainly before

19     April?

20            MR. KYROS:  Right, but he – Mr.

21     Lograsso has ongoing neurological issues.  So as

22     part of his ongoing medical care, he's seeing a

23     neurologist.

24            So the basic notion is that all of the

25     wrestlers --

```
 1                    THE COURT:  So - so let me ask you a
 2          few more questions.  How did - how did this
 3          diagnosis come about?  How did he come to begin
 4          to see this physician?
 5                    MR. KYROS:  I believe he's suffering
 6          from serious issues and he has had ongoing
 7          problems with his memory and -
 8                    THE COURT:  When did he start seeing --
 9                    MR. KYROS:  -- all sorts of other
10          neurological symptoms.
11                    THE COURT:  When did he begin seeing
12          this physician?  Prior to 2015?
13                    MR. KYROS:  Your Honor, I don't have
14          Mr. Lograsso's medical file with me.  So I you
15          know, I can answer the questions as a general
16          matter.
17                    THE COURT:  Before you filed the case
18          in the first instance, yes or no?
19                    MR. KYROS:  Well he - Mr. Lograsso
20          alleged symptoms obviously before we filed the
21          case.  And you know, he - he has been suffering
22          from these symptoms for some time.
23                    THE COURT:  What are the symptoms?
24                    MR. KYROS:  I believe that they are
25          memory loss, deafness, depression, and other
```

1          indicia of serious neurological problems that he

2          sustained while he was retired after he wrestled.

3                    THE COURT:  And so if he was suffering

4          from – he started experiencing these conditions

5          after he retired or before he retired?

6                    MR. KYROS:  Well, the basic notion for

7          Mr. Lograsso as well as most of the athle –– most

8          of the performers that are –– join these cases is

9          that after they retire, they begin to experience

10         these types of symptoms.

11                   THE COURT:  Mr. Kyros, you think that

12         a good faith belief in the facts you include in a

13         complaint filed on behalf of two identified

14         individuals can be based upon a general notion?

15                   MR. KYROS:  No, Your Honor.  I was –– I

16         was describing the – the basis of the case

17         generally.

18                   THE COURT:  I'm asking about – well Mr.

19         Singleton, I mean first of all you don't have a

20         class action anymore, correct?

21                   MR. KYROS:  That's correct.  This is

22         plead as an individual case.

23                   THE COURT:  All right.  So and – and

24         then the question – I mean – I'm assuming that

25         Mr. Lograsso and Mr. Singleton's conditions are

```
 1        not identical?

 2               MR. KYROS:  That is correct.

 3               THE COURT:  And why – why do we not

 4        have misjoinder?

 5               MR. KYROS:  I'm sorry?

 6               THE COURT:  Why should these case be

 7        joined in a single action?

 8               MR. KYROS:  Well we have the same

 9        defendant.

10               THE COURT:  You think every case

11        against the defendant should be -- all cases

12        against the defendant should be in the single

13        case?  All claims of all parties against the

14        defendant that might be similar in some way

15        should be included in a single case?

16               MR. KYROS:  Well, not as a general

17        matter.

18               THE COURT:  I mean they fought at

19        different times with different people, different

20        number of times.  I'm assuming they have

21        different medical conditions.  They've been seen

22        by different doctors.  They have different

23        diagnosis. They have different prognosis.  Is

24        that true?

25               MR. KYROS:  Yes, that is.
```

```
 1              THE COURT:  So they don't have the same

 2      nucleus of fact.  The only thing they have in

 3      common is that they both assert that their

 4      injuries emanated from working for the defendant.

 5              MR. KYROS:  That is correct.  But there

 6      is a large body of commonality.

 7              THE COURT:  What --

 8              MR. KYROS:  In the nature of the

 9      abusive culture that we allege.  In fact, Mr.

10      Singleton and Mr. Lograsso both had the same

11      trainer.  So they – you know, there are certain –

12      and I think that the over arching factual record

13      is the same because the theory that undergrids

14      the case --

15              THE COURT:  How – how could it be the

16      same?  I mean they were both injured at different

17      times in different places as a consequence of

18      different conduct, correct?

19              MR. KYROS:  Well the conduct forms a

20      pattern according to our theory of the case.

21              THE COURT:  Okay.  Well tell me how the

22      patterns for these two individuals are the same

23      and not in generalities, not on the basis of your

24      general notion of the case, but specifically

25      these two individuals.  Is the jury going to hear
```

1     the same evidence or are we basically going to

2     have two trials at the same time?  Are we going

3     to have you know, guilt by association?  I mean

4     what – why should these cases be tried together?

5     Typically cases would only be tried together if

6     they arise out of the same nucleus of fact.

7     These cases seem to be wholly factually distinct.

8     There may be a culture.  I mean on that theory,

9     every single person that alleges an employment

10    discrimination at Pitney Bowes for example, would

11    be able to file a single lawsuit.  That doesn't

12    happen.

13           MR. KYROS:  Well, that raises an

14    interesting question about separating two cases,

15    Your Honor.  The cases as you know, were

16    originally filed together as a class claim and

17    then they were transferred to this Court.  And

18    then --

19           THE COURT:  Right.  And even as a class

20    claim, I mean let's face it, where's the –

21    where's the typicality in Mr. Lograsso and Mr.

22    Singleton?  How could you allege that they're

23    representative of a whole class of people that

24    fought for the WWE?

25           MR. KYROS:  Well, that – that I would

1          argue that – we're arguing that the class

2          actually is all WWE wrestlers. Singleton does

3          present unique facts in the nature of how his

4          injury occurred and I do believe that you're

5          right Your Honor, that Singleton's case in some

6          ways is distinct because the injury alleged is –

7          is more in line with a single incident, single

8          event, but it does play into the negligent

9          discharge – negligent pattern of conduct we

10         allege where they are prayed.  If for example Mr.

11         Singleton's case, he was taught how to do a choke

12         slam six minutes according to him – he was taught

13         how to do it six minutes before he was put in one

14         and subsequently permanently injured.

15              So that type of conduct is, I think,

16         something that runs through the note – the cases,

17         including Mr. Lograsso's case.  And you know, the

18         notion that you know, Lograsso has this

19         degenerative disease, is distinct in a sense.

20         But it continues – his – the allegation that Mr.

21         Lograsso makes is that during his time at the WWE

22         when he was injured less severely in a single

23         incident, but he continued to space these

24         injuries throughout his tenure there.  And there

25         was no medical treatment, both at ringside or

```
 1          outside the ring.  And in fact, the abusive
 2          culture encouraged these folks to not speak up
 3          about their injuries because if they did, they
 4          would lose their spot on television or they
 5          wouldn't be allowed to perform and earn a living.
 6          So the WWE contrary to the representations that
 7          they make even to this Court, wasn't very
 8          concerned according to our theory of the case and
 9          according to Mr. Lograsso and other wrestlers
10          that we've investigated and spoken to.
11                  THE COURT:  But – okay.  Doesn't your
12          complaint say that WWE required them to fight,
13          even though they were injured?
14                  MR. KYROS:  I believe it says
15          "encouraged".
16                  THE COURT:  Now you're saying it's the
17          opposite.  Now you're saying that they couldn't
18          disclose that they were injured because if they
19          disclosed they were injured, the WWE wouldn't
20          allow them to fight.
21                  MR. KYROS:  Well that's part of the
22          culture which is if you –
23                  THE COURT:  Is part of the culture --
24                  MR. KYROS:  – if they were being --
25                  THE COURT:  -- you can't fight if
```

```
 1        you're injured --

 2              MR. KYROS:  -- if they said: hey, I'm

 3        injured --

 4              THE COURT:  -- or you must fight

 5        injured?  Which is it?  I don't think it could be

 6        both, right?

 7              MR. KYROS:  Well, it can be in a way.

 8        Because the exercise of power is more subtle

 9        sometimes.  And the power is exerted over these

10        folks when they're working for the organization

11        (inaudible) is manifest in different ways.  And

12        one of the ways is through the pressure of the

13        economic power that the WWE wields over them

14        because they don't have any good safety net or

15        ability to get insurance or health care or any of

16        things that are provided through an employer.

17        They don't have that.  So if they want to work,

18        they are told: perform.

19              So as an independent contractor goes

20        in, they were under a tremendous amount of

21        pressure to perform.  If they were injured, their

22        - one of their counterintuitive thing would be to

23        not talk about it because they wouldn't want to

24        say that they were injured.  And the culture

25        itself at this organization seems to promote
```

```
 1        that.  I -
 2                THE COURT:  Well --
 3                MR. KYROS:  And to the broad question,
 4        Your Honor, I just want to - just you know, I
 5        know you didn't want me to talk in generalities,
 6        but I represented a large number of NFL football
 7        players --
 8                THE COURT:  No, I'm sorry.  I don't
 9        want you to talk in generalities.  This isn't
10        football.  And you know, I'm going to give you a
11        week to amend this complaint and I want you to
12        read it this time.  And a complaint should be a
13        compilation of facts - facts.  I'd really, really
14        like you to read the Federal rule, give it some
15        close consideration, perhaps read some cases on
16        the pleadings standards, and then file this
17        complaint again in a week without any scrivener
18        errors, without a lot of superfluous, hyperbolic,
19        inflammatory opinions and references to things
20        that don't have any relevance such as -- I mean
21        you've got references to -- well, maybe not.
22        You've got references to some reports that - well
23        you've got references to one report I can think
24        of right off the bat that was - became - went
25        public in 2014.  What does that have to do with
```

1    either of your clients?  They had both stopped

2    wrestling before 2014.  I see no reason to

3    include that in the complaint, other than to

4    inflame.  It's argumentative.  A complaint should

5    be a clear and concise statement of the facts

6    that form the basis of your claim. So you need to

7    identify what claim you're asserting, do the

8    research to find out what facts have to be proven

9    in order to establish that claim and allege the

10   facts that are necessary to prove each claim.

11   Because the rest of that is just window dressing.

12   And that's where you get into the trouble that

13   you're in where you're asserting that someone's

14   dead who's not because the complaint is full of

15   hyperbolic stuff.  It's not clear; it's not

16   concise.  Well it may be clear, but it's neither

17   – it's not concise and it's not accurate.

18           MR. KYROS:  Yes, Your Honor.  I – I

19   understand some of the – some of the – some of

20   the material in the complaint is designed to

21   illustrate you know, the culture of abuse that we

22   believe exists.

23           THE COURT:  You illustrate the culture

24   to the jury through the introduction of evidence.

25           MR. KYROS:  On that – I do believe that

```
 1        I was not aware of that - that scrivener error.

 2        But my - my client Nelson Fraser is dead at the

 3        age of 43.

 4              THE COURT:  Is Nelson Fraser a

 5        plaintiff in this case?

 6              MR. KYROS:  He is not.

 7              THE COURT:  Well what difference does

 8        it make?

 9              MR. KYROS:  Well that was -- you know,

10        that was -- I believe that the culture is so

11        abusive that it's causing folks to prematurely

12        you know, die.

13              THE COURT:  Are you - okay, well.  Are

14        you a doctor also?

15              MR. KYROS:  No, Your Honor.

16              THE COURT:  Does the complaint

17        reference Mr. Fraser?  Are you going to reference

18        every wrestler that's dead in your complaint?  I

19        don't - I don't follow that.  You really need to

20        read and get a better grip on the pleading

21        standard in the next week and file an amended

22        complaint.  I'm going to give the defense an

23        additional week to file their motion to dismiss.

24              But Mr. Kyros, neither the defense, nor

25        the Court has time to waste.  So you need to know
```

1       if you have facts, not general notions, not

2       impressions, not feelings, but facts to support a

3       claim and assert only those claims for which you

4       have factual support.  Only those claims that you

5       have a good faith belief based upon fact, not gut

6       emotion, but facts to support and then the

7       defense will have an opportunity to file their

8       motion to dismiss.

9              But until you have a complaint that's

10      worthy of discovery, it's pointless to order the

11      defense to conduct discovery because the defense

12      would be wasting their time conducting discovery

13      on Mr. Fraser.  And you've just admitted that

14      that's irrelevant here.

15             MR. KYROS:  Well, in order to get some

16      facts, we would – we would you know, request some

17      discovery.  For example in Singleton's case --

18             THE COURT:  Oh, you're --

19             MR. KYROS:  -- he was – he was

20      allegedly -- the match in which he was injured,

21      he was videotaped. So we would like to ask the

22      defense for the copy of that tape.

23             THE COURT:  Mr. who?  Mr. Singleton?

24             MR. KYROS:  Yes.

25             THE COURT:  He's your client.  He knows

```
1          what happened.  What do you mean?

2                  MR. KYROS:  He certainly – we've

3          alleged it in the complaint, but we don't have a

4          copy of the video.

5                  THE COURT:  I don't think you need the

6          video to – to file a compliant complaint.  And as

7          long as the complaint is riddled with irrelevant

8          and hyperbolic material, it is a waste of time --

9          a violation of Rule 1 in fact to have the

10         defendant proceed with discovery.  The complaint

11         needs to be clear and concise to the point to put

12         the defendant on notice of what they need to

13         discover.  And if they don't need to discovery

14         facts about Mr. Fraser and God only knows what

15         else is in there, then why should I order them to

16         proceed to try to do that?

17                 I know what I've written.  And

18         generally that would be my position.  But that

19         would be in a case where the plaintiff has a good

20         faith belief in specific facts that form the

21         basis for the claim and they have filed a

22         complaint that puts the defendant on notice of

23         their claims and your complaint doesn't do that.

24         Your complaint puts the defendant on notice of

25         things that aren't claims, that are general
```

```
1        notions, that are irrelevant, like a 2014 report.

2        If you're going to say the 2014 report was

3        preceded by a 2002 report that the defendant had

4        it, that's -- that's one thing, but that's not

5        what the complaint says.  It's punctuated with a

6        lot of superfluous information.

7                 MR. KYROS:  If - if - Your Honor --

8                 THE COURT:  So --

9                 MR. KYROS:  -- we will get a clear,

10       concise version of this to the Court.

11                THE COURT:  And I'll look at it week

12       after next and I'll decide the motion to stay at

13       that time.

14                But in the interim, you know, for the

15       next two weeks or so, I'm not going to order

16       discovery because it would be a waste of the

17       defendant's time.  It's going to generate

18       unnecessary work for the defense and unnecessary

19       work for the Court.

20                Is there anything else?

21                MR. McDEVITT:  Not from me, Your Honor.

22                MR. KYROS:  I mean Your Honor, I would

23       - I would - you know, I would just say that I do

24       believe that these are tremendously important

25       cases for these folks.  And you know, in terms of
```

1      barring any facts of both of these individuals, I

2      think both of the facts and the factual records

3      shows that they were mistreated and that there

4      was negligence and its ongoing negligence and

5      that's part of the basis of this case.

6              THE COURT:  That's a matter for the

7      trier of the fact; I'm the neutral Judge.  That's

8      an argument that you can make to the jury when

9      you get there.  And I assume that every case is

10     vitally important to both parties. And the only

11     reason people come to Court is because they feel

12     very strongly about their position, so strongly

13     that they're unable to resolve their dispute for

14     whatever reason.

15             So I don't diminish your client's

16     claims and I don't in any sense, believe that

17     your complaint lacks merit.  That certainly isn't

18     what I said, but it certainly bears serious

19     refinement.

20             MR. KYROS:  Thank you, Your Honor.

21             MR. McDEVITT:  Thank you for your time

22     today, Your Honor.

23             THE COURT:  You're welcome.

24             COURT CLERK:  All rise.  The Honorable

25     United States District Court for the District of

1          Connecticut now stands adjourned.

2   (Court adjourned at 3:24:09 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATE

2

3              I hereby certify that the foregoing 68

4  pages are a complete and accurate transcription to the

5  best of my ability of the electronic recording of the

6  United States District Court Hearing, District of

7  Connecticut in re:  Singleton, et al v. WWE, Inc,. on

8  June 8, 2015.

9

10 s/s_____         _____

11 MARY C. INDOMENICO, Transcriber            Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# *EXHIBIT B*

**From:** Chris Gilreath [mailto:chrisgil@sidgilreath.com]
**Sent:** Friday, July 10, 2015 12:04 PM
**To:** McDevitt, Jerry
**Cc:** 'Konstantine Kyros'; 'Erica Mirabella'; drmalik@shezadmalik.com; Genender, Paul
**Subject:** RE: Osborne suit filed on June 26, 2015

We have already responded concerning your issue raised as to a proposed motion to transfer, which we oppose.  There is no requirement that we state our reasons, and we decline to engage you on the matter of summarizing our reasons why.

We acknowledge your request to defer filing an Answer until after any purported motion to transfer is dealt with.  We have not yet had an opportunity to confer on that point.  As it is separate and apart from any motion to transfer, we will respond to that issue after we have had a chance to discuss the same.

R. Christopher Gilreath
Gilreath & Associates, PLLC
200 Jefferson Avenue, Suite 711
Memphis, TN 38103
(901) 527-0511
(901) 527-0514 (fax)

Follow me on:

www.sidgilreath.com
www.facebook.com/chris.gilreath
www.linkedin.com/in/christophergilreath
www.twitter.com/tntrial

**CONFIDENTIALITY:** This email may contain confidential/privileged information intended only for the person(s) named.  Any use, distribution, copying or disclosure by any other person is strictly prohibited.  If you receive this transmission in error, please notify Gilreath & Associates, PLLC at the telephone number(s) and/or email address above.

**NO CLIENT RELATIONSHIP:** Communication with an attorney or staff member at Gilreath & Associates, PLLC does not by itself create an attorney-client relationship or constitute the provision or receipt of legal advice.  Any communication from this office should be considered informational only, and should not be relied or acted upon until a formal attorney-client relationship is established via a signed written agreement.

---

**From:** McDevitt, Jerry [mailto:Jerry.McDevitt@klgates.com]
**Sent:** Friday, July 10, 2015 9:04 AM
**To:** Chris Gilreath
**Cc:** Konstantine Kyros; Erica Mirabella; drmalik@shezadmalik.com; Genender, Paul
**Subject:** RE: Osborne suit filed on June 26, 2015

1

I have received no response to the two issues identified below, specifically any statement as to your reasons for not honoring the forum selection clause in Mr. Osborne's contract with WWE and whether you agree to the same procedure which has been used in every other case where motion practice has been necessary. We will have to present a motion to the Court to adjourn our response date until the forum issue is decided, and need to know whether it is opposed or not. Having received no response, I called Mr. Gilreath's office yesterday morning, was told he was in court , and would be back in the afternoon.  I left a message to call to discuss these matters, but the call was not returned.
We would appreciate a response to both issues, but certainly as to whether you oppose or agree to adjourning the response date until the forum issue is resolved. We will be moving the Court most likely on Monday.

---

**From:** McDevitt, Jerry
**Sent:** Wednesday, July 08, 2015 3:52 PM
**To:** Chris Gilreath
**Cc:** Konstantine Kyros; Erica Mirabella; drmalik@shezadmalik.com; Genender, Paul
**Subject:** Re: Osborne suit filed on June 26, 2015

I do not intend to debate the Rule 11 issues by email. All of you are now on specific notice of the obvious problems with the Complaint that has been filed. We will deal with that in due course.
 As to the immediate issue, you state you are not agreeable to transfer but offer no reason for your position. As you know by now, the burden will be on you to establish extraordinary circumstances unrelated to the convenience of the parties under Atlantic Marine.
 So that briefing can be done in a meaningful way,  please advise in summary form as to the reasons you refuse to honor the forum selection clause in Mr. Osborne's contract.
 Secondly, since briefing will once again be necessary, please advise if you are agreeable to the same procedure that has been done each time, ie, jointly asking the court to adjourn our response date until the forum issue is decided.

Sent from my iPad

On Jul 8, 2015, at 1:18 PM, Chris Gilreath <chrisgil@sidgilreath.com> wrote:

> Thank you for your email.  As an initial matter, starting a discussion with mention of Rule 11 is not a productive way to have a dialogue about any matter in a case.  You are free to make any conclusion about the nature and substance of allegations made, but simply concluding that Rule 11 is involved reaches too far to have any meaningful discussion on point.  It would be the same if we were to initiate a Rule 11 letter to you, asserting that you have had knowledge about the effect of cumulative head trauma and the methods and processes of WWE for years, and that by denying the same, you were fabricating responses.  As a matter of professional conduct, we elect to allow the pleadings and proof in the case demonstrate where the truth lies, rather than engage in such tactics.  If there were not a dispute as to the nature and effect of these circumstances, there would be no lawsuit.
>
> Concerning the matter of your proposed Motion to Transfer, we do not consent to transfer.  We have the same meet & confer rule in the Western District of Tennessee, as Gene Podesta can confirm to you.  If this communication is not sufficient to convey our position on any proposed pre-answer motion you seek , I am available today and tomorrow to discuss the same.  I am not available on Friday as I will be travelling via air and generally not reachable for the bulk of the day.
>
> Should you have any questions concerning this response to your inquiry, please do not hesitate to contact me.
>
> R. CHRISTOPHER GILREATH
> GILREATH & ASSOCIATES, PLLC
> 200 JEFFERSON AVENUE, SUITE 711

2

Memphis, TN 38103
(901) 527-0511
(901) 527-0514 (fax)

Follow me on:

www.sidgilreath.com
www.facebook.com/chris.gilreath
www.linkedin.com/in/christophergilreath
www.twitter.com/tntrial

**CONFIDENTIALITY:** This email may contain confidential/privileged information intended only for the person(s) named.  Any use, distribution, copying or disclosure by any other person is strictly prohibited.  If you receive this transmission in error, please notify Gilreath & Associates, PLLC at the telephone number(s) and/or email address above.

**NO CLIENT RELATIONSHIP:** Communication with an attorney or staff member at Gilreath & Associates, PLLC does not by itself create an attorney-client relationship or constitute the provision or receipt of legal advice.  Any communication from this office should be considered informational only, and should not be relied or acted upon until a formal attorney-client relationship is established via a signed written agreement.

**From:** McDevitt, Jerry [mailto:Jerry.McDevitt@klgates.com]
**Sent:** Wednesday, July 08, 2015 10:06 AM
**To:** Konstantine Kyros; Erica Mirabella; Chris Gilreath; drmalik@shezadmalik.com
**Cc:** Genender, Paul
**Subject:** Fwd: Osborne suit filed on June 26, 2015

We have received no response to our email of July 2, 2015, which appears below. If you do not intend to dismiss the case and refile in Connecticut, if at all, free of the Rule 11 violations, we would appreciate a response to that effect as well as times tomorrow or Friday during which we can hold the pre-motion conference required by the local rules.
 If you do not respond, we will advise the Court that we twice attempted to confer but were unsuccessful in obtaining a response.

Sent from my iPad

Begin forwarded message:

> **From:** Jerry McDevitt <jrrymcdv@aol.com>
> **Date:** July 2, 2015 at 11:07:39 AM EDT
> **To:** Konstantine Kyros <kon@kyroslaw.com>, Erica Mirabella <erica@mirabellallc.com>, Chris Gilreath <chrisgil@sidgilreath.com>, "drmalik@shezadmalik.com" <drmalik@shezadmalik.com>
> **Subject: Osborne suit filed on June 26, 2015**
>
> I am writing regarding the above captioned matter, filed on behalf of Pennsylvania residents in Texas despite a forum selection clause in the contract of the decedent, Matt Osborne, requiring that any such suit be brought exclusively in federal court in Connecticut. This case, remarkably, was brought in Texas one day after a federal judge in Oregon found that Mr. Kyros had been forum shopping and noted the importance of the fact that there were forum selection clauses in the contracts of a significant number of the purported class. Mr. Osborne is, of course, a member of the purported class in that case,which has just been transferred to Conn, and in the California case in which Mr. Kyros continues to

conceal his role , and of the class in the lograsso case already in Conn before the class allegations were dropped there in the recent round of gamesmanship.

We also note that Mr. Kyros and the others on the complaint in Osborne ignored the admonitions of United States District Judge Bryant regarding the improper pleading style used by Mr. Kyros, including specifically cautioning him about the propriety of naming other dead wrestlers in a federal lawsuit about a specific wrestler. To be fair, I do not know if Misters Gilreath and Malik were informed by Mr. Kyros of those directives by a federal judge at the time this lawsuit was filed, but you now do know and for your information there is a transcript of those directives from a federal judge.

One need not read too far into the allegations of the Osborne Complaint to see that it, like all prior complaints involving Mr. Kyros, is constructed on Rule 11 violations.  Indeed, the Complaint opens with the false allegation that Mr. Osborne performed for WWE beginning in 1985 and ending in 2007. Building on that false premise, the complaint elsewhere suggests that he performed for over 20 years for WWE and claims exposure to and mistreatment by wwe physicians associated with the company's wellness program.

In reality, Mr.Osborne was with WWE from 1985-1986, and had a second tour from Oct 1992-1993, when his drug issues caused WWE to end its relationship with him, all of which is well known and publicly available information. Simply put, he had no exposure whatsoever to any of the doctors involved in the wellness program, which was not put in place until long after Mr. Osborne last performed. He and many other formers performers were invited to appear on an anniversary show in 2007, and he appeared for a few minutes on that show, and never again thereafter.

There are other complete fabrications in this complaint, including the same false concoctions about an alleged concealment by WWE which have now been pointed out to the Court in Connecticut in our motion to dismiss, and which will soon be the subject of further motion practice in that court.

Thus, consider this our demand that you dismiss the complaint you have now filed in Texas and, if you choose to refile it, that you do so in federal court in Conn. without the rule 11 violations contained in it that have always been known to Mr. Kyros and the drafters of the document, and which all of you are now on notice of and should have known about even without this notice.

It is my understanding that the local rules of court in the Texas proceeding require us to have a premotion conference before we engage in motion practice. Needless to say, we will move again to transfer under Atlantic Marine and circuit authority if you do not dismiss, and for relief from the Rule 11 matters. Thus, if you intend not to comply with the demands made herein, please provide some dates and times next week when you will be available for the requisite conference. In doing so, please provide more than one date so we can confer next week if needed.

Sent from my iPad

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is proh bited. If you have received this e-mail in error, please contact me at Jerry.McDevitt@klgates.com.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distr bution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jerry.McDevitt@klgates.com.

# *EXHIBIT C*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MICHELLE JAMES, as mother and next
friend of MATTHEW OSBORNE, a Minor
Child and TEAGAN OSBORNE, a Minor
Child,

                 Plaintiffs,

v.

WORLD WRESTLING
ENTERTAINMENT, INC.,

                 Defendant.

Case No.  3:15-cv-02146-L

## AFFIDAVIT OF JAMES W. LANGHAM

State of Connecticut   )
                     )    ss:
County of Fairfield    )

I, James W. Langham, being first duly sworn, hereby depose and say:

1.     I am over eighteen (18) years of age.  I have personal knowledge of the matters

set forth herein or, where indicated, have reviewed World Wrestling Entertainment, Inc.

("WWE") corporate records, and am competent to testify thereto.

2.     I am employed as the Senior Vice President and Assistant General Counsel of

WWE.  In that capacity, I assist in the oversight of WWE's legal department and I have gained

direct and substantial knowledge of WWE's business operations.

3.     WWE is an integrated media company principally engaged in the development,

production, and promotion of television programming and live events, featuring its unique brand

of wrestling-based sports entertainment.

1

4.      WWE is a Delaware corporation with its corporate headquarters in Stamford, Connecticut.

5.      Matthew Osborne wrestled for WWE from 1985 to 1986 and from 1992 to 1993 pursuant to agreements called booking contracts (a "Booking Contract"). Attached as Exhibits A and B, respectively, are true and accurate copies of the only Booking Contracts for Mr. Osborne; one of which is dated January 1, 1985 (the "1985 Booking Contract"), while the other is dated October 31, 1992 (the "1992 Booking Contract"). Mr. Osborne also made a brief appearance at a WWE anniversary show in 2007.

6.      When Mr. Osborne entered into the 1992 Booking Contract, he represented that he resided in Georgia. The first paragraph of the 1992 Booking Contract describes Mr. Osborne as "residing at 4238 Hopkins Lake Drive, Duluth, GA 30136." *See* Exhibit B, first paragraph, page 1. Moreover, pursuant to the 1992 Booking Contract, WWE was obligated to provide Mr. Osborne with contractually-required notices at "4238 Hopkins Lake Drive, Duluth, GA 30136." *See id.*, § 13.6.

7.      Each of Mr. Osborne's Booking Contracts contains a choice of law provision requiring the application of Connecticut law. *See* Exhibit A, § 20; Exhibit B, § 13.7. Specifically, the 1985 Booking Contract states: "This Agreement shall be governed by the laws of the State of Connecticut applicable to contracts entirely made and performed therein." Exhibit A, § 20. Similarly, the 1992 Booking Contract states: "This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut." Exhibit B, § 13.7.

8.      The 1992 Booking Contract also contains a mandatory forum selection clause that requires Mr. Osborne's claims to be litigated in Connecticut. Specifically, the clause at issue

2

states:

> In the event that there is any claim, dispute, or other matter in question arising out
> of or relating to this Agreement, the enforcement of any provisions therein, or
> breach of any provision thereof, it shall be submitted to the Federal, state or local
> courts, as appropriate, only in the State of Connecticut.  This provision to submit
> all claims, disputes or matters in question to the Federal or state courts in the State
> of Connecticut shall be specifically enforceable; and each party, hereby waiving
> personal service of process and venue, consents to jurisdiction in Connecticut for
> purposes of any other party seeking or securing any legal and/or equitable relief.

Exhibit B, § 13.8.

9.  Booking Contracts entered into between WWE and its wrestlers after June 13, 1991, typically require that disputes arising out of or relating to the Booking Contracts be litigated in Connecticut.  There are no Booking Contracts entered into between WWE and its wrestlers that contain forum selection clauses requiring that disputes arising out of or relating to the Booking Contracts be litigated in Texas.

10.  WWE enters into Booking Contracts with independent contractors who live all over the world.  WWE includes choice of law provisions and forum selection clauses in the Booking Contracts in order to have a uniform body of law apply to these contracts and to have all disputes arising out of or relating in any way to them be adjudicated uniformly in Connecticut.

11.  The WWE executives identified in plaintiffs' complaint, specifically, the "small group of related executives" whom plaintiffs allege "manage both policies and the conduct of wrestlers during matches" all reside in Connecticut and have substantial work responsibilities in WWE's Connecticut headquarters.  Additionally, the vast majority, if not all, of WWE's employees who would have discoverable information regarding plaintiffs' claims also work out of WWE's Connecticut headquarters.

3

12.    WWE maintains the vast majority of its business records in Connecticut, either in
its corporate headquarters or in an off-site records storage facility.

James W. Langham, Senior Vice President
and Assistant General Counsel


STATE OF CONNECTICUT )
                     ) ss:  Stamford
COUNTY OF FAIRFIELD  )

I, a Notary Public for said County and State, do hereby certify that James W. Langham personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this 10th day of July, 2015.

Notary Public
My commission expires:    7-31-17

MARGARET M. YTUARTE
    NOTARY PUBLIC
COMMISSION EXP 7/31/17

4

# EXHIBIT A

AGREEMENT made as of the 1st day of Oct , 19__, by and between Titan Sports, Inc., having a principal place of business at 81 Holly Hill Lane, Greenwich, Connecticut 06830 ("Promoter") and Matthew Osborne, residing at _____ ("Wrestler") whose ring name is " Matt Borne                      .

WHEREAS, Promoter is in the business of arranging and staging wrestling events throughout the world and of representing professional wrestlers in the promotion and exploitation of such wrestler's name, likeness and personality;

WHEREAS, Wrestler is a professional wrestler who desires Promoter to arrange wrestling events for Wrestler and to represent Wrestler in the promotion and exploitation of Wrestler's name, likeness and personality;

NOW, THEREFORE, in consideration of the above premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Promoter and Wrestler hereby agree as follows:

1. Grant of Rights. Wrestler hereby exclusively grants to Promoter, and Promoter hereby accepts, the following worldwide rights:

(a) During the term of this Agreement, to book Wrestler for, and to arrange Wrestler's performances at, wrestling events, engagements, matches and appearances of any type at which Wrestler performs services as a professional wrestler (collectively the "Events") and irrespective of whether such Events are staged before a live audience, in a broadcast studio or in another location for later broadcast or otherwise;

(b) During the term of this Agreement, to sell tickets of admission to the general public to any or all the Events;

(c) To own in perpetuity all of the rights, results, products and proceeds in and to, or derived from, Wrestler's services hereunder (including without limitation, all incidents, dialogue, characters, actions, gags, routines, ideas, titles, inventions, and other material written, composed, submitted, added, improvised, interpolated and invented by Wrestler in connection with the rendering of Wrestler's services hereunder) and to obtain copyright and/or trademark protection therefor in the name of Promoter or Promoter's designee;

(d) During the term of this Agreement, to film, tape or otherwise record, or to authorize others to do so, by any media now known or hereafter created, any or all of the Events (any such film, tape or other recording is referred to herein as a "Program");

(e) To produce, reproduce, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitation, free, cable, pay cable, closed circuit and pay-for-view television), transmit, publish, copy, print, reprint, vend, sell, distribute and use, and to authorize others so to do, the product of Wrestler's services hereunder and/or any or all of the Programs in perpetuity and in any manner or media and by any art, method or device, now known or hereafter created (including without limitation, by means of videodisc, videocassette, theatrical motion picture and non-theatrical motion picture);

(f) To use, and to authorize others to use, in perpetuity, in any and all media now known or hereafter created, Wrestler's name, ring name, likeness, photograph, biography, voice, signature, caricature, characteristics, and any costumes and/or props used by or associated with Wrestler in connection with Wrestler's services hereunder as a professional wrestler (collectively "Name and Likeness") in advertising and/or publicity in connection with Wrestler's services hereunder and/or the exercise of the rights granted to Promoter hereunder; and

(g) During the term of this Agreement, to solicit, negotiate and enter into agreements for and on behalf of Wrestler for the exploitation of merchandising, commercial tie-up, publishing, personal appearance, performing at non-wrestling related Events and endorsement rights (collectively the "Rights") in and to Wrestler's Name and Likeness, provided Promoter shall advise Wrestler of any such agreements.

2. Territory. The territory of this Agreement shall be the world.

3. Term. The term of this Agreement shall be 2 years from the date hereof. This Agreement shall automatically renew for successive one year terms unless either party (the "Terminating Party") shall serve written notice to the other party, at least ninety days prior to the anniversary date of this Agreement, of the Terminating Party's decision to terminate this Agreement as of the anniversary date of this Agreement immediately following the service of such termination notice. Notwithstanding anything herein to the contrary, termination of this Agreement shall not affect Promoter's ownership of, and rights to: (a) any Program produced hereunder; (b) the rights, results, products and proceeds in and to and derived from Wrestler's services hereunder; (c) the exploitation of the rights set forth in subparagraphs (a) and (b) hereof in any and all media now known or hereafter created; or (d) any agreement concerning any or all

of the Rights to Wrestler's Name and Likeness, or any renewal, extension or modification thereof, and agreement and obligations of Wrestler and Promoter hereunder with respect to any such exploitation of the Rights to Wrestler's Name and Likeness shall continue until the last to expire of any such agreement, or any renewal, extension or modification thereof.

## 4. Consideration.

(a) In consideration of Wrestler's services hereunder and the rights herein granted to Promoter, provided that Wrestler fully and faithfully performs all of his obligations hereunder, Promoter agrees to pay, and Wrestler agrees to accept the following:

(i) If Wrestler renders his services in connection with the production of a television show intended to promote Wrestler and Wrestler's appearances at live Events, an amount not less than $50 for each day, if any, on which Wrestler renders services hereunder in connection with any such promotional television show;

(ii) If Wrestler appears in any Event in an arena before a live audience at which admission is charged, an amount equal to such percentage of the gross gate receipts for such Event as is consistent with the nature of the wrestling match in which Wrestler appears, i.e., preliminary bout, main event, etc., and the prevailing practices of the United States professional wrestling community; and at the sole discretion of the Promoter; and,

(iii) If Wrestler's Name and Likeness are exploited in connection with the Rights, an amount equal to $5$ %*of the gross receipts derived by Promoter from any such exploitation. If the exploitation of Wrestler's Name and Likeness in connection with the Rights occurs in connection with the exploitation of the Rights in respect of other wrestlers represented by Promoter, Promoter shall allocate and pro rate the amount of compensation paid to Wrestler pursuant to this Paragraph 4(a)(iii) based upon the number of wrestler's whose Rights are so exploited. * This amount will be paid on gross receipts derived from the sale of Wrestler's merchandise items in arenas (cont. below)

(b) Any amounts due from Promoter to Wrestler hereunder shall be paid to Wrestler by the twentieth day of the month immediately following the month in which Promoter receives sums a portion of which is payable to Wrestler pursuant to the provisions hereof.

## 5. Expenses.

(a) Promoter shall bear the following costs in connection with the development, and enhancement of the value, of Wrestler's Name and Likeness and his standing in the professional wrestling industry:

(i) In connection with Wrestler's appearances, if any, at Events staged before a live audience: the cost of location rental, sound and light equipment, wrestling ring, wrestling officials, police and fire protection, such additional security guards as Promoter shall require in its sole discretion, promotional assistance, all facility charges, and applicable state and local admissions taxes; and

. (ii) In connection with the production, distribution and exploitation of the Programs: all costs incurred in connection with said production, distribution and exploitation.

(b) Wrestler shall be responsible for supplying all wardrobe, props and makeup necessary for the performance of Wrestler's services at any Event at which Wrestler appears and for any costs incurred in connection with his transportation to and from any such Events as well as the costs of any food consumed and hotel lodging utilized by Wrestler in connection with his appearances at such Events; provided that if Promoter has scheduled Wrestler to appear at a particular Event and said Event fails to occur as a result of the absence of Wrestler's scheduled opponent or cancellation of the Event, Promoter shall pay Wrestler's reasonable out-of-pocket expenses which Wrestler incurred as a direct result of Promoter's scheduling of Wrestler's appearance.

6. Scheduling Events. Promoter shall, in its sole discretion, select the time and location of any Events at which Wrestler shall appear, Wrestler's opponent(s), if any, and any other wrestlers who will appear at such Event. Promoter shall provide Wrestler with reasonable advance notice of the date, time and place of any such Event, and Wrestler shall appear at the designated location for any such Event no later than one hour before the designated time for said Event. Wrestler agrees that he will comply with all requirements, directions and requests, and with rules and regulations made by Promoter in connection with the regular conduct of its business and the scheduling of the Events, and that he will render his services hereunder in a competent, conscientious and professional manner.

7. Agreements For Rights. Wrestler is relying on Promoter's expertise in connection with the exploitation of the Rights in and to Wrestler's Name and Likeness and Wrestler's approval shall not be required in order for Promoter to enter into any agreement which authorizes the exploitation anywhere in the world of any or all of the Rights in and to Wrestler's Name and Likeness. Wrestler agrees to execute any

4.(a)(iii) (continued)   or through Promoter's mail order outlet; 25 % will be paid from gross receipts derived from outside licensing.          - 2 -

8. Promotional Appearances. Wrestler agrees that he will cooperate and assist in the publicizing, advertising and promoting of scheduled Events, and that he will appear at, and participate in, a reasonable number of joint and/or separate press conferences, interviews and other publicity or exploitation appearances and/or activities (any or all of which may be filmed, taped or otherwise recorded, telecast by any form of television now known or hereafter created, including without limitation free, cable, paycable, closed circuit and pay-for-view television, broadcast, exhibited, distributed and used in any manner or media any by any art method or device, now known or hereafter created, including without limitation by means of videodisc, videocassette, theatrical motion picture and/or non-theatrical motion picture), at times and places designated by Promoter. Wrestler will receive no additional compensation in connection therewith.

9. Promoter's Control. Wrestler acknowledges the right of Promoter to make any changes in the product of any of the Wrestler's services hereunder in the preparation and exploitation of the Programs or the exercise of any of Promoter's other rights hereunder, and in this connection, Wrestler acknowledges and agrees that Promoter's decision with respect to any agreements disposing of the rights to Wrestler's Name and Likeness or the exercise of any other rights hereunder will be final. The Promoter shall have no obligation to schedule Events for Wrestler or to produce or release the Programs, or actually to use the Wrestler's services, or to continue such production or release or use if commenced.

10. Trademarks. Wrestler acknowleges that his ring name, and any props and/or costumes associated with Wrestler in the performance of his services hereunder are trademarks of Promoter (collectively the "Trademarks"), that all rights therein and good will pertaining thereto belong exclusively to Promoter, and that all use of the Trademarks will inure to the exclusive benefit of Promoter.

11. Protection of Trademarks. Wrestler agrees to cooperate fully and in good faith with Promoter for the purpose of securing and preserving Promoter's rights in and to the Trademarks. In the event there has been no previous registration of a claim to copyright, or of trademark or service mark rights, in the Trademarks, Wrestler shall, at Promoter's expense, but only at Promoter's request, assist Promoter in the filing and prosecution of one or more applications for copyright, tradename and/or service mark registrations in the appropriate office(s) or class(es) in the name of Promoter or its designee. It is agreed that nothing contained in this Agreement shall be construed as an assignment, or grant to Wrestler of any right, title or interest in or to Promoter's trademarks except that during the term of this Agreement Wrestler may use the trademarks at Events which Promoter schedules for Wrestler; all other rights relating to the Trademarks are reserved by Promoter. Wrestler hereby agrees that at the expiration or termination of this Agreement, for any reason, Wrestler will be deemed automatically to have assigned, transferred and conveyed to Promoter any and all copyrights, trademark or service mark rights, equities, goodwill or other right, title or interest in and to the Trademarks which Wrestler may have obtained or which may have vested in Wrestler as a result of Wrestler's services hereunder. Wrestler will execute, and hereby irrevocably appoints Promoter his attorney-in-fact to execute if Wrestler refuses to do so, any instruments requested by Promoter to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual convenants and considerations of this Agreement. Wrestler agrees that he will not during the term of this Agreement or thereafter attack the title or any rights of Promoter in and to the Trademarks.

12. Representations and Warranties. Wrestler represents, warrants and agrees that:

(a) He is free to enter into this Agreement and to grant the rights herein granted to Promoter; he has not heretofore entered, and shall not hereinafter enter, into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by Wrestler of his obligations hereunder or the free and unimpaired exercise by Promoter of any of the rights herein granted to it; and

(b) There are no pending claims or litigations affecting Wrestler which would or might interfere with the full and complete exercise or enjoyment by Promoter of any rights granted hereunder.

13. Unique Services. Wrestler acknowledges and agrees that the services to be rendered or furnished by him and the rights granted to Promoter hereunder are of a special, unique, unusual and extraordinary character, giving them peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law and would cause Promoter irreparable damage and injury. Wrestler, therefore, agrees that Promoter shall be entitled to injunctive and other equitable relief to prevent any breach or default hereunder, which shall be in addition to and without prejudice to any other rights or remedies Promoter APPENDIX, Page 088 damages.

-3-

14. **Life Insurance.** Promoter shall have the right of its election, its own life cost and expense, including but not limited to insurance against the failure of Wrestler to appear and to participate in any Event; Wrestler shall have no right, title or interest in any such insurance. Wrestler agrees to cooperate and assist in Promoter's obtaining such insurance, including submitting to such physical or other examinations of Wrestler as may be required to obtain such insurance and by preparing, signing, and delivering such applications and other documents as may reasonably be required.

15. **Indemnification.** Wrestler shall indemnify Promoter and Promoter's licensees, assignees and affiliates and their respective officers, directors, employees and representatives and hold each of them harmless from any claims, demands, liabilities, actions, costs, suits, proceedings or expenses (including without limitation reasonable attorneys fees and expenses) incurred by any of them by reason of the breach or alleged breach of any warranty, undertaking representation, agreement or certification made or entered into herein or hereunder by Wrestler and/or Wrestler's conduct within or around the ring, hallways, dressing rooms, parking lots or other areas within or in the immediate vicinity of the facilities where Promoter has scheduled Events for Wrestler.

16. **Independent Contractor.** Nothing contained in the Agreement shall be construed to constitute Wrestler as a partner or joint venturer of Promoter, nor shall Wrestler have any authority to bind Promoter in any respect. Wrestler shall render his services hereunder as an independent contractor. Wrestler will execute, and hereby irrevocably appoints Promoter his attorney-in-fact to execute if Wrestler refuses to do so, any instruments requested by Promoter to accomplish or confirm the foregoing.

17. **Entire Contract.** This Agreement contains the entire understanding of the parties, with respect to the subject matter hereof, and supersedes all previous verbal and written agreements; there are no other agreements, representations, or warranties not set forth herein, with respect to the subject matter hereof. This Agreement may not be changed or altered except by an agreement in writing signed by Promoter and Wrestler.

18. **Assignment.** Promoter shall have the right to assign, license or transfer any or all of the rights granted to it hereunder to any person, firm or corporation and if any assignee shall assume in writing Promoter's obligations hereunder, Promoter shall have no further obligations to Wrestler hereunder. Wrestler may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

19. **Notices.** Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows (or addressed as the parties may hereafter in writing otherwise designate):

TO PROMOTER:
Titan Sports, Inc.
81 Holly Hill Lane, P.O. Box 4520
Greenwich, Connecticut 06830
Attention: President

TO WRESTLER:

The date of mailing or delivery to the telegraph office shall be deemed to constitute the date of service of any such notice.

20. **Choice of Law.** This Agreement shall be governed by the laws of the State of Connecticut applicable to contracts entirely made and performed therein.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

(Wrestler) Ring Name

(Legal Name)

TITAN SPORTS, INC.

By: _____
Authorized Officer

EXEC. VICE PRESIDENT

# EXHIBIT B

## TITAN SPORTS, INC.
## BOOKING CONTRACT

This contract is made this __31__ day of __October__, 1992, by and between Titan Sports, Inc., a Delaware corporation d/b/a The World Wrestling Federation ("WWF") with its principal place of business at 1241 East Main Street in Stamford, Connecticut (hereinafter referred to as "PROMOTER"), and _____ __Matthew Osborne__ residing at _____ __4238 Hopkins Lake Drive  Duluth, GA  30136__ _____ (hereinafter referred to as "WRESTLER"), whose ring name is "_____".

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business of organizing, publicizing, arranging, staging and conducting professional wrestling exhibitions throughout the world and of representing professional wrestlers in the promotion and exploitation of a WRESTLER's name, likeness, personality and character; and

WHEREAS, PROMOTER has established a nationwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions; and in addition thereto, PROMOTER has developed and produced certain other television programs, such as "TNT" and "Saturday Night's Main Event" which are also used to publicize PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his/her wrestling services and his/her standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute exhibitions and promotions organized to provide athletic-styled entertainment to the public, and such wrestling exhibitions constitute entertainment and are not competitive athletic competition; and

WHEREAS, WRESTLER desires PROMOTER to arrange wrestling matches for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the premises and of their mutual promises and agreements as herein set forth, the parties do hereby agree as follows:

## 1. BOOKING

1.1      WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a) During the term of this Agreement, the right to book WRESTLER for and to arrange WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast), or otherwise.

(b) During the term of this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing any or all of the Events, as well as any closed circuit television, or other video exhibition of the Events.

(c) During the term of this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of publicity, merchandising, commercial tie-up, publishing, personal appearance, performing in non-wrestling events, and endorsement rights (collectively referred to as the "Rights") of WRESTLER, his/her legal and/or ring name, likeness, personality, and character, or any other of his/her distinctive or identifying indicia; provided PROMOTER shall inform WRESTLER of any such agreements.

1.2      In consideration of WRESTLER's grant of rights, license and other services, as hereinafter set forth, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER in wrestling matches at various Events, and during the term of this Agreement PROMOTER guarantees WRESTLER a minimum of ten (10) bookings per year at PROMOTER's own Events.

- 2 -

## 2.   PROGRAMS

2.1      WRESTLER hereby grants to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereafter created, any or all of the Events.  (These recordings by tape, disc, film, or otherwise are collectively referred to herein as "Programs").

2.2      PROMOTER may produce, reproduce, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitations, free, cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, print, reprint, vend, sell, distribute and use, and to authorize others to do so, the Programs in perpetuity in any manner or media and by any art, method or device, now known or hereafter created (including without limitation, by means of videodisc, videocassette, theatrical motion picture and non-theatrical motion picture).

2.3.      PROMOTER shall own in perpetuity all of the rights, results, products and proceeds in and to, or derived from the Programs (including without limitation, all incidents, dialogue, characters, actions, gags, routines, ideas, titles, inventions, and other material written, composed, submitted, added, improvised, interpolated and invented by WRESTLER in connection with his/her appearance in the Programs) and to obtain copyright and/or trademark protection therefor in the name of PROMOTER or PROMOTER's designee.

## 3.   TRADEMARKS

3.1      WRESTLER hereby assigns in good faith to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement, to use WRESTLER's service marks, trademarks and any and all of his/her other distinctive and identifying indicia, including but not limited to his/her legal name, his/her ring name, likeness, voice, signature, costumes, props, gimmicks, gestures, routines, themes, personality, character, and caricatures as used by or associated with WRESTLER in the business of professional wrestling, (collectively the "Intellectual Property").  It is the intention of the parties that the assignment granted with respect to Intellectual Property is exclusive to PROMOTER during the term hereof, even to the exclusion of WRESTLER, and includes the right to sublicense, promote, expose, exploit and otherwise use the Intellectual Property in any commercial manner now known or hereafter discovered.

3.2      If WRESTLER does not own, possess or use service marks, trademarks or distinctive and identifying indicia and PROMOTER develops such service marks, trademarks, and distinctive and

- 3 -

identifying indicia for WRESTLER, they shall belong to PROMOTER and PROMOTER shall have the exclusive license and right in perpetuity, to use, and to authorize others to use, WRESTLER's ring name, likeness, voice, signature, costumes, props, gimmicks, gestures, routines, themes, personality, character and caricatures as used by or associated with WRESTLER's performance as a professional wrestler (collectively "Name and Likeness"). It is the intention of the parties that the assignment with respect to Name and Likeness belongs to PROMOTER in perpetuity, even to the exclusion of WRESTLER, and the assignment includes the right to sublicense, promote, expose, exploit and otherwise use the Name and Likeness in any commercial manner now known or hereinafter discovered.

3.3     WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving their respective rights in and to the trademarks, service marks, Intellectual Property, and Name and Likeness.   At PROMOTER's expense and request PROMOTER and WRESTLER shall take such steps as PROMOTER deems necessary for any registration or any litigation or other proceeding, to protect their respective rights in such service marks, trademarks or other Intellectual Property, and Name and Likeness.

## 4.   MERCHANDISING

4.1     WRESTLER hereby grants to PROMOTER, and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to use the Intellectual Property and/or Name and Likeness to manufacture, have manufactured, print, produce, reproduce, broadcast, rebroadcast, distribute, sell, and otherwise commercially exploit and use, any and all copyrightable material, goods, or merchandise, or any other item containing copyrightable material; and, as to all such items created and produced during the term of this Agreement, PROMOTER shall have exclusive right in perpetuity, to sell and/or distribute them. By way of example and not of limitation, such items include t-shirts, posters, photos, television rights, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such copyrightable material or item relating to WRESTLER or his/her performance as a professional wrestler.   It is the intention of the parties that this grant is exclusive to PROMOTER even to the exclusion of WRESTLER.   PROMOTER shall own all copyrights in any and all such materials, goods, merchandise and items and shall be entitled to obtain registrations thereof in its own name, and wrestler shall provide all reasonable assistance to PROMOTER in so obtaining such copyrights.

4.2     WRESTLER hereby grants to PROMOTER, and PROMOTER hereby accepts, the identical rights described in paragraph 4.1 above for non-copyrightable material and items, such as key chains, pens, etc., upon the same terms and conditions as stated in paragraph 4.1.   It is the intention of the parties that this

- 4 -

grant is exclusive to PROMOTER, even to the exclusion of WRESTLER.

## 5.  EXCLUSIVITY

5.1      It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted to PROMOTER during the term of this Agreement are exclusive to the PROMOTER even to the exclusion of WRESTLER.

5.2      In the event WRESTLER desires to participate in any commercial activity in which PROMOTER is not otherwise engaged, and WRESTLER's participation in such activity requires use of his/her Intellectual Property or Name and Likeness, PROMOTER may at its discretion, upon WRESTLER's written request, execute a sublicense to WRESTLER for the limited purpose of authorizing WRESTLER to participate in such specific commercial activity upon mutually agreeable terms and conditions.  PROMOTER's sublicense to WRESTLER shall constitute an exception to paragraphs 3 and 4 herein, solely with respect to WRESTLER's participation in such specific commercial activity and shall not license, sublicense, authorize, grant or permit any other or further appropriation or infringement of PROMOTER's rights whatsoever.

## 6.  TERM AND TERRITORY

6.1      The term of the Agreement shall be two (2) years from the date hereof.  Thereafter, this Agreement shall automatically renew for successive one year terms, unless either party shall serve written notice to the other party at least ninety (90) days' prior to the end of the term of this Agreement of such party's decision to terminate this Agreement as at the end of the term.   Reference herein to the term hereof means the original term and any such renewal or extended term.   During any such extended term, all rights, duties, obligations, and privileges hereunder shall continue as stated herein. Notwithstanding anything herein to the contrary, termination of this Agreement shall not affect PROMOTER's ownership of and rights to any Programs; the rights, results, products, and proceeds in and to and derived from WRESTLER's performance as a professional wrestler during the term of this Agreement; and the exploitation of the rights set forth in Paragraphs 1, 2, 3 and 4 hereof in any and all media now known or hereafter developed; and any Agreement concerning any and all of the Rights to WRESTLER's Name and Likeness.

6.2      The territory of this Agreement shall be the world.

- 5 -

## 7.  PAYMENTS

7.1     If WRESTLER appears in any Event in an arena before a live audience at which admission is charged other than those arena events which are taped for promotional purposes pursuant to paragraph 7.2 hereof, he/she shall be paid by PROMOTER an amount equal to such percentage of the gate receipts for such Event as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary bout, main event, etc.; the prevailing practices of the United States professional wrestling community; and any standards PROMOTER or others establish specifically for such Event.   However, such amount shall not be less than One Hundred Fifty ($150.00) Dollars, per Event.

7.2     If WRESTLER renders his/her service in connection with an arena or studio event which is taped for promotional use on PROMOTER's television network or otherwise, he/she shall be paid by PROMOTER an amount not less than Fifty Dollars ($50.00) for each day, if any, on which WRESTLER renders services hereunder in connection with the production of such promotional television show(s)/spots.

7.3     In the event WRESTLER's Intellectual Property and/or Name and Likeness are licensed, sublicensed, or otherwise assigned to third parties for reproduction and/or sale and distribution, in conjunction with any copyrightable material or items, pursuant to paragraph 4.1 hereof, or non-copyrightable material or items, pursuant to paragraph 4.2 hereof (hereinafter "Licensed Products"), such that the applicable product features WRESTLER's Intellectual Property and/or Name and Likeness only, WRESTLER shall receive twenty-five percent (25%) of "Licensed Products' Net Receipts" received by PROMOTER with respect to any such licensing, sublicensing or assignment.   Licensed Products' Net Receipts means the gross amount received by PROMOTER less expenses incurred by PROMOTER's licensing agent for the applicable product.

        If WRESTLER's Intellectual Property and/or Name and Likeness are licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate and prorate the amount of compensation paid to WRESTLER pursuant to this paragraph 7.3, based upon the number of wrestlers whose Intellectual Property and/or Name and Likeness are so exploited.

7.4     In the event WRESTLER's Intellectual Property and/or Name and Likeness are licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER shall be paid an amount to be mutually agreed to by WRESTLER and by PROMOTER of the "Personal Appearance Net Receipts" received by PROMOTER.   Personal Appearance Net Receipts

- 6 -

means the amount received by PROMOTER after payment of and provision for all costs and expenses, except income taxes.

7.5     In the event any other products developed by Promoter pursuant to paragraph 4.1 or 4.2 above are exploited directly through Arena Sales, and/or Mail Order Sales (hereinafter "Direct Sales Products"), such that the applicable product features WRESTLER's Intellectual Property and/or Name and Likeness only, WRESTLER shall receive an amount equal to five percent (5%) of the "Direct Sales Products' Net Receipts" derived by PROMOTER from such exploitation.   Direct Sales Products' Net Receipts means the gross amount received by PROMOTER for sales of such products sold at Arenas and/or via Mail Order after deduction of local taxes and applicable arena commission(s) allocated for concession sales.

In the event WRESTLER's Intellectual Property and/or Name and Likeness are exploited by PROMOTER such that Direct Sales Products feature WRESTLER's Intellectual Property and/or Name and Likeness with other wrestlers represented by PROMOTER, PROMOTER shall allocate and prorate the amount paid to WRESTLER pursuant to this paragraph 7.5, based upon the number of wrestlers whose Intellectual Property and/or Name and Likeness are so exploited.

7.6     In the event WRESTLER is a featured performer whose Intellectual Property and/or Name and Likeness are exploited with other wrestlers represented by PROMOTER in the videos made of Pay-Per-View Specials such as "Wrestlemania," "Royal Rumble," "Summerslam" and "Survivor Series" (hereinafter "WWF Video Specials"), PROMOTER shall allocate and prorate twenty-five percent (25%) of the "WWF Video Specials' Net Receipts" paid to PROMOTER by Licensee based upon the total amount paid to the wrestlers for the live event whose Intellectual Property and/or Name and Likeness are so exploited.   WWF Video Specials' Net Receipts mean the gross amount received by PROMOTER from its licensees less all costs, if any, incurred by PROMOTER to produce the applicable WWF Video Special.

7.7     In the event WRESTLER is a featured performer whose Intellectual Property and/or Name and Likeness are exploited with other wrestlers represented by PROMOTER, in non-pay-per-view video programs such as "Best of WWF" and "Saturday Night's Main Event" (hereinafter "WWF Series"), PROMOTER shall allocate and prorate twenty-five percent (25%) of the "WWF Series' Net Receipts" paid to PROMOTER from its licensees based upon the number of wrestlers whose Intellectual Property and/or Name and Likeness are so exploited.   WWF Series' Net Receipts mean the gross amount received by PROMOTER from its licensees less expenses, if any, incurred by PROMOTER in connection with production of the applicable WWF Series.

- 7 -

7.8     In the event WRESTLER's Intellectual Property and/or Name and Likeness are featured exclusively (as described below) in videodiscs or cassettes (hereinafter "Video Products"), WRESTLER shall receive an amount equal to twelve and one-half percent (12-1/2%) of the "Video Net Receipts" derived by PROMOTER for such exploitation. The remaining twelve and one-half percent (12-1/2%) royalty allocation will be prorated among the other wrestlers who appear incidentally on the Video Products but who are not the featured WRESTLER. Video Net Receipts mean the gross amount received by PROMOTER from its licensees less all costs, if any, incurred by PROMOTER to produce the applicable Video Product.

An Exclusive Feature shall mean that the WRESTLER is shown in each and every match on the Video Product. WRESTLER is entitled to the payment provided for above only for those Video Products which feature him/her exclusively, i.e., "Roddy Piper," or "Andre the Giant," or on those Video Products which feature a tag team or group to which WRESTLER belongs, i.e., the "Hart Foundation." Relative to a tag team or group appearing on a Video Product, the remaining twelve and one-half percent (12-1/2%) royalty will be prorated among the wrestlers according to the number of wrestlers in the featured group.

7.9     It is the understanding of the parties that WRESTLER shall not be paid anything for PROMOTER's exploitation of his/her Intellectual Property and/or Name and Likeness in PROMOTER's wrestling magazine known as the WWF Official Magazine, or any of PROMOTER's other magazines, which PROMOTER may publish, produce or distribute at arenas, at newsstands and/or by mail.

7.10    All payments made to WRESTLER are in full without withholding of any Federal, state or local income taxes, and/or any social security, FICA or FUTA taxes. After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER.

7.11    Statements as to royalties payable hereunder shall be sent by PROMOTER to WRESTLER within ninety (90) days following the end of each quarter-annual period together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

(a)     WRESTLER shall be deemed to have consented to all royalty Statements and all other accountings rendered by PROMOTER hereunder and each such royalty statement or other accounting shall be conclusive, final, and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever unless specific, objection in writing, stating the basis thereof, is given by WRESTLER to PROMOTER within one (1) year from the date rendered.

- 8 -

(b) PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business in Stamford, Connecticut. WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine and copy PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations. WRESTLER shall not audit PROMOTER's books and records more than once during any calendar year of the term hereof and such audit may not continue for more than thirty (30) days. Statements may be changed from time to time to reflect year-end adjustments, to correct errors and for similar purposes.

## 8. PROMOTER'S OBLIGATIONS

8.1     PROMOTER shall be responsible for obtaining all appropriate licenses to conduct professional wrestling exhibitions.

8.2     PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance as professional WRESTLER and his/her standing in the professional wrestling community, all of which shall inure to the benefit of WRESTLER:

(a) In connection with WRESTLER's appearances at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion to protect WRESTLER'S safety during his/her performance in a professional wrestling match;

(b) In connection with the production, distribution, and exploitation of the Programs, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication.

(c) In connection with any licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the licensing arrangements; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or

- 9 -

otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3      PROMOTER shall schedule events and book WRESTLER for Events.  In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event.  PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time.  If WRESTLER fails to appear as required without advance 24 hour notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then WRESTLER shall be subject to a fine to be determined by PROMOTER.

8.4      Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fine shall not be imposed.  For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; a strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite his/her best efforts prohibits his/her performance or appearance at such Event.

## 9.  WRESTLER'S OBLIGATIONS

9.1      WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2      WRESTLER shall be responsible for his/her own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

(a) WRESTLER shall establish his/her own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining his/her physical fitness for wrestling. WRESTLER shall select his/her own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his/her own training facilities and equipment, whether by purchase, lease, license, or otherwise.

(b) WRESTLER shall establish his/her own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning.  WRESTLER shall select his/her time for sleep, time for eating, and time for other activities.  WRESTLER shall select his/her own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs.

- 10 -

9.3     WRESTLER shall be responsible for supplying all wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event at which WRESTLER appears and for any costs incurred in connection with his/her transportation to and from any such Events (except those transportation costs which are covered by PROMOTER's current travel policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his/her appearance at such Events.

9.4     WRESTLER shall use his/her skills and talents as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers of each match consistent with and complying with all requirements, directions and requests made by PROMOTER in connection with the booking of WRESTLER at scheduled Events.

9.5     WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, and to appear at and participate in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter created, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture), at times and places designated by PROMOTER. WRESTLER will receive no additional compensation in connection therewith.

9.6     WRESTLER shall use his/her best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of his/her wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this paragraph shall cause a forfeiture of any payment due WRESTLER, pursuant to paragraph 7.1, for the Event at which the breach occurs and shall terminate PROMOTER's guarantee as provided in paragraph 1.2 above, as well as all other obligations of PROMOTER to WRESTLER hereunder, but such breach shall not terminate PROMOTER's licenses and other rights hereunder during the term hereof.

9.7     WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Programs or the exercise of any other rights respecting Intellectual Property or Name and Likeness, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights

- 11 -

to WRESTLER's Intellectual Property and/or Name and Likeness are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's consent. WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.8      WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER'S appearance and/or performance in a professional wrestling match.

9.9      WRESTLER shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, and affiliates and their respective officers, directors, employees, and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, proceedings or expenses, incurred by any of them by reason of WRESTLER'S breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. And, WRESTLER shall indemnify and defend PROMOTER against any and all claims arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked.

9.10     WRESTLER shall be responsible for payment of all his/her own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to his retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon his retirement from professional wrestling.

9.11     (a)  WRESTLER shall be responsible for his/her own commercial general liability insurance, workman's compensation insurance, professional liability insurance and as well as any excess liability insurance, as he/she deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of his/her own acts, transactions, or conduct as a professional wrestler.

         (b)  WRESTLER acknowledges that the participation and activities required by WRESTLER in connection with his/her performance in a professional wrestling exhibition may be dangerous and may involve the risk of serious bodily injury. WRESTLER knowingly and freely assumes full responsibility for all such risks whether due to the negligence of PROMOTER or otherwise.

- 12 -

(c)   WRESTLER hereby releases, waives and discharges PROMOTER from all liability to WRESTLER and covenants not to sue PROMOTER for any and all loss or damage on account of injury to the person or property or resulting in serious or permanent injury to WRESTLER or in WRESTLER'S death, whether caused by the negligence of the PROMOTER or otherwise.

(d)   WRESTLER acknowledges that the foregoing release, waiver and indemnity is intended to be as broad and inclusive as permitted by the law of the State, Province or Country in which the professional wrestling exhibition or Events are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full force and effect.

9.12   (a)   WRESTLER may at his/her election obtain health, life and/or disability insurance to provide benefits in the event of physical injury arising out of his/her professional activities; and WRESTLER acknowledges that PROMOTER shall not have any responsibility for such insurance or payment in the event of physical injury arising out of his/her professional activities.

(b)   In the event of physical injury arising out of WRESTLER'S professional activities, WRESTLER acknowledges that he/she is not entitled to any workman's compensation coverage or similar benefits for injury, disability, death or loss of wages; and WRESTLER shall make no claim against PROMOTER for such coverage or benefit.

9.13   WRESTLER shall act at all times with due regard to public morals and conventions during the Term of this Agreement. If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings him/her into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures his/her reputation or diminishes the value of his/her professional wrestling services to the public or PROMOTER then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER, in addition to its other legal and equitable remedies, and/or to suspend and/or terminate this Agreement forthwith.

## 10.   WARRANTY

10.1   WRESTLER represents, warrants, and agrees that he/she is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; he/she has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete

- 13 -

performance by WRESTLER of his/her obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are not pending claims or litigation affecting WRESTLER which would or might interfere with the full and complete exercise or enjoyment by PROMOTER of any rights and licenses granted hereunder.  Any exceptions to this Warranty are set forth in Exhibit A, attached hereto.

10.2     WRESTLER represents, warrants and agrees that he/she is in sound mental and physical condition; that he/she is suffering from no disabilities that would impair or adversely affect his/her ability to perform professional wrestling services; and that he/she is free from the influence of illegal drugs or controlled substances, which can threaten his/her well being and pose a risk of injury to himself/herself or others. To insure compliance with this warranty, WRESTLER shall abide by PROMOTER's Drug Policy for Wrestlers and consents to the sampling and testing of his/her urine in accordance with such policy.   In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by PROMOTER.    PROMOTER'S current Drug Policy, which WRESTLER acknowledges herewith receiving, is annexed hereto and incorporated herein.

## 11.   EARLY TERMINATION

11.1     This Agreement may be terminated prior to the end of its term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either.  In the event of such early termination, WRESTLER hereby waives any claims to future compensation or payments in connection with revenues derived from use of the Intellectual Property and/or Name and Likeness subsequent to such termination.

11.2     This Agreement will be terminated by WRESTLER's death during the term.

## 12.   BREACH

12.1     In the event PROMOTER breaches this Agreement, WRESTLER may recover such actual direct damages as may be established in any Court of law having jurisdiction of the parties and the subject matter.

12.2     In the event WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law having jurisdiction of the parties and the subject matter, as provided in paragraph 13.8.  In addition, WRESTLER shall forfeit any future payments due pursuant to paragraphs 7.3, 7.4, 7.5, and 7.6, 7.7 and 7.8; WRESTLER shall not appear under, use or exploit in any manner, parenthetically or otherwise, his/her Intellectual Property (except for his/her legal name) for

- 14 -

the remaining term of this Agreement; and WRESTLER shall not appear under, use or exploit in any manner, parenthetically or otherwise his/her Name and Likeness forever.

12.3     The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, programs, Events, Intellectual Property and/or Name and Likeness, which are the subject matter of this agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief which shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4     In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement, or otherwise, are expressly waived.

## 13.  MISCELLANEOUS

13.1     Nothing contained in this Agreement shall be construed to constitute WRESTLER as a partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect.    WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER his/her attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing.

13.2     This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement.    There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3     This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

13.4     Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the

- 15 -

remaining terms and provisions of this Agreement, or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

13.5     PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted to and hereunder to any firm or corporation, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall have no further obligations to WRESTLER.   WRESTLER may not assign, transfer or delegate his/her rights or obligations hereunder and any attempt to do so shall be void.

13.6     Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows, or as the parties may hereafter in writing otherwise designate:

          Titan Sports, Inc.
          ATTENTION:  President
          1241 E. Main Street
          P.O. Box 3857
          Stamford, Connecticut 06902

TO WRESTLER:

          Matthew Osborne

          4238 Hopkins Lake Drive

          Duluth, GA  30136


     The date of mailing shall be deemed to constitute the date of service of any such notice.


13.7     This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut.

13.8     In the event that there is any claim, dispute, or other matter in question arising out of or relating to this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of Connecticut. This provision to submit all claims, disputes or matters in question to the Federal or state courts in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

- 16 -

13.9     In the event that any legal action or any other proceeding is commenced to enforce any provision of this Agreement or as a result of a dispute, breach, default or misrepresentation in conjunction with this Agreement, the successful or prevailing party shall be entitled, in addition to any other relief, to recover all costs of litigation, including expert fees and reasonable attorneys' fees incurred in such action or proceeding; and all such costs and fees shall be made part of the judgment.

## 14.  CONFIDENTIALITY

14.1     Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either.

14.2     Each party acknowledges that he/she has read this Agreement; that he/she understands the terms and conditions set forth therein; and that his/her execution of this Agreement is a voluntary act by which he/she intends to be legally bound in a court of law.


        IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.


TITAN SPORTS, INC.

BY: _____

   Title: _____


___Matthew Osborne___ _____
WRESTLER's legal name, or
professional corporation


_____
Wrestler's Ring Name


_____
WRESTLER's signature and title, if a
professional corporation



- 17 -

STATE OF CONNECTICUT)
                    ) ss:
COUNTY OF FAIRFIELD )


        I,                           , a Notary Public for said County
and   State,   do   hereby   certify   that   _____,
_____   of   Titan   Sports,   Inc.,   personally   appeared
before  me  this  day  and  acknowledged  the  due  execution  of  the
foregoing  instrument  to  be  his/her  free  act  and  deed  for  the
purposes  therein  expressed.

        WITNESS   my   hand   and   notarial   seal   this   18th   day   of
December,  1992.


                                          _Kelley Eaton_____
                                          Notary Public

                                          KELLEY ANN EATON
                                          NOTARY PUBLIC
My commission expires:          MY COMMISSION EXPIRES AUG. 31, 1997
                                _____


STATE OF  Georgia      )
                       ) ss:
COUNTY OF  Forsyth     )


        I, Kristin M. Freiert        , a Notary Public for said
County and State, do hereby certify that Matthew Osborne
(Real Name) _____ (Ring Name) personally appeared
before  this  day  and  acknowledged  the  due  execution  of  the
foregoing  instrument  to  be  his/her  free  act  and  deed  for  the
purposes  therein  expressed.

        WITNESS   my   hand   and   notarial   seal   this   27th   day   of
Sept.      ,  1992.


                                          _Kristin M. Freiert_____
                                          Notary Public


My commission expires:          FORSYTH COUNTY
                                COMMISSION EXPIRES APRIL 28, 1996
                                _____

                                - 18 -

# *EXHIBIT D*

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

**WILLIAM ALBERT HAYNES III,**
**individually and on behalf of all others**
**similarly situated,**

            **Plaintiff,**

  **v.**

**WORLD WRESTLING**
**ENTERTAINMENT, INC.,**

           **Defendant.**

**Case No. 3:14-cv-01689-ST**

**OPINION AND ORDER**

**STEWART, Magistrate Judge:**

## <u>INTRODUCTION</u>

On October 23, 2014, plaintiff, William Albert Haynes III ("Haynes"), a former

professional wrestler, filed this action on behalf of himself and all other United States residents

who currently or formerly wrestled for defendant, World Wrestling Entertainment, Inc.[1]

("WWE"),[2] or a predecessor company.[3]  He alleges that WWE is in the "business of selling

violence" and has profited at the expense of its wrestlers' health by subjecting them to extreme

---

[1]  The class definition lists the defendant as World "Wide" Entertainment which appears to be a typographical error.  First Amended Class Action Complaint, ¶ 132.
[2]  "WWE" includes World Wrestling Entertainment, Inc., along with all predecessor companies, including but not limited to, Titan Sports, Inc., World Wrestling Federation, Inc., World Wrestling Federation Entertainment, Inc., World Championship Wrestling, Inc., and Extreme Championship Wrestling.
[3]  The class definition excludes WWE, entities controlled by WWE, WWE's legal representatives, assigns and successors, the judge to whom this case is assigned, and any member of the judge's immediate family.

1 – OPINION AND ORDER

physical brutality that it knew, or should have known, caused irreversible bodily damage, including brain damage, without providing adequate medical care.  First Amended Class Action Complaint ("FAC"), ¶ 1.  Additionally, Haynes alleges that WWE engaged in a "campaign of misinformation and deception to prevent its wrestlers from understanding the true nature and consequences of the injuries they have sustained."  *Id*.  As a result of WWE's "representations, actions, and inactions," WWE wrestlers have suffered "long-term debilitating injuries, lost profits, premature retirement, medical expenses, and other losses."  *Id*.  In particular, WWE wrestlers have suffered repeated head injuries which have altered wrestlers' brains and resulted in an "array of side effects, including depression, cognitive deterioration, and suicide."  *Id*, ¶ 3.  WWE has both failed to protect its wrestlers by concealing and denying the medical research and evidence concerning traumatic brain injuries and deliberately heightened the violence of its matches in order to increase its own profits.  *Id*, ¶¶ 1, 4.

Based on these allegations, Haynes alleges the following seven claims against WWE: (1) Fraudulent Concealment and Failure to Disclose or Warn ("First Claim"); (2) Negligent Misrepresentation ("Second Claim"); (3) Declaratory and Injunctive Relief ("Third Claim"); (4) Negligence ("Fourth Claim"); (5) Medical Negligence ("Fifth Claim"); (6) Medical Monitoring ("Sixth Claim"); and (7) Strict Liability for Abnormally Dangerous Activities ("Seventh Claim").

Haynes is a citizen of Oregon.[4]  The matter in controversy exceeds $5 million, exclusive of interest and costs.  *Id*, ¶ 14.  WWE is a Delaware corporation with its principal place of

---

[4]  Haynes alleges that he is a "resident" of Oregon.  FAC, ¶ 16.  However, "[r]esidence and citizenship are not the same thing."  *Seven Resorts, Inc. v. Cantlen*, 57 F3d 771, 774 (9th Cir 1995) (citation omitted).   A person's state of citizenship is determined by the person's state of domicile, not state of residence.  *Kanter v. Warner-Lambert Co.*, 265 F3d 853, 857 (9th Cir 2001).  "A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return."  *Id*, citing *Lew v. Moss*, 797 F2d 747, 749 (9th Cir 1986).  "A person residing in a given state is not necessarily domiciled there . . . ."  *Id*.  For purposes of the present motions, this court assumes that Haynes is both a resident and a citizen of Oregon.

2 – OPINION AND ORDER

business in Stamford, Connecticut. *Id*, ¶ 17. Accordingly, this court has subject matter

jurisdiction over this case under the Class Action Fairness Act of 2005, 28 USC § 1332(d)(2).

WWE has now filed a Motion to Dismiss (docket #44) and a Motion to Transfer Venue

(docket #47) seeking either dismissal of all seven claims or, if any claims remain, transfer of this

action to the District of Connecticut. For the reasons that follow, the Motion to Transfer Venue

is GRANTED and this action is transferred to the United States District Court for the District of

Connecticut for resolution of the Motion to Dismiss.

## DISCUSSION

WWE asks this court to rule on its Motion to Dismiss before ruling on the Motion to

Transfer Venue. However, among other things, the parties dispute whether this court has

personal jurisdiction over the WWE. Where "personal jurisdiction is difficult to determine, and

*forum non conveniens* considerations weigh heavily in favor of dismissal," the United States

Supreme Court expressly authorizes trial courts to take "the less burdensome course" and decide

the *forum non conveniens* issue before any merits-based issues.[5] *Sinochem Int'l Ltd. v. Malaysia

Int'l Shipping Corp.*, 549 US 422, 436 (2007).

**I.** **Legal Standard**

"A motion to transfer venue is a non-dispositive matter falling within the province of a

United States Magistrate Judge." *Penguin Grp. (USA) Inc. v. Am. Buddha,* No. 3:13–cv–00497–

HU, 2013 WL 6385916, at *1 n1 (D Or Dec. 6, 2013) (citations omitted); *see also Pavao v.

Unifund CCR Partners,* 934 F Supp2d 1238, 1241 n1 (SD Cal 2013) (citing cases).

///

---

[5] Although *Sinochem* involved a *forum non conveniens* dismissal in favor of pending litigation in a foreign court, the same logic applies with equal force to a *forum non conveniens* transfer to another district court: "For the federal court system, Congress has codified the doctrine and has provided for transfer, rather than dismissal, when a sister federal court is the more convenient place for trial of the action." *Sinochem*, 549 US at 1190-91 (citations omitted).

3 – OPINION AND ORDER

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 USC § 1404(a).  A motion under 28 USC § 1404(a) requires a district court to engage in a two-step inquiry.  The threshold issue is whether the case could have been brought in the forum to which transfer is sought. *Hatch v. Reliance Ins. Co.*, 758 F2d 409, 414 (9th Cir 1985).  The court considers whether the proposed forum "would have had subject matter jurisdiction at the time the action was filed; [whether] defendants would have been subject to personal jurisdiction; and [whether] venue would have been proper."  *E. & J. Gallo Winery v. F. & P. S .p.A.*, 899 F Supp 465, 466 (ED Cal 1994) (citations omitted).

If the action could have been brought in the forum where transfer is sought, the court then considers "whether the convenience of the parties, the convenience of the witnesses, and the interest of justice weigh in favor of transferring venue to that forum.  This step of the inquiry requires an 'individualized, case-by-case consideration of convenience and fairness.'"  *Jones v. GNC Franchising, Inc.*, 211 F3d 495, 498 (9th Cir 2000), quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 US 22, 29 (1988).  Relevant factors include:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiffs choice of forum, (4) the respective parties' contacts with the forum, (5) the contracts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party wit-nesses, and (8) the ease of access to sources of proof.

*Id* at 499.

The court may also consider "the local interest in the controversy and the relative court congestion and time to trial in each forum."  *Safe Drain, Inc. v. Vito*, No. C–14–01867–DMR,

4 – OPINION AND ORDER

2014 WL 4088147, at * 3 (ND Cal August 19, 2014), citing *Williams v. Bowman*, 157 F Supp2d

1103, 1106 (ND Cal 2001).

The district court has great discretion in deciding whether the relevant factors warrant

transfer of the action to another forum.  *See Sparling v. Hoffman Constr. Co.*, 864 F2d 635, 639

(9th Cir 1988) ("'Weighing of factors for and against transfer involves subtle considerations and

is best left to the discretion of the trial judge.'"), quoting *Commodity Futures Trading Comm'n v.*

*Savage*, 611 F2d 270, 279 (9th Cir1979).

## II.  Analysis

This court has carefully considered the materials submitted in connection with both of the

pending motions and concludes that transfer of this action is warranted.  It is clear that this action

could have been filed in the District of Connecticut.  Moreover, the record reveals that, for 15 of

the 30 years at issue in this case,[6] every booking contract between the WWE and its wrestlers

contains a forum selection clause requiring the parties to submit "all disputes arising out of or

relating in any way to" the booking contract "exclusively to the jurisdiction of the United States

District Court of Connecticut."  Langham Aff. (docket #47-1), ¶¶ 15-16.  Based on those

mandatory forum selection clauses, one district court has already transferred a substantially

similar case to the District of Connecticut.  *Singleton, et al. v. World Wrestling Entm't, Inc.*,

Eastern District of Pennsylvania Case No. 5:15-cv-00223-LS.  In two other cases filed in

Tennessee and California, motions to transfer venue to the District of Connecticut based on the

existence of forum selection clauses in the wrestlers' contracts with WWE remain pending.

*Frazier v. World Wrestling Entm't, Inc.*, No. 2:15-cv-02198-JPM-cgc (WD Tenn) (Motion to

---

[6] At a minimum, this case purports to cover wrestling between 1986 when that Haynes began wrestling with the
WWE's predecessor  and the present.  FAC, ¶¶ 16 (noting that Haynes wrestled with the WWE between 1986 and
1988), 132 (defining class as "[a]ll persons who *currently or formerly* wrestled for [WWE] or a predecessor
company . . . .") (emphasis added).

5 – OPINION AND ORDER