Change Venue Pursuant to 28 U.S.C. § 1404(a) Due to Forum-Selection Clauses in the Contracts

Between WWE and the Decedent (docket #5) filed March 27, 2015, pending); and *McCullough*

*et al. v. World Wrestling Entm't, Inc.*, No. 2:15-cv-02662-AB-JEM (CD Cal) (WWE's Motion to

Transfer Venue Due to Mandatory Forum-Selection Clauses in the Contracts Between the Parties

(docket #16), set for a hearing on July 13, 2015).

The bulk of the relevant factors are either neutral or weigh in favor of a transfer of this

case.  As to where the relevant agreement was negotiated, the record reveals that Haynes

"negotiated the terms of [his] relationship" in Oregon by telephone with WWE's predecessor,

Titan Sports, Inc.  Haynes Decl. (docket #51), ¶ 4.[7]  However, that factor is neutral, given that it

appears likely that the negotiator for WWE's predecessor was in Connecticut or some other state.

The pleadings do not identify the place(s) of performance of that booking contract, though

Haynes now avers that he participated in "at least" four wrestling matches in Oregon.  *Id*, ¶ 7.

He does not deny participating in wrestling matches for WWE's predecessor in other states, and

nothing currently in the record ties his four Oregon wrestling matches to the damages alleged in

this case.  Thus, contacts relating to the plaintiff's cause of action is a neutral factor.  The

difference in costs of litigation is neutral, given that either Haynes must travel to Connecticut or

WWE must travel to Oregon.  The record supports WWE's contention that the availability of

compulsory process to compel attendance of non-party witnesses and the ease of access to

sources of proof both weigh in favor of transfer.

This leaves only the plaintiff's chosen forum and the relative familiarity of Oregon courts

with Oregon law.  "Although great weight is generally accorded plaintiff's choice of forum,

when an individual brings a derivative suit or represents a class, the named plaintiff's choice of

---

[7]  While Haynes states that he requested and was refused a written contract (Haynes Decl., ¶ 5), WWE states that Haynes "entered into a booking agreement" dated June 2, 1986, implying that it was a written agreement.  However, WWE has not submitted a copy of any written booking agreement between Haynes and WWE's predecessor.

6 – OPINION AND ORDER

forum is given less weight." *Lou v. Balzberg*, 834 F2d 730, 739 (9th Cir 1987) (citations

omitted). *See also Johns v. Panera Bread Co.*, No. 08–1071–SC, 2008 WL 2811827 (ND Cal

July 21, 2008) (citing cases "consistent with Ninth Circuit and Supreme Court authority" for the

proposition that "[p]laintiff's decision to seek to represent a nationwide class substantially

undercuts this deference [normally afforded plaintiff's choice of forum]."). Whatever remaining

deference that is accorded plaintiff's choice of forum is further eroded by evidence in the record

that many of the putative class members are subject to mandatory forum selection clauses

requiring disputes to be resolved in the District of Connecticut. Langham Decl., ¶¶ 15-16.

　　　　In addition, it appears that Haynes's attorneys may be engaging in forum shopping. "If

there is any indication that plaintiff's choice of forum is the result of forum shopping, plaintiff's

choice will be accorded little deference." *Williams v. Bowman*, 157 F Supp2d 1103, 1106 (ND

Cal July 26, 2001) (citation omitted). On January 16, 2015, shortly before the filing of the FAC

and currently pending motion to dismiss based on Oregon's statute of repose in this case, a

second nationwide class action, *Singleton*, was filed in the United States District Court for the

Eastern District of Pennsylvania. The plaintiffs in *Singleton* are represented by one of the

attorneys representing Haynes in this case, Konstantine Kyros ("Kyros"). Just over two months

later, on March 23, 2015, Judge Lawrence Stengel transferred the *Singleton* action to the District

of Connecticut, noting that plaintiffs did not oppose a transfer of venue and agreed that the

District of Connecticut is an appropriate forum. Order dated March 23, 2015 (docket #11). On

May 22, 2015, the *Singleton* plaintiffs filed an Amended Complaint, voluntarily dismissing their

class allegations. *Singleton, et al. v. World Wrestling Entm't, Inc.*, United States District Court

of Connecticut (New Haven), Case No. 3:15–cv–00425-VLB, First Amended Complaint (docket

#67).

7 – OPINION AND ORDER

On February 18, 2015, prior to the transfer of the *Singleton* action, the Personal

Representative for a the estate of a former WWE wrestler, also represented by Kyros, filed

another case in Tennessee state court, alleging claims for negligence, negligent and intentional

misrepresentation, fraudulent concealment, fraud by omission/failure to warn, vicarious liability,

wrongful death, punitive damages, and loss of consortium. *Frazier, et al. v. World Wrestling

Entm't, Inc.*, Circuit Court of Shelby County Tennessee (Thirtieth Judicial District at Memphis),

Case No. CT-000702-15. That case was subsequently removed to the United States District

Court for the Western District of Tennessee. On March 27, 2015, WWE filed a Motion to

Change Venue (docket #5) based on the terms of a mandatory forum-selection clause in the

booking contract. That motion has, as yet, not been decided.

Finally, on April 9, 2015, *McCullough*, an identical nationwide class action, was filed in

the Central District of California. The *McCullough* action alleges several claims identical to

those alleged here and adds a claim for violation of the California Unfair Competition Law.

Again, based on mandatory forum-selection clauses in booking contracts, the WWE has moved

to transfer that case to the District of Connecticut, and a hearing is set on that motion in mid-

July. Kyros is not listed as counsel in that case, and WWE attorneys have been unable to

confirm whether he represents the plaintiffs. However, the pleadings in the *McCullough* action

incorporate many of the identical allegations and photographs and seek the identical relief

alleged in the FAC in this case.

This court is persuaded that the content and timing of these multi-jurisdictional filings

constitute evidence of forum shopping. Accordingly, plaintiff's choice of Oregon as one state on

a hit-list of potential venues for this nationwide class action is "accorded little deference."

///

8 – OPINION AND ORDER

## ORDER

Based on the above, it is ORDERED that WWE's Motion to Transfer Venue (docket #47) is GRANTED and this case is transferred to the United States District Court for the District of Connecticut.

This court expresses no opinion on the merits of any portion of the WWE's Motion to Dismiss (docket #44) which is reserved for a ruling by the United States District Court for the District of Connecticut.

DATED  June 25, 2015.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

9 – OPINION AND ORDER

# *EXHIBIT E*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

WILLIAM ALBERT HAYNES III,
individually and on behalf of all others
similarly situated,

          Plaintiffs,

     v.

WORLD WRESTLING
ENTERTAINMENT, INC.,

          Defendant.

Case No. 3:14-cv-01689-ST


## AFFIDAVIT OF JAMES W. LANGHAM

State of Connecticut )
             ) ss:
County of Fairfield )

I, James W. Langham, being first duly sworn, hereby depose and say:

1.     I am over eighteen (18) years of age.  I have personal knowledge of the matters set forth herein or, where indicated, have reviewed WWE corporate records, and am competent to testify thereto.

2.     I am employed as the Senior Vice President and Assistant General Counsel of World Wrestling Entertainment, Inc. ("WWE").  In that capacity, I assist in the oversight of WWE's legal department and I have gained direct and substantial knowledge of WWE's business operations.

PI-3414812 v1

3.      WWE is an integrated media company principally engaged in the development, production, and promotion of television programming and live events, featuring its unique brand of wrestling-based sports entertainment.

4.      WWE is a Delaware corporation with its principal place of business in Stamford, Connecticut. WWE maintains the vast majority of its business records in Connecticut, either in its corporate headquarters or in an off-site records storage facility.

5.      Plaintiff William Albert Haynes, III entered into a booking agreement with WWE's predecessor-in-interest, Titan Sports, Inc., dated June 2, 1986 and performed for WWE under the ring name Billy Jack Haynes through in or around January 1988. Haynes has not performed in any WWE-sponsored event since 1988.

6.      The WWE executives identified in Plaintiff's Complaint, specifically, the "small group of related executives whom Plaintiff alleges "tightly control" WWE, *see* First Amended Class Action Complaint ¶ 18, reside in Connecticut and work out of WWE's Connecticut headquarters. Additionally, the vast majority, if not all, of WWE's employees who would have discoverable information regarding Plaintiff's claims also work out of WWE's Connecticut headquarters.

7.      While WWE is registered to do business, and has designated a registered agent, in Oregon, WWE does not have any permanent or continuous presence in Oregon.

8.      WWE does not have an office in Oregon.

9.      WWE owns no real estate in Oregon, nor does it lease any property in Oregon.

10.     WWE does not maintain a telephone listing in Oregon.

2

11.     WWE does not have a bank account in Oregon and has not borrowed money from any financial institution in Oregon.

12.     WWE has one non-executive employee who resides in Oregon and works out of his home.

13.     WWE corporate records indicate that, over the past ten years (since 2005), WWE has performed only thirteen shows in Oregon out of more than one thousand WWE shows performed over that time.  All WWE events are performed by a separate Delaware corporation, Event Services, Inc., which is a wholly-owned subsidiary of WWE.

14.     A WWE event typically occurs over the course of a few hours on a given show date.  Because so many WWE events take place during a given year throughout the United States and indeed around the world, the process is akin to a traveling road show, with WWE's crew and talent constantly traveling from state to state and venue to venue for the next event.

15.     A substantial majority of the putative class members Plaintiff seeks to certify in this lawsuit are subject to contracts containing forum selection clauses that require their claims to be litigated in Connecticut.

16.     Specifically, booking contracts typically entered into between WWE and its wrestlers after June 13, 1991 require that any disputes arising out of or relating in any way to the booking contracts be litigated in Connecticut.  Certain booking contracts entered into between 1997 and 2000 have an arbitration provision requiring arbitration in Connecticut.  All known booking contracts entered into after 2000 have a forum selection clause of Connecticut.

17.    No contract between WWE and a wrestler has a forum selection clause of Oregon.


James W. Langham, Senior Vice President and
Assistant General Counsel


Subscribed and sworn to before me
this _23rd_ day of March, 2015


Notary Public
My Commission Expires:


AMY L. ANNUCCI
NOTARY PUBLIC
MY COMMISSION EXPIRES NOVEMBER 30, 2018

4

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March, 2015, I served a copy of the foregoing

AFFIDAVIT OF JAMES W. LANGHAM on the following parties via the Court's CM/ECF

System:

Steve D. Larson
Joshua L. Ross
Stoll Stoll Berne Lokting & Shlachter P.C.
209 SW Oak Street, Suite 500
Portland, OR  97204
Email: slarson@stollberne.com; jross@stollberne.com
       Attorneys for Plaintiff William Albert Haynes III

Pro Hac Vice admitted attorneys for Plaintiffs:

| | |
|---|---|
| Konstantine Kyros<br>Kyros Law Offices, PC<br>kon@kyroslaw.com | Taylor Asen<br>Cuneo Gilbert & LaDuca, LLP<br>tasen@cuneolaw.com |
| Erica Mirabella<br>Mirabella LLC<br>erica@mirabellaLLC.com | Scott Moriarty<br>Lockridge Grindal Nauen PLLP<br>samoriarity@locklaw.com |
| Brendan Thompson<br>Cuneo Gilbert & LaDuca, LLP<br>brendant@cuneolaw.com | Robert Shelquist<br>Lockridge Grindal Nauen PLLP<br>rkshelquist@locklaw.com |
| Charles LaDuca<br>Cuneo Gilbert & LaDuca, LLP<br>charles@cuneolaw.com | |

DATED this 31st day of March, 2015.

_s/B. John Casey_
B. John Casey

K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

# *EXHIBIT F*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

CIVIL MINUTES - GENERAL

| Case No.: | CV 15-02662 AB (JEMx) | | Date: | July 10, 2015 |
|---|---|---|---|---|

| Title: | Russ McCullough *et al.* v. World Wrestling Entertainment, Inc. |
|---|---|

Present: The Honorable    ANDRÉ BIROTTE JR.

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:**    **[In Chambers] Order GRANTING Defendant's Motion to Transfer Venue**

    Pending before the Court is Defendant World Wrestling Entertainment, Inc.'s ("WWE") Motion to Transfer Venue. (Motion, Dkt. No. 16.) Plaintiffs Russ McCullough, Ryan Sakoda, and Matthew R. Wiese filed an opposition and WWE filed a reply. (Opposition, Dkt. No. 21; Reply, Dkt. No. 22.) The Court took this matter under submission on July 10, 2015. (Dkt. No. 23.)

    Having considered the materials submitted, the Court **GRANTS** the Motion to transfer this case to the U.S. District Court for the District of Connecticut.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

    This action arises out of Plaintiffs' injuries that occurred while performing under WWE's written contracts. Plaintiffs are all residents of California. (Complaint, Dkt. No. 1, ¶¶ 20-22.) WWE is a registered Delaware corporation with a corporate headquarters in Connecticut. (Mot., p. 8.) With this matter exceeding the amount in controversy of $5 million, this Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 USC § 1332(d)(2).

At various points between 1999 to 2004, each Plaintiff wrestled professionally for WWE. (Compl., ¶¶ 20-22.) "WWE is an integrated media company principally engaged in the development, production, and promotion of television programming and live events featuring its unique brand of wrestling-based sports entertainment." (Mot., p. 8.) Plaintiffs suffered physical and neurological injuries as a result of WWE's alleged intentional conduct and negligence. (Opp., p. 1.) According to Plaintiffs, WWE continued to conceal and deny the medical research of the brain injuries Plaintiffs suffered during the course of their professional wrestling careers. (Compl., ¶ 2.) Based on these allegations, Plaintiffs initiated this action, suing WWE for seven claims, including: (1) fraudulent concealment and failure to disclose or warn; (2) negligent misrepresentation; (3) negligence; (4) declaratory and injunctive relief; (5) medical monitoring; (6) strict liability for abnormally dangerous activities; and for (7) violation of the California Unfair Competition Law. (*See* Compl.)

### A. Forum Selection Clause at Issue

WWE filed this motion seeking to transfer the matter to the United States District Court for the District of Connecticut because before Plaintiffs began their wrestling careers, each of them signed a booking agreement that explicitly included a forum selection clause. (*See* Mot.) The contracts at issue are attached as Exhibits A, B, and C to the Declaration of James W. Langham.[1] (Dkt. No. 16-7.) Plaintiffs Ryan Sakoda and Matthew R. Wiese signed agreements that included forum selection clauses that read in relevant part:

> The parties agree to submit any and all disputes **arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut.** The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

(Langham Decl., Dkt. No. 16-7, Exs. A, B ("Agreement 1") § 13.8 (emphasis added).) Plaintiff Russ McCullough signed a different agreement with a similar forum selection clause that read:

> In the event there is any claim, dispute, or other matter in **question arising out of or relating to this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of**

---

[1] The Court hereby takes judicial notice of these contracts. Fed. R. Evid. 201.

**Connecticut**. This provision to submit all claims, disputes or matters in question to the Federal or state courts in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any' legal and/or equitable relief.

(Langham Decl., Dkt. No. 16-7, Ex. C ("Agreement 2") § 13.8 (emphasis added).)

According to WWE, each forum selection clause is enforceable and warrants the transfer of this matter to the District of Connecticut.   (*See* Mot.)   Plaintiffs contend that the forum selection clause at issue is unconscionable under California and Connecticut law and should not be enforced.   (*See* Opp.)

After considering the Parties' arguments, the Court finds that this venue to be improper and orders the transfer of this case to the District of Connecticut.

## II.   LEGAL STANDARD

In diversity actions, as the case herein, federal law determines the validity and enforcement of a forum selection clause.   *Bernikow v. Xerox Corp. Long–Term Disability Income Plan*, 2006 WL 2536590, at *1 (C.D. Cal. 2006) (citing *Manetti–Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 513 (9th Cir. 1988)).   Forum selection clauses "are prima facie valid" and should be enforced absent a strong showing by the party opposing the clause "that enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud or overreaching."   *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).

The burden placed on the party opposing enforcement of a forum selection clause is high.

For business or convenience reasons the parties may have bargained that litigation arising from their contract be resolved in one jurisdiction.   Absent some evidence submitted by the party opposing enforcement of the clause to establish fraud, undue influence, overweening bargaining power, or such serious inconvenience in litigating in the selected forum as to deprive that party of a meaningful day in court, the provision should be respected as the expressed intent of the parties.

*Pelleport Investors, Inc. v. Budco Quality Theaters, Inc.*, 741 F.2d 273, 280 (9th Cir. 1984); *see also R.A. Argueta v. Banco Mexicano*, 87 F.3d 320, 325 (9th Cir. 1996) (holding that a forum selection clause can be set aside only if "its incorporation into the contract was the result of fraud," it will deprive a party of its day in court, or it will "contravene a strong public policy of the forum in which the suit is brought").

When a party seeks enforcement of a contract's forum selection clause, a court draws all reasonable inferences in favor of the party opposing the clause's enforcement. *See Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 1998). If it is determined that the clause should be enforced, "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

## III.   DISCUSSION

Plaintiffs have a heavy burden to meet in order to prove that § 13.8 is unenforceable because it is evident that the forum selection clauses extend to claims "arising out of or relating" to these contracts or any of the transactions contemplated by these contracts, and requires those claims to be litigated in Connecticut and nowhere else. (§ 13.8 of Agreement 1, 2.) Its plain language indicates that the parties intended and agreed to litigate disputes in Connecticut, the venue where WWE is headquartered.

### A. The Forum Selection Clause is Valid

Plaintiffs primary argument is that § 13.8 is unconscionable in both California and Connecticut. (*See* Opp., pp. 8-18.)

In order to be deemed unenforceable under California and Connecticut law, a contract must be both procedurally and substantively unconscionable. *Davis v. O'Melveny & Myers,* 485 F.3d 1066, 1070 (9th Cir. 2007) (citations omitted), *overruled on other grounds*, *Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928 (9th Cir. 2013); *see also Smith v. Mitsubishi Motors Credit of America, Inc.*, 247 Conn. 342, 349 (1998) ("[W]e have come to divide this definition into two aspects of unconscionability, one procedural and the other substantive . . . .") (citation omitted).

As for procedural unconscionability, Plaintiffs argue that they were presented these agreements on a "take it or leave it" basis.[2] (Opp., p. 10.) According to Plaintiffs, they were given no opportunity to review or negotiate the contracts because of the vastly disproportionate bargaining power between WWE and Plaintiffs. (*Id*. at pp. 4, 9.)

---

[2] Plaintiffs cite numerous California and Connecticut cases in which courts have considered the unconscionability of a particular contract. (*Id.* citing *Carboni v. Arrospide*, 2 Cal. App. 4th 76, 81 (1991); *Pardee Construction Co. v. Superior Cour*t, 100 Cal. App. 4th 1081, 1088 (2002); *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001); *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 817 (1981); *Neal v. State Farm Ins. Cos.*, 188 Cal. App. 2d 690, 694 (1961); *Fairfield Lease Corporation v. Romano's Auto Service*, 4 Conn. App. 495, 498 (1985); *Smith v. Mitsubishi Motors Credit of America, Inc.*, 247 Conn. 342, 349 (1998).) None of these cases considered a forum selection clause. Furthermore, the use of California and Connecticut case law is misplaced because federal law governs forum selection clauses. *Manetti-Farrow*, 858 F.2d at 513. As such, Plaintiffs' authorities are inapplicable.

Without knowledge as to the contents of these contracts and without legal representation to assist in the interpretation of these clauses, Plaintiffs never fully understood the parameters of the agreements at issue. (*Id*. at pp. 9-10.) With respect to substantive unconscionability, Plaintiffs contend that these contracts are unfairly one-sided because Plaintiffs were allegedly required to give up all their intellectual property rights in exchange for WWE's ability to book them performances. (*Id*. at pp. 11-16 (citing §§ 1.2, 2.5, 3.1, 5.2, 13.7, 13.8 of Agreement 1, 2).) Moreover, Plaintiffs assert that the agreements are unfairly one-sided because "[t]he costs of litigating in Connecticut, a jurisdiction that is among the farthest possible in the United States from California, is unduly burdensome." (Opp, p. 14.) None of these arguments are convincing.

Taking these allegations as true, Plaintiffs' unconscionability arguments against enforcing the forum selection clause still fall far short of satisfying their heavy burden. Under Supreme Court jurisprudence, Plaintiffs' lack of bargaining power and loss of intellectual property rights do not invalidate the forum-selection provision of these agreements. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–95 (1991). As held in *Shute*, "take it or leave it" adhesion contracts do not necessarily render a forum-selection clause unenforceable. *Id*.; *see also Schneider*, 362 F.3d at 1141 (To "decline enforcement of a forum selection merely on the showing of non-negotiability and power difference . . .would disrupt the settled expectations of the parties."). Indeed, federal law requires there to be facts that demonstrate an overweening display of bargaining power. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 591 (1991). That is not the case here. Plaintiffs claim that WWE maintained unequal bargaining power because WWE is the only professional wrestling company in the country, leaving Plaintiffs with no opportunity to find another employer. The Court is hard-pressed to believe that WWE is the *only* professional wrestling company in the country, especially without evidence to support that proposition. WWE may be the largest professional wrestling company in the country but to claim that WWE is only available employer is speculative at best.[3] Regardless, under federal law, neither a difference in bargaining power nor the non-negotiability of the contract is a sufficient reason to set aside the forum selection clause. *See Murphy*, 362 F.3d at 1141. It is whether the forum selection clause is fundamentally unfair or unreasonable that determines the enforceability of a forum selection clause. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–95 (1991). Plaintiffs do not dispute either of these rules; instead, Plaintiffs' unconscionability arguments mainly rely on the *state law* standard of unconscionability. State law arguments that discuss, *inter alia*, the power difference between the parties and the undue

---

[3] Several professional wrestling companies offer similar services as WWE. *See Pagtakhan v. Doe*, No. C 08-2188 SI (pr), 2013 WL 3052865 (N.D. Cal. 2013) (All Pro Wrestling); *Bollea v. World Championship Wrestling, Inc.*, 271 Ga.App. 555 (Ga. App. 2005) (Universal Wrestling Corporation (formerly known as World Championship Wrestling))..

burden of litigating this case in Connecticut are not contentions that rebut the federal law presumption in favor of forum selection clauses. *See Zaborowski v. M.H.N. Gov't Servs., Inc.*, 936 F.Supp.2d 1145, 1152 (N.D. Cal. 2013) ("Adhesion . . . is insufficient to find a contract unconscionable."); *Fireman's Fund Ins. Co. v. M/V DSR Atlantic*, 131 F.3d 1336, 1338 (9th Cir. 1998) (the court held that the plaintiff insurance company was required to litigate in Korea pursuant to clause in bill of lading, despite "serious inconvenience"); *See Murphy*, 362 F.3d at 1141 (rejecting the proposition that unequal bargaining power between the parties renders a forum selection clause unenforceable).

Given that Plaintiffs have not established that the forum selection clause was fundamentally unfair or unreasonable, the forum selection clause is *prima facie* valid. *Manetti-Farrow*, 858 F.2d at 514.

### B. This Action Falls Within § 13.8 of the Booking Agreements

Plaintiffs argue that the forum selection clause does not reach their claims. In particular, Plaintiffs state that "[t]hese contracts do not relate to Plaintiffs' claims as they concern tortious conduct outside the scope of a performer's contract." (Opp., p. 1.)

To determine whether Plaintiffs' claims are encompassed within the forum selection clause, the Court must start with the clause's plain language. *Doe I v. AOL, LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009) ("[T]he plain language of the contract should be considered first."). The forum selection clause here is unambiguous. The parties submit to the exclusive jurisdiction of Connecticut in any and all claims or disputes "arising out of or relating" to this Agreement and the parties to this Agreement hereby "consent[] to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief." (§ 13.8 of Agreement 1, 2.) Thus, phrased in the plain language of the forum selection clause, the question is simply whether Plaintiffs' claims "aris[e] out of or relat[e] to" the Agreement.

Plaintiffs' claims clearly "aris[e] out of" or "relat[e]" to the Agreement. The phrase "arising out of or relating" reaches a broad range of claims. It is certainly broad enough to reach tort claims, as the case herein. Plaintiffs' fraudulent concealment, negligent misrepresentation, negligence, and strict liability claims all allege that WWE pressured Plaintiffs to continue to wrestle despite their neurological injuries and subjected Plaintiffs to dangerous conditions without providing adequate medical care. (*See* Compl.) As WWE notes in its Motion, "[t]here can be no real dispute that the claims asserted by Plaintiffs here involve a determination of who bears the responsibility for bodily injury allegedly sustained while wrestling for WWE pursuant to the Booking Contract." (Mot., p. 16.) The Court therefore finds that these tort allegations relate to Plaintiffs' professional wrestling services for WWE which are services encompassed within the agreements at issue. Similar to *Manetti*, the Ninth Circuit explained that

where tort claims cannot be adjudicated without analyzing whether the parties were in compliance with the contract, they fall within the scope of the forum selection clause. 858 F.2d at 509. Moreover, the Supreme Court has construed "arising out of or relating to this Agreement" to be "easily broad enough to encompass" a claim that the agreement was induced by fraud. *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 406 (1967); *see also AJZN, Inc. v. Yu*, 2013 WL 97916, at *2 (N.D. Cal. Jan. 7, 2013) (concluding that federal and state securities claims and state law fraud claims fell within forum selection clause that applied to "any matter arising out of or in connection with" the agreement). The forum selection clause here is broad enough to encompass all of Plaintiffs' claims related to the business relationship established by these agreements. *See*, *e.g.*, *Stewart Organization, Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987) (finding that because the forum selection clause governed all claims relating to the parties' business relationship evidenced by the contract, it necessarily governed claims that were not contractual in nature).

In short, it is clear that Plaintiffs' claims "relate[] in some way to rights and duties enumerated in the" Agreement, *Manetti-Farrow*, 858 F.2d at 514, so the claims are within the scope of the forum selection clause. These claims are therefore within the scope of the forum selection clause.

### C. Public Policy Favors the Transfer of this Matter

The public policy of the forum is another factor relevant to the district court's § 1404(a) determination. Plaintiffs urge the Court not to enforce this forum selection clause because "it would be unjust and against public policy to force Plaintiffs to litigate these claims outside their home state and chosen forum." (Opp., p. 2.) According to Plaintiffs, having them litigate their claims in a distant court is unreasonable and contravenes public policy. (*Id*.)

A forum selection clause will not be enforced if enforcement of the clause contravenes public policy. *See Doe 1*, 552 F.3d at 1083. If Plaintiffs satisfy their "heavy burden of showing that trial in the chosen forum would be so difficult and inconvenient that the party would effectively be denied a meaningful day in court[,]" then a forum selection clause may be found unenforceable. *Pelleport Investors*, 741 F.2d at 281.

As noted above, the Court is not persuaded that the clause is unconscionable due to any alleged disparity in bargaining power between the two parties or that the contracts unduly burdensome. There is no evidence that the clause was implemented to deprive Plaintiff of its day in court, or to make it unduly inconvenient for Plaintiffs' participation in any proceedings based on the agreement. In fact, public policy would favor transferring this matter in Connecticut based on two reasons. First, WWE is headquartered in Connecticut. Plaintiffs' lawsuit involves claims for concealment which suggests that a

majority of the witnesses and material documentary evidence is located in Connecticut. Second, there are several lawsuits that involve these similar issues that are currently pending in Connecticut. *Singleton et al. v. World Wrestling Entertainment, Inc.*, No. 3:15-cv-00425-VLB[4]; *Haynes III v. World Wrestling Entertainment, Inc.*, No. 3:14-cv-01689-ST, 2015 WL 3905281 (D. Or. 2015) (transferring to District of the Connecticut).   Transferring this case would only continue to promote judicial economy because having one court preside over all of these matters eliminates the possibility of conflicting decisions or duplicative work.   The reduction of inefficiencies ultimately supports WWE's position to enforce this forum selection clause.   Because Connecticut has a nexus to this controversy as the forum to WWE's headquarters and other related cases, the Court concludes that public policy tips in favor of transferring this matter to Connecticut.

For the foregoing reasons, the Court finds that, based on the parties' forum selection clause whereby they agreed to litigate the within claims in Connecticut, venue is improper in this district.   Consistent with § 1406(a), the Court finds that transferring the action to the United States District Court for the District of Connecticut, rather than dismissing it, is in the interests of justice.

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that the forum selection clause in § 13.8 of Plaintiffs' contracts is valid and enforceable.   Because Plaintiffs agreed that the sole and exclusive venue for any legal action brought in connection with these contracts would be in the District of Connecticut, venue is not proper here.

Thus, the Court **GRANTS** WWE's Motion to transfer.   The case will be **TRANSFERRED IMMEDIATELY** to the District of Connecticut.   28 U.S.C. § 1404(a).

**IT IS SO ORDERED.**

---

[4]  The Court hereby takes judicial notice of this case.   Fed. R. Evid. 201.

# *EXHIBIT G*

| | |
|---|---|
| **From:** | McDevitt, Jerry |
| **Sent:** | Tuesday, July 14, 2015 12:34 PM |
| **To:** | Charles LaDuca; Chris Gilreath; 'Konstantine Kyros'; 'Erica Mirabella' |
| **Cc:** | Ben Elga |
| **Subject:** | RE: RE: |

No, I will not be removing you from the dialogue. You were listed on the cover page of the Objections to Magistrate Stewart's opinion and order, which stated that there was no evidence of forum shopping by counsel; and which represented to the Court that each suit against the WWE " was filed by individuals in their home districts". Those statements failed, of course, to apprise the Court that your co- counsel  Mr. Kyros and Ms. Mirabella had in fact filed yet another suit in Texas on behalf of Pennsylvania residents literally the day after the Magistrate concluded there had been forum shopping. Hardly their home district.  Now, despite the fact three federal judges have ruled against these forum shopping efforts, we are told that you all need to see what happens in another case before deciding what to do, a candid admission that the strategy now is to hope for inconsistent results, one of the principal vices of forum shopping noted by the Courts.

We want to be quite sure you are on notice of everything here.

**From:** Charles LaDuca [mailto:charles@cuneolaw.com]
**Sent:** Tuesday, July 14, 2015 12:07 PM
**To:** McDevitt, Jerry; Chris Gilreath; 'Konstantine Kyros'; 'Erica Mirabella'
**Cc:** Ben Elga
**Subject:** RE: RE:

I am not listed in these two cases. Remove me from the string immediately.

Charles J. LaDuca, Esq.
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, Maryland 20814
Tel:  202-789-3960
Fax:  202-789-1813
www.cuneolaw.com

**From:** McDevitt, Jerry [mailto:Jerry.McDevitt@klgates.com]
**Sent:** Tuesday, July 14, 2015 11:52 AM
**To:** Chris Gilreath; 'Konstantine Kyros'; Charles LaDuca; 'Erica Mirabella'
**Subject:** RE: RE:

Chris,I would have thought that your co-counsel would have sent you the opinion, or alternatively that we would get a response from Mr. Kyros, who has presumably read the order and opinion. Either way, I have attached it for you to read. It is a short opinion, only 8 pages in length, and can be summarized easily. The Court has rejected the exact same arguments you presented in the Frazier case.

I do not agree that the state of the law is such that transfer is the appropriate vehicle instead of a dismissal without prejudice under Rule 41. There is not a thing in any case I have ever seen that suggests you cannot take a voluntary dismissal without prejudice in the wrong forum and refile in the forum agreed to by the parties should you and your co-counsel wish to pursue a case in the proper forum. Doing so would reduce the costs of everybody, and eliminate the delay caused by the incessant forum shopping strategy being employed here. Your response plainly indicates that you and your co-counsel hope to generate inconsistent results among the federal jurists who have had to deal with the

1

blatant forum shopping that is ongoing, and been adjudicated by one federal jurist already. Frazier and Osborne are both members of the purported class in all three of the cases which three different federal judges have now ordered be transferred to Conn. Both signed forum selection clauses which were identical or nearly identical to the clauses at issue in the Lograsso case, which your co-counsel agreed should be transferred to Conn, and to the clauses at issue in the California case, which were litigated, upheld, and enforced by the Court.

I would urge all of you to reconsider your position and either dismiss the Frazier and Osborne cases per the above or consent to the transfer based on the forum selection clauses. In the meantime, we will advise the Texas Court that you do not oppose the adjournment of a response date until the transfer motion is decided should that remain necessary. Needless to say, we reserve all rights regarding your continued refusal to honor the forum selection clauses, which in my view is now even more unreasonable than before.

---

**From:** Chris Gilreath [mailto:chrisgil@sidgilreath.com]
**Sent:** Tuesday, July 14, 2015 10:59 AM
**To:** McDevitt, Jerry; 'Konstantine Kyros'; <charles@cuneolaw.com> LaDuca; 'Erica Mirabella'
**Subject:** RE:

Jerry, I am out of town and have not been able to review the California decision as of yet.

Concerning the deadline to file an Answer, we have no objection to deferring the deadline to Answer until no more than 30 days after resolution of the transfer issue.

As you are aware, the state of the law is that transfer is the appropriate vehicle in the case of venue under 1404(a), not dismissal. We need to see what happens with the WDTN decision in Frazier before having additional discussion about the for selection clause issue in other cases.


R. Christopher Gilreath
Gilreath & Associates, PLLC
200 Jefferson Avenue, Suite 711
Memphis, TN 38103
(901) 527-0511


-------- Original message --------
From: "McDevitt, Jerry" <Jerry.McDevitt@klgates.com>
Date: 07/13/2015 3:19 PM (GMT-05:00)
To: 'Konstantine Kyros' <kon@kyroslaw.com>, "<charles@cuneolaw.com> LaDuca" <charles@cuneolaw.com>, Chris Gilreath <chrisgil@sidgilreath.com>, 'Erica Mirabella' <erica@mirabellallc.com>
Subject:

As I trust each of you know by now, the Federal Court in California today issued an order and opinion rejecting all your arguments which you have been making against the forum selection clauses in the contract between talent and WWE, and ordered that purported class action be transferred to Conn. immediately. This is now the third different federal court to order the transfer of your purported class actions to Conn. The other two outstanding claims of Frazier and Osborne both involve alleged members of the purported class, and both men signed forum selection clauses. To avoid further costs and expenses, we would ask that you dismiss the Frazier and Osborne suits without prejudice and if you choose to continue those cases to refile those cases in federal court in Conn.
 We are about to file a transfer motion in the Osborne matter so we would appreciate your prompt advise.

2



**Jerry S. McDevitt**
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: 412-355-8608
Cell: 412-708-9328
Fax: 412-355-6501
jerry.mcdevitt@klgates.com
www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distr bution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jerry.McDevitt@klgates.com.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distr bution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jerry.McDevitt@klgates.com.

The information contained in this message may be attorney-client or work-product privileged and should be treated as confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, destroying the original message and any copies.

# *EXHIBIT H*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

EVAN SINGLETON and VITO LOGRASSO,
individually and on behalf of all others
similarly situated,

                Plaintiffs,

vs.

WORLD WRESTLING ENTERTAINMENT,
INC.,

                Defendant.

Case No. 5:15-cv-00223-LS

## DEFENDANT'S MOTION TO TRANSFER VENUE
## PURSUANT TO 28 U.S.C. § 1404(a) DUE TO
## <u>FORUM-SELECTION CLAUSES IN THE CONTRACTS BETWEEN THE PARTIES</u>

Defendant World Wrestling Entertainment, Inc. ("WWE") hereby moves this Court to

transfer venue from the United States District Court for the Eastern District of Pennsylvania to

the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1404(a)

and the decision of the United States Supreme Court in *Atlantic Marine Constr. Co., Inc. v.*

*United States Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568 (2013). The grounds for this Motion

are set forth in the accompanying memorandum of law, which is incorporated herein by

reference as though fully set forth herein. Briefly stated, the parties in this case all agreed to a

mandatory forum-selection provision establishing the U.S. District Court for the District of

Connecticut as the exclusive forum for any disputes arising out or related in any way to the

contracts for professional wrestling services between the parties. The Supreme Court ruled in

*Atlantic Marine* that a district court should ordinarily transfer a case to the forum specified in a

forum-selection clause unless there are extraordinary circumstances unrelated to the convenience

of the parties. No such circumstances are present here.

Dated:  February 27, 2015                Respectfully submitted,

By:   s/ Matthew H. Haverstick
         Matthew H. Haverstick
         CONRAD O'BRIEN PC
         1500 Market Street
         Centre Square West Tower, Suite 3900
         Philadelphia, PA 19102-1921
         Telephone:  (215) 864-9600
         Facsimile:  (215) 523-9725
         E-mail:  mhaverstick@conradobrien.com

         Jerry S. McDevitt  (pro hac vice pending)
         Curtis B. Krasik  (pro hac vice pending)
         K&L GATES LLP
         Pittsburgh, PA  15222-2613
         Telephone:  (412) 355-6500
         Facsimile:  (412) 355-6501
         E-mail: jerry.mcdevitt@klgates.com

         *Counsel for Defendant*
         *World Wrestling Entertainment, Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

EVAN SINGLETON and VITO LOGRASSO,
individually and on behalf of all others
similarly situated,

                  Plaintiffs,

vs.

WORLD WRESTLING ENTERTAINMENT,
INC.,

                  Defendant.

Case No. 5:15-cv-00223-LS

## **ORDER**

**AND NOW**, this _____ day of _____, 2015, upon consideration of

Defendant World Wrestling Entertainment, Inc.'s ("WWE") Motion to Transfer Venue pursuant

to 28 U.S.C. § 1404(a) Due to Forum-Selection Clauses in the Contracts Between the Parties, **IT**

**IS HEREBY ORDERED** as follows:  Plaintiffs Evan Singleton and Vito Lograsso both are

subject to mandatory forum selection clauses contained in written contracts with WWE.  Based

on those mandatory forum selection clauses, this action shall be transferred from the United

States District Court for the Eastern District of Pennsylvania to the United States District Court

for the District of Connecticut pursuant to *Atlantic Marine Constr. Co., Inc. v. United States*

*Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568 (2013).

_____

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that a copy of the foregoing DEFENDANT WORLD WRESTLING

ENTERTAINMENT, INC.'S MOTION TO TRANSFER VENUE DUE TO FORUM-

SELECTION CLAUSES IN THE CONTRACTS BETWEEN THE PARTIES was served by

the Court's CM/ECF System to all counsel registered to receive electronic notice.


February 27, 2015          s/ Matthew H. Haverstick

                Matthew H. Haverstick

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

EVAN SINGLETON and VITO LOGRASSO,
individually and on behalf of all others
similarly situated,

               Plaintiffs,

vs.

WORLD WRESTLING ENTERTAINMENT,
INC.,

               Defendant.

Case No. 5:15-cv-00223-LS

---

**DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE DUE TO FORUM-SELECTION CLAUSES IN THE CONTRACTS BETWEEN THE PARTIES**

---

Matthew H. Haverstick
CONRAD O'BRIEN PC
1500 Market Street
Centre Square West Tower, Suite 3900
Philadelphia, PA 19102-1921
Telephone:  (215) 864-9600
Facsimile:  (215) 523-9725
E-mail:  mhaverstick@conradobrien.com

Jerry S. McDevitt  (pro hac vice pending)
Curtis B. Krasik  (pro hac vice pending)
K&L GATES LLP
210 Sixth Avenue
Pittsburgh, PA  15222-2613
Telephone:  (412) 355-6500
Facsimile:   (412) 355-6501
E-mail:  jerry.mcdevitt@klgates.com

*Counsel for Defendant*
*World Wrestling Entertainment, Inc.*

# TABLE OF CONTENTS

Page

I.     **BACKGROUND** ...........................................................................................**1**

     A.    Summary of the Allegations .......................................................1

     B.    Plaintiffs Are Subject to Identical Contractual Forum-Selection
          Provisions...................................................................................2

     C.    WWE's Operations and Substantial Relationship to the State of
          Connecticut ................................................................................2

II.    **WWE's ATTEMPTS TO OBTAIN PLAINTIFFS' COMPLIANCE WITH
THE FORUM-SELECTION CLAUSES** .......................................................**3**

III.   **ARGUMENT** ..............................................................................................**7**

     A.    Standard of Review....................................................................7

     B.    The District of Connecticut Has Subject Matter Jurisdiction And Venue
          is Proper in the District of Connecticut....................................9

     C.    The Private Interest Factors Conclusively Require a Transfer ..............................10

     D.    The Public Interest Factors Overwhelmingly Favor a Transfer..........................11

IV.   **CONCLUSION** ........................................................................................**13**

i

# TABLE OF AUTHORITIES

Page

**Cases**

*Asphalt Paving Systems, Inc. v. General Combustion Corp.*, 215 W.L. 167378 (D. N.J. 2015) ......................................................................................................................... 8

*Atlantic Marine Construction Co., Inc. v. United States Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568 (2013) ............................................................................................. passim

*Barbera v. Lowe's Home Ctrs., Inc.*, No. 09–1617, 2009 WL 1362608 (E.D. Pa. May 15, 2009) ..................................................................................................................... 12

*Dawes v. Publish America LLP*, 563 Fed. App. 117 (3d Cir. 2014)................................................ 8

*Depuy v. Edwards*, 23 F. Supp. 3d 472 (E.D. Pa. 2014)................................................................. 9

*Geosonics, Inc. v. Aegean Associates, Inc.*, No. 2:14-cv-908, 2014 WL 7409529 (W.D. Pa. Dec. 31, 2014) ............................................................................................... 10

*Jolly v. Faucett*, No. 06-3286, 2007 WL 137833 (E.D. Pa. Jan. 16, 2007) .................................. 12

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 880 (3d Cir. 1995) ................................................. 11

*Kessler v. Royal Caribbean Cruises, Ltd.*, No. CIV. A. 02-7974, 2002 WL 32130105 (E.D. Pa. Jan. 27, 2003) ............................................................................................. 4

*Mato v. Window World, Inc.*, No. 10–7617, 2011 WL 710473 (E.D. Pa. Feb. 28, 2011) ...... 10, 12

*North Am. Dental Wholesalers, Inc. v. Danaher Corp.*, No. 11–247, 2011 WL 3606866 (E.D. Pa. Aug. 15, 2011)........................................................................................... 12

*Rogal v. Skilstaf, Inc.*, 446 F. Supp. 2d 334 (E.D. Pa. 2006) ................................................. 10, 11

*Saladworks, LLC v. Sottosanto Salads, LLC*, Civil Action No. 13-3764, 2014 WL 2862241 (E.D. Pa. June 24, 2014) .......................................................................... 8

*SKF USA Inc. v. Okkeise*, 992 F. Supp. 2d 432 (E.D. Pa. 2014) ......................................... 3, 8, 13

*Smith v. HireRight Solutions, Inc.*, No. CIV.A. 09-6007, 2010 WL 2270541 (E.D. Pa. June 7, 2010) .......................................................................................................... 10

*Wall Street Aubrey Golf, LLC v. Aubrey*, 189 Fed. Appx. 82, 85 (3d Cir. 2006) .......................... 8

*Wallace v. Mercantile Cnty. Bank*, No. CIV A 06-3974, 2006 WL 3302490 (E.D. Pa. Nov. 9, 2006) ......................................................................................................... 9, 13

ii

**Rules**

28 U.S.C. § 1332(d) ................................................................................................................. 9

28 U.S.C. § 1391(b) ............................................................................................................ 6, 9

28 U.S.C. § 1391(c) ............................................................................................................. 10

28 U.S.C. § 1404(a) ........................................................................................................... 1, 7

iii

Defendant World Wrestling Entertainment, Inc. ("WWE") respectfully submits this Memorandum of Law in support of its Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) Due to Forum-Selection Clauses in the Contracts Between the Parties (the "Motion").

## I.     BACKGROUND

### A.     Summary of the Allegations

Plaintiffs are professional wrestlers who performed their craft for WWE. Both now claim that they suffered head injuries during the time they wrestled for WWE. *See* Compl. ¶¶ 128-136. Plaintiffs assert that WWE allegedly subjected them and other similarly-situated wrestlers to such physical harm and purportedly failed to warn wrestlers about the consequences of head trauma that they purportedly sustained while wrestling for WWE. *See* Compl. ¶ 1. As a result, plaintiffs seek to certify a broad class of "[a]ll persons who currently or formerly wrestled for [WWE] or a predecessor company, and who reside in the United States." Compl. ¶ 134.

Plaintiff Singleton wrestled for WWE from 2012 to 2013. *See* Compl. ¶ 16. Plaintiff LoGrasso alleges that he wrestled for WWE from 1991 to 1998 and from 2005 to 2007. *See* Compl. ¶ 17. This allegation is not accurate. In the 1990s, Mr. LoGrasso was an occasional "jobber." *See* Affidavit of C. Scott Amann ("Amann Aff.") ¶ 6, attached at Tab 1. In wrestling parlance, a "jobber" is a temporary wrestler used on an as-needed basis essentially as a prop to lose to more prominent wrestlers. *Id.* A search of WWE business records found that between 1991 and 1998, WWE only paid Mr. LoGrasso: (i) $650 for four events worked in 1991; (ii) $900 for six events worked in 1992; (iii) $675 for three events worked in 1993; and (iv) $200 for one event worked in 1997. *Id.* ¶ 5. There is no record of any payment by WWE to Mr. LoGrasso in 1994, 1995, 1996, or 1998. *Id.* He did perform for WWE on a more regular basis from 2005-2007 pursuant to a formal contract, as discussed herein.

## B.  Plaintiffs Are Subject to Identical Contractual Forum-Selection Provisions

Each Plaintiff wrestled for WWE pursuant to an agreement called a booking contract (the "Booking Contract").  *See* Affidavit of James W. Langham ("Langham Aff.") ¶ 5 and Exs. A & B, attached at Tab 2.  Each Booking Contract spells out the professional wrestling services to be rendered by Messrs. Singleton and LoGrasso, and the terms of agreement between the parties relating to those services.  *See id.*, Exs. A & B.  Each Plaintiff's Booking Contract contains a mandatory forum-selection clause that requires any and all disputes arising out of or relating in any way to those services to be litigated in the United States District Court for the District of Connecticut.  *See id.*, Exs. A & B § 13.8.  The identical clauses at issue state:

> **The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut**.  The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

*See id.*, Exs. A & B § 13.8 (emphasis added).

In fact, booking contracts typically entered into between WWE and its wrestlers after June 13, 1991, which is a sizeable portion of the putative class, require that disputes arising out of or relating to the booking contracts be litigated in Connecticut.  *See* Langham Aff. ¶ 6.

## C.  WWE's Operations and Substantial Relationship to the State of Connecticut

WWE is an integrated media company principally engaged in the development, production and promotion of television programming and live events featuring its unique brand of wrestling-based sports entertainment.  WWE is a Delaware corporation with its corporate headquarters in Stamford, Connecticut.  *See* Langham Aff. ¶ 4.  The "small group of related executives" whom plaintiffs allege "manage both policies and the conduct of wrestlers during

2

matches," *see* Compl. ¶ 19, all reside in Connecticut and have substantial work responsibilities in

WWE's Connecticut headquarters.  *See* Langham Aff. ¶ 8.  WWE maintains the vast majority of

its business records in Connecticut, either in its corporate headquarters or in an off-site records

storage facility.  *See id.* ¶ 9.  This Court has recognized that a state bears a substantial relationship

to the parties to a forum-selection clause when the corporate party has its principal place of

business and headquarters in the chosen state.  *SKF USA Inc. v. Okkeise*, 992 F. Supp. 2d 432

(E.D. Pa. 2014).

## II.  WWE'S ATTEMPTS TO OBTAIN PLAINTIFFS' COMPLIANCE WITH THE FORUM-SELECTION CLAUSES

On January 23, 2015, WWE's counsel advised plaintiffs' counsel of the forum-selection

clauses and asked for their justification for ignoring those clauses and filing suit in the Eastern

District of Pennsylvania.  None of the multiple law firms representing plaintiffs responded.

Thus, on Monday, February 23, 2015, WWE's counsel again sought plaintiffs' position

regarding their non-compliance with the forum-selection clauses.  *See* Tab 3, pp. 5-7.  WWE's

counsel provided plaintiffs' counsel with the exact language of the forum-selection clauses and

advised of the holding of the United States Supreme Court that such clauses are to be given

controlling weight in all but the most exceptional cases.  *See id.*, p. 6.  Plaintiffs' counsel was

asked either to take a voluntary dismissal under Fed. R. Civ. P. 41 without prejudice and then re-

file in Connecticut or concur in a transfer motion to effectuate the forum-selection clauses.  *See*

*id.*, p. 7.  Lastly, WWE's counsel pointed out that there was no difference between the two

methods because the Supreme Court had made clear that the law of the state which the parties had

agreed to be the forum would supply the choice of law rules once transfer is effectuated.  *See id.*

That simple proposal to plaintiffs' counsel triggered what became a series of evasive

responses emblematic of the gamesmanship condemned by the Supreme Court's controlling

decision of *Atlantic Marine Construction Co., Inc. v. United States Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568 (2013).

First, plaintiffs' counsel indicated they agreed to transfer Mr. Singleton's claims to Connecticut but, inconsistently, refused to agree to transfer Mr. LoGrasso's claims, even though he signed a forum-selection clause identical to Mr. Singleton.[1] *See id.*, p. 4. The only reason provided for their inconsistent position was the erroneous assertion that Mr. LoGrasso "wrestled without any contract for many years of his career." *See id.*[2]

On February, 25, 2015, WWE's counsel urged plaintiffs' counsel to reconsider their inconsistent position, pointing out that both plaintiffs had signed identical forum-selection clauses. *See id.*, pp. 3-4. WWE's counsel also pointed out that it made little sense to split a purported class action into two different venues. *See id*. WWE's counsel concluded by pointing out that the reasons provided for not honoring Mr. LoGrasso's agreement on the proper forum did not constitute the requisite "extraordinary circumstances" required by the Supreme Court. *See id.*, p. 4. Later that same morning, plaintiffs' counsel responded that they would reconsider and "get back to you asap," but indicated that he might need "until first thing tomorrow morning" due to the travel of other counsel. *See id.*, p. 3.

On February 26, 2015, WWE's counsel inquired as to whether plaintiffs' counsel had

---

[1] Counsel for Mr. Singleton conditioned his agreement on WWE agreeing to take Mr. Singleton's deposition in his home town if he is unable to travel, which of course WWE agreed to readily. *See* Tab 3, p.3.

[2] Notably, even prior to *Atlantic Marine*'s strong directive to enforce forum-selection clauses, this Court previously rejected a similar argument by a plaintiff seeking to avoid a mandatory forum-selection clause. *See Kessler v. Royal Caribbean Cruises, Ltd.*, No. CIV. A. 02-7974, 2002 WL 32130105, at *2 (E.D. Pa. Jan. 27, 2003) ("Plaintiffs' first argument appears to be that, because this action involves alleged acts of misrepresentation by Defendant prior to the parties entering the contract in question, venue for the action should not be governed by the forum selection clause in the contract. Initially, the Court notes that Plaintiffs have failed to cite any authority for this argument. In addition, the contention that all of the acts by Defendant complained of by Plaintiffs in this action occurred prior to entering the contract is inaccurate.").

4

reconsidered the transfer of Mr. LoGrasso's claims to Connecticut and provided specific factual

information to counsel correcting the stated basis for refusing to honor the mandatory forum-

selection clause — that he had supposedly performed for many years without a contract.  *See id.*,

p. 2.  It was pointed out that Mr. LoGrasso had wrestled only 4 days in 1991, 6 days in 1992, 3

days in 1993, and 1 day in 1997, before he signed the formal contract in 2005 containing a

forum-selection clause.  Plaintiffs' counsel finally responded later in the afternoon, as follows:

> We do not agree with any of your emails.  Or, that the contract
> applies for either of our clients.  However, we will not oppose a
> 1404(a) transfer for Lograsso and Singleton.  Our clients do not
> waive any rights to challenge the applicability of any alleged
> contract.

*Id.*, p. 1.  No further explanation was given for their response.

Plaintiffs' position appears to be an attempt to avoid the rule articulated by the Supreme

Court in *Atlantic Marine* that "when a party bound by a forum-selection clause flouts its

contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not

carry with it the original venue's choice-of-law rules."  134 S. Ct. at 582.  In rejecting the *Van*

*Dusen* rule that otherwise would apply the state law applicable in the transferor court in the event

of a § 1404(a) transfer, the Supreme Court reasoned that "a plaintiff who files suit in violation of

a forum-selection clause enjoys no 'privilege' with respect to its choice of forum, and therefore it

is entitled to no concomitant 'state-law advantages,"  Not only would it be inequitable to allow

the plaintiff to fasten its choice of substantive law to the venue transfer, but it would also

encourage gamesmanship."  *Id.* at 583.

Such gamesmanship is precisely what plaintiffs are attempting here.  By agreeing to a §

1404(a) transfer of venue but attempting to preserve some argument about whether transfer was

pursuant to the mandatory forum-selection clauses, plaintiffs are seeking avoid the application of

5

the clear law of the Supreme Court cited above.  As the Supreme Court held, "we will not apply the *Van Dusen* rule when a transfer stems from enforcement of a forum-selection clause."  *Id.*

The issue before this Court, therefore, is now squarely presented:  whether to apply the rule of *Atlantic Marine* and transfer this case pursuant to the mandatory forum-selection clauses to which both plaintiffs agreed.

Not only are plaintiffs' personal claims subject to a mandatory forum-selection clause requiring transfer to the District of Connecticut but, as further explained in the Langham Affidavit submitted in support of this Motion, the majority of the putative plaintiff class is subject to similar forum-selection clauses in their WWE contracts mandating the litigation of the purported class' claims in the District of Connecticut as well.

Aside from plaintiffs' gamesmanship, as the parties "defying the forum-selection clause," plaintiffs bear the heavy burden of demonstrating "exceptional circumstances" that transfer is unwarranted pursuant to the mandatory forum-selection clauses.  Plaintiffs cannot meet that burden here, and did not even attempt to do so in the pre-motion correspondence.  For the following reasons, the parties' forum-selection clause and the other Section 1404(a) considerations mandate the transfer of this case to the District of Connecticut.

*First*, the District of Connecticut would have subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, and venue would be proper in the District of Connecticut under 28 U.S.C. § 1391(b) because WWE maintains its principal place of business in the State of Connecticut.

*Second*, because the parties are subject to a mandatory contractual forum-selection clause requiring the action to be litigated in the District of Connecticut, the Supreme Court requires that clause be given controlling weight absent exceptional factors.  There are no such factors here.

6

Plaintiffs each signed contracts to provide professional wrestling services in which they voluntarily agreed to submit "all disputes arising out of or relating in any way" to their agreement in Connecticut, and thereby waived the right to challenge the preselected forum as inconvenient. Under well-established Supreme Court precedent, mandatory forum-selection clauses must be enforced to protect the parties' legitimate expectations, and should be given "controlling weight" in "all but the most exceptional cases." Plaintiffs cannot carry their "heavy" burden of demonstrating any such exceptional circumstances in this case and, in fact, have conceded that transfer is appropriate.

*Third*, the public interest also overwhelmingly favors the transfer of this case to the District of Connecticut. If plaintiffs were to succeed, they would be able to enforce a judgment in the District of Connecticut because WWE is domiciled there. Trial would also be conducted more easily, expeditiously and inexpensively in the District of Connecticut, because most of the witnesses are WWE employees or representatives who work or reside in Connecticut and because WWE's corporate records and other documentary evidence are also located in Connecticut. A transfer would also lighten this District's docket, which is far more congested than that of the District of Connecticut. A transfer would not offend any pertinent public policies because plaintiffs will be able to pursue their claims in the District of Connecticut. Furthermore, the federal courts of Connecticut exercising diversity jurisdiction are more familiar with Connecticut law than this Court, which sits in a different Federal Circuit. Because the public interest factors "will rarely defeat a transfer motion," the forum-selection clause controls and the case should be transferred to Connecticut.

### III. ARGUMENT

#### A. Standard of Review

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the

7

interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Atlantic Marine*, 134 S. Ct. at 581. Thus, where the parties are subject to a valid forum-selection clause, the Court is to give plaintiff's choice of forum "no weight." *Id.*

Forum-selection clauses are "presumptively valid." *Wall Street Aubrey Golf, LLC v. Aubrey*, 189 Fed. Appx. 82, 85 (3d Cir. 2006); *see also Saladworks, LLC v. Sottosanto Salads, LLC*, Civil Action No. 13-3764, 2014 WL 2862241, at *2 (E.D. Pa. June 24, 2014). "The enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Atlantic Marine*, 134 S.Ct. at 581 (internal quotations omitted). "For that reason, and because the overarching consideration under § 1404(a) is whether a transfer would promote the interest of justice, ***a valid forum-selection clause should be given controlling weight in all but the most exceptional cases***." *Id.* (internal quotations and brackets omitted) (emphasis added). Plaintiffs "bear the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.*; *SKF USA, Inc.*, 992 F. Supp. 2d at 432 ("The party opposing a forum selection clause bears the heavy burden of proving that the clause should not be enforced.").

Forum-selection clauses that dictate an exclusive venue, as is the case here, are considered mandatory and presumed to be enforceable. *See Dawes v. Publish America LLP*, 563 Fed. App. 117, 118 (3d Cir. 2014). Here, the forum-selection clause agreed to by the parties uses the word "shall," which also dictates an exclusive venue. *See Wall Street Aubrey Golf*, 189 Fed. Appx. at 85-86 (noting that "shall" suffices, without more, to indicate mandatory intent); *see also Asphalt Paving Systems, Inc. v. General Combustion Corp.*, 215 WL 167378 (D. N.J. 2015)

8

(noting that use of the word "shall" evinces mandatory nature).  As such, the identical forum-selection clauses here are clearly mandatory under controlling law.

To resist application of the otherwise mandatory transfer, the burden is on plaintiffs under *Atlantic Marine* to show extraordinary circumstances unrelated to the convenience of the parties that clearly disfavor a transfer.  Under the analysis now required by *Atlantic Marine*, unlike a typical motion to transfer pursuant to Section 1404(a), the Court "should not consider arguments about the parties' private interests . . . [and in fact] must deem private-interest factors to weigh entirely in favor of the preselected forum."  *Atlantic Marine*, 134 S.Ct. at 582.  *See also Depuy v. Edwards*, 23 F. Supp. 3d 472 (E.D. Pa. 2014) (refusing to consider private interests in 1404 motions as required by *Atlantic Marine*).  Although public interest factors can be considered, "[b]ecause public-interest factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases."  *Id.*

### B. The District of Connecticut Has Subject Matter Jurisdiction And Venue is Proper in the District of Connecticut

In determining whether an action might have been brought in the transferee district, the court assesses whether the transferee district would have jurisdiction over the matter and whether venue would be proper there.  *See Wallace v. Mercantile Cnty. Bank*, No. CIV A 06-3974, 2006 WL 3302490, at *3 (E.D. Pa. Nov. 9, 2006) (granting motion to transfer).  As plaintiffs admit in their Complaint, the District of Connecticut would have subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2).  *See* Compl. ¶ 14.

Likewise, venue is proper in the District of Connecticut.  Pursuant to 28 U.S.C. § 1391(b)(1), a case may be brought in "a judicial district in which any defendant resides . . . ."  Here, WWE maintains its principal place of business, and thus resides, in Connecticut.  *See* 28

U.S.C. § 1391(b)(1) & (c)(1).  Therefore, the first prong of the Section 1404 transfer analysis is met.

### C.       The Private Interest Factors Conclusively Require a Transfer

The private interest factors conclusively mandate transferring this case to the District of Connecticut because plaintiffs are subject to identical mandatory forum-selection clauses that require this case to be litigated in the District of Connecticut.  As the Supreme Court expressly held in *Atlantic Marine*, an analysis of the private interest factors becomes unnecessary when the parties are subject to a forum-selection clause, because the court "must deem the private-interest factors to weigh entirely in favor of the preselected forum."[3]  134 S.Ct. at 582.  The Supreme Court also instructed that the plaintiff's choice of forum is entitled to no weight when a forum-selection clause applies.  *Id.*; *see also Rogal v. Skilstaf, Inc.*, 446 F. Supp. 2d 334 (E.D. Pa. 2006) (party opposing transfer has "heavy burden" to show forum-selection clause should be ignored); *Mato v. Window World, Inc.*, No. 10–7617, 2011 WL 710473, at *3 (E.D. Pa. Feb. 28, 2011) (same); *Geosonics, Inc. v. Aegean Associates, Inc.*, No. 2:14-cv-908, 2014 WL 7409529, at *3 (W.D. Pa. Dec. 31, 2014) (forum selection clause renders plaintiff's choice of forum irrelevant).

Here, each plaintiff's Booking Contract requires that disputes between the parties be litigated in the District of Connecticut.  Plaintiffs voluntarily and expressly agreed that they would bring suit in Connecticut when they signed their respective agreements.  *Atlantic Marine*,

---

[3] Even in the absence of the Supreme Court's holding in *Atlantic Marine*, the individual private interest factors would still favor a transfer to the District of Connecticut.  First, most of the witnesses are WWE executives and employees who reside and/or work in Connecticut.  *See* Langham Aff. ¶ 8.  Second, most of the documentary evidence will also be located in Connecticut.  *See id.* ¶ 9.  Third, plaintiffs' choice of forum would be given less deference because this case is styled as a class action and plaintiffs have not alleged that any of the underlying alleged conduct occurred in Pennsylvania, or that they were injured in Pennsylvania. *See Smith v. HireRight Solutions, Inc.*, No. CIV.A. 09-6007, 2010 WL 2270541, at *3 (E.D. Pa. June 7, 2010) (less deference provided to class action plaintiffs' choice of forum; granting motion to transfer).

134 S.Ct. at 581 (a forum-selection clause "represents the parties' agreement as to the most proper forum"); *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 880 (3d Cir. 1995) (same). Plaintiffs cannot "flout[ their] contractual obligation" to bring suit wherever they please. *Atlantic Marine*, 134 S.Ct. at 581-82. Plaintiffs have blatantly disregarded their contractual obligations to file suit in the District of Connecticut, and thus the Court should transfer this case to that forum where it should have been brought, if at all, in the first instance.

### D. The Public Interest Factors Overwhelmingly Favor a Transfer

The Court in *Atlantic Marine* made clear that only public interest factors are to be considered, but also that such factors rarely suffice to defeat a mandatory forum-selection clause. *See Atlantic Marine*, 134 S.Ct. at 582 ("Public interest factors will rarely defeat a transfer motion."). Thus, the practical effect is that a mandatory forum-selection clause should control.

Public interest factors include: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases." *Jumara*, 55 F.3d at 879-880 (internal citations omitted). Here, all the public interest factors favor a transfer to the District of Connecticut.

*First*, if successful, plaintiffs will be able to enforce a judgment more easily in the District of Connecticut where WWE is domiciled. *Rogal*, 446 F. Supp. 2d at 337 (noting in public interest analysis that it would be easier to enforce judgment in transferee district because defendant is located there).

*Second*, any trial would be conducted more easily, expeditiously and inexpensively in the District of Connecticut because most of the witnesses are WWE employees or representatives

11

who work or reside in Connecticut, including the alleged "small group of related [WWE] executives," *see* Compl. ¶ 21, and because WWE's corporate records and other documentary evidence are also located in Connecticut. *See Barbera v. Lowe's Home Ctrs., Inc.*, No. 09–1617, 2009 WL 1362608, at *3 (E.D. Pa. May 15, 2009) (transferring negligence case in part because much of relevant evidence and witnesses are located in transferee district); *Jolly v. Faucett*, No. 06-3286, 2007 WL 137833, at *3 (E.D. Pa. Jan. 16, 2007) (public interests favored transfer partly because defendants were from transferee district). Transporting these witnesses to Pennsylvania will also be costly, and will significantly burden the "small group of related [WWE] executives" who have substantial work responsibilities in Connecticut.

*Third*, the District of Connecticut's docket is much less congested than that of this District. *See North Am. Dental Wholesalers, Inc. v. Danaher Corp.*, No. 11–247, 2011 WL 3606866, at *6 (E.D. Pa. Aug. 15, 2011) (noting transferee court's "substantially lighter caseload" as favoring transfer); *Mato*, 2011 WL 710473, at *6 (same). For example, through September 2014, the District of Connecticut had 3,044 total pending cases, whereas this District had more than three times as many (10,952). Similarly, the District of Connecticut had less pending cases per judge (381) than this District (508).[4]

*Fourth*, there is no indication that transferring this case to the District of Connecticut would offend any applicable public policy. Plaintiffs will be able to pursue their claims in the District of Connecticut. Moreover, Connecticut has a greater interest in adjudicating claims related to alleged wrongdoings that were allegedly committed by a Connecticut resident. *See North Am. Dental Wholesalers, Inc.*, 2011 WL 3606866, at *6 (California had more substantial

---

[4] *See* Federal Court Management Statistics, available at http://www.uscourts.gov/viewer.aspx?doc=/uscourts/Statistics/FederalCourtManagementStatistics/2014/district-fcms-profiles-june-2014.pdf&page=8 (last visited February 10, 2014).

12

interest in adjudicating suit because it involved conduct of individuals in California and corporation with principal place of business in California); *Wallace*, 2006 WL 3302490, at *4 (Maryland had greater interest in resolving dispute because case involved alleged misconduct by defendant bank with its principal place of business in Maryland). *See also SKF USA, Inc.*, 992 F. Supp. 2d at 432 (noting that state where corporation has principal place of business bears a substantial relationship to the parties.)

*Finally*, judges in the District of Connecticut are likely more familiar with Connecticut law than judges in this District. At a minimum, a court would have to consider Connecticut's choice of law rules because, as the Supreme Court held in *Atlantic Marine*, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules . . . ." 134 S.Ct. at 582.

In sum, the public interest factors conclusively establish that this case should be transferred to the District of Connecticut.

## IV.    <u>CONCLUSION</u>

For all these reasons, the Court should grant WWE's Motion to transfer this case to the District of Connecticut.

13

Dated:  February 27, 2015                          Respectfully submitted,

                                        By:  s/ Matthew H. Haverstick
                                             Matthew H. Haverstick
                                             CONRAD O'BRIEN PC
                                             1500 Market Street
                                             Centre Square West Tower, Suite 3900
                                             Philadelphia, PA 19102-1921
                                             Telephone:  (215) 864-9600
                                             Facsimile:  (215) 523-9725
                                             E-mail:  mhaverstick@conradobrien.com

                                             Jerry S. McDevitt  (pro hac vice pending)
                                             Curtis B. Krasik  (pro hac vice pending)
                                             K&L GATES LLP
                                             210 Sixth Avenue
                                             Pittsburgh, PA  15222-2613
                                             Telephone:  (412) 355-6500
                                             Facsimile:  (412) 355-6501
                                             E-mail: jerry.mcdevitt@klgates.com

                                             *Counsel for World Wrestling Entertainment, Inc.*

14

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing DEFENDANT WORLD WRESTLING

ENTERTAINMENT, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER

VENUE DUE TO FORUM-SELECTION CLAUSES IN THE CONTRACTS BETWEEN THE

PARTIES was served by the Court's CM/ECF System to all counsel registered to receive

electronic notice.


February 27, 2015                                     s/ Matthew H. Haverstick
                                                     Matthew H. Haverstick

15

# TAB 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

EVAN SINGLETON and VITO LOGRASSO,
individually and on behalf of all others
similarly situated,

             Plaintiffs,

                                   Case No. 5:15-cv-00223-LS

vs.

WORLD WRESTLING ENTERTAINMENT,
INC.,

             Defendant.

## AFFIDAVIT OF C. SCOTT AMANN

State of Connecticut  )
                   )  ss:
County of Fairfield   )

     I, C. Scott Amann, being first duly sworn, hereby depose and say:

     1.     I am over eighteen (18) years of age. I have personal knowledge of the matters set forth herein or, where indicated, have reviewed WWE corporate records, and am competent to testify thereto.

     2.     I am employed as the Vice President, Legal and Business Affairs of World Wrestling Entertainment, Inc. ("WWE"). In that capacity, I provide legal counsel to, among other areas, the WWE talent relations department and I have gained direct and substantial knowledge of such areas of WWE's business.

3.      I am aware of the lawsuit filed by Evan Singleton and Vito LoGrasso against WWE and have reviewed the allegations asserted in Messrs. Singleton's and LoGrasso's Complaint.

4.      In response to the allegation that Mr. LoGrasso supposedly wrestled with WWE from 1991 to 1998, I supervised a search of WWE business records reflecting payments to Mr. LoGrasso to assess the accuracy of the allegation that Mr. LoGrasso wrestled with WWE in those years.

5.      The search found that, between 1991 and 1998, WWE only paid Mr. LoGrasso as follows: (i) $650 for four events worked in 1991; (ii) $900 for six events worked in 1992; (iii) $675 for three events worked in 1993; and (iv) $200 for one event worked in 1997. There is no record of any payment by WWE to Mr. LoGrasso in 1994, 1995, 1996, or 1998.

6.      The minimal payments to Mr. LoGrasso in 1991, 1992, 1993, and 1997 for only a handful of events indicate that Mr. LoGrasso was not a full-time wrestler with WWE in any of those years, but rather was a sporadically-used, temporary "jobber." In wrestling parlance, a "jobber" is a temporary wrestler used on an as-needed basis essentially as a prop to lose to more prominent wrestlers.

C. Scott Amann, Vice President, Legal and Business Affairs

Subscribed and sworn to before me this 26ᵗʰ day of February, 2015.

Notary Public
My Commission Expires:      **JANET P. COLE**
                             **NOTARY PUBLIC**
                             **MY COMMISSION EXPIRES MARCH 31, 2019**

# TAB 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

EVAN SINGLETON and VITO LOGRASSO,
individually and on behalf of all others
similarly situated,

              Plaintiffs,

vs.

WORLD WRESTLING ENTERTAINMENT,
INC.,

              Defendant.

Case No. 5:15-cv-00223-LS

## **AFFIDAVIT OF JAMES W. LANGHAM**

State of Connecticut  )
                  )  ss:
County of Fairfield   )

      I, James W. Langham, being first duly sworn, hereby depose and say:

      1.      I am over eighteen (18) years of age.  I have personal knowledge of the matters set forth herein or, where indicated, have reviewed WWE corporate records, and am competent to testify thereto.

      2.      I am employed as the Senior Vice President and Assistant General Counsel of World Wrestling Entertainment, Inc. ("WWE").  In that capacity, I assist in the oversight of WWE's legal department and I have gained direct and substantial knowledge of WWE's business operations.

3. WWE is an integrated media company principally engaged in the development, production, and promotion of television programming and live events, featuring its unique brand of wrestling-based sports entertainment.

4. WWE is a Delaware corporation with its corporate headquarters in Stamford, Connecticut.

5. Plaintiffs Evan Singleton and Vito Lograsso each wrestled for WWE pursuant to an agreement called a booking contract (the "Booking Contract"). Attached at Exhibits A and B, respectively, are true and correct copies of Messrs. Singleton's and Lograsso's Booking Contracts. Each Plaintiff's Booking Contract contains the identical mandatory forum selection clause that requires their claims to be litigated in the United States District Court for the District of Connecticut. Specifically, the clauses at issue state:

> The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

See Exhibits A and B, ¶ 13.8.

6. In fact, booking contracts typically entered into between WWE and its wrestlers after June 13, 1991 require that any disputes arising out of or relating to the booking contracts be litigated in Connecticut.

7. Each Plaintiff's Booking Contract also contains a choice of law provision that states: "This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law." See Exhibits A and B, ¶ 13.7.

8.      The WWE executives identified in Plaintiff's Complaint, specifically, the "small group of related executives whom Plaintiff alleges "tightly control" WWE, *see* Complaint ¶ 19, all reside in Connecticut and have substantial work responsibilities in WWE's Connecticut headquarters.  Additionally, the vast majority, if not all, of WWE's employees who would have discoverable information regarding Plaintiff's claims also work out of WWE's Connecticut headquarters.

9.      WWE maintains the vast majority of its business records in Connecticut, either in its corporate headquarters or in an off-site records storage facility.


_____

James W. Langham, Senior Vice President and
Assistant General Counsel


Subscribed and sworn to before me
this _24_ day of February, 2015.

_____
Notary Public
My Commission Expires:  11/30/18


        AMY L. ANNUCCI
        NOTARY PUBLIC
MY COMMISSION EXPIRES NOVEMBER 30, 2018

# Exhibit A



# WORLD WRESTLING ENTERTAINMENT, INC.
## BOOKING CONTRACT

This World Wrestling Entertainment, Inc. Booking Contract ("Agreement"), made effective as of the date World Wrestling Entertainment, Inc. executes said Agreement ("Effective Date"), by and between WORLD WRESTLING ENTERTAINMENT, INC., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "PROMOTER"), and EVAN MITCHELL SINGLETON, an individual residing at 1115 Wheatland Avenue, Apt. G5, Lancaster, Pennsylvania 17603 (hereinafter referred to as "WRESTLER").

## PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business throughout the world of organizing, publicizing, arranging, staging, conducting professional wrestling exhibitions and/or Events, as defined below, and representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness and personality; and

WHEREAS, PROMOTER has established a worldwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and/or Events, as defined below, and PROMOTER has established a network of cable, satellite and internet organizations which regularly broadcast, transmit, stream and exhibit PROMOTER's professional wrestling Events on a pay-per-view and subscription basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or Events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and Events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange professional wrestling exhibitions and/or Events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound, do hereby agree as follows:

## 1. BOOKING

1.1     WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

1

(a)     During the Term, the exclusive worldwide rights to WRESTLER's services, appearances, and/or performances in the entertainment industry. Without limiting the generality of the foregoing, such worldwide rights shall include, without limitation, the right to engage WRESTLER's services, appearances, and/or performances in: (i) those professional wrestling matches designated by PROMOTER and those other events, engagements, appearances, filmings, photography shoots, autograph signings and other business and charitable events designated by WWE relating to professional wrestling or sports entertainment, whether or not staged before a live audience, in a television broadcast studio, on location or otherwise (collectively, the "Events"); and (ii) all other events, engagements, appearances, filmings, photography shoots, autograph signings and other business and charitable events that are not related to professional wrestling or sports entertainment in connection with movies, films, commercials, product endorsements, videos, television programs, radio, magazines, books, theatre, Internet or any other media in the entertainment industry (collectively, "Other Appearances"). Pursuant to Section 13.5 herein and during the Term of this Agreement, WRESTLER acknowledges and agrees that PROMOTER, in its sole discretion, shall have the right to assign WRESTLER's obligations under this Agreement for any period of time as PROMOTER sees fit to other promoters in order to enhance or improve WRESTLER's overall wrestling abilities, in-ring skills, conditioning, or other attributes deemed necessary by PROMOTER.

(b)     During the Term and thereafter as provided for in this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as the right to exhibit, broadcast and transmit the Footage, as defined in Section 2.1, via closed circuit transmission, pay-per-view transmission, subscription transmission (e.g., subscription video on demand), video on demand transmission, video exhibition, or any other medium now known or hereinafter discovered.

(c)     During the Term of this Agreement and thereafter as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of WRESTLER Intellectual Property, as defined herein below, through any means whatsoever including internet websites, merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2     In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER faithfully and fully performs all obligations hereunder, PROMOTER shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in PROMOTER's sole discretion, in wrestling matches and at various Events.

## 2. WORKS

2.1     WRESTLER hereby grants to PROMOTER the exclusive right during the Term to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for or related to the Events or for or related to any and all of the services performed by WRESTLER pursuant to the terms herein. (These recordings by tape, film, photograph, disc, or otherwise are collectively referred to herein as the "Footage").

2.2     Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, or otherwise disseminate the Footage in perpetuity by any form of media, now or hereafter devised (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television, the internet, video on demand, and subscription video on demand).

2

2.3    WRESTLER's appearance, performance and work product in connection in any way with the Events, Footage, WRESTLER's services and the rights granted herein shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all Footage and all of the rights, results, products and proceeds in and to, or derived from the Events, Footage, WRESTLER's services and the rights granted herein (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with the Events, Footage, WRESTLER's services and the rights granted herein) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of PROMOTER and/or on behalf of PROMOTER's designee.

2.4    If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and PROMOTER shall own such Development. All Footage and Developments referred to in this Agreement are collectively referred to as "Works".

2.5    All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement. To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby irrevocably assigns in perpetuity to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

### 3. INTELLECTUAL PROPERTY

3.1    All service marks, trademarks and other distinctive and identifying indicia used by WRESTLER prior to the Effective Date in connection with the business of professional wrestling, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "WRESTLER Intellectual Property") are described and identified on Exhibit A attached hereto and incorporated herein by reference. WRESTLER hereby assigns to PROMOTER the right during the Term and thereafter as provided for in this Agreement including any Sell Off Period set forth in Section 4.3 and PROMOTER hereby accepts all worldwide right, title and interest in and to WRESTLER's Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the WRESTLER Intellectual Property. WRESTLER further acknowledges and agrees that PROMOTER shall own in perpetuity all Footage, as defined in Section 2.1 of the Agreement, and that PROMOTER shall have perpetual rights in the Footage, as set forth in Section 2.2 of this Agreement.

3.2    Except for the WRESTLER Intellectual Property specifically set forth on Exhibit A, any intellectual property rights, including but not limited to trademarks, service marks, copyrighted works, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with

3

WRESTLER's performance in the business of professional wrestling or sports entertainment which were procured, owned or created by PROMOTER during the Term or those which were procured, owned or created by PROMOTER prior to the Term and which are described and identified on Exhibit B attached hereto and incorporated herein by reference (collectively the "PROMOTER Intellectual Property") shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

3.3     PROMOTER may from time to time during the Term create or develop trademarks, service marks, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which WRESTLER acknowledges shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement. In addition, WRESTLER agrees to assign and relinquish to PROMOTER any and all claims of ownership and/or good will that may be acquired by WRESTLER now or in the future to and from such character name and image. With respect to all of the foregoing, WRESTLER agrees to immediately execute an amendment to this Agreement to add to Exhibit B any additional intellectual property rights created pursuant to this Section 3.3 as PROMOTER Intellectual Property.

3.4     WRESTLER Intellectual Property and PROMOTER Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

3.5     WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving PROMOTER's rights in and to the Intellectual Property. In connection herewith, WRESTLER acknowledges and hereby grants to PROMOTER the exclusive worldwide right during the Term of this Agreement (with respect to WRESTLER Intellectual Property) and in perpetuity (with respect to PROMOTER Intellectual Property) to apply for and obtain trademarks, service marks, copyrights and other registrations throughout the world in PROMOTER's name and/or on behalf of PROMOTER's designee and to enforce any and all of PROMOTER's rights therein. At PROMOTER's expense and request, PROMOTER and WRESTLER shall take such steps, as PROMOTER deems necessary, for any registration or any litigation or other proceeding, to protect and enforce any and all of PROMOTER's rights in the WRESTLER Intellectual Property and/or PROMOTER Intellectual Property and/or Works. Further, WRESTLER authorizes PROMOTER to execute any documents on his behalf that are required by the U.S. Patent and Trademark Office in order to protect the aforementioned Intellectual Property.

## 4. MERCHANDISING

4.1     WRESTLER hereby agrees that PROMOTER shall have the exclusive right in perpetuity to use and exploit WRESTLER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all copyrighted work incorporating the WRESTLER Intellectual Property. PROMOTER shall own in perpetuity all copyrights in such copyrighted work and PROMOTER shall be entitled to obtain copyright registrations in PROMOTER's name or on behalf of its designee. WRESTLER shall provide all reasonable assistance to PROMOTER in so obtaining such copyright registrations, and WRESTLER authorizes PROMOTER to execute any documents on WRESTLER's behalf as attorney-in-fact that are required by the United States Copyright Office.

4.2     In addition to the perpetual rights to use and exploit WRESTLER Intellectual Property as set forth in Section 4.1 of this Agreement, WRESTLER agrees that during the Term and any applicable Sell Off Period as

4

provided for in this Agreement, PROMOTER shall have the exclusive right to use, exploit, and license the WRESTLER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of goods and merchandise incorporating the WRESTLER Intellectual Property.

4.3     Sell Off Period.  Upon the expiration or termination of this Agreement, PROMOTER shall have the right to sell any goods and merchandise in inventory, on hand or manufactured containing WRESTLER Intellectual Property for a period of ninety (90) days immediately following such expiration or termination ("Sell Off Period") provided, however, that: (i) there shall be no restriction on PROMOTER's rights to use or exploit WRESTLER Intellectual Property in connection with the perpetual rights granted herein by WRESTLER; and (ii) with respect to goods, merchandise and/or programming that include the WRESTLER Intellectual Property regarding which PROMOTER has made a material time, resources and/or financial investment prior to expiration or termination of this Agreement and which have a commercial life that extends beyond the Sell Off Period (including, without limitation, video games, animated books and/or television programs, etc.), PROMOTER shall have the right to continue development and exploitation of such goods, merchandise and/or programming until the end of the commercial life thereof.

4.4     Book Rights.  WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the licensing, sublicensing, manufacture, distribution, publication, and exploitation of WRESTLER's autobiography or authorized biography (collectively "Book Rights").

4.5     Publishing Rights.  WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the creation and sale of certain movies, or other forms of media now known or hereinafter discovered, as PROMOTER shall determine in its sole discretion (collectively "Publishing Rights").

4.6.    Auction Sale Rights.  WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to sell via the Internet, television or through any other distribution method now known or hereafter created, by an auction method, any item containing WRESTLER Intellectual Property which shall include but not be limited to items containing WRESTLER's signature ("Auction Sale").

## 5. EXCLUSIVITY

5.1     It is the understanding of the parties that, during the Term, the worldwide rights to WRESTLER's services, appearances and/or performances in the entertainment industry, whether related to professional wrestling, sports entertainment or Other Appearances, are exclusive to PROMOTER.  Without limiting the generality of the foregoing, it is the further understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER hereunder are exclusive to PROMOTER even to the exclusion of WRESTLER.

5.2     In the event WRESTLER desires upon reasonable notice to PROMOTER during the Term either individually or through his authorized representatives to participate in Other Appearances, whether or not procured by PROMOTER, WRESTLER may do so only subject to and conditioned upon PROMOTER's

APPENDIX - Page 179

express, written approval and provided that a written sublicense is executed between PROMOTER, WRESTLER, and any relevant third parties ("Permitted Activities"), and further provided that WRESTLER shall not utilize the Intellectual Property in any manner in connection with such Permitted Activities without PROMOTER's written consent. Notwithstanding the foregoing, it is agreed that PROMOTER retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term of this Agreement, as defined herein. It is further agreed that PROMOTER shall receive from WRESTLER a management fee to reimburse PROMOTER for its reasonable administrative costs incurred in connection with WRESTLER's participation in each such Permitted Activity provided that PROMOTER's costs shall not be less than ten percent (10%) of any fees received by WRESTLER for each such Permitted Activity described herein. Additionally, all monies earned by WRESTLER from such Permitted Activities in a specific Contract Year shall be credited against the Minimum Annual Compensation for that Contract Year as set forth in paragraph 7.1 below.

## 6. TERM AND TERRITORY

6.1    Unless terminated pursuant to the terms herein, the term of this Agreement shall be for three (3) years from the Effective Date ("Term"). Each consecutive twelve (12) month period during the Term commencing with the Effective Date shall be referred to as a "Contract Year".

6.2    Notwithstanding anything herein to the contrary, termination of this Agreement for any or no reason shall not affect PROMOTER's ownership of and rights in or to any intellectual property rights, including but not limited to, any Works, PROMOTER Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in Sections 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.3    The territory of this Agreement shall be the world ("Territory").

## 7. PAYMENTS/ROYALTIES

7.1    (a)    Unless terminated pursuant to the terms herein, PROMOTER shall pay WRESTLER each Contract Year the total sum of Thirty One Thousand Two Hundred US Dollars (US$31,200.00) (referred to hereinafter as "Minimum Annual Compensation"). PROMOTER agrees, commencing with the Effective Date, to pay WRESTLER the Minimum Annual Compensation in fifty-two (52) weekly installments consistent with PROMOTER's regular payment procedures.

(b)    Moving Expenses:    In further consideration of WRESTLER's obligations hereunder, PROMOTER shall, in addition to the amounts set forth in paragraph 7.1(a) above, pay WRESTLER a one-time moving allowance to assist WRESTLER's relocation from Lancaster, Pennsylvania to Tampa, Florida in the amount of Two Thousand US Dollars ($2,000.00) within fifteen (15) calendar days after PROMOTER executes this Agreement.

(c)    PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any fines levied against WRESTLER, as provided for in Sections 8.3 or 9.13(a); any costs or expenses paid by PROMOTER on behalf of WRESTLER, as provided for in Sections 8.1 and 9.13(b); or any deductions permitted as set forth in Section 7.13 and 10.2(b). PROMOTER shall also have the right to credit against the Minimum Annual Compensation: (i) any royalties earned by WRESTLER; (ii) any payments made to WRESTLER by PROMOTER in accordance with Section 7.2; and/or (iii) any other payments due or earned by WRESTLER for the rights granted herein or pursuant to the terms of this Agreement. For the purposes of this Agreement, any royalty payments due shall be deemed "earned" only at the time they are paid to WRESTLER.

6

(d)     Unless terminated for breach pursuant to Sections 12.1(a) through (f) and 12.2, if applicable, at least one hundred twenty (120) days after each Contract Year, if it is determined that WRESTLER has earned more than the Minimum Annual Compensation for services rendered during that Contract Year, WRESTLER shall be paid subject to any permitted deductions or credits in accordance with Section 7.1(c), in a one lump sum the difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during that Contract Year.

7.2     (a)     If WRESTLER appears and performs in any Non-Televised Live Event, defined as an Event produced by PROMOTER in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast as set forth in  Sections 7.2 (b) and 7.2 (c) below, WRESTLER shall be paid by PROMOTER an amount equal, in PROMOTER's sole discretion,  to such percentage of the paid receipts for such Non-Televised Live Event only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such Non-Televised Live Event.

(b)     If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is taped or broadcast for use on PROMOTER's television network ("TV Taping"), WRESTLER shall be paid by PROMOTER, in its sole discretion, an amount only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such TV Taping.

(c) .     If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is aired or broadcast via satellite broadcast or pay-per-view distribution technology for use by PROMOTER ("Pay-Per-View"), WRESTLER shall be paid by PROMOTER an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3     Licensed Product Sale

(a)     Licensed Product Sale--Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to the Licensed Product Sale.  Licensed Products' Net Receipts means the gross amount received by PROMOTER from a Licensed Product Sale less expenses incurred by PROMOTER or its licensing agent.

"Licensed Product Sale" shall mean the sale, other than an Auction Sale as defined in Section 7.7, of any product, merchandise, consumer material or good, other than Books as defined in Section 7.8 and Pay Per View DVD/Home Videos as defined in Section 7.6(a), which is made pursuant to a license agreement between PROMOTER and a party wherein a party is granted the contractual right and obligation to manufacture, distribute, and sell the product, merchandise, consumer material or good to wholesale and/or retail customers through designated distribution channels.

"Other PROMOTER Talent" shall mean a professional wrestler who has an agreement with PROMOTER and to whom PROMOTER is obligated to pay royalties.

(b)     Licensed Product Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, PROMOTER

7

shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.4     Direct Sale and Direct Venue Sale

(a)     Direct Sale---Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Sale, WRESTLER shall be paid five percent (5%) of the Direct Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Sale reduced by returns. "Direct Sale" shall mean a sale by PROMOTER by any method other than a Licensed Product Sale, Auction Sale, or a Direct Venue Sale, as defined in Section 7.4(c), wherein PROMOTER has or retains the right and/or obligation to manufacture, distribute or sell any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, to an end user and where such sale may be made by any distribution method (e.g., catalog, television or any internet site owned or controlled by PROMOTER).

(b)     Direct Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Sale, PROMOTER shall allocate five percent (5%) of the Direct Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

(c)     Direct Venue Sale---Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, WRESTLER shall be paid five percent (5%) of the Direct Venue Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Venue Sale reduced by any expenses charged to PROMOTER by the venue for the sale of the product, merchandise, consumer materials or goods. "Direct Venue Sale" shall mean the sale by PROMOTER of any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, which occurs in or about the venue of a PROMOTER live event.

(d)     Direct Venue Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, PROMOTER shall allocate five percent (5%) of the Direct Venue Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.5     Featured Performer

(a)     Licensed Product Sales.  If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Licensed Product Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.3(b), PROMOTER shall pay five percent (5%) of the Net Receipts paid to PROMOTER with respect to the Licensed Product Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(a) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.  For the purposes of this Section 7.5, PROMOTER shall determine in its sole discretion whether WRESTLER shall be deemed a "Featured Performer".

(b)     Direct Sale.  If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(b), PROMOTER

8

shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(b) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

(c)     Direct Venue Sale. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Venue Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(d), PROMOTER shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Venue Sale of the DVD and/or home video to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(c) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

7.6     Pay Per View DVD/Home Video

(a)     Sold By Licensees As A Single Unit. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of "Pay Per View DVD/Home Videos" which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(a) less any and all costs incurred by PROMOTER or its licensing agent. "Pay Per View/DVD Home Videos" shall mean a DVD and/or home video produced by PROMOTER which is a reproduction of an entire live pay per view event, as set forth in Section 7.2(c).

(b)     Sold By Licensees As A Collection Set. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a collection set featuring multiple Pay Per View DVD/Home Videos (e.g., Wrestlemania Box Set") ("Collection Set"), which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the Net Receipts as defined in Section 7.6(a) to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

(c)     Sold By PROMOTER As A Single Unit. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of Pay Per View DVD/Home Videos which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER

9

Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage, as set forth in Section 7.2(c), that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(c) less any and all costs incurred by PROMOTER or its licensing agent.

(d)     Sold By PROMOTER As A Collection Set. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a Collection Set which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the Net Receipts, as defined in Section 7.6(c), to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

7.7     Auction Sale

(a)     Sole Performer. In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent, WRESTLER shall be paid thirty five (35%) percent of the "Net Sales", defined as the gross revenue received for an Auction Sale less (i) the cost of goods related to the item sold; (ii) any shipping or freight charges; and (iii) PROMOTER's administrative fee which shall be equal to thirty (30%) percent of the gross revenue received from the Auction Sale of the item sold.

(b)     Other Performers. In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used together with intellectual property of Other PROMOTER Talent, PROMOTER shall allocate thirty five (35%) percent of the "Net Sales" defined in Section 7.7 (a) to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such product pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.8     Book Sales. In the event that pursuant to the rights granted in Section 4.4 above, PROMOTER publishes or grants to a third party the right to publish WRESTLER's autobiography ("Book"), WRESTLER shall be paid an amount which shall be equal to fifty percent (50%) of the "Licensed Products' Net Receipts" less the cost of any photography, illustration and/or writer fees. For the purpose of this Section 7.8, "Licensed Products' Net Receipts" shall mean the gross amount received by PROMOTER from the publication, sale and distribution of the Book less any out of pocket expenses incurred or paid by PROMOTER, other than photography, illustration and/or writer fees which are the sole responsibility of WRESTLER.

7.9     Publishing Rights. As respects WRESTLER's compensation in connection with PROMOTER's or PROMOTER's designee's exploitation of the Publishing Rights granted to PROMOTER as set forth in Section 4.5, the parties shall negotiate in good faith for a period of thirty (30) days commencing immediately after PROMOTER advises WRESTLER that PROMOTER desires to exploit the Publishing Rights ("Negotiation Period"). However, upon the expiration of the Negotiation Period, if the parties have not agreed on the compensation to be paid WRESTLER for PROMOTER's exploitation of the Publishing Rights, the parties agree that WRESTLER shall be paid an amount that is equal to the lowest compensation paid by PROMOTER within the previous three (3) years to Other PROMOTER Talent who have received payment for PROMOTER's exploitation of such talent's own Publishing Rights.

10

7.10    Subject to paragraph 12.2, as it relates to WRESTLER's appearance or performance of any services pursuant to this Agreement, including the appearance and or performance of WRESTLER's services at Events or at other activities conducted by PROMOTER, WRESTLER shall be eligible only for the payments and royalties specifically set forth in Sections 7.1 through 7.9.

7.11    <u>No Royalties Paid to WRESTLER</u>. Except as specifically set forth in Section 7.1 through 7.9 above, WRESTLER shall not be eligible for any payment or royalties with respect to any other goods, services or otherwise including without limitation to the following: television license fees; television subscription fees; internet subscription fees; subscription video on demand fees; magazine subscription fees and/or advertising; and/or distribution fees of any kind paid to PROMOTER by any entity in connection with the exploitation of the Intellectual Property.

7.12    All payments made to WRESTLER are in full without withholding, except where required by law. After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.13    If WRESTLER at any time during the Term is unable to wrestle for six (6) consecutive weeks due to an injury suffered while performing services at PROMOTER's direction, PROMOTER may: (i) for every Non-Televised Live Event or TV Taping, as described in Sections 7.2(a) and (b), reduce the Minimum Annual Compensation by .5%; and/or (ii) for every Pay-Per-View as described in Section 7.2(c), reduce the Minimum Annual Compensation by the average pay received by WRESTLER for the three (3) immediately preceding Pay-Per-Views or, if WRESTLER appeared in fewer than three (3) Pay-Per-Views, then the average WRESTLER receives for such similar events ("Similar Event") or .5% if WRESTLER did not appear in any such Similar Event.

7.14    (a)    PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

        (b)    PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business.    WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice.    Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations. WRESTLER shall not audit PROMOTER's books and records more than twice during any calendar year and no such audit shall be conducted later than six (6) months after the most recent statement of royalties is given, delivered or sent to WRESTLER.    Each audit is limited to five (5) days in duration.    Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

        (c)    WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless an audit has been conducted by WRESTLER to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

        (d)    No claim shall be filed pursuant to Section 13.8 below against PROMOTER or PROMOTER's affiliates that disputes any statement of royalties or accounting given by PROMOTER hereunder or that makes

11

any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to Sections 7.14(b) and (c) above.

## 8. PROMOTER'S OBLIGATIONS

8.1     Although under Section 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining such licenses, which shall include any permits, visas, or otherwise, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2     PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

        (a)     In connection with WRESTLER's appearances and performance at any Events produced by PROMOTER and staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

        (b)     In connection with the production, distribution, and exploitation of the Footage, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication; and

        (c)     In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3     PROMOTER shall schedule the Events and book WRESTLER for the Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time. If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then PROMOTER may fine, suspend or terminate WRESTLER in its sole discretion.

8.4     Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

APPENDIX - Page 186

## 9. WRESTLER'S OBLIGATIONS

9.1     WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2     WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

        (a)     WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise; and

        (b)     WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs.

9.3     WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events (except for those transportation costs which are covered by PROMOTER's then current Travel Policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events.

9.4     WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5     WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to himself and to others in any and all Events. These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match. In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6     WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this Section 9.6 shall cause a forfeiture of any payments due WRESTLER pursuant to Section 7 and shall entitle PROMOTER to terminate this Agreement, or suspend WRESTLER without pay, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement. If PROMOTER in its discretion suspends this Agreement, when reinstated, PROMOTER may extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof and this Agreement will therefore continue to be of full force and effect throughout the remainder of the Term.

13

9.7     WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, including without limitation, appearing at and participating in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter discovered, including without limitation free, cable, pay cable, subscription video on demand, video on demand and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture and Internet), at times and places designated by PROMOTER, in connection therewith.

9.8     WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Footage and/or the exercise of any other rights respecting WRESTLER and/or PROMOTER Intellectual Property, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to the WRESTLER and/or PROMOTER Intellectual Property are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's written consent.  WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.9     WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER's appearance and/or performance in a professional wrestling match.

9.10    WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them by reason of WRESTLER's breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of the harmless against any and all claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them, arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked.

9.11    WRESTLER shall be responsible for payment of all of WRESTLER's own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon retirement from professional wrestling.

9.12    (a)     **WRESTLER SHALL BE RESPONSIBLE FOR HIS OWN COMMERCIAL GENERAL LIABILITY INSURANCE, WORKER'S COMPENSATION INSURANCE, PROFESSIONAL LIABILITY INSURANCE, AS WELL AS ANY EXCESS LIABILITY INSURANCE, AS HE DEEMS APPROPRIATE TO INSURE, INDEMNIFY AND DEFEND WRESTLER WITH RESPECT TO ANY AND ALL CLAIMS ARISING OUT OF HIS OWN ACTS, TRANSACTIONS, OR CONDUCT AS A PROFESSIONAL WRESTLER.**

14

(b) **WRESTLER ACKNOWLEDGES THAT THE PARTICIPATION AND ACTIVITIES REQUIRED BY WRESTLER IN CONNECTION WITH HIS PERFORMANCE IN A PROFESSIONAL WRESTLING EXHIBITION MAY BE DANGEROUS AND MAY INVOLVE THE RISK OF SERIOUS BODILY INJURY, INCLUDING DEATH. WRESTLER KNOWINGLY AND FREELY ASSUMES FULL RESPONSIBILITY FOR ALL SUCH INHERENT RISKS AS WELL AS THOSE DUE TO THE NEGLIGENCE OF PROMOTER OR OTHER WRESTLERS.**

(c) **WRESTLER HEREBY RELEASES, WAIVES AND DISCHARGES PROMOTER FROM ALL LIABILITY TO WRESTLER AND COVENANTS NOT TO SUE PROMOTER FOR ANY AND ALL LOSS OR DAMAGE ON ACCOUNT OF INJURY TO THEIR PERSON OR PROPERTY OR RESULTING IN SERIOUS OR PERMANENT INJURY TO WRESTLER OR IN WRESTLER'S DEATH, WHETHER CAUSED BY NEGLIGENCE OF PROMOTER OR OTHER WRESTLERS UNDER CONTRACT TO PROMOTER.**

(d) **NOTWITHSTANDING PROMOTER'S CURRENT POLICY OF PAYING MEDICAL EXPENSES FOR INJURIES WRESTLER MAY INCUR WHILE PERFORMING UNDER THIS AGREEMENT, WRESTLER SHALL MAINTAIN, AT HIS COST AND EXPENSE, HEALTH INSURANCE COVERAGE. THIS HEALTH INSURANCE MUST REMAIN IN EFFECT FOR THE TERM OF THE AGREEMENT, AND WRESTLER SHALL PROVIDE PROMOTER PROOF OF THIS INSURANCE ANNUALLY. WRESTLER MAY AT HIS ELECTION OBTAIN HEALTH, LIFE AND/OR DISABILITY INSURANCE TO PROVIDE BENEFITS IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF OTHER PROFESSIONAL ACTIVITIES; AND WRESTLER ACKNOWLEDGES THAT PROMOTER SHALL NOT HAVE ANY RESPONSIBILITY FOR SUCH INSURANCE OR PAYMENT IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF HIS PROFESSIONAL ACTIVITIES.**

(e) **IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF WRESTLER'S PROFESSIONAL ACTIVITIES, WRESTLER ACKNOWLEDGES THAT AS AN INDEPENDENT CONTRACTOR HE IS NOT ENTITLED TO ANY WORKERS' COMPENSATION COVERAGE OR SIMILAR BENEFITS FOR INJURY, DISABILITY, DEATH OR LOSS OF WAGES; AND WRESTLER SHALL MAKE NO CLAIM AGAINST PROMOTER FOR SUCH COVERAGE OR BENEFIT.**

9.13 (a) WRESTLER shall act at all times with due regard to public morals and conventions during the Term of this Agreement. If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings WRESTLER into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures WRESTLER's reputation in PROMOTER's sole judgment, or diminishes the value of WRESTLER's professional wrestling services to the public or PROMOTER, then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER; and PROMOTER shall have the right to immediately suspend WRESTLER and/or terminate this Agreement pursuant to Section 12.

(b) Should at any time during the Term, WRESTLER be involved in any way with a criminal or civil legal proceeding or regulatory or administrative hearing (e.g., immigration hearing) or otherwise ("Proceeding"), PROMOTER shall have the right but not the obligation to retain counsel to represent WRESTLER in the Proceeding and PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any and all costs and expense (including attorney's fees) related to the Proceeding. WRESTLER agrees that should PROMOTER retain counsel pursuant to this Section 9.13(b), PROMOTER

15

shall not be admitting that PROMOTER has any obligation, liability, and/or responsibility whatsoever in connection with the Proceeding.

9.14    During the Term, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity for any other martial arts or wrestling organization and/or entity not owned or controlled by PROMOTER or any affiliated or subsidiary company thereof, or otherwise in the entertainment industry, including without limitation appearances in live events, pay-per-view or other televised events.

## 10. WARRANTY

10.1    WRESTLER represents, warrants, and agrees that WRESTLER is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; WRESTLER has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no prior or pending claims, administrative proceedings, civil lawsuits, criminal prosecutions or other litigation matters, including without limitation any immigration or athletic commission related matters, affecting WRESTLER which would or might interfere with PROMOTER's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Exhibit C, attached hereto.

10.2    (a)    WRESTLER represents and warrants that WRESTLER is in sound mental and physical condition; that WRESTLER is suffering from no disabilities or pre-existing conditions or injuries that would impair or adversely affect WRESTLER's ability to perform professional wrestling services; and that WRESTLER is free from the influence of illegal drugs or controlled substances, which can threaten WRESTLER's well being and pose a risk of injury to WRESTLER or others. To insure compliance with this warranty, WRESTLER shall abide by any drug policy conveyed to WRESTLER and/or his representative(s) as well as any and all amendments, additions or modifications to any such drug policy, and WRESTLER further consents to sampling and testing, in accordance with any such drug policy. In addition, WRESTLER agrees to submit no less than annually to complete physical examination(s) by a physician either selected or approved by PROMOTER.

(b)    In the event that WRESTLER is unable to wrestle for six (6) consecutive weeks during the Term of this Agreement, for any or no reason, including, without limitation, due to an injury suffered while performing services at PROMOTER's direction, PROMOTER shall have the right to thereafter: (i) terminate this Agreement; (ii) suspend WRESTLER either with or without pay; and/or (iii) extend the Term of this Agreement for a period of time equal to the entire period of inability to wrestle, or any portion thereof. Upon certification by WRESTLER or PROMOTER's physician during any period of suspension that WRESTLER is fully recovered and capable of performing all services as required under this Agreement, PROMOTER shall have the right to reinstate this Agreement, and it will thereafter continue to be of full force and effect throughout the remainder of the Term.

10.3    PROMOTER reserves the right to have WRESTLER examined by a physician of its own choosing at its expense at any point during the Term of this Agreement.

## 11. EARLY TERMINATION

11.1    (a)    This Agreement may be terminated by PROMOTER during the Term for any or no reason whatsoever by providing WRESTLER at least thirty (30) days advance written notice of said termination. The thirtieth (30th) day shall be defined as the "Termination Date".

(b)     This Agreement may be terminated prior to the end of its Term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either party.

(c)     This Agreement may be terminated by PROMOTER immediately due to WRESTLER's breach as set forth in Section 12.1.

(d)     In the event of a termination pursuant to Section 11.1(a) or Section 11.1(b), PROMOTER shall be obligated to pay WRESTLER a pro-rated portion of the Minimum Annual Compensation up until the Termination Date and to pay WRESTLER any royalties which may be due WRESTLER in accordance with Sections 7.3 through 7.9 for the use of the WRESTLER Intellectual Property.

11.2     This Agreement shall automatically and immediately terminate upon WRESTLER's death and PROMOTER shall have no further obligation to WRESTLER or WRESTLER's heirs, successors, personal representatives or assigns pursuant to any of the terms herein including but not limited to any payment obligations as described in Section 7.

11.3

(a)     Upon expiration or termination of this Agreement for any reason, the parties acknowledge and agree that: (i) PROMOTER shall own in perpetuity all right, title and interest in all Footage, Works, PROMOTER Intellectual Property and any registrations thereof; (ii) PROMOTER shall also have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items as set forth in Section 4.2

(b)     Upon expiration or termination of this Agreement by PROMOTER pursuant to Section 12.1, WRESTLER shall not work, appear, or perform in any capacity for any professional wrestling, sports entertainment, mixed martial arts and/or ultimate fighting organization, promotion or entity not owned or controlled by PROMOTER (or any affiliated or subsidiary company thereof) in the United States for a period of up to one (1) year from the date of such expiration or termination, as specified by PROMOTER in the notice of termination; provided, however, that if no lesser period is specified by PROMOTER in the notice of termination, such period shall be one (1) year.

## 12. BREACH

12.1     In addition to those reasons set forth elsewhere in this Agreement, PROMOTER shall have the right, in its sole discretion, to immediately suspend or terminate this Agreement, both as to services and compensation, if any of the following occurs:

(a)     PROMOTER has the right to terminate WRESTLER pursuant to the provisions of any drug policy adopted by WWE, as well as any and all amendments, additions or modifications to any such drug policy;

(b)     WRESTLER is not in compliance with the representation and warranty set forth in Section 10.2(a), including, without limitation, as evidenced by any cardiovascular test, physical examination or other medical screening implemented by PROMOTER during the Term.

(c)     WRESTLER is habitually late and/or absent for scheduled Events or appearances as PROMOTER determines in its sole discretion;

(d)     WRESTLER fails any physical examination conducted on behalf of PROMOTER, as required herein;

17

(e)     WRESTLER fails to maintain physical condition or training such that his weight, and/or his performance is unsatisfactory as determined by PROMOTER in its sole discretion;

(f)     PROMOTER, on behalf of WRESTLER, is unable to obtain any necessary athletic commission licenses or immigration documents, including, but not limited to visas; or

(g)     WRESTLER breaches Section 9.13(a).

12.2     In the event that WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law, as provided in Section 13.8. In addition, in the event of an immediate termination pursuant to Sections 12.1(a) through (f), WRESTLER shall forfeit and shall not be entitled to:  (i) any remaining Minimum Annual Compensation owed and (ii) any future payments that may have been due WRESTLER pursuant to Section 7. WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the WRESTLER Intellectual Property for the remainder of the Term and the PROMOTER Intellectual Property forever. Further, at PROMOTER's sole option, the Term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period.

12.3     The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, Footage, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4     In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

## 13. MISCELLANEOUS

13.1     Nothing contained in this Agreement shall be construed to constitute WRESTLER as an employee, partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect. WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or any and all of the rights granted to PROMOTER herein.

13.2     This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement. There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3     This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

13.4     If any provision or clause of this Agreement, or portion thereof, shall be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of

18

such provision shall not thereby be affected and shall be given full effect, without regard to the invalid portion. It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce or modify the duration, area, or matter of such provision, and, in its reduced or modified form, such provision shall then be enforceable and shall be enforced.

13.5    PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted by WRESTLER to PROMOTER pursuant to the terms of this Agreement to any person, firm or corporation, provided that such assignee has the financial ability to meet the PROMOTER's obligations hereunder, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall be released from any liability and shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6    Any notices required or desired hereunder shall be in writing and shall be deemed given when personally delivered or if mailed by certified mail, return receipt requested or registered mail, when deposited in the United States Mail, postage prepaid, or if telecopied, when telecopied, or if sent by courier service, when deposited with such service, or if sent by overnight delivery service, on the next business day following delivery to such service. Notices shall be addressed as follows (unless either party at any time or times designates another address for itself by notifying the other party thereof as provided herein):

TO PROMOTER:                                            TO WRESTLER:

World Wrestling Entertainment, Inc.                    Evan Mitchell Singleton
Attn:   General Counsel                                 1115 Wheatland Avenue
1241 E. Main Street                                     Apt. G5
Stamford, Connecticut 06902                            Lancaster, Pennsylvania 17603

13.7    This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8    The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

13.9    WRESTLER understands and acknowledges that, from time to time during the Term, he may request that attorneys employed by or associated with PROMOTER represent WRESTLER's interests in connection with certain contracts and/or other matters relating to WRESTLER's career, including, without limitation, in connection with certain Permitted Activities, whether or not utilizing the Intellectual Property. WRESTLER thus confirms his understanding and acknowledgement that, in connection with such representation, such attorneys (including attorneys who may have previously represented, and who may in the future represent, PROMOTER in a role potentially adverse to WRESTLER) may represent WRESTLER, either individually and/or concurrently with representing PROMOTER. Such representation during the Term may constitute a potential conflict of interest. Accordingly, WRESTLER understands and acknowledges by his execution of this Agreement that, he further waives any such conflict of interest arising from such representation of WRESTLER by PROMOTER's attorneys. WRESTLER further understands and acknowledges that he has been encouraged to seek the advice of and retain independent counsel in connection with all matters relating to his interests, including contract negotiation and any and all other issues relating to his career, as well as advice with respect to the meaning and impact of the consent and waiver set forth in this Section 13.9, and WRESTLER hereby represents and warrants to PROMOTER that he knowingly either has and will retained

19

such independent counsel, or has decided or will decide intentionally not to do so. The consent and waiver set forth in this Section 13.9 shall remain in effect during the Term, unless revoked in writing by WRESTLER and delivered to PROMOTER pursuant to Section 13.6.

## 14. CONFIDENTIALITY

14.1    (a) Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that in further    consideration of PROMOTER's entering into this Agreement, WRESTLER shall not, at any time during the Term of this Agreement, or after the termination of this Agreement for any or no reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of WRESTLER or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances in the Footage, information regarding any contractual relationships maintained by PROMOTER and/or the terms thereof, and/or any and all information regarding wrestlers engaged by PROMOTER.

(b) Notwithstanding the foregoing, WRESTLER's obligation of confidentiality shall not include information which:

> (i)    at the time of disclosure was in the public domain;

> (ii)    after such disclosure becomes generally available to the public other than through any act or omission by WRESTLER; and

> (iii)    is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to PROMOTER in a timely manner in order to afford PROMOTER an opportunity to seek a protective order against such disclosure.

14.2    WRESTLER acknowledges and agrees that his agreement to be bound by the terms hereof is a material condition of PROMOTER's willingness to use and continue to use WRESTLER's services. Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either. Notwithstanding the foregoing, WRESTLER shall be free to disclose the terms and conditions of this Agreement to his lawyers, agents, financial advisers and spouse and PROMOTER shall be free to disclose the terms and conditions of this Agreement to its lawyers, accountants and to those employees who have a legitimate need to know such information.

14.3    This Agreement and any amendments thereto may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute the same instrument.    Counterparts may be executed either in original or faxed form and the parties adopt any signatures received by a receiving fax machine as original signatures of the parties.    All of the terms and conditions of any Exhibits shall be incorporated herein by reference and shall be made a part hereof.

20

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written below.

WORLD WRESTLING
ENTERTAINMENT, INC.
("PROMOTER")

By: _____
   John Laurinaitis
   EVP, Talent Relations

Date: _____12/16/11_____

EVAN MITCHELL SINGLETON
("WRESTLER")

By: _____
   Evan Mitchell Singleton
Social Security No.:

Date: __11/28/11__


STATE OF _Pennsylvania_ )
                 ) ss:
COUNTY OF _Lancaster_ )

     I am a Notary Public for said County and State, do hereby certify that Evan Mitchell Singleton personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

     WITNESS my hand and notarial seal this _28th_ day of _November_, 2011.

_____
Notary Public
My commission expires: _____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Richard A. Katz, Notary Public
City of Lancaster, Lancaster County
My Commission Expires Sept. 22, 2014
Member, Pennsylvania Association of Notaries

STATE OF CONNECTICUT )
                               ) ss: Stamford

COUNTY OF FAIRFIELD )

     On _December_ _16_, 2011 before me personally came John Laurinaitis, Executive Vice President of Talent Relations, to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of World Wrestling Entertainment, Inc., and that he executed the same on behalf of said Company.

     WITNESS my hand and notarial seal this _16th_ day of _December_, 2011.

Notary Public
My commission expires:

APPROVED

CEO
Legal
Finance

**EXHIBIT A**

WRESTLER INTELLECTUAL PROPERTY

Evan Mitchell Singleton

# EXHIBIT B

## PROMOTER INTELLECTUAL PROPERTY

**EXHIBIT C**

EXCEPTIONS TO WARRANTY
PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR
CONFLICT WITH
<u>WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS</u>

None

# Exhibit  B

**ORIGINAL**

## WORLD WRESTLING ENTERTAINMENT, INC.
## BOOKING CONTRACT

This World Wrestling Entertainment, Inc. Booking Contract ("Agreement"), made effective as of the date World Wrestling Entertainment, Inc. executes said Agreement ("Effective Date"), by and between World Wrestling Entertainment, Inc., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "PROMOTER"), and VITO LOGRASSO, an individual residing at 17 Albion Place, Staten Island, New York 10302 (hereinafter referred to as "WRESTLER").

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business throughout the world of organizing, publicizing, arranging, staging, conducting professional wrestling exhibitions and/or Events, as defined below, and representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness and personality; and

WHEREAS, PROMOTER has established a worldwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and/or Events, as defined below, and PROMOTER has established a network of cable, satellite and internet organizations which regularly broadcast, transmit, stream and exhibit PROMOTER's professional wrestling Events on a pay-per-view and subscription basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or Events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and Events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange professional wrestling exhibitions and/or Events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound, do hereby agree as follows:

## 1. BOOKING

1.1    WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)    During the Term of this Agreement, the exclusive right to engage WRESTLER's performance in wrestling matches at any professional wrestling exhibitions whatsoever, as well as at appearances at any other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler or which are related to sports entertainment (collectively, the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location or by promotions to whom WRESTLER's services are assigned by PROMOTER for developmental, training or other purposes, or otherwise.  Pursuant to Section 13.5 herein and during the Term of this Agreement, WRESTLER acknowledges and agrees that PROMOTER, in its sole discretion, shall have the right to assign WRESTLER's obligations under this Agreement for any period of time as PROMOTER sees fit to other promoters in order to enhance or improve WRESTLER's overall wrestling abilities, in-ring skills, conditioning, or other attributes deemed necessary by PROMOTER.

(b)    During the Term and thereafter as provided for in this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as the right to exhibit, broadcast and transmit the Footage, as defined in Section 2.1, via closed circuit transmission, pay-per-view transmission, subscription transmission (e.g., subscription video on demand), video on demand transmission, video exhibition, or any other medium now known or hereinafter discovered.

(c)    During the Term of this Agreement and thereafter as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of WRESTLER Intellectual Property, as defined herein below, through any means whatsoever including internet websites, merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2    In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in PROMOTER's sole discretion, in wrestling matches at various Events.

## 2. WORKS

2.1    WRESTLER hereby grants to PROMOTER the exclusive right during the Term  to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for or related to the Events or for or related to any and all of the services performed by WRESTLER pursuant to the terms herein.  (These recordings by tape, film, photograph, disc, or otherwise are collectively referred to herein as the "Footage").

2.2    Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, or otherwise disseminate the Footage in perpetuity by any form of media, now or hereafter devised (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television, the internet, video on demand, and subscription video on demand).

2.3    WRESTLER's appearance, performance and work product in connection in any way with the Events, Footage, WRESTLER's services and the rights granted herein shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all Footage and all of the rights, results, products and proceeds in and to, or derived from the Events, Footage, WRESTLER's services and the rights granted herein (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with the Events, Footage, WRESTLER's services and the rights granted herein) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of PROMOTER and/or on behalf of PROMOTER's designee.

2.4    If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and PROMOTER shall own such Development.  All Footage and Developments referred to in this Agreement are collectively referred to as "Works".

2.5    All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement.  To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.).  In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement.  To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby irrevocably assigns in perpetuity to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

### 3. INTELLECTUAL PROPERTY

3.1    All service marks, trademarks and  other distinctive and identifying indicia used by WRESTLER prior to the Effective Date in connection with the business of professional wrestling, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures,  signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "WRESTLER Intellectual Property") are described and identified on Exhibit A attached hereto and incorporated herein by reference.  WRESTLER hereby grants to PROMOTER a

license and right during the Term and thereafter as provided for in this Agreement including any Sell Off Period set forth in Section 4.3 and PROMOTER hereby accepts all worldwide right, title and interest in and to WRESTLER's Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the WRESTLER Intellectual Property. WRESTLER further acknowledges and agrees that PROMOTER shall own in perpetuity all Footage, as defined in Section 2.1 of the Agreement, and that PROMOTER shall have perpetual rights in the Footage, as set forth in Section 2.2 of this Agreement.

3.2     Except for the WRESTLER Intellectual Property specifically set forth on Exhibit A, any intellectual property rights, including but not limited to trademarks, service marks, copyrighted works, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which were procured, owned or created by PROMOTER prior to the Term which are described and identified on Exhibit B attached hereto and incorporated herein by reference (collectively the "PROMOTER Intellectual Property") shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

3.3     PROMOTER may from time to time during the Term create or develop trademarks, service marks, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which WRESTLER acknowledges shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement. In addition, WRESTLER agrees to assign and relinquish to PROMOTER any and all claims of ownership and/or good will that may be acquired by WRESTLER now or in the future to and from such character name and image. With respect to all of the foregoing, WRESTLER agrees to immediately execute an amendment to this Agreement to add to Exhibit B any additional intellectual property rights created pursuant to this Section 3.3 as PROMOTER Intellectual Property.

3.4     WRESTLER Intellectual Property and PROMOTER Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

## 4. MERCHANDISING

4.1     WRESTLER hereby agrees that PROMOTER shall have the exclusive right in perpetuity to use and exploit WRESTLER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all copyrighted work incorporating the WRESTLER Intellectual Property. PROMOTER shall own in perpetuity all copyrights in such copyrighted work and PROMOTER shall be entitled to obtain copyright

4

registrations in PROMOTER's name or on behalf of its designee. WRESTLER shall provide all reasonable assistance to PROMOTER in so obtaining such copyright registrations, and WRESTLER authorizes PROMOTER to execute any documents on WRESTLER's behalf as attorney-in-fact that are required by the United States Patent and Trademark Office.

4.2    In addition to the perpetual rights to use and exploit WRESTLER Intellectual Property as set forth in Section 4.1 of this Agreement, WRESTLER agrees that during the Term and any applicable Sell Off Period as provided for in this Agreement, PROMOTER shall have the exclusive right to use, exploit, and license the WRESTER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of goods and merchandise incorporating the WRESTLER Intellectual Property.

4.3    <u>Sell Off Period</u>.  Upon the expiration or termination of this Agreement, PROMOTER shall have the right to sell any licensed products in inventory, on hand or manufactured containing WRESTLER Intellectual Property for a period of ninety (90) days immediately following such expiration or termination ("Sell Off Period") provided, however, that there shall be no restriction on PROMOTER's rights to use or exploit WRESTLER Intellectual Property in connection with the perpetual rights granted herein by WRESTLER.

4.4    <u>Book Rights</u>.  WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the licensing, sublicensing, manufacture, distribution, publication, and exploitation of WRESTLER's autobiography or authorized biography (collectively "Book Rights").

4.5    <u>Publishing Rights</u>.  WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the creation and sale of certain movies, or other forms of media now known or hereinafter discovered, as PROMOTER shall determine in its sole discretion (collectively "Publishing Rights").

4.6.    <u>Auction Sale Rights</u>.  WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to sell via the Internet, television or through any other distribution method now known or hereafter created, by an auction method, any item containing WRESTLER Intellectual Property which shall include but not be limited to items containing WRESTLER's signature ("Auction Sale").

## 5. EXCLUSIVITY

5.1    It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER are exclusive to PROMOTER

even to the exclusion of WRESTLER.

5.2    In the event WRESTLER desires upon reasonable notice to PROMOTER during the Term of this Agreement either individually or through his authorized representative(s) to participate in movies, films, commercials, product endorsements, videos, television programs or similar activities, whether or not procured by PROMOTER (collectively "Permitted Activities") and promotional events for the Permitted Activities, WRESTLER may do so subject to PROMOTER's approval, which shall not be unreasonably withheld provided a written sublicense is executed between PROMOTER, WRESTLER and any relevant third parties and further provided WRESTLER shall not utilize the  Intellectual Property in any manner in connection with such Permitted Activities without PROMOTER's written consent, and that PROMOTER retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term of this Agreement, as defined herein. It is further agreed that PROMOTER shall receive from WRESTLER a management fee to reimburse PROMOTER for its reasonable administrative costs incurred in connection with WRESTLER's participation in each such Permitted Activity, provided that PROMOTER's costs shall not be less than ten percent (10%) of any fees received by WRESTLER for each such Permitted Activity described herein. Additionally, all monies earned by WRESTLER from such Permitted Activities in a specific Contract Year shall be credited against the Minimum Annual Compensation for that Contract Year as set forth in paragraph 7.1 below.

## 6. TERM AND TERRITORY

6.1    Unless terminated pursuant to the terms herein, the term of this Agreement shall be for three (3) year(s) from the Effective Date ("Term"). Each consecutive twelve (12) month period during the Term commencing with the Effective Date shall be referred to as a "Contract Year".

6.2    Notwithstanding anything herein to the contrary, termination of this Agreement for any or no reason shall not affect PROMOTER's ownership of and rights in, including but not limited to, any Works, PROMOTER Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in  Sections 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.3    The territory of this Agreement shall be the world ("Territory").

## 7.  PAYMENTS/ROYALTIES

7.1    (a)    Unless terminated pursuant to the terms herein, PROMOTER shall pay WRESTLER each Contract Year the total sum of Seventy Five Thousand US Dollars (US$75,000.00) (referred to hereinafter as "Minimum Annual Compensation"). PROMOTER agrees, commencing with the Effective Date, to pay WRESTLER the Minimum Annual Compensation in fifty-two (52) weekly installments consistent with PROMOTER's regular payment procedures.

(b)    PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any fines levied against WRESTLER, as provided for in Sections 8.3 or 9.6; any costs or expenses paid by PROMOTER on behalf of WRESTLER, as provided for in Sections 8.1 and 9.13(b); or any deductions permitted as set forth in Section 7.13 and 10.2(b). PROMOTER shall also have the right

to credit or deduct from the Minimum Annual Compensation: (i) any royalties earned by WRESTLER; (ii) any payments made to WRESTLER by PROMOTER in accordance with Section 7.2; and/or (iii) any other payments due or earned by WRESTLER for the rights granted herein or pursuant to the terms of this Agreement. For the purposes of this Agreement, any royalty payments due shall be deemed "earned" only at the time they are paid to WRESTLER.

(c)     Unless terminated pursuant to the terms herein and subject to Section 7.10, if applicable, and Section 10.2 (b) below, at least one hundred twenty (120) days after each Contract Year, if it is determined that WRESTLER has earned more than the Minimum Annual Compensation for services rendered during that Contract Year, WRESTLER shall be paid subject to any permitted deductions or credits in accordance with Section 7.1(b), in a one lump sum  the difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during that Contract Year.

7.2     (a)     If WRESTLER appears and performs in any Event produced by PROMOTER in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast as set forth in  Sections 7.2 (b) and 7.2 (c) below (hereinafter "Non-Televised Live Events"), WRESTLER shall be paid by PROMOTER an amount equal, in PROMOTER's sole discretion,  to such percentage of the paid receipts for such Non-Televised Live Event from the live Non-Televised Live Event gate receipts only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such Non-Televised Live Event.

(b)     If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is taped or broadcast for use on PROMOTER's television network ("TV Taping"), WRESTLER shall be paid by PROMOTER, in its sole discretion, an amount only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such TV Taping.

(c)     If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is aired or broadcast via satellite broadcast or pay-per-view distribution technology for use by PROMOTER ("Pay-Per-View"), WRESTLER shall be paid by PROMOTER an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3     Licensed Product Sale

(a)     Licensed Product Sale--Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to the Licensed Product Sale. Licensed Products' Net Receipts means the gross amount received by PROMOTER from a Licensed Product Sale less expenses incurred by PROMOTER or its licensing agent.

"Licensed Product Sale" shall mean the sale, other than an Auction Sale as defined in Section 7.7, of any product, merchandise, consumer material or good, other than Books as defined

in Section 7.8 and Pay Per View DVD/Home Videos as defined in Section 7.6(a), which is made pursuant to a license agreement between PROMOTER and a party wherein a party is granted the contractual right and obligation to manufacture, distribute, and sell the product, merchandise, consumer material or good to wholesale and/or retail customers through designated distribution channels.

"Other PROMOTER Talent" shall mean a professional wrestler who has an agreement with PROMOTER and to whom PROMOTER is obligated to pay royalties.

(b)     Licensed Product Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, PROMOTER shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.4     Direct Sale and Direct Venue Sale

(a)     Direct Sale---Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Sale, WRESTLER shall be paid five percent (5%) of the Direct Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Sale reduced by returns.  "Direct Sale" shall mean a sale by PROMOTER by any method other than a Licensed Product Sale, Auction Sale, or a Direct Venue Sale, as defined in Section 7.4(c), wherein PROMOTER has or retains the right and/or obligation to manufacture, distribute or sell any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, to an end user and where such sale may be made by any distribution method (e.g., catalog, television or any internet site owned or controlled by PROMOTER).

(b)     Direct Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Sale, PROMOTER shall allocate five percent (5%) of the Direct Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

(c)     Direct Venue Sale---Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, WRESTLER shall be paid five percent (5%) of the Direct Venue Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Venue Sale reduced by any expenses charged to PROMOTER by the venue for the sale of the product, merchandise, consumer materials or goods. "Direct Venue Sale" shall mean the sale by PROMOTER of any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, which occurs in or about the venue of a PROMOTER live event.

(d)     Direct Venue Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, PROMOTER shall allocate five percent (5%) of the Direct Venue Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.5    Featured Performer

(a)    Licensed Product Sales. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Licensed Product Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.3(b), PROMOTER shall pay five percent (5%) of the Net Receipts paid to PROMOTER with respect to the Licensed Product Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(a) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units. For the purposes of this Section 7.5, PROMOTER shall determine in its sole discretion whether WRESTLER shall be deemed a "Featured Performer".

(b)    Direct Sale. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(b), PROMOTER shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(b) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

(c)    Direct Venue Sale. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Venue Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(d), PROMOTER shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Venue Sale of the DVD and/or home video to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(c) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

7.6    Pay Per View DVD/Home Video

(a)    Sold By Licensees As A Single Unit. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of "Pay Per View DVD/Home Videos" which is sold by a third party pursuant to a license agreement,

PROMOTER shall allocate twenty-five (25%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(a) less any and all costs incurred by PROMOTER or its licensing agent. "Pay Per View/DVD Home Videos" shall mean a DVD and/or home video produced by PROMOTER which is a reproduction of an entire live pay per view event, as set forth in Section 7.2(c).

(b)    Sold By Licensees As A Collection Set. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a collection set featuring multiple Pay Per View DVD/Home Videos (e.g., Wrestlemania Box Set") ("Collection Set"), which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the Net Receipts as defined in Section 7.6(a) to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

(c)·    Sold By PROMOTER As A Single Unit. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of Pay Per View DVD/Home Videos which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage, as set forth in Section 7.2(c), that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(c) less any and all costs incurred by PROMOTER or its licensing agent.

(d)    Sold By PROMOTER As A Collection Set. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a Collection Set which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the Net Receipts, as defined in Section 7.6(c), to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

7.7    Auction Sale

(a)    Sole Performer.  In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent, WRESTLER shall be paid thirty five (35%) percent of the "Net Sales", defined as the gross revenue received for an Auction Sale less (i) the cost of goods related to the item sold; (ii) any shipping or freight charges; and (iii) PROMOTER's administrative fee which shall be equal to thirty (30%) percent of the gross revenue received from the Auction Sale of the item sold.

(b)    Other Performers.  In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used together with intellectual property of Other PROMOTER Talent, PROMOTER shall allocate thirty five (35%) percent of the "Net Sales" defined in Section 7.7 (a) to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such product pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.8    Book Sales.  In the event that pursuant to the rights granted in Section 4.4 above, PROMOTER publishes or grants to a third party the right to publish WRESTLER's autobiography ("Book"), WRESTLER shall be paid an amount which shall be equal to fifty percent (50%) of the "Licensed Products' Net Receipts" less the cost of any photography, illustration and/or writer fees. For the purpose of this Section 7.8, "Licensed Products' Net Receipts" shall mean the gross amount received by PROMOTER from the publication, sale and distribution of the Book less any out of pocket expenses incurred or paid by PROMOTER, other than photography, illustration and/or writer fees which are the sole responsibility of WRESTLER.

7.9    Publishing Rights.  As respects WRESTLER's compensation in connection with PROMOTER's or PROMOTER's designee's exploitation of the Publishing Rights granted to PROMOTER as set forth in Section 4.5, the parties shall negotiate in good faith for a period of thirty (30) days commencing immediately after PROMOTER advises WRESTLER that PROMOTER desires to exploit the Publishing Rights ("Negotiation Period").  However, upon the expiration of the Negotiation Period, if the parties have not agreed on the compensation to be paid WRESTLER for PROMOTER's exploitation of the Publishing Rights, the parties agree that WRESTLER shall be paid an amount that is equal to the lowest compensation paid by PROMOTER within the previous three (3) years to Other PROMOTER Talent who have received payment for PROMOTER's exploitation of such talent's own Publishing Rights.

7.10    Subject to paragraph 12.2, the non-compete provisions of this Agreement, as it relates to WRESTLER's appearance or performance of any services pursuant to this Agreement, including the appearance and or performance of WRESTLER's services at Events or at other activities conducted by PROMOTER, WRESTLER shall be eligible only for the payments and royalties specifically set forth in Sections 7.1 through 7.9.  Any payments or royalties earned in connection with any wrestling services WRESTLER may perform during the Term of this Agreement for any wrestling/sports entertainment or martial arts organization, other than PROMOTER's, and /or entity shall be credited against WRESTLER's Minimum Annual Compensation, as set forth in Section 7.1(b).

7.11    No Royalties Paid to WRESTLER. Except as specifically set forth in Section 7.1 through 7.9 above, WRESTLER shall not be eligible for any payment or royalties with respect to any other goods, services or otherwise including without limitation to the following: television license fees; television subscription fees; internet subscription fees; subscription video on demand fees; magazine subscription fees and/or advertising; and/or distribution fees of any kind paid to PROMOTER by any entity in connection with the exploitation of the Intellectual Property.

7.12    All payments made to WRESTLER are in full without withholding, except where required by law. After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.13    If WRESTLER at any time during the Term is unable to wrestle for six (6) consecutive weeks due to an injury suffered while performing services at PROMOTER's direction, PROMOTER may: (i) for every Non-Televised Live Event or TV Taping, as described in Sections 7.2(a) and (b), reduce the Minimum Annual Compensation by .5%; and/or (ii) for every Pay-Per-View as described in Section 7.2(c), reduce the Minimum Annual Compensation by the average pay received by WRESTLER for the three (3) immediately preceding Pay-Per-Views or, if WRESTLER appeared in fewer than three (3) Pay-Per-Views, then the average WRESTLER receives for such similar events ("Similar Event") or .5% if WRESTLER did not appear in any such Similar Event.

7.14    (a)    PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

(b)    PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business. WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations. WRESTLER shall not audit PROMOTER's books and records more than twice during any calendar year and no such audit shall be conducted later than six (6) months after the most recent statement of royalties is given, delivered or sent to WRESTLER. Each audit is limited to five (5) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

(c)    WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless an audit has been conducted by WRESTLER to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

(d)    No claim shall be filed pursuant to Section 13.8 below against PROMOTER or PROMOTER's affiliates that disputes any statement of royalties or accounting given by PROMOTER

hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to Sections 7.13(b) and (c) above.

## 8. PROMOTER'S OBLIGATIONS

8.1    Although under Section 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining such licenses, which shall include any permits, visas, or otherwise, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2    PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

(a)    In connection with WRESTLER's appearances and performance at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

(b)    In connection with the production, distribution, and exploitation of the Footage, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication; and

(c)    In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services.  In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3    PROMOTER shall schedule the Events and book WRESTLER for the Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time. If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then PROMOTER may fine, suspend or terminate WRESTLER in its sole discretion.

8.4     Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

## 9. WRESTLER'S OBLIGATIONS

9.1     WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2     WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

        (a)     WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise; and

        (b)     WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs.

9.3     WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events (except for those transportation costs which are covered by PROMOTER's then current Travel Policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events.

9.4     WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5     WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to himself and to others in any and all Events. These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match. In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the

match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6     WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this Section 9.6 shall cause a forfeiture of any payments due WRESTLER pursuant to Section 7 and shall entitle PROMOTER to terminate this Agreement, or suspend WRESTLER without pay, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement. If PROMOTER in its discretion suspends this Agreement, when reinstated, PROMOTER may extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof and this Agreement will therefore continue to be of full force and effect throughout the remainder of the Term.

9.7     WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, including without limitation, appearing at and participating in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter discovered, including without limitation free, cable, pay cable, subscription video on demand, video on demand and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture and Internet), at times and places designated by PROMOTER, in connection therewith.

9.8     WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Footage and/or the exercise of any other rights respecting WRESTLER and/or PROMOTER Intellectual Property, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to the WRESTLER and/or PROMOTER Intellectual Property are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's written consent. WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.9     WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER's appearance and/or performance in a professional wrestling match.

9.10    WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them by reason of WRESTLER's breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. WRESTLER, on

behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of the harmless against any and all claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them, arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked. Such indemnification shall include all claims arising out of any acts, transactions and/or conduct of WRESTLER or others occurring at Events or in connection with any appearances or performances by WRESTLER not conducted by PROMOTER in accordance with this Agreement.

9.11    WRESTLER shall be responsible for payment of all of WRESTLER's own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon retirement from professional wrestling.

9.12    (a)    **WRESTLER SHALL BE RESPONSIBLE FOR HIS OWN COMMERCIAL GENERAL LIABILITY INSURANCE, WORKER'S COMPENSATION INSURANCE, PROFESSIONAL LIABILITY INSURANCE, AS WELL AS ANY EXCESS LIABILITY INSURANCE, AS HE DEEMS APPROPRIATE TO INSURE, INDEMNIFY AND DEFEND WRESTLER WITH RESPECT TO ANY AND ALL CLAIMS ARISING OUT OF HIS OWN ACTS, TRANSACTIONS, OR CONDUCT AS A PROFESSIONAL WRESTLER.**

(b)    **WRESTLER ACKNOWLEDGES THAT THE PARTICIPATION AND ACTIVITIES REQUIRED BY WRESTLER IN CONNECTION WITH HIS PERFORMANCE IN A PROFESSIONAL WRESTLING EXHIBITION MAY BE DANGEROUS AND MAY INVOLVE THE RISK OF SERIOUS BODILY INJURY. WRESTLER KNOWINGLY AND FREELY ASSUMES FULL RESPONSIBILITY FOR ALL SUCH INHERENT RISKS AS WELL AS THOSE DUE TO THE NEGLIGENCE OF PROMOTER OR OTHER WRESTLERS.**

(c)    **WRESTLER HEREBY RELEASES, WAIVES AND DISCHARGES PROMOTER FROM ALL LIABILITY TO WRESTLER AND COVENANTS NOT TO SUE PROMOTER FOR ANY AND ALL LOSS OR DAMAGE ON ACCOUNT OF INJURY TO THEIR PERSON OR PROPERTY OR RESULTING IN SERIOUS OR PERMANENT INJURY TO WRESTLER OR IN WRESTLER'S DEATH, WHETHER CAUSED BY NEGLIGENCE OF PROMOTER OR OTHER WRESTLERS UNDER CONTRACT TO PROMOTER.**

(d)    **WRESTLER MAY AT HIS ELECTION OBTAIN HEALTH, LIFE AND/OR DISABILITY INSURANCE TO PROVIDE BENEFITS IN THE EVENT OF PHYSICAL INJURY ARISING OUT OTHER PROFESSIONAL ACTIVITIES; AND WRESTLER ACKNOWLEDGES THAT PROMOTER SHALL NOT HAVE ANY RESPONSIBILLITY FOR SUCH INSURANCE OR PAYMENT IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF HIS PROFESSIONAL ACTIVITIES.**

(e)   **IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF WRESTLER'S PROFESSIONAL ACTIVITIES, WRESTLER ACKNOWLEDGES THAT AS AN INDEPENDENT CONTRACTOR HE IS NOT ENTITLED TO ANY WORKERS' COMPENSATION COVERAGE OR SIMILAR BENEFITS FOR INJURY, DISABILITY, DEATH OR LOSS OF WAGES; AND WRESTLER SHALL MAKE NO CLAIM AGAINST PROMOTER FOR SUCH COVERAGE OR BENEFIT.**

9.13   (a)   WRESTLER shall act at all times with due regard to public morals and conventions during the Term of this Agreement. If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings WRESTLER into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures WRESTLER's reputation in PROMOTER's sole judgment, or diminishes the value of WRESTLER's professional wrestling services to the public or PROMOTER, then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER; and PROMOTER shall have the right to immediately suspend WRESTLER and/or terminate this Agreement pursuant to Section 12.

(b)   Should at any time during the Term, WRESTLER be involved in any way with a criminal or civil legal proceeding or regulatory or administrative hearing (e.g., immigration hearing) or otherwise ("Proceeding"), PROMOTER shall have the right but not the obligation to retain counsel to represent WRESTLER in the Proceeding and PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any and all costs and expense (including attorney's fees) related to the Proceeding. WRESTLER agrees that should PROMOTER retain counsel pursuant to this Section 9.13(b), PROMOTER shall not be admitting that PROMOTER has any obligation, liability, and/or responsibility whatsoever in connection with the Proceeding.

9.14   During the Term, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity for any other martial arts or wrestling organization and/or entity not owned or controlled by PROMOTER or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-view or other televised events.

## 10. WARRANTY

10.1   WRESTLER represents, warrants, and agrees that WRESTLER is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; WRESTLER has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no prior or pending claims, administrative proceedings, civil lawsuits, criminal prosecutions or other litigation matters, including without limitation any immigration or athletic commission related matters, affecting WRESTLER which would or might interfere with PROMOTER's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Exhibit C, attached hereto.

10.2   (a)   WRESTLER represents, warrants and agrees that WRESTLER is in sound mental and

17

physical condition; that WRESTLER is suffering from no disabilities or pre-existing conditions or injuries that would impair or adversely affect WRESTLER's ability to perform professional wrestling services; and that WRESTLER is free from the influence of illegal drugs or controlled substances, which can threaten WRESTLER's well being and pose a risk of injury to WRESTLER or others. To insure compliance with this warranty, WRESTLER agrees to abide by any drug policy adopted, amended or modified by WWE during the Term of this Agreement and further consents to the sampling and testing of his urine, if in the sole discretion and judgment of PROMOTER, reasonable cause exists to perform such testing. In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by PROMOTER.

(b)    In the event that WRESTLER is unable to wrestle for six (6) consecutive weeks during the Term of this Agreement for any or no reason including due to an injury suffered in the ring while performing services at PROMOTER's direction, PROMOTER shall have the right to thereafter terminate this Agreement or suspend WRESTLER without pay. PROMOTER can opt in its discretion to extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof. Upon certification by WRESTLER or PROMOTER's physician during any period of suspension that WRESTLER is fully recovered and capable of performing all services as required under this Agreement, PROMOTER can reinstate the Agreement, and it will therefore continue to be of full force and effect throughout the remainder of the Term of this Agreement.

10.3    PROMOTER reserves the right to have WRESTLER examined by a physician of its own choosing at its expense at any point during the Term of this Agreement.

## 11. EARLY TERMINATION

11.1    (a)    This Agreement may be terminated by PROMOTER during the Term for any or no reason whatsoever by providing WRESTLER at least ninety (90) days advance written notice of said termination. The ninetieth (90th) day shall be defined as the "Termination Date".

(b)    This Agreement may be terminated prior to the end of its Term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either party.

(c)    This Agreement may be terminated by PROMOTER immediately due to WRESTLER's breach as set forth in Section 12.1.

(d)    In the event of a termination pursuant to Section 11.1(a) or Section 11.1(b), PROMOTER shall be obligated to pay WRESTLER a pro-rated portion of the Minimum Annual Compensation up until the Termination Date and to pay WRESTLER any royalties which may be due WRESTLER in accordance with Sections 7.3 through 7.9 for the use of the WRESTLER Intellectual Property.

11.2    This Agreement shall automatically and immediately terminate upon WRESTLER's death and PROMOTER shall have no further obligation to WRESTLER or WRESTLER's heirs, successors, personal representatives or assigns pursuant to any of the terms herein including but not limited to any payment obligations as described in Section 7.

11.3    Upon the termination of this Agreement for any reason, including breach, the parties acknowledge and agree that PROMOTER shall own in perpetuity all right, title and interest in all Footage, Works, PROMOTER Intellectual Property and any registrations thereof. PROMOTER shall also have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items as set forth in Section 4.2.

## 12. BREACH

12.1    In addition to those reasons set forth elsewhere in this Agreement, PROMOTER shall have the right, in its sole discretion, to immediately suspend or terminate this Agreement, both as to services and compensation, if any of the following occurs:

   (a)    WRESTLER violates any drug policy adopted, amended, or modified by PROMOTER during the Term of this Agreement and/or fails any pre-contract drug test required by PROMOTER and/or fails or refuses to take any drug test directed to be taken by PROMOTER pursuant to Section 10.2(a);

   (b)    WRESTLER is habitually late and/or absent for scheduled Events or appearances as PROMOTER determines in its sole discretion;

   (c)    WRESTLER fails any physical examination conducted on behalf of PROMOTER, as required herein;

   (d)    WRESTLER fails to maintain physical condition or training such that his weight, and/or his performance is unsatisfactory as determined by PROMOTER in its sole discretion;

   (e)    PROMOTER, on behalf of WRESTLER, is unable to obtain any necessary athletic commission licenses or immigration documents, including, but not limited to visas; or

   (f)    WRESTLER breaches Section 9.13(a).

12.2    In the event that WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law, as provided in Section 13.8. In addition, in the event of an immediate termination pursuant to Section 12.1, WRESTLER shall forfeit and shall not be entitled to: (i) any remaining Minimum Annual Compensation owed and (ii) any future payments that may have been due WRESTLER pursuant to Section 7. WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the WRESTLER Intellectual Property for the remainder of the Term and the PROMOTER Intellectual Property forever.    Further, at PROMOTER's sole option, the Term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period.  In the event WRESTLER breaches this Agreement, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity in the United States for any other wrestling organization and/or entity not owned or controlled by PROMOTER or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-view or other televised events, for one (1) year from the date of the termination of this Agreement as a result of breach of this Agreement by WRESTLER.

12.3    The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, Footage, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief  shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4    In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

### 13. MISCELLANEOUS

13.1    Nothing contained in this Agreement shall be construed to constitute WRESTLER as an employee, partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect.   WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or any and all of the rights granted to PROMOTER herein.

13.2    This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement. There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3    This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

13.4    If any provision or clause of this Agreement, or portion thereof, shall be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision shall not thereby be affected and shall be given full effect, without regard to the invalid portion.   It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce or modify the duration, area, or matter of such provision, and, in its reduced or modified form, such provision shall then be enforceable and shall be enforced.

13.5    PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted by WRESTLER to PROMOTER pursuant to the terms of this Agreement to any person, firm or corporation, provided that such assignee has the financial ability to meet the PROMOTER's obligations hereunder, and if any assignee shall assume in writing PROMOTER's obligations

hereunder, PROMOTER shall be released from any liability and shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6    Any notices required or desired hereunder shall be in writing and shall be deemed given when personally delivered or if mailed by certified mail, return receipt requested or registered mail, when deposited in the United States Mail, postage prepaid, or if telecopied, when telecopied, or if sent by courier service, when deposited with such service, or if sent by overnight delivery service, on the next business ay following delivery to such service. Notices shall be addressed as follows (unless either party at any time or times designates another address for itself by notifying the other party thereof as provided herein):

TO PROMOTER:                                    TO WRESTLER:

World Wrestling Entertainment, Inc.            Vito LoGrasso
Attn:   Edward L. Kaufman                       17 Albion Place
Executive Vice President and General Counsel    Staten Island, New York   10302
1241 E. Main Street
Stamford, CT  06902

13.7    This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8    The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

## 14.  CONFIDENTIALITY

14.1    (a)  Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that in further consideration of PROMOTER's entering into this Agreement, WRESTLER shall not, at any time during the Term of this Agreement, or after the termination of this Agreement for any or no reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of WRESTLER or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances in the Footage, information regarding any contractual relationships maintained by PROMOTER and/or the

terms thereof, and/or any and all information regarding wrestlers engaged by PROMOTER.

(b) Notwithstanding the foregoing, WRESTLER's obligation of confidentiality shall not include information which:

      (i)    at the time of disclosure was in the public domain;

      (ii)   after such disclosure becomes generally available to the public other than through any act or omission by WRESTLER; and

      (iii)  is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to PROMOTER in a timely manner in order to afford PROMOTER an opportunity to seek a protective order against such disclosure.

14.2    WRESTLER acknowledges and agrees that his agreement to be bound by the terms hereof is a material condition of PROMOTER's willingness to use and continue to use WRESTLER's services. Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either. Notwithstanding the foregoing, WRESTLER shall be free to disclose the terms and conditions of this Agreement to his lawyers, agents, financial advisers and spouse and PROMOTER shall be free to disclose the terms and conditions of this Agreement to its lawyers, accountants and to those employees who have a legitimate need to know such information.

14.3    This Agreement and any amendments thereto may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute the same instrument.  Counterparts may be executed either in original or faxed form and the parties adopt any signatures received by a receiving fax machine as original signatures of the parties.  All of the terms and conditions of any Exhibits shall be incorporated herein by reference and shall be made a part hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written below.

WORLD WRESTLING
ENTERTAINMENT, INC.
("PROMOTER")

By: _____
    John Laurinaitis
    Vice President of Talent Relations

Date: _____ 6/28/05 _____

VITO LOGRASSO
("WRESTLER")

By: _____
    Vito LoGrasso
Social Security No.:

Date: _____ June 17th, 2005 _____

STATE OF CONNECTICUT )
                              ) ss: Stamford
COUNTY OF FAIRFIELD )

On ___June 28,___ 2005 before me personally came John Laurinaitis, Vice President of Talent Relations, to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of World Wrestling Entertainment, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this 28th day of ___June___, 2005.

_Margaret M. Ytuarte_
Notary Public
My commission expires: ___7-31-07___

**MARGARET M. YTUARTE**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2007

STATE OF New York )
                               ) ss:
COUNTY OF Richmond )

I am a Notary Public for said County and State, do hereby certify that Vito LoGrasso personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this 17th day of ___June___, 2005.

Notary Public
My commission expires: 

JASON DIAMOND
NOTARY PUBLIC STATE OF NEW YORK
NO. 01DI6077556
QUALIFIED IN RICHMOND COUNTY
COMMISSION EXPIRES 7/15/06

## EXHIBIT A

WRESTLER INTELLECTUAL PROPERTY

Vito LoGrasso

## EXHIBIT B

<u>PROMOTER INTELLECTUAL PROPERTY</u>

None

## EXHIBIT C

EXCEPTIONS TO WARRANTY
PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR
CONFLICT WITH
<u>WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS</u>

None

# TAB 3

Begin forwarded message:

**From:** Charles LaDuca <charles@cuneolaw.com>
**Date:** February 26, 2015 at 4:37:57 PM EST
**To:** 'Jerry McDevitt' <jrrymcdv@aol.com>
**Cc:** "Harris L. Pogust" <hpogust@pbmattorneys.com>, "Robert K. Shelquist"
<rkshelquist@locklaw.com>, Konstantine Kyros <kon@kyroslaw.com>, Erica Mirabella
<erica@mirabellallc.com>, Ben Elga <belga@cuneolaw.com>
**Subject: RE: Improper venue of Singleton v WWE.**

We do not agree with any of your emails. Or, that the contract applies for either of our clients.
However, we will not oppose a 1404(a) transfer for Lograsso and Singleton. Our clients do not
waive any rights to challenge the applicability of any alleged contract.

Charles J. LaDuca, Esq.
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, Maryland 20814
Tel: 202-789-3960
Fax: 202-789-1813
www.cuneolaw.com

-----Original Message-----
From: Jerry McDevitt [mailto:jrrymcdv@aol.com]
Sent: Thursday, February 26, 2015 4:22 PM
To: Charles LaDuca
Cc: Harris L. Pogust; Robert K. Shelquist; Konstantine Kyros; Erica Mirabella; Ben Elga
Subject: Re: Improper venue of Singleton v WWE.

Its now well past this morning and well past " within the hour", both of which were your
promised response time. This is not rocket science. Are you going to honor the contract of
lograsso also or not?

Sent from my iPad

1

On Feb 26, 2015, at 2:58 PM, Charles LaDuca <charles@cuneolaw.com> wrote:

We will get back to you within the hour.

Charles J. LaDuca, Esq.
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, Maryland 20814
Tel:  202-789-3960
Fax:  202-789-1813
www.cuneolaw.com

-----Original Message-----
From: Jerry McDevitt [mailto:jrrymcdv@aol.com]
Sent: Thursday, February 26, 2015 9:30 AM
To: Charles LaDuca
Cc: Harris L. Pogust; Robert K. Shelquist; Konstantine Kyros; Erica
Mirabella; Ben Elga
Subject: Re: Improper venue of Singleton v WWE.

Have you reconsidered your position whether you will now also agree to the transfer of the claims of Mr. Lograsso to Connecticut?

Yesterday, you contended that he did not have to honor his contractual agreement because, according to you, he wrestled " for many years of his career " without a contract. This echoes an allegation made in the Complaint that he supposedly wrestled with the WWE " from 1991 to 1998" and from 2005 to 2007.

To the extent you are alleging that he worked consecutively for WWE for 7 years without a contract, that is categorically false. In the 90's , he was a jobber, which is akin to casual and occasional labor. We checked yesterday and it appears he worked 4 times in 1991 and was paid $650, 6 times in 1992 for $900, 3 times in 1993 for $675, and one time in 1997 for $200.

None of this, of course, has anything to do with whether the claims he is making arise out of or relate to the performances he rendered pursuant to the formal contract he later signed with WWE. That contract had a mandatory forum selection clause, and it should be honored without further delay or cost to enforce it.  Please advise as to your position so we know whether motion practice will be necessary.

2

Sent from my iPad

> On Feb 25, 2015, at 10:05 AM, Charles LaDuca <charles@cuneolaw.com> wrote:

Thank you for your courtesies regarding Mr. Singleton. Our position on Mr. Singleton was a compromise offer. In fact, we believe his permanent physical and mental disabilities would fit squarely within the extraordinary circumstances allowed by the Sup Ct.

Regardless, we will of course honor your request and reconsider our position, and get back to you asap. Please note, a lot of folks on my side are traveling from the AAJ meeting in California. I might need until first thing tomorrow morning.

Charles J. LaDuca, Esquire

Cuneo Gilbert & LaDuca, LLP

8120 Woodmont Avenue

Suite 810

Bethesda, Maryland 20814

Telephone: 202 789 3960

www.cuneolaw.com

> > On Feb 25, 2015, at 9:50 AM, Jerry McDevitt <jrrymcdv@aol.com> wrote:

Although it is certainly premature to be discussing whether this case will get into the discovery phase, or where Mr. Singleton's deposition should take place, we would certainly agree to take his deposition in his hometown if he is unable to travel and would be willing to discuss doing it there even if he is able to travel.

I would urge you to reconsider your position re Mr. Lograsso to avoid further additional expenses associated with his breach of the forum selection clause. The fact he performed episodically as a jobber prior to signing the contract with the forum selection clause has no bearing on whether he has

3

agreed to that provision and is obligated to honor it. Indeed, it is the exact same provision which you now recognize obligates you to litigate Mr. Singleton's claims in federal court in Connecticut.

Moreover, it makes exactly no sense to split a purported class action into two different venues and ,as I have previously advised , the forum selection clause is in the contracts of most of the class you seek to represent.

I do not believe your reasons for not honoring that clause in Mr. Lograsso's case is the requisite extraordinary circumstances required by the Supreme Court to avoid complying with his contractual commitment, and would urge you to reconsider your position.

Sent from my iPad

> On Feb 24, 2015, at 8:28 PM, Charles LaDuca <charles@cuneolaw.com> wrote:
>
> If you will agree to take
>
> Mr. Singleton's deposition in his hometown, if he is mentally and
>
> physically unable to travel at that time--then will agree to transfer Mr. Singleton to Conn.
>
> We will resist transfer as to
>
> Mr. Lograsso as he wrestled without any contract for many years of his career.
>
> Charles J. LaDuca, Esquire
>
> Cuneo Gilbert & LaDuca, LLP
>
> 8120 Woodmont Avenue
>
> Suite 810
>
> Bethesda, Maryland 20814
>
> Telephone: 202 789 3960
>
> www.cuneolaw.com

4

On Feb 23, 2015, at
9:56 AM, Jerry
McDevitt
<jrrymcdv@aol.com>
wrote:

On Jan. 23, 2015, I
advised you that
Misters Singleton and
Lograsso were parties
to written contracts by
which they agreed to
a forum selection
clause requiring this
litigation to be filed
and conducted in
federal court in
Connecticut. I asked
for your advise as to
the justification for
bringing suit in the
Eastern District of
Pennsylvania in light
of their agreement to
litigate exclusively in
Connecticut.

Since providing this
notice, none of you
have responded or
offered a justification
for breaching the
contract and filing
suit in the EDPa. I
must assume that you
have verified the
contents of your
client's contracts
following my notice,
and would assume
you did so as part of
the requisite diligence
before filing suit.

In any event, in light
of your silence, this is
to advise that each of
your clients agreed to
a mandatory forum
selection clause,

5

which provides as follows:

"The parties agree to submit any and all disputes arising out of

or relating in any

way to this Agreement exclusively to the

jurisdiction of the United States District

Court of Connecticut. The provision to

submit all claims, disputes or matters

in question to the federal court in the State

of Connecticut shall be specifically

enforceable; and each party, hereby waiving

personal service of process and venue,

consents to jurisdiction in Connecticut

for purposes of any other party seeking

or securing any legal and/or equitable relief"

As we trust you know, the United States Supreme Court has ruled that mandatory forum selection clauses are to be given controlling weight in all but the most exceptional cases. Additionally, as the party defying the

6

clause, you bear the "heavy burden" of demonstrating exceptional circumstances, none of which are present here.

Thus, as we see it, we can proceed in one of two ways. First, you can take a voluntary dismissal without prejudice under Rule 41 and refile your suit in federal court in Connecticut. Alternatively, we can move to transfer the case to the federal court in Connecticut and indicate your concurrence to the Judge. There is no substantive difference between the two methods to honor the forum selection clause, as the Supreme Court has made clear that the law of the state agreed to be the exclusive forum is to provide the choice of law rules when transfer is done to effectuate a forum selection clause.

Thus, we would appreciate your advise by the close of business on Tuesday, Feb 24th as to how you wish to proceed.


Sent from my iPad

7

The information contained in this message may be attorney-client or work-product privileged and should be treated as confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, destroying the original message and any copies.

# *EXHIBIT I*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| EVAN SINGLETON and VITO LOGRASSO, individually and on behalf of all others similarly situated, Plaintiffs, | : : : : : : | CIVIL ACTION<br><br>No. 15-223 |
| v. | : : | |
| WORLD WRESTLING ENTERTAINMENT, INC., Defendant. | : : : | |

## O R D E R

**AND NOW**, this 23rd day of March, 2015, upon consideration of the defendant's motion for transfer of venue (Doc. No. 6) and epistolary correspondence from the parties to the court, it is hereby **ORDERED** that the motion is **GRANTED**, and this action is hereby transferred to the United States District Court for the District of Connecticut.[1]

It is further **ORDERED** that:

1) Such order shall be implemented immediately without the 21 day stay period contemplated by Local Rule 3.2.

---

[1] A court may transfer an action to any other district where an action might have been brought or to any district to which all parties have consented. 28 U.S.C. § 1404(a). Venue is appropriate in "a judicial district in which any defendant resides." 28 U.S.C. § 1391. The defendant is a Delaware corporation with its principal place of business in Connecticut. By all accounts offered, the defendant would be considered a resident of Connecticut. See 28 U.S.C. § 1332(c)(1); Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010). The District of Connecticut is a district in which this action could have been brought.

The plaintiffs do not oppose a transfer of venue and agree the District of Connecticut is an appropriate forum. In addition, a transfer of this action to the District of Connecticut is appropriate "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). The WWE executives, who will likely serve as witnesses in this case, reside in Connecticut. The corporate records and other documentary evidence needed to litigate this action are located in Connecticut. The defendants agree to depose the plaintiffs at locations convenient to them, posing no inconvenience to the plaintiffs in litigating in Connecticut. The plaintiffs can more easily enforce a judgment against WWE in Connecticut.

1

2)      The defendant shall have **fourteen (14) days** from the date on which this case is transferred to the District of Connecticut to file a response to the complaint.

> BY THE COURT:
>
> /s/Lawrence F. Stengel
> LAWRENCE F. STENGEL, J.

2

# *EXHIBIT J*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CASSANDRA FRAZIER, individually and as
next of kin to her deceased husband,
NELSON LEE FRAZIER, JR. A/K/A
"MABEL" A/K/A "VISCERA" A/K/A "BIG
DADDY V" A/K/A "KING MABEL," and as
personal representative of THE ESTATE OF
NELSON LEE FRAZIER, JR., DECEASED,

            Plaintiffs,

v.

WORLD WRESTLING
ENTERTAINMENT, INC.,

            Defendant.

Case No. 2:15-cv-02198

## DEFENDANT'S MOTION TO TRANSFER VENUE
## PURSUANT TO 28 U.S.C. § 1404(a) DUE TO FORUM-SELECTION CLAUSES
## IN THE CONTRACTS BETWEEN DEFENDANT AND THE DECEDENT

Defendant World Wrestling Entertainment, Inc. ("WWE") hereby moves this Court to

transfer venue from the U.S. District Court for the Western District of Tennessee to the U.S.

District Court for the District of Connecticut pursuant to 28 U.S.C. § 1404(a) and the decision of

the U.S. Supreme Court in *Atlantic Marine Constr. Co., Inc. v. United States Dist. Ct. for W.*

*Dist. of Texas*, 134 S. Ct. 568 (2013). The grounds for this Motion are set forth in the

accompanying memorandum of law, which is incorporated herein by reference as though fully

set forth herein. Briefly stated, WWE and the decedent agreed to multiple contracts that

contained a mandatory forum-selection provision establishing the U.S. District Court for the

District of Connecticut as the exclusive forum for any disputes arising out of or relating in any

way to the contracts for professional wrestling services. The Supreme Court ruled in *Atlantic*

*Marine* that a district court should ordinarily transfer a case to the forum specified in a forum-selection clause unless there are extraordinary circumstances unrelated to the convenience of the parties. No such circumstances are present here.

Dated: March 27, 2015                    Respectfully submitted,

                                   By:   s/ Eugene J. Podesta, Jr.
                                         ─────────────────────────────────
                                         Eugene J. Podesta, Jr.
                                         gpodesta@bakerdonelson.com
                                         Baker, Donelson, Bearman, Caldwell
                                             & Berkovitz, PC
                                         First Tennessee Building
                                         165 Madison Avenue
                                         Suite 2000
                                         Memphis, Tennessee 38103
                                         (901) 577-2213 (phone)
                                         (901) 577-0761 (facsimile)

                                         Jerry S. McDevitt  (pro hac vice to be filed)
                                         Curtis B. Krasik  (pro hac vice to be filed)
                                         K&L GATES LLP
                                         210 Sixth Avenue
                                         Pittsburgh, PA  15222-2613
                                         Telephone:  (412) 355-6500
                                         Facsimile:  (412) 355-6501
                                         E-mail: jerry.mcdevitt@klgates.com
                                         curtis.krasik@klgates.com

                                         *Counsel for World Wrestling Entertainment,
                                         Inc.*

## CERTIFICATE OF CONSULTATION

In accordance with LR 7.2, I hereby certify that counsel for WWE consulted with counsel for Plaintiff as follows: WWE's counsel, Jerry S. McDevitt, consulted with Plaintiffs' counsel, Konstatine Kyros and R. Christopher Gilreath by emails dated March 17, 18, 20, 23, and 24, 2015, and WWE's counsel Eugene J. Podesta, Jr. consulted with Mr. Gilreath in telephone conferences on March 25 and 26, 2015. Despite these efforts, the parties were unable to reach an accord as to the relief sought by the foregoing DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a) DUE TO FORUM-SELECTION CLAUSES IN THE CONTRACTS BETWEEN DEFENDANT AND THE DECEDENT.

Dated:  March 27, 2015                s/ Eugene J. Podesta, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT WORLD WRESTLING

ENTERTAINMENT, INC.'S MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C.

§ 1404(a) DUE TO FORUM-SELECTION CLAUSES IN THE CONTRACTS BETWEEN

DEFENDANT AND THE DECEDENT was served by the Court's CM/ECF System to all

counsel registered to receive electronic notice.

Dated: March 27, 2015                              s/ Eugene J. Podesta, Jr.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CASSANDRA FRAZIER, individually and as
next of kin to her deceased husband,
NELSON LEE FRAZIER, JR. A/K/A
"MABEL" A/K/A "VISCERA" A/K/A "BIG
DADDY V" A/K/A "KING MABEL," and as
personal representative of THE ESTATE OF
NELSON LEE FRAZIER, JR., DECEASED,

          Case No.  2:15-cv-02198

          Plaintiffs,

v.

WORLD WRESTLING
ENTERTAINMENT, INC.,

          Defendant.

---

**DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER
VENUE PURSUANT TO 28 U.S.C. § 1404(a) DUE TO FORUM-SELECTION CLAUSES
IN THE CONTRACTS BETWEEN WWE AND THE DECEDENT**

---

Eugene J. Podesta, Jr.
gpodesta@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell
  & Berkovitz, PC
First Tennessee Building
165 Madison Avenue
Suite 2000
Memphis, Tennessee 38103
(901) 577-2213 (phone)
(901) 577-0761 (facsimile)

Jerry S. McDevitt
jerry.mcdevitt@klgates.com
Curtis B. Krasik
curtis.krasik@klgates.com
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222-2613
(412) 355-6500 (phone)
(412) 355-6501 (facsimile)

*Counsel for Defendant World Wrestling Entertainment, Inc.*

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................1

II.     BACKGROUND ..................................................................................................4

        A.      Summary of the Allegations ....................................................................4

        B.      Plaintiff's Claims Are Subject to Contractual Forum-Selection
                Provisions to Which the Decedent Expressly Agreed ............................5

        C.      WWE's Operations and Lack of Contacts with the State of Tennessee .................6

        D.      WWE's Attempts to Obtain Plaintiff's Compliance with the Forum-
                Selection Clauses ....................................................................................6

III.    ARGUMENT .......................................................................................................9

        A.      Standard of Review ..................................................................................9

        B.      The District of Connecticut Has Subject Matter Jurisdiction And Venue
                is Proper in the District of Connecticut ..................................................10

        C.      The Private Interest Factors Conclusively Require a Transfer ..............11

        D.      The Public Interest Factors Overwhelmingly Favor a Transfer.............13

IV.     CONCLUSION ..................................................................................................18

Defendant World Wrestling Entertainment, Inc. ("WWE") respectfully submits this memorandum of law in support of motion to transfer venue (the "Motion") pursuant to 28 U.S.C. § 1404(a) due to forum-selection clauses in the contracts between WWE and the decedent.

## I.     INTRODUCTION

Rarely is an issue so squarely controlled by a recent U.S. Supreme Court decision as is the issue presented by this Motion. The Supreme Court's 2013 opinion in *Atlantic Marine Constr. Co., Inc. v. United States Dist. Ct. for W. Dist. of Texas* specifically addressed "the procedure that is available to a defendant in a civil case who seeks to enforce a forum-selection clause." 134 S. Ct. 568, 575 (2013). The Court held that "the clause may be enforced through a motion to transfer under § 1404(a)" and that "a district court should ordinarily transfer the case to the forum specified in that clause." *Id.* at 579-81. Under the controlling precedent of *Atlantic Marine*, this case should be transferred to the District of Connecticut because plaintiff, through her decedent, is bound by mandatory contractual forum-selection clauses in decedent's contracts with WWE that expressly and unequivocally require this case to be litigated in the District of Connecticut. *See* Affidavit of James W. Langham ("Langham Aff.") attached at Tab 1, Exs. A, C, & D. As the party "defying the forum-selection clause," *Atlantic Marine* imposes on plaintiff the heavy burden of demonstrating "exceptional circumstances" that transfer is unwarranted pursuant to the mandatory forum-selection clauses to which decedent agreed. Plaintiff plainly cannot meet that burden here.

Significantly, WWE is facing another lawsuit in the U.S. District Court for the Eastern District of Pennsylvania asserting substantially-similar allegations filed by two of the same attorneys representing the plaintiff in this case. *See Singleton et al. v. World Wrestling Entertainment, Inc.*, No. 5:15-cv-00223-LS (E.D. Pa.). The plaintiffs there signed contracts with

mandatory forum-selection provisions that are identical to the provisions in the last two contracts between the decedent and WWE. On February 27, 2015, WWE filed a "Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) Due to Forum-Selection Clauses in the Contracts Between the Parties" (the "Motion" attached at Tab 2). The plaintiffs filed no opposition to the Motion. On March 23, 2015, the Eastern District of Pennsylvania granted WWE's Motion, noting that "**[t]he plaintiffs do not oppose a transfer of venue and agree the District of Connecticut is an appropriate forum**." *See* 3/23/15 Order at 1 n.1 (emphasis added) attached at Tab 3. There is no basis for plaintiff and her counsel to assert a contrary position here.

Accordingly, enforcement of the mandatory forum-selection clauses under *Atlantic Marine* as well as the other Section 1404(a) considerations mandate the transfer of this case to the District of Connecticut for the following reasons:

*First*, the District of Connecticut would have subject matter jurisdiction over this action pursuant to diversity jurisdiction under 28 U.S.C. § 1332, and venue would be proper in the District of Connecticut under 28 U.S.C. § 1391(b) because WWE maintains its principal place of business in the State of Connecticut.

*Second*, plaintiff's claims are governed by mandatory contractual forum-selection clauses requiring the action to be litigated in the District of Connecticut pursuant to agreements the decedent entered into with WWE. Because the plaintiff stands in the shoes of the decedent by bringing this wrongful death action, she is bound by these mandatory forum-selection clauses, which the Supreme Court requires be given controlling weight absent exceptional factors. There are no such factors present here. Plaintiff's decedent signed contracts to provide professional wrestling services in which he voluntarily agreed to submit "all disputes arising out of or relating in any way" to the agreements in Connecticut, and thereby he, and the plaintiff suing in his stead,

2

waived the right to challenge the preselected forum as inconvenient. Under well-established Supreme Court precedent, mandatory forum-selection clauses must be enforced to protect the parties' legitimate expectations, and should be given "controlling weight" in "all but the most exceptional cases." Plaintiff cannot carry her "heavy" burden of demonstrating any such exceptional circumstances in this case.

*Third*, the public interest also overwhelmingly favors the transfer of this case to the District of Connecticut. The District of Connecticut has an extensive connection to this case, considerably more so than this District. Trial would be conducted more easily, expeditiously and inexpensively in the District of Connecticut, because most of the witnesses are WWE employees or representatives who work or reside in Connecticut and because WWE's corporate records and other documentary evidence are also located in Connecticut. A transfer additionally would ensure a faster disposition of the case and would lighten this District's docket, which is far more congested than that of the District of Connecticut. A transfer would not offend any pertinent public policies because plaintiff will be able to pursue her claims in the District of Connecticut. Furthermore, the federal courts of Connecticut exercising diversity jurisdiction are more familiar with Connecticut law than this Court. A transfer also would promote systemic integrity because, as noted above, plaintiffs' counsel previously "agree[d] the District of Connecticut is an appropriate forum" while not opposing WWE's motion to transfer to the District of Connecticut in a lawsuit asserting substantially-similar claims filed by two former-WWE wrestlers. *See* Tab 3 at 1 n.1. It would be beneficial to litigate similar cases in the same District to conserve judicial resources and promote consistent rulings. In any event, the Supreme Court noted in *Atlantic Marine* that the public interest factors "will rarely defeat a transfer motion." Under any circumstances, therefore, the forum-selection clauses control and mandate that this case be

3

transferred to the District of Connecticut.

## II.     BACKGROUND

### A.     Summary of the Allegations

The plaintiff, Cassandra Frazier ("plaintiff"), brings this wrongful death action as the next-of-kin and personal representative of the estate of Nelson Lee Frazier (the "decedent"). *See* Compl. ¶ 2. At various times during his life, the decedent performed as a professional wrestler for WWE. *See id.* He last performed for WWE in early-2008. *See id.* ¶ 108. Plaintiff dubiously alleges "on information and belief" that the decedent supposedly "sustained head and other long-term injuries" in each of the 289 wrestling matches in which the decedent performed for WWE. *See id.* ¶¶ 117-406. The plaintiff readily admits, however, that the decedent, a 500 pound man with diabetes and an enlarged heart, died of a massive heart attack after taking a shower. *See id.* ¶¶ 14, 98, 115. It takes no doctor to know that extreme obesity and diabetes are directly linked to heart disease, an illness that claims the lives of hundreds of thousands of Americans annually.[1] Yet, plaintiff alleges that WWE somehow is responsible for a morbidly obese individual's lifestyle that caused his demise 6 years after he was last affiliated with WWE. *See id.* ¶¶ 2, 107-108. To attempt to bridge the gap between a heart attack and the decedent's alleged head injuries, the plaintiff makes the implausible allegation that the purported effects of the decedent's head trauma "more likely than not attributed [sic] to [the decedent's] heart attack and his inability to survive the heart attack." *Id.* ¶ 516. While sympathetic to plaintiff's loss, her claims defy logic and science, and will be fully exposed at another time.

---

[1] *See* Heart Disease Facts reported by the Centers for Disease Control and Prevention at http://www.cdc.gov/heartdisease/facts.htm (reporting that each year 610,000 people die in the United States -- or 1 in every 4 deaths -- due to heart disease; listing diabetes and obesity as the first two risk factors for heart disease).

4

**B.     Plaintiff's Claims Are Subject to Contractual Forum-Selection Provisions to Which the Decedent Expressly Agreed**

During his various stints with WWE, decedent wrestled for WWE pursuant to agreements called booking contracts (the "Booking Contracts"). *See* Langham Aff. ¶ 5. The decedent entered into Booking Contracts with WWE dated June 12, 1993 (the "1993 Booking Contract"), January 25, 1999 (the "1999 Booking Contract"), November 11, 2004 (the "2004 Booking Contract"), and November 11, 2007 (the "2007 Booking Contract"). *See* Langham Aff. ¶ 5 and Exs. A, B, C and D. Each of these Booking Contracts was made in Connecticut. *See* Langham Aff. ¶ 5 and Exs. A, B, C and D, § 13.7.

Three of the decedent's Booking Contracts, including the two most recent agreements, contain mandatory forum-selection clauses requiring his claims to be litigated in Connecticut. *See* Langham Aff. ¶¶ 6, 8 and Exs. A, C and D, § 13.8. The forum-selection clauses in the 2004 and the 2007 Booking Contracts are identical. They require this matter to be litigated exclusively in the U.S. District Court for the District of Connecticut, providing as follows:

> **The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut**. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.[2]

---

[2]  The forum-selection provision in the 1993 Booking Contract similarly provides:

> **In the event that there is any claim, dispute, or other matter in question arising out of or relating to this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of Connecticut.** This provision to submit all claims, disputes or matters in question to the Federal or state courts in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

5

*See* Langham Aff. ¶¶ 6 and Exs. C and D, § 13.8 (emphasis added).

### C.  WWE's Operations and Lack of Contacts with the State of Tennessee

WWE is an integrated media company principally engaged in the development, production and promotion of television programming and live events featuring its unique brand of wrestling-based sports entertainment. *See* Langham Aff. ¶ 3. WWE is a Delaware corporation with its corporate headquarters in Stamford, Connecticut. *See id.* ¶ 4. Most of WWE's executives who oversee WWE's operations and are in charge of policy-making, reside in Connecticut and have substantial work responsibilities in WWE's Connecticut headquarters. *See id.* ¶ 11. WWE also maintains the vast majority of its business records in Connecticut, either in its corporate headquarters or in an off-site records storage facility. *See id.* ¶ 12.

### D.  WWE's Attempts to Obtain Plaintiff's Compliance with the Forum-Selection Clauses

On March 17, 2015, WWE's counsel advised Plaintiff's counsel, Konstatine Kyros, who is one of the attorneys representing the plaintiffs in *Singleton et al. v. World Wrestling Entertainment, Inc.*, No. 5:15-cv-00223-LS (E.D. Pa.), that the decedent's contracts with WWE, including the last two contracts entered into in 2004 and 2007, contained the identical forum-selection clause as the plaintiffs' contracts in the Eastern District of Pennsylvania case. Of course, Plaintiff's counsel knew that WWE has already moved to transfer the venue of the Eastern District of Pennsylvania case to the District of Connecticut based on the forum-selection

---

*See* Langham Aff. ¶ 8 and Ex. A, § 13.8 (emphasis added). The 1999 Booking Contract, which was terminated in September 2000, contains an arbitration clause similarly requiring the arbitration of claims in Connecticut. *See* Langham Aff. ¶ 9 and Ex. B, § 13.8 ("The parties agree that if a claim or controversy should arise concerning this Agreement, or the breach of any obligation arising under this Agreement, or the interpretation of this Agreement, such dispute shall be resolved by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association with the arbitration to be held in Stamford, Connecticut. . . .").

6

clauses in those contracts. Plaintiff's counsel also knew that the plaintiffs in the Eastern District

of Pennsylvania case consented to transfer the case to Connecticut and that they ultimately filed

no opposition to WWE's transfer motion. WWE's counsel asked if Plaintiff here would agree to

dismiss this case without prejudice and honor the forum-selection clause by re-filing the lawsuit

in the District of Connecticut should she choose to re-file.

Plaintiff's counsel responded by asking for copies of the decedent's contracts with WWE,

indicating that Plaintiff's counsel evidently had not reviewed those contracts as part of his pre-

suit investigation. WWE's counsel provided copies of the contracts and even pointed out certain

specific provisions of the contracts that bear directly on the claims at issue, including, for

example: (i) Section 9.2, in which the decedent agreed he was responsible for his own

conditioning; (ii) Section 9.2(a), in which the decedent agreed to be responsible for his own

training and pattern of exercise; (iii) Section 9.2(b), in which the decedent agreed to be

responsible for his own method of physical conditioning and the foods he consumed; (iv) Section

9.9, in which the decedent agreed to indemnify and defend WWE against any claims incurred by

reason of the breach of any undertaking by him that would include the very claims now being

asserted; (v) Section 9.12(a), in which the decedent promised to obtain health and life insurance

to provide benefits in the event of injury and disavowed any responsibility of WWE in the event

he sustained a physical injury; (vi) Section 9.12(b), in which the decedent promised to make no

claim against WWE in the event he is injured; (vii) Section 12.4, in which the decedent promised

not to seek punitive damages against WWE under any circumstances; and (viii) various

contractual provisions acknowledging and assuming the risk of injury.

On March 26, 2015, WWE's Memphis-based counsel once more asked Plaintiff's

Memphis-based counsel if Plaintiff would agree to dismiss the lawsuit without prejudice in light