of the forum-selection clause. Plaintiff's counsel responded that he did not think the claims in this case related to the contracts, which he characterized as being in the nature of intellectual property licenses. This response was surprising because the contract provisions described above, which WWE's counsel had previously explained to Plaintiff's counsel, clearly go well beyond intellectual property rights and address the respective obligations of WWE and the decedent with respect to the decedent's performance of wrestling services for WWE. In particular, numerous clauses of the contracts bear directly on the allocation of risk of injury, the obligations to obtain insurance for any such injury, and the decedent's responsibility for his own health and physical conditioning. Although the contracts also deal with intellectual property rights, they are far from a simple intellectual property license but rather are comprehensive contracts that bear directly on any personal injury claim ever asserted by the decedent, including, specifically, the claims asserted by Plaintiff here. The response was further surprising because no such argument was made by the plaintiffs' counsel in the Eastern District of Pennsylvania, even though substantially the same contracts containing identical forum-selection clauses were at issue.

Notwithstanding Plaintiff's newly-minted contention regarding the nature of the contracts, on their face, all of the contracts are governed by and interpreted in accordance with Connecticut law. Under Connecticut law, "[w]hen 'arising out of,' 'relating to,' or similar words appear in a forum-selection clause, such language is regularly construed to encompass . . . tort claims associated with the underlying contract." *Nat'l Cabinet & Millwork Installation, LLC v. Zepsa Indus.*, CV146048332S, 2014 WL 7739249, at *6 (Conn. Super. Ct. Dec. 31, 2014) (quoting *BioCapital, LLC v. BioSystem Solutions, Inc.*, FSTCV085009331S, 2009 WL 1815056, at *6 (Conn. Super. Ct. June 1, 2009). This interpretation is consistent with the general rule that the phrase "any disputes arising under a contract" is "all-embracing, all-encompassing and

8

broad." *Fink v. Golenbock*, 238 Conn. 183, 196 (1996). Accordingly, Plaintiff's apparent position regarding her refusal to honor the forum-selection clauses in her decedent's contracts with WWE is squarely contrary to Connecticut law on the scope of such forum-selection clauses.

## III. ARGUMENT

### A. Standard of Review

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Atlantic Marine*, 134 S. Ct. at 581. Thus, where the parties are subject to a valid forum-selection clause, the Court is to give plaintiff's choice of forum "no weight." *Id.*

Forum-selection clauses are presumed valid and should be enforced. *See Moses v. Bus. Card Exp., Inc.*, 929 F.2d 1131, 1136 (6th Cir. 1991); *Elite Physicians Servs., LLC v. Citicorp Payment Servs., Inc.*, No. 1:05-CV-344, 2006 WL 752536, at *2 (E.D. Tenn. Mar. 17, 2006). "The enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Atlantic Marine*, 134 S. Ct. at 581 (internal quotations omitted). "For that reason, and because the overarching consideration under § 1404(a) is whether a transfer would promote the interest of justice, **a valid forum-selection clause should be given controlling weight in all but the most exceptional cases**." *Id.* (internal quotations and brackets omitted) (emphasis added). As the party "defying the forum-selection clause," plaintiff "bear[s] the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* at 581.

Forum-selection clauses which are mandatory, as opposed to permissive, are given controlling weight in virtually all cases. *See Atlantic Marine*, 134 S. Ct. at 581. Forum-selection

9

clauses which dictate an exclusive venue are considered mandatory. *See Carrillo v. TIFCO Industries, Inc.*, No. 3–11–0733, 2011 WL 4538079, at *3 (M.D. Tenn. Sep. 29, 2011) (holding that forum-selection clause was mandatory due to use of word "shall"). Here, the forum-selection clauses agreed to by the decedent and WWE use the word "shall," and dictate an exclusive venue. As such, they are clearly mandatory clauses under controlling law. *See Union Planters Bank, N.A. v. EMC Mortg. Corp.*, 67 F. Supp. 2d 915, 922 (W.D. Tenn. 1999).

  **B. The District of Connecticut Has Subject Matter Jurisdiction And Venue is Proper in the District of Connecticut**

  The traditional analysis under 28 U.S.C. § 1404(a) begins with the determination of whether the action could have been brought in the transferee district. *See Elite Physicians Servs., LLC*, 2006 WL 752536, at *3. In determining whether an action might have been brought in the transferee district, the court assesses whether the transferee district would have jurisdiction over the matter and whether venue would be proper there. *Id.*

  Plaintiff could have brought this action in the District of Connecticut pursuant to diversity jurisdiction. *See* 28 U.S.C. 1332; *Elite Physicians Servs., LLC*, 2006 WL 752536, at *3 (holding action could have been brought in transferee district because transferee court would have had diversity jurisdiction over matter). There is complete diversity between the parties because plaintiff is a citizen of Tennessee whereas WWE is a citizen of Connecticut (where it maintains its headquarters) and of Delaware (where it is incorporated). As set forth in WWE's Notice of Removal (filed as Dkt. No. 1), the amount in controversy exceeds $75,000, exclusive of interest and costs.

  Likewise, venue is proper in the District of Connecticut. Pursuant to 28 U.S.C. § 1391(b)(1), a case may be brought in "a judicial district in which any defendant resides . . . ." Here, WWE maintains its principal place of business, and thus resides, in Connecticut. *See* 28

U.S.C. § 1391(b)(1) & (c)(1); *Dantes v. Indecomm Holdings, Inc.*, No. 1:13–CV–1290–JDB–
EGB, 2014 WL 4161982, at *1 (W.D. Tenn. Aug. 19, 2014) (holding case could have been
brought in transferee district because defendant was headquartered there); *Elite Physicians
Servs., LLC*, 2006 WL 752536, at *3 (same). Accordingly, the first prong of the Section 1404
transfer analysis is met.

### C. The Private Interest Factors Conclusively Require a Transfer

Under the analysis required by *Atlantic Marine*, unlike a typical motion to transfer
pursuant to Section 1404(a), the Court "should not consider arguments about the parties' private
interests . . . [and in fact] must deem private-interest factors to weigh entirely in favor of the
preselected forum." *Atlantic Marine*, 134 S. Ct. at 582. Moreover, forum-selection clauses are
binding on non-signatories who stand in the shoes of a decedent, including specifically
representatives of a decedent's estate such as the plaintiff in this case. *See Tellez v. Chios Sea
Ship. & Trading S A*, 247 F.3d 241, at *1 (5th Cir. 2001) (affirming judge's ruling that "next-of-
kin of a deceased Nicaraguan seaman is bound by the foreign forum selection clause contained in
the seaman's contract of employment when bringing a wrongful death action against the
seaman's employer."); *Brenner v. National Outdoor L'ship Sch.*, 20 F. Supp. 3d 709, 716, 719
(D. Minn. 2014) (granting motion to transfer venue and holding that forum-selection clause in a
contract involving the decedent was binding on the trustee of the decedent's heirs in a wrongful
death action).

Where, as here, a wrongful death claim derives directly from the claim possessed by the
decedent had he lived, his estate and his heirs stand in the shoes of the decedent and are bound
by agreements in which the decedent entered while alive. *See THI of N.M. at Hobbs Ctr., LLC v.
Spradlin*, 532 Fed. App'x 813, 817-18 (10th Cir. 2013) (concluding that wrongful death claims
under state law derive directly from the claim decedent possessed were he still alive such that

11

agreement to arbitrate wrongful death claim was binding on the decedent's estate); *Wilkerson ex rel. Estate of Wilkerson v. Nelson*, 395 F. Supp. 2d 281, 288-89 (M.D.N.C. 2005) (same); *Peltz ex rel. Estate of Peltz v. Sears, Roebuck & Co.*, 367 F. Supp. 2d 711, 718 (E.D. Pa. 2005) (same); *THI of S.C. at Columbia, LLC v. Wiggins*, No. 3:11–888–CMC, 2011 WL 4089435, at *5 (D.S.C. Sep. 13, 2011) (same). Plaintiff has asserted a wrongful death claim and other negligence and fraud-based claims that are derivative of those that the decedent would have had were he still alive. *See* T.C.A. § 20-5-106(a) (providing that decedent's claims pass to surviving spouse); *Kline v. Eyrich*, 69 S.W.3d 197, 206-07 (Tenn. 2002); *Parker v. Portland Nursing & Nursing Rehab*, No. M2011-02633-COA-R9-CV, 2012 WL 3776800, at *1 (Aug. 30, 2012) (administrator of decedent's estate asserting, among other things, negligence claims based on alleged breach of duties owed to decedent). Thus, the plaintiff stands in the shoes of the decedent and is bound by the forum-selection clauses set forth in the decedent's Booking Contracts.

Because the plaintiff is bound by the forum-selection clauses in the decedent's Booking Contracts, the private interest factors automatically apply in favor of a transfer. *See Brenner*, 20 F. Supp. 3d at 718-19 (applying *Atlantic Marine* and enforcing forum-selection clause against representative of decedent's heirs).[3] Here, three of the four Booking Contracts, including the

---

[3] Even in the absence of the Supreme Court's holding in *Atlantic Marine*, the individual private interest factors would still favor a transfer to the District of Connecticut. First, most of the witnesses are WWE executives and employees who reside and/or work in Connecticut. *See* Langham Aff. ¶ 11. Second, most of the documentary evidence is also located in Connecticut either at WWE's headquarters or at an off-site records storage facility. *See id.* ¶ 12. Third, plaintiff's choice of forum would be given little weight because this case was removed to federal court which is not the forum that plaintiff originally selected, and the State of Tennessee has little connection to the challenged conduct. *See Maberry v. Nuclear Fuel Servs., Inc.*, No. 3:13–CV–499, 2013 WL 5560318, at *2 (E.D. Tenn. Oct. 7, 2013) ("[A] plaintiff's choice of forum is entitled to somewhat less weight when the case is removed to federal court because the plaintiff is no longer in his or her chosen forum, which was state court." (citation omitted); *Allenberg*

12

two most recent Booking Contracts, specifically require any disputes arising out of or relating in any way to the Booking Contracts to be litigated in the District of Connecticut. WWE and the decedent voluntarily and expressly agreed that they would bring suit in Connecticut when they signed the Booking Contracts. *Atlantic Marine*, 134 S. Ct. at 581 (a forum-selection clause "represents the parties' agreement as to the most proper forum"). By standing in the shoes of the decedent vis-à-vis the Booking Contracts, "the plaintiff has waived the privilege to bring suit in the forum of [her] choice as well as the right to challenge the preselected forum as inconvenient." *Wingo v. Twitter, Inc.*, No. 14–2643, 2014 WL 7013826, at *3 (W.D. Tenn. Dec. 12, 2014) (citing *Atlantic Marine*, 134 S. Ct. at 581-582).[4]

**D.    The Public Interest Factors Overwhelmingly Favor a Transfer**

The Court in *Atlantic Marine* made clear that, although public interest factors are to be considered, such factors rarely suffice to defeat a mandatory forum-selection clause. Thus, the practical effect is that the mandatory forum-selection clause should control. *See* 134 S. Ct. at 582 ("Public interest factors will rarely defeat a transfer motion.").

"The public interest factors include 'docket congestion, the burden of a trial to a jurisdiction with no relation to the cause of action, the local interest in deciding local controversies at home, and the familiarity of the local court with controlling state law.'" *Livermore v. Engles*, No. 2:09–CV–70, 2010 WL 2220307, at *7 (E.D. Tenn. Mar. 31, 2010)

---

*Cotton Co. v. Staple Cotton Co-Op. Ass'n*, No. 06-2449, 2007 WL 2156352, at *2 (W.D. Tenn. July 25, 2007) (holding in pre-*Atlantic Marine Allenberg*, decision that plaintiff's choice of forum merits little weight "given the limited connection the events giving rise to this cause of action have to this district.").

[4] Even in the pre-*Atlantic Marine* environment, the Sixth Circuit was unsympathetic to a plaintiff's choice of forum where that choice conflicted with the contractually predetermined forum. *See Elite Physicians Servs., LLC*, 2006 WL 752536, at *6-7; *see also In re ImagePoint, Inc.*, No. 3:12–410, 2013 WL 2457900, at *3 (E.D. Tenn. June 6, 2013) ("As to the general preference for the Plaintiff's chose forum . . . this presumption is negated by a valid forum-selection clause.").

13

(quoting *In re Aredia & Zometa Prods. Liab. Litig.*, Nos. 3:07-CV-01184 et al., 2008 WL 686213, at *2 (M.D. Tenn. Mar. 6, 2008)). These factors strongly support a transfer of this case.

*First*, this District has little connection with this litigation because the alleged acts or omissions of WWE occurred, if at all, through its decision-makers who work out of WWE's headquarters in Connecticut. *See Dantes*, 2014 WL 4161982, at *3 ("As far as location of the events giving rise to the dispute, Defendant has the advantage" because Defendants' decision makers were located in transferee district where Defendant was headquartered). Similarly, out of the alleged 289 wrestling matches in which the decedent supposedly sustained injuries — albeit, dubiously alleged "upon information and belief" — 282 (or **approximately 98%**) of the matches occurred outside of Tennessee. *See* Compl. ¶¶ 117-406; *see also Flight Solutions, Inc. v. Club Air, Inc.*, No. 3:09-CV-1155, 2010 WL 276094, at *5 (M.D. Tenn. Jan. 14, 2010) (noting mandatory forum-selection clauses require filing of suit in specified forum). Further, the decedent sought out WWE's association in Connecticut as reflected by the fact that the Booking Contracts were made in Connecticut. *See* Langham Aff. ¶ 5 and Exs. A, B, C and D, § 13.7; *see also Ozark Entm't, Inc. v. Wilson*, No. 3:09-0195, 2009 WL 4884445, at *2 (M.D. Tenn. Dec. 10, 2009) (contract was entered into in transferee district); *Returns Distrib. Specialists, LLC v. Playtex Prods., Inc.*, No. 02-1195-T, 2003 WL 21244142, at *8 (W.D. Tenn. May 28, 2003) (explaining plaintiff sought out defendant's business in transferee district); *see also Blue Diamond Coal Co. v. Michigan Sugar Co.*, 463 F. Supp. 14, 16 (E.D. Tenn. 1978) (noting contract negotiations occurred in transferee district). Notably, the decedent represented in his last two contracts in 2004 and 2007 that he resided in Arkansas, not Tennessee. *See* Langham Aff. ¶ 7, Exs. C and D, § 13.6 and at p. 1. Pursuant to both the 2004 and 2007 Booking Contracts, WWE was obligated to provide the decedent with contractually-required notices at his

14

Arkansas address. *See id.*

     *Second*, the litigation would be conducted more easily, expeditiously and inexpensively

in the District of Connecticut because most of the witnesses are WWE employees or

representatives who work or reside in Connecticut, including most of WWE's executives who

are in charge of operations and policy-making, and because WWE's corporate records and other

documentary evidence are also located in Connecticut. *See Dantes*, 2014 WL 4161982, at *3

(transferee district "would be the superior location as Defendant is headquartered there . . . .");

*Maberry*, 2013 WL 5560318, at *2 (litigation would be conducted more efficiently and

inexpensively in transferee division because most of witnesses and plaintiff's employment

records were located there); *Allenberg Cotton Co.*, 2007 WL 2156352, at *2 (concluding that

transferee district "is where the majority of witnesses to the circumstances surrounding this

litigation can be found and proof relative to the claims can be obtained"). Transporting these

witnesses to Tennessee will also be costly, and will significantly burden the WWE executives

who have substantial work responsibilities in Connecticut. *See Flight Solutions, Inc.*, 2010 WL

276094, at *4 (defendant would be burdened by travel expenses of witnesses). Moreover, "[i]t

would be difficult for [WWE] to operate [its] business[] if [its] employees were required to be in

Tennessee during the trial of this matter." *See Returns Distrib. Specialists, LLC*, 2003 WL

21244142, at *7. Pertinently, in granting WWE's motion to transfer venue, the Eastern District

of Pennsylvania noted that "transfer of this action to the District of Connecticut is appropriate

'[f]or the convenience of parties and witnesses, in the interest of justice" because, among other

reasons, "[t]he WWE executives, who will likely serve as witnesses in this case, reside in

Connecticut [and] [t]he corporate records and other documentary evidence needed to litigate this

action are located in Connecticut." *See* Tab 3 at 1 n.1. This reasoning applies with even greater

15

force here given the significantly greater distance — and thus inconvenience and expense — of travel from Connecticut to Memphis, Tennessee as compared to Philadelphia, Pennsylvania.[5]

*Third*, a transfer would facilitate the faster disposition of this action due to this District's docket being more congested than that of the District of Connecticut. *See Esperson v. Trugreen Ltd. P'ship*, No. 2:10-CV-02130-STA, 2010 WL 4362794, at *6 (W.D. Tenn. Oct. 5, 2010) *report & recommendation adopted*, No. 2:10-CV-02130-STA, 2010 WL 4337823 (W.D. Tenn. Oct. 27, 2010) (transfer analysis should consider promptness of determination of case by referring to relative docket loads of transferor and transferee districts). Indeed, the District of Connecticut had less pending cases per judge (381) than this District (512) as of September 30, 2014.[6] As a result, the District of Connecticut disposes of cases 9.8 months from filing on average, whereas the average for this District is 11.3 months.

*Fourth*, there is no indication that transferring this case to the District of Connecticut would offend any applicable public policy. *See Elite Physicians Servs., LLC*, 2006 WL 752536, at *6 ("public policy of Tennessee would not be contravened by litigating this case in New York."). Plaintiff will be able to pursue her claims in the District of Connecticut. Moreover, Connecticut has a greater interest in adjudicating claims related to alleged wrongdoings that were allegedly committed by a Connecticut resident. *See United States v. Gonzales & Gonzales Bonds & Ins. Agency, Inc.*, 677 F. Supp. 2d 987, 994 (W.D. Tenn. 2010) (transferring case in part because Tennessee had no local interest in adjudicating case); *Oakley v. Remy Intern., Inc.*,

---

[5] WWE is agreeable to conducting any deposition of Plaintiff in Memphis (or whereever she may be residing at the time), thereby alleviating any potential inconvenience to her by the litigation of her claims in Connecticut notwithstanding the forum-selection clauses to which her decedent agreed.

[6] *See* Federal Court Management Statistics, available at http://www.uscourts.gov/viewer.aspx?doc=/uscourts/Statistics/FederalCourtManagementStatistics/2014/district-fcms-profiles-september-2014.pdf&page=8 (last visited March 16, 2014).

16

No. 2:09–0107, 2010 WL 503125, at *6 (M.D. Tenn. Feb. 5, 2010) (noting that transferee district had interest in adjudicating case involving defendant based out of state within which transferee district is located). And even if Tennessee had a stronger interest in adjudicating this dispute (which it does not), such interest cannot categorically trump an enforceable forum-selection clause. *See Wong v. PartyGaming Ltd.*, 589 F.3d 821, 832 (6th Cir. 2009).

*Fifth*, judges in the District of Connecticut are likely more familiar with Connecticut law than judges in this District. At a minimum, a court would have to consider Connecticut's choice of law rules because, as the Supreme Court held in *Atlantic Marine*, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules . . . ." 134 S. Ct. at 582. *See Ozark Entm't, Inc.*, 2009 WL 4884445, at *3 (transferee court is more familiar with laws of state in which it sits).

*Finally*, transferring this case to the District of Connecticut would also promote systemic integrity because on March 23, 2015 the Eastern District of Pennsylvania granted WWE's motion to transfer to the District of Connecticut a lawsuit asserting substantially-similar claims filed by two former-WWE wrestlers (and represented by two of the same attorneys representing plaintiff here) subject to identical mandatory forum-selection clauses. *See* Tab 3. Accordingly, systemic integrity would be promoted by having these similar cases litigated in the same district to ensure consistent rulings. *See Gonzales & Gonzales Bonds & Ins. Agency, Inc.*, 677 F. Supp. 2d at 994 (systemic integrity promoted by transferring case to district where other similar case was being adjudicated); *Proffitt v. Abbott Labs*, No. 2:08-CV-151, 2008 WL 4401367, at *7 (E.D. Tenn. Sep. 23, 2008) (cases were "similar enough to the Delaware cases that they should be heard by the same court that is familiar with the issues in order to conserve judicial resources

17

and to prevent inconsistent rulings.").

In sum, the public interest factors conclusively establish that this case should be transferred to the District of Connecticut.

## IV. CONCLUSION

For all of the foregoing reasons, the Court should grant WWE's Motion to transfer this case to the District of Connecticut.

Dated: March 27, 2015

Respectfully submitted,

By:     s/ Eugene J. Podesta, Jr.
_____
Eugene J. Podesta, Jr.
gpodesta@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell
    & Berkovitz, PC
First Tennessee Building
165 Madison Avenue
Suite 2000
Memphis, Tennessee 38103
(901) 577-2213 (phone)
(901) 577-0761 (facsimile)

Jerry S. McDevitt  (pro hac vice to be filed)
Curtis B. Krasik  (pro hac vice to be filed)
K&L GATES LLP
210 Sixth Avenue
Pittsburgh, PA  15222-2613
Telephone:  (412) 355-6500
Facsimile:  (412) 355-6501
E-mail: jerry.mcdevitt@klgates.com
curtis.krasik@klgates.com

*Counsel for World Wrestling Entertainment, Inc.*

APPENDIX - Page 266

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE was served by the Court's CM/ECF System to all counsel registered to receive electronic notice.

March 27, 2015

Eugene J. Podesta, Jr.

# TAB 1

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

CASSANDRA FRAZIER, individually and as
next of kin to her deceased husband,
NELSON LEE FRAZIER, JR. A/K/A
"MABEL" A/K/A "VISCERA" A/K/A "BIG
DADDY V" A/K/A "KING MABEL," and as
personal representative of THE ESTATE OF
NELSON LEE FRAZIER, JR., DECEASED,

Plaintiffs,

v.

WORLD WRESTLING
ENTERTAINMENT, INC.,

Defendant.

Case No. 2:15-cv-02198

## AFFIDAVIT OF JAMES W. LANGHAM

State of Connecticut )
) ss:
County of Fairfield )

I, James W. Langham, being first duly sworn, hereby depose and say:

1. I am over eighteen (18) years of age. I have personal knowledge of the matters set forth herein or, where indicated, have reviewed WWE corporate records, and am competent to testify thereto.

2. I am employed as the Senior Vice President and Assistant General Counsel of World Wrestling Entertainment, Inc. ("WWE"). In that capacity, I assist in the oversight of WWE's legal department and I have gained direct and substantial knowledge of WWE's business operations.

BOS-3447108 v2

3.     WWE is an integrated media company principally engaged in the development, production, and promotion of television programming and live events, featuring its unique brand of wrestling-based sports entertainment.

4.     WWE is a Delaware corporation with its corporate headquarters in Stamford, Connecticut.

5.     Nelson Lee Frazier wrestled for WWE pursuant to agreements called booking contracts (the "Booking Contracts"). Attached at Exhibits A, B, C and D, respectively, are true and correct copies of Mr. Frazier's Booking Contracts entered into on June 12, 1993 (the "1993 Booking Contract"), on January 25, 1999 (the "1999 Booking Contract"), on November 11, 2004 (the "2004 Booking Contract"), and on November 11, 2007 (the "2007 Booking Contract"). Each of these Booking Contracts were made in Connecticut. *See* Exhibits A, B, C and D, § 13.7.

6.     The 2004 and 2007 Booking Contracts of Mr. Frazier contain identical mandatory forum selection clauses that require his claims to be litigated in the United States District Court for the District of Connecticut. Specifically, the clauses at issue state:

> The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

*See* Exhibits C and D, ¶ 13.8.

7.     When Mr. Frazier entered into the 2004 and the 2007 Booking Contracts, he represented that he resided in Arkansas. The first paragraph of both the 2004 and the 2007 Booking Contracts describe Mr. Frazier as "an individual residing at 521 Par Drive, #9, Marion, Arkansas 72364 . . . ." *See* Exhibits C and D, first paragraph at page 1. Moreover, pursuant to

both the 2004 and the 2007 Booking Contracts, WWE was obligated to provide Mr. Frazier with contractually-required notices at "521 Par Drive, #9, Marion, Arkansas 72364." *See* Exhibits C and D, ¶ 13.6.

8.      Similar to Mr. Frazier's 2004 and 2007 Booking Contracts, Mr. Frazier's 1993 Booking Contract with WWE required his claims to be litigated in Connecticut. The pertinent provision states:

> In the event that there is any claim, dispute, or other matter in question arising out of or relating to this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of Connecticut. This provision to submit all claims, disputes or matters in question to the Federal or state courts in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

*See* Exhibit A, ¶ 13.8

9.      The 1999 Booking Contract, which was terminated in September 2000, contained an arbitration provision similarly requiring arbitration in Stamford, Connecticut. *See* Ex. B, § 13.8.

10.     Each of the decedent's Booking Contracts contains a choice of law provision requiring the application of Connecticut law. *See* Exhibits A, B, C and D, ¶ 13.7. The decedent's last three Booking Agreements contain identical choice of law provisions that state: "This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law." See Exhibits B, C and D, ¶ 13.7.

11.     Most of WWE's executives who oversee WWE's operations and are in charge of policy-making reside in Connecticut and have substantial work responsibilities in WWE's Connecticut headquarters. Additionally, the vast majority, if not all, of WWE's employees who

would have discoverable information regarding the plaintiff's claims also work out of WWE's Connecticut headquarters.

12. WWE maintains the vast majority of its business records in Connecticut, either in its corporate headquarters or in an off-site records storage facility.


_____

James W. Langham, Senior Vice President and
Assistant General Counsel


Subscribed and sworn to before me
this 23rd day of March, 2015.


_____

Notary Public
My Commission Expires:


AMY L. ANNUCCI
NOTARY PUBLIC
MY COMMISSION EXPIRES NOVEMBER 30, 2018

# EXHIBIT A

## TITAN SPORTS, INC.
### BOOKING CONTRACT

This contract is made this ___12___ day of __June_____, 1993, by and between Titan Sports, Inc., a Delaware corporation d/b/a The World Wrestling Federation ("WWF") with its principal place of business at 1241 East Main Street in Stamford, Connecticut (hereinafter referred to as "PROMOTER"), and _____ __Nelson Frazier_____ residing at _____ __5646 Amalie Drive Apt. #A-2_____ __Nashville, TN  37211_____ (hereinafter referred to as "WRESTLER"), whose ring name is "_____".

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business of organizing, publicizing, arranging, staging and conducting professional wrestling exhibitions throughout the world and of representing professional wrestlers in the promotion and exploitation of a WRESTLER's name, likeness, personality and character; and

WHEREAS, PROMOTER has established a nationwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions; and in addition thereto, PROMOTER has developed and produced certain other television programs, such as "TNT" and "Saturday Night's Main Event" which are also used to publicize PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his/her wrestling services and his/her standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute exhibitions and promotions organized to provide athletic-styled entertainment to the public, and such wrestling exhibitions constitute entertainment and are not competitive athletic competition; and

WHEREAS, WRESTLER desires PROMOTER to arrange wrestling matches for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the premises and of their mutual promises and agreements as herein set forth, the parties do hereby agree as follows:

### 1. BOOKING

1.1    WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a) During the term of this Agreement, the right to book WRESTLER for and to arrange WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast), or otherwise.

(b) During the term of this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing any or all of the Events, as well as any closed circuit television, or other video exhibition of the Events.

(c) During the term of this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of publicity, merchandising, commercial tie-up, publishing, personal appearance, performing in non-wrestling events, and endorsement rights (collectively referred to as the "Rights") of WRESTLER, his/her legal and/or ring name, likeness, personality, and character, or any other of his/her distinctive or identifying indicia; provided PROMOTER shall inform WRESTLER of any such agreements.

1.2    In consideration of WRESTLER's grant of rights, license and other services, as hereinafter set forth, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER in wrestling matches at various Events, and during the term of this Agreement PROMOTER guarantees WRESTLER a minimum of ten (10) bookings per year at PROMOTER's own Events.

- 2 -

## 2.  PROGRAMS

2.1      WRESTLER hereby grants to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereafter created, any or all of the Events.  (These recordings by tape, disc, film, or otherwise are collectively referred to herein as "Programs").

2.2      PROMOTER may produce, reproduce, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitations, free, cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, print, reprint, vend, sell, distribute and use, and to authorize others to do so, the Programs in perpetuity and in any manner or media and by any art, method or device, now known or hereafter created (including without limitation, by means of videodisc, videocassette, theatrical motion picture and non-theatrical motion picture).

2.3.      PROMOTER shall own in perpetuity all of the rights, results, products and proceeds in and to, or derived from the Programs (including without limitation, all incidents, dialogue, characters, actions, gags, routines, ideas, titles, inventions, and other material written, composed, submitted, added, improvised, interpolated and invented by WRESTLER in connection with his/her appearance in the Programs) and to obtain copyright and/or trademark protection therefor in the name of PROMOTER or PROMOTER's designee.

## 3.  TRADEMARKS

3.1      WRESTLER hereby assigns in good faith to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement, to use WRESTLER's service marks, trademarks and any and all of his/her other distinctive and identifying indicia, including but not limited to his/her legal name, his/her ring name, likeness, voice, signature, costumes, props, gimmicks, gestures, routines, themes, personality, character, and caricatures as used by or associated with WRESTLER in the business of professional wrestling, (collectively the "Intellectual Property").  It is the intention of the parties that the assignment granted with respect to Intellectual Property is exclusive to PROMOTER during the term hereof, even to the exclusion of WRESTLER, and includes the right to sublicense, promote, expose, exploit and otherwise use the Intellectual Property in any commercial manner now known or hereafter discovered.

3.2      If WRESTLER does not own, possess or use service marks, trademarks or distinctive and identifying indicia and PROMOTER develops such service marks, trademarks, and distinctive and

- 3 -

identifying indicia for WRESTLER, they shall belong to PROMOTER and PROMOTER shall have the exclusive license and right in perpetuity, to use, and to authorize others to use, WRESTLER's ring name, likeness, voice, signature, costumes, props, gimmicks, gestures, routines, themes, personality, character and caricatures as used by or associated with WRESTLER's performance as a professional wrestler (collectively "Name and Likeness"). It is the intention of the parties that the assignment with respect to Name and Likeness belongs to PROMOTER in perpetuity, even to the exclusion of WRESTLER, and the assignment includes the right to sublicense, promote, expose, exploit and otherwise use the Name and Likeness in any commercial manner now known or hereinafter discovered.

3.3     WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving their respective rights in and to the trademarks, service marks, Intellectual Property, and Name and Likeness. At PROMOTER's expense and request PROMOTER and WRESTLER shall take such steps as PROMOTER deems necessary for any registration or any litigation or other proceeding, to protect their respective rights in such service marks, trademarks or other Intellectual Property, and Name and Likeness.

### 4. MERCHANDISING

4.1     WRESTLER hereby grants to PROMOTER, and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to use the Intellectual Property and/or Name and Likeness to manufacture, have manufactured, print, produce, reproduce, broadcast, rebroadcast, distribute, sell, and otherwise commercially exploit and use, any and all copyrightable material, goods, or merchandise, or any other item containing copyrightable material; and, as to all such items created and produced during the term of this Agreement, PROMOTER shall have exclusive right in perpetuity, to sell and/or distribute them. By way of example and not of limitation, such items include t-shirts, posters, photos, television rights, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such copyrightable material or item relating to WRESTLER or his/her performance as a professional wrestler. It is the intention of the parties that this grant is exclusive to PROMOTER even to the exclusion of WRESTLER. PROMOTER shall own all copyrights in any and all such materials, goods, merchandise and items and shall be entitled to obtain registrations thereof in its own name, and wrestler shall provide all reasonable assistance to PROMOTER in so obtaining such copyrights.

4.2     WRESTLER hereby grants to PROMOTER, and PROMOTER hereby accepts, the identical rights described in paragraph 4.1 above for non-copyrightable material and items, such as key chains, pens, etc., upon the same terms and conditions as stated in paragraph

- 4 -

4.1.    It is the intention of the parties that this grant is exclusive to PROMOTER, even to the exclusion of WRESTLER.

## 5.  EXCLUSIVITY

5.1       It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted to PROMOTER during the term of this Agreement are exclusive to the PROMOTER even to the exclusion of WRESTLER.

5.2  In the event WRESTLER desires to participate in any commercial activity in which PROMOTER is not otherwise engaged, and WRESTLER's participation in such activity requires use of his/her Intellectual Property or Name and Likeness, PROMOTER may at its discretion, upon WRESTLER's written request, execute a sublicense to WRESTLER for the limited purpose of authorizing WRESTLER to participate in such specific commercial activity upon mutually agreeable terms and conditions. PROMOTER's sublicense to WRESTLER shall constitute an exception to paragraphs 3 and 4 herein, solely with respect to WRESTLER's participation in such specific commercial activity and shall not license, sublicense, authorize, grant or permit any other or further appropriation or infringement of PROMOTER's rights whatsoever.

## 6.  TERM AND TERRITORY

6.1       The term of the Agreement shall be two (2) years from the date hereof. Thereafter, this Agreement shall automatically renew for successive one year terms, unless either party shall serve written notice to the other party at least ninety (90) days' prior to the end of the term of this Agreement of such party's decision to terminate this Agreement as at the end of the term. Reference herein to the term hereof means the original term and any such renewal or extended term. During any such extended term, all rights, duties, obligations, and privileges hereunder shall continue as stated herein. Notwithstanding anything herein to the contrary, termination of this Agreement shall not affect PROMOTER's ownership of and rights to any Programs; the rights, results, products, and proceeds in and to and derived from WRESTLER's performance as a professional wrestler during the term of this Agreement; and the exploitation of the rights set forth in Paragraphs 1, 2, 3 and 4 hereof in any and all media now known or hereafter developed; and any Agreement concerning any and all of the Rights to WRESTLER's Name and Likeness.

6.2       The territory of this Agreement shall be the world.

- 5 -

## 7. PAYMENTS

7.1     If WRESTLER appears in any Event in an arena before a live audience at which admission is charged other than those arena events which are taped for promotional purposes pursuant to paragraph 7.2 hereof, he/she shall be paid by PROMOTER an amount equal to such percentage of the gate receipts for such Event as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary bout, main event, etc.; the prevailing practices of the United States professional wrestling community; and any standards PROMOTER or others establish specifically for such Event. However, such amount shall not be less than One Hundred Fifty ($150.00) Dollars, per Event.

7.2     If WRESTLER renders his/her service in connection with an arena or studio event which is taped for promotional use on PROMOTER's television network or otherwise, he/she shall be paid by PROMOTER an amount not less than Fifty Dollars ($50.00) for each day, if any, on which WRESTLER renders services hereunder in connection with the production of such promotional television show(s)/spots.

7.3     In the event WRESTLER's Intellectual Property and/or Name and Likeness are licensed, sublicensed, or otherwise assigned to third parties for reproduction and/or sale and distribution, in conjunction with any copyrightable material or items, pursuant to paragraph 4.1 hereof, or non-copyrightable material or items, pursuant to paragraph 4.2 hereof (hereinafter "Licensed Products"), such that the applicable product features WRESTLER's Intellectual Property and/or Name and Likeness only, WRESTLER shall receive twenty-five percent (25%) of "Licensed Products' Net Receipts" received by PROMOTER with respect to any such licensing, sublicensing or assignment. Licensed Products' Net Receipts means the gross amount received by PROMOTER less expenses incurred by PROMOTER's licensing agent for the applicable product.

        If WRESTLER's Intellectual Property and/or Name and Likeness are licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate and prorate the amount of compensation paid to WRESTLER pursuant to this paragraph 7.3, based upon the number of wrestlers whose Intellectual Property and/or Name and Likeness are so exploited.

7.4     In the event WRESTLER's Intellectual Property and/or Name and Likeness are licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER shall be paid an amount to be mutually agreed to by WRESTLER and by PROMOTER of the "Personal Appearance Net Receipts" received by

APPENDIX - Page 279

PROMOTER.    Personal  Appearance  Net  Receipts  means  the  amount
received by PROMOTER after payment of and provision for all costs
and expenses, except income taxes.

7.5        In the event any other products developed by Promoter
pursuant to paragraph 4.1 or 4.2 above are exploited directly
through Arena Sales, and/or Mail Order Sales (hereinafter "Direct
Sales  Products"),  such  that  the  applicable  product  features
WRESTLER's Intellectual Property and/or Name and Likeness only,
WRESTLER shall receive an amount equal to five percent (5%) of the
"Direct Sales Products' Net Receipts" derived by PROMOTER from such
exploitation.  Direct Sales Products' Net Receipts means the gross
amount received by PROMOTER for sales of such products sold at
Arenas and/or via Mail Order after deduction of local taxes and
applicable arena commission(s) allocated for concession sales.

        In the event WRESTLER's Intellectual Property and/or Name
and Likeness are exploited by PROMOTER such that Direct Sales
Products feature WRESTLER's Intellectual Property and/or Name and
Likeness with other wrestlers represented by PROMOTER, PROMOTER
shall allocate and prorate the amount paid to WRESTLER pursuant to
this paragraph 7.5, based upon the number of wrestlers whose
Intellectual Property and/or Name and Likeness are so exploited.

7.6        In the event WRESTLER is a featured performer whose
Intellectual Property and/or Name and Likeness are exploited with
other wrestlers represented by PROMOTER in the videos made of
Pay-Per-View  Specials  such  as  "Wrestlemania,"  "Royal  Rumble,"
"Summerslam"    and    "Survivor    Series"    (hereinafter    "WWF    Video
Specials"), PROMOTER shall allocate and prorate twenty-five percent
(25%) of the "WWF Video Specials' Net Receipts" paid to PROMOTER by
Licensee based upon the total amount paid to the wrestlers for the
live event whose Intellectual Property and/or Name and Likeness are
so exploited.   WWF Video Specials' Net Receipts mean the gross
amount received by PROMOTER from its licensees less all costs, if
any, incurred by PROMOTER to produce the applicable WWF Video
Special.

7.7        In the event WRESTLER is a featured performer whose
Intellectual Property and/or Name and Likeness are exploited with
other wrestlers represented by PROMOTER, in non-pay-per-view video
programs such as "Best of WWF" and "Saturday Night's Main Event"
(hereinafter "WWF Series"), PROMOTER shall allocate and prorate
twenty-five percent (25%) of the "WWF Series' Net Receipts" paid to
PROMOTER from its licensees based upon the number of wrestlers
whose  Intellectual  Property  and/or  Name  and  Likeness  are  so
exploited. WWF Series' Net Receipts mean the gross amount received
by PROMOTER from its licensees less expenses, if any, incurred by
PROMOTER in connection with production of the applicable WWF
Series.

- 7 -

7.8     In the event WRESTLER's Intellectual Property and/or Name and Likeness are featured exclusively (as described below) in videodiscs or cassettes (hereinafter "Video Products"), WRESTLER shall receive an amount equal to twelve and one-half percent (12-1/2%) of the "Video Net Receipts" derived by PROMOTER for such exploitation. The remaining twelve and one-half percent (12-1/2%) royalty allocation will be prorated among the other wrestlers who appear incidentally on the Video Products but who are not the featured WRESTLER.   Video Net Receipts mean the gross amount received by PROMOTER from its licensees less all costs, if any, incurred by PROMOTER to produce the applicable Video Product.

        An Exclusive Feature shall mean that the WRESTLER is shown in each and every match on the Video Product.  WRESTLER is entitled to the payment provided for above only for those Video Products which feature him/her exclusively, i.e., "Roddy Piper," or "Andre the Giant," or on those Video Products which feature a tag team or group to which WRESTLER belongs, i.e., the "Hart Foundation."  Relative to a tag team or group appearing on a Video Product, the remaining twelve and one-half percent (12-1/2%) royalty will be prorated among the wrestlers according to the number of wrestlers in the featured group.

7.9     It is the understanding of the parties that WRESTLER shall not be paid anything for PROMOTER's exploitation of his/her Intellectual Property and/or Name and Likeness in PROMOTER's wrestling magazine known as the WWF Official Magazine, or any of PROMOTER's other magazines, which PROMOTER may publish, produce or distribute at arenas, at newsstands and/or by mail.

7.10    All payments made to WRESTLER are in full without withholding of any Federal, state or local income taxes, and/or any social security, FICA or FUTA taxes.   After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER.

7.11    Statements as to royalties payable hereunder shall be sent by PROMOTER to WRESTLER within ninety (90) days following the end of each quarter-annual period together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

        (a)  WRESTLER shall be deemed to have consented to all royalty Statements and all other accountings rendered by PROMOTER hereunder and each such royalty statement or other accounting shall be conclusive, final, and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever unless specific, objection in writing, stating the basis thereof, is given by WRESTLER to PROMOTER within one (1) year from the date rendered.

- 8 -

(b)  PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business in Stamford, Connecticut. WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine and copy PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations. WRESTLER shall not audit PROMOTER's books and records more than once during any calendar year of the term hereof and such audit may not continue for more than thirty (30) days. Statements may be changed from time to time to reflect year-end adjustments, to correct errors and for similar purposes.

## 8. PROMOTER'S OBLIGATIONS

8.1     PROMOTER shall be responsible for obtaining all appropriate licenses to conduct professional wrestling exhibitions.

8.2     PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance as professional WRESTLER and his/her standing in the professional wrestling community, all of which shall inure to the benefit of WRESTLER:

(a)  In connection with WRESTLER's appearances at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion to protect WRESTLER'S safety during his/her performance in a professional wrestling match;

(b)  In connection with the production, distribution, and exploitation of the Programs, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication.

(c)  In connection with any licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the licensing arrangements; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it

- 9 -

deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3      PROMOTER shall schedule events and book WRESTLER for Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time.   If WRESTLER fails to appear as required without advance 24 hour notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then WRESTLER shall be subject to a fine to be determined by PROMOTER.

8.4      Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fine shall not be imposed.  For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; a strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite his/her best efforts prohibits his/her performance or appearance at such Event.

## 9.  WRESTLER'S OBLIGATIONS

9.1      WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2      WRESTLER shall be responsible for his/her own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

        (a) WRESTLER shall establish his/her own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining his/her physical fitness for wrestling. WRESTLER shall select his/her own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his/her own training facilities and equipment, whether by purchase, lease, license, or otherwise.

        (b) WRESTLER shall establish his/her own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning.  WRESTLER shall select his/her time for sleep, time for eating, and time for other activities. WRESTLER shall select his/her own foods, vitamins and

- 10 -

other ingested items, excepting illegal and/or controlled substances and drugs.

9.3     WRESTLER shall be responsible for supplying all wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event at which WRESTLER appears and for any costs incurred in connection with his/her transportation to and from any such Events (except those transportation costs which are covered by PROMOTER's current travel policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his/her appearance at such Events.

9.4     WRESTLER shall use his/her skills and talents as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers of each match consistent with and complying with all requirements, directions and requests made by PROMOTER in connection with the booking of WRESTLER at scheduled Events.

9.5     WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, and to appear at and participate in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter created, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture), at times and places designated by PROMOTER.   WRESTLER will receive no additional compensation in connection therewith.

9.6     WRESTLER shall use his/her best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of his/her wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this paragraph shall cause a forfeiture of any payment due WRESTLER, pursuant to paragraph 7.1, for the Event at which the breach occurs and shall terminate PROMOTER's guarantee as provided in paragraph 1.2 above, as well as all other obligations of PROMOTER to WRESTLER hereunder, but such breach shall not terminate PROMOTER's licenses and other rights hereunder during the term hereof.

9.7     WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Programs or the exercise of any other rights respecting

- 11 -

Intellectual Property or Name and Likeness, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to WRESTLER's Intellectual Property and/or Name and Likeness are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's consent. WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.8      WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER'S appearance and/or performance in a professional wrestling match.

9.9      WRESTLER shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, and affiliates and their respective officers, directors, employees, and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, proceedings or expenses, incurred by any of them by reason of WRESTLER'S breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. And, WRESTLER shall indemnify and defend PROMOTER against any and all claims arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked.

9.10     WRESTLER shall be responsible for payment of all his/her own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to his retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon his retirement from professional wrestling.

9.11     (a)    WRESTLER shall be responsible for his/her own commercial general liability insurance, workman's compensation insurance, professional liability insurance and as well as any excess liability insurance, as he/she deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of his/her own acts, transactions, or conduct as a professional wrestler.

         (b)    WRESTLER acknowledges that the participation and activities required by WRESTLER in connection with his/her performance in a professional wrestling exhibition may be dangerous and may involve the risk of serious bodily injury.  WRESTLER

- 12 -

knowingly and freely assumes full responsibility for all such risks
whether due to the negligence of PROMOTER or otherwise.

(c) WRESTLER hereby releases, waives and discharges
PROMOTER from all liability to WRESTLER and covenants not to sue
PROMOTER for any and all loss or damage on account of injury to the
person or property or resulting in serious or permanent injury to
WRESTLER or in WRESTLER'S death, whether caused by the negligence
of the PROMOTER or otherwise.

(d) WRESTLER acknowledges that the foregoing release,
waiver and indemnity is intended to be as broad and inclusive as
permitted by the law of the State, Province or Country in which the
professional wrestling exhibition or Events are conducted and that
if any portion thereof is held invalid, it is agreed that the
balance shall, notwithstanding, continue in full force and effect.

9.12    (a) WRESTLER may at his/her election obtain health, life
and/or disability insurance to provide benefits in the event of
physical injury arising out of his/her professional activities; and
WRESTLER acknowledges that PROMOTER shall not have any
responsibility for such insurance or payment in the event of
physical injury arising out of his/her professional activities.

(b) In the event of physical injury arising out of
WRESTLER'S professional activities, WRESTLER acknowledges that
he/she is not entitled to any workman's compensation coverage or
similar benefits for injury, disability, death or loss of wages;
and WRESTLER shall make no claim against PROMOTER for such coverage
or benefit.

9.13    WRESTLER shall act at all times with due regard to public
morals and conventions during the Term of this Agreement.    If
WRESTLER shall have committed or shall commit any act or do
anything that is or shall be an offense or violation involving
moral turpitude under Federal, state or local laws, or which brings
him/her into public disrepute, contempt, scandal or ridicule, or
which insults or offends the community or any employee, agent or
affiliate of PROMOTER or which injures his/her reputation or
diminishes the value of his/her professional wrestling services to
the public or PROMOTER then at the time of any such act, or any
time after PROMOTER learns of any such act, PROMOTER shall have the
right to fine WRESTLER in an amount to be determined by PROMOTER,
in addition to its other legal and equitable remedies, and/or to
suspend and/or terminate this Agreement forthwith.

## 10. WARRANTY

10.1    WRESTLER represents, warrants, and agrees that he/she is
free to enter into this Agreement and to grant the rights and
licenses herein granted to PROMOTER; he/she has not heretofore

- 13 -

entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his/her obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are not pending claims or litigation affecting WRESTLER which would or might interfere with the full and complete exercise or enjoyment by PROMOTER of any rights and licenses granted hereunder. Any exceptions to this Warranty are set forth in Exhibit A, attached hereto.

10.2    WRESTLER represents, warrants and agrees that he/she is in sound mental and physical condition; that he/she is suffering from no disabilities that would impair or adversely affect his/her ability to perform professional wrestling services; and that he/she is free from the influence of illegal drugs or controlled substances, which can threaten his/her well being and pose a risk of injury to himself/herself or others. To insure compliance with this warranty, WRESTLER shall abide by PROMOTER's Drug Policy for Wrestlers and consents to the sampling and testing (insofar as permitted by applicable law) of his/her urine in accordance with such policy.  In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by PROMOTER.    PROMOTER'S current Drug Policy, which WRESTLER acknowledges herewith receiving, is annexed hereto and incorporated herein.

## 11.   EARLY TERMINATION

11.1    This Agreement may be terminated prior to the end of its term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either.  In the event of such early termination, WRESTLER hereby waives any claims to future compensation or payments in connection with revenues derived from use of the Intellectual Property and/or Name and Likeness subsequent to such termination.

11.2    This Agreement will be terminated by WRESTLER's death during the term.

## 12.   BREACH

12.1    In the event PROMOTER breaches this Agreement, WRESTLER may recover such actual direct damages as may be established in any Court of law having jurisdiction of the parties and the subject matter.

12.2    In the event WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law having jurisdiction of the parties and the subject

- 14 -

matter, as provided in paragraph 13.8. In addition, WRESTLER shall forfeit any future payments due pursuant to paragraphs 7.3, 7.4, 7.5, and 7.6, 7.7 and 7.8; WRESTLER shall not appear under, use or exploit in any manner, parenthetically or otherwise, his/her Intellectual Property (except for his/her legal name) for the remaining term of this Agreement; and WRESTLER shall not appear under, use or exploit in any manner, parenthetically or otherwise his/her Name and Likeness forever.

12.3    The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, programs, Events, Intellectual Property and/or Name and Likeness, which are the subject matter of this agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief which shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4    In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement, or otherwise, are expressly waived.

### 13.  MISCELLANEOUS

13.1    Nothing contained in this Agreement shall be construed to constitute WRESTLER as a partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect. WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER his/her attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing.

13.2    This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement.  There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3    This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

- 15 -

13.4      Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

13.5      PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted to and hereunder to any firm or corporation, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall have no further obligations to WRESTLER.  WRESTLER may not assign, transfer or delegate his/her rights or obligations hereunder and any attempt to do so shall be void.

13.6      Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows, or as the parties may hereafter in writing otherwise designate:

> Titan Sports, Inc.
> ATTENTION:  President
> 1241 E. Main Street
> P.O. Box 3857
> Stamford, Connecticut 06902

TO WRESTLER:

> Nelson Frazier
>
> 5646 Amalie Drive Apt. #A-2
>
> Nashville, TN  37211

        The date of mailing shall be deemed to constitute the date of service of any such notice.

13.7      This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut.

13.8      In the event that there is any claim, dispute, or other matter in question arising out of or relating to this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of Connecticut. This provision to submit all claims, disputes or matters in question to the Federal or state courts in the State of Connecticut

- 16 -

APPENDIX - Page 289

shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

13.9    In the event that any legal action or any other proceeding is commenced to enforce any provision of this Agreement or as a result of a dispute, breach, default or misrepresentation in conjunction with this Agreement, the successful or prevailing party shall be entitled, in addition to any other relief, to recover all costs of litigation, including expert fees and reasonable attorneys' fees incurred in such action or proceeding; and all such costs and fees shall be made part of the judgment.

## 14. CONFIDENTIALITY

14.1    Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either.

14.2    Each party acknowledges that he/she has read this Agreement; that he/she understands the terms and conditions set forth therein; and that his/her execution of this Agreement is a voluntary act by which he/she intends to be legally bound in a court of law.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

TITAN SPORTS, INC.

BY: _____
    Title:

_____
    **Nelson Frazier**
WRESTLER's legal name, or
professional corporation


Wrestler's Ring Name
_____
WRESTLER's signature and title, if a
professional corporation

- 17 -

STATE OF CONNECTICUT)
) ss: Stamford
COUNTY OF FAIRFIELD )


I, Susan L. DeRosa , a Notary Public for said County
and State, do hereby certify that Vincent K. McMahon ,
Chairman & C.E.O. of Titan Sports, Inc., personally appeared
before me this day and acknowledged the due execution of the
foregoing instrument to be his/her free act and deed for the
purposes therein expressed.

WITNESS my hand and notarial seal this 11th day of
August , 1993.



Susan L. DeRosa
Notary Public


My Commission Expires May 31, 1996

My commission expires: _____


STATE OF Tennessee )
) ss:
COUNTY OF Davidson )


I, Patricia A. Harris , a Notary Public for said
County and State, do hereby certify that Nelson Frazier
(Real Name) _____ (Ring Name) personally appeared
before me this day and acknowledged the due execution of the
foregoing instrument to be his/her free act and deed for the
purposes therein expressed.

WITNESS my hand and notarial seal this 25th day of
May , 1993.



Patricia A. Harris
Notary Public
Patricia A. Harris

My commission expires: My Commission Expires March 31, 1994


- 18 -

# EXHIBIT B

## TITAN SPORTS, INC.
## BOOKING CONTRACT

**ORIGINAL**

This Titan Sports, Inc. Booking Contract ("Agreement"), is entered into this Fifth (5th) day of February, 1999 and made effective as of January 25, 1999, by and between Titan Sports, Inc., d/b/a World Wrestling Federation, a Delaware corporation with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "PROMOTER"), and Nelson Frazier, an individual, residing at 1301 La Paloma Street, Memphis TN 38114 (hereinafter referred to as "WRESTLER").

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business of organizing, publicizing, arranging, staging and conducting professional wrestling exhibitions throughout the world and of representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness, personality and character; and

WHEREAS, PROMOTER has established a nationwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and PROMOTER has established a network of cable television organizations which regularly broadcast PROMOTER's professional wrestling exhibitions on a pay-per-view basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such wrestling exhibitions constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange wrestling matches for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

1

F:\USERS\Legal Affairs\Booking Contracts\Frazier Nelson.doc
02/05/99

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and the parties intending to be legally bound, do hereby agree as follows:

## 1. BOOKING

1.1     WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)     During the term of this Agreement as defined below, the right to engage WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler, entertainer or otherwise directed by PROMOTER in its sole discretion (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast) or otherwise.

(b)     During the term of this Agreement as defined below, the right, in perpetuity, to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events, as well as on any closed circuit television, pay-per-view television, video exhibition, or any other medium now known or hereinafter discovered, of the Events.

(c)     During the term of this Agreement and thereafter, as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of Intellectual Property (as defined hereinbelow) for merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2     In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in PROMOTER's sole discretion, in wrestling matches at various Events.

## 2. WORKS

2.1     If PROMOTER books WRESTLER to appear and perform at Events, WRESTLER hereby grants to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for any or all of the Events. (These recordings by tape, disc, film, or otherwise are collectively referred to herein as the "Programs".)

2

F:\USERS\Legal Affairs\Booking Contracts\Frazier Nelson.doc
02/05/99

2.2    Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, reconfigure, compile, print, reprint, vend, sell, distribute and use via any other medium now known or hereinafter discovered, and to authorize others to do so, the Programs, in perpetuity, in any manner or media and by any art, method or device, now known or hereinafter discovered (including without limitation, by means of videodisc, videocassette, optical, electrical and/or digital compilations, theatrical motion picture and/or non-theatrical motion picture).  All gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible property provided to WRESTLER by PROMOTER and/or containing New Intellectual Property as defined in paragraph 3.2(a) shall be immediately returned to PROMOTER upon termination of this Agreement for any reason.

2.3    WRESTLER's appearance, performance and work product in any or all of the Events and/or Programs shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all Programs and all of the rights, results, products and proceeds in and to, or derived from the Events and Programs (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearance at the Events and/or in the Programs) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of PROMOTER and/or on behalf of PROMOTER's designee.

2.4    If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and PROMOTER shall own such Development.  All Programs and Developments referred to in this Agreement are collectively referred to as "Works."

2.5    All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement.  To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.).  In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement.  To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby assigns to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the

3

F:\USERS\Legal Affairs\Booking Contracts\Frazier Nelson.doc
02/05/99

copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

### 3. INTELLECTUAL PROPERTY

3.1     The parties agree that as of the date of this Agreement, all service marks, trademarks and any and all other distinctive and identifying indicia under which WRESTLER claims any rights, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "Original Intellectual Property") are described and identified on Schedule A attached hereto and incorporated herein by reference. WRESTLER hereby assigns in good faith to PROMOTER and PROMOTER hereby accepts all worldwide right, title and interest in and to WRESTLER's Original Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the Original Intellectual Property anywhere in the world in any commercial manner, media, art form, method or device now known or hereafter discovered.

3.2     (a)     (i)     With the exception of WRESTLER's Original Intellectual Property, any service marks, trademarks and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, voice, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment during the term of this Agreement (collectively the "New Intellectual Property") are hereby assigned to and shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

(ii)     WRESTLER acknowledges that PROMOTER created and developed the ring name and persona of "Viscera" and "Mabel", and/or the tag teams "M.O.M." and the "Ministry of Darkness" and that all trademarks, service marks, ring names, characters, persona and related intellectual property set forth in paragraph 3.2 (a)(i) concerning "Viscera" and "Mabel", and/or the tag teams "M.O.M." and the "Ministry of Darkness", used alone and/or as part of any tag team, are hereinafter deemed New Intellectual Property.

(b)     Upon the termination of this Agreement, all rights in and to the Original Intellectual Property shall revert to WRESTLER, except that PROMOTER, its licensees, sublicensees and assigns may continue to exploit any and all materials, goods, merchandise and other items incorporating the Original Intellectual Property made before such termination, until all such materials, goods and merchandise are sold off.

4

F:\USERS\Legal Affairs\Booking Contracts\Frazier Nelson.doc
02/05/99

3.3     It is the intention of the parties that the New Intellectual Property belongs to PROMOTER, in perpetuity, even to the exclusion of WRESTLER, and shall survive the termination of this Agreement for any reason.  PROMOTER shall have the exclusive right to assign, license, sublicense, reproduce, promote, expose, exploit and otherwise use the New Intellectual Property in any commercial manner now known or hereinafter discovered, regardless of whether such rights are exercised during or after the Term of this Agreement and notwithstanding termination of this Agreement for any reason.

3.4     The Original Intellectual Property and the New Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

3.5     WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving PROMOTER's rights in and to the Intellectual Property.  In connection herewith, WRESTLER acknowledges and hereby grants to PROMOTER the exclusive worldwide right during the Term of this Agreement (with respect to Original Intellectual Property) and in perpetuity (with respect to New Intellectual Property) to apply for and obtain trademarks, service marks, copyrights and other registrations throughout the world in PROMOTER's name and/or on behalf of Promoter's designee.   At PROMOTER's expense and request, PROMOTER and WRESTLER shall take such steps, as PROMOTER deems necessary for any registration or any litigation or other proceeding, to protect PROMOTER's rights in the Original Intellectual Property and/or New Intellectual Property and/or Works.

## 4. MERCHANDISING

4.1     WRESTLER hereby agrees that PROMOTER shall have the exclusive right (i) during the Term of this Agreement and thereafter, as provided in this Agreement, to use the Original Intellectual Property and (ii) in perpetuity, to use the New Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, broadcast, rebroadcast, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all materials, goods, merchandise and other items incorporating the Intellectual Property.  As to all such materials, goods, merchandise or items created, developed, produced and/or distributed during the Term of this Agreement using the Original Intellectual Property, PROMOTER shall have the exclusive right to sell and exploit such materials, goods and merchandise until the sell-off of same.  As to all such materials, goods, merchandise or items using the New Intellectual Property, PROMOTER shall have the exclusive right, in perpetuity, to sell and exploit same forever.  By way of example and not of limitation, such items include t-shirts, posters, photos, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such material goods, merchandise, or items relating to WRESTLER.

4.2     It is the intention of the parties that PROMOTER's rights described under paragraph 4.1 are exclusive to PROMOTER even to the exclusion of WRESTLER.  PROMOTER shall own all copyrights and trademarks in any and all such materials, goods, merchandise and items and shall be entitled to obtain copyright, trademark, service mark or other registrations in PROMOTER's name

5

or on behalf of its designee; and WRESTLER shall provide all reasonable assistance to PROMOTER in so obtaining such copyright, trademark, service mark or other registrations.

## 5. EXCLUSIVITY

5.1 It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER are exclusive to PROMOTER even to the exclusion of WRESTLER.

5.2 In the event WRESTLER desires to participate in any commercial activity in which PROMOTER is not otherwise engaged, and WRESTLER's participation in such activity requires use of the Original and/or New Intellectual Property, PROMOTER may at its discretion, upon WRESTLER's written request, execute a sublicense to WRESTLER, upon mutually agreeable terms and conditions, for the limited purpose of authorizing WRESTLER to participate in such specific commercial activity. PROMOTER's sublicense to WRESTLER shall constitute an exception to Paragraphs 3 and 4 herein, solely with respect to WRESTLER's participation in such specific commercial activity and shall not license, sublicense, authorize, grant or permit any other or further appropriation or infringement of PROMOTER's rights whatsoever.

## 6. TERM AND TERRITORY

6.1 The term of the Agreement shall be two (2) years from the effective date hereof ("Initial Term"). Each year of the Agreement shall be referred to hereinafter as a "Contract Year" Thereafter, this Agreement shall automatically renew for a successive one (1) year term ("Renewal Term") unless PROMOTER opts to serve written notice to WRESTLER, at least ninety (90) days prior to the end of the Initial Term, terminating this Agreement upon expiration of the Initial Term. Thereafter, this Agreement shall automatically renew for successive one (1) year Renewal Terms, unless either party serves written notice to the other party, at least ninety (90) days prior to the end of that Renewal Term, terminating this Agreement upon expiration of that Renewal Term.

6.2 At the expiration of the first Renewal Term, should PROMOTER desire to renew the Term pursuant to the provisions of paragraph 6.1 above, but WRESTLER does not wish to renew the Term because WRESTLER has received an offer from a competing wrestling/sports entertainment organization or entity, WRESTLER must indicate same to PROMOTER in the written notice of non-rollover within the specified time periods, and further, WRESTLER must not provide or agree to provide any services to such other competing wrestling/sports entertainment organization or entity until providing PROMOTER the opportunity, during the ninety (90) day notice period, to enter into an agreement for WRESTLER'S services on substantially similar terms.

6.3 Reference herein to the Term hereof means the Initial Term and any such Renewal Term. During any such Renewal Term, all rights, duties, obligations, and privileges hereunder shall continue as stated herein. Notwithstanding anything herein to the contrary, termination of this Agreement for any reason shall not affect PROMOTER's ownership of and rights in, including but

6

not limited to, any Works, New Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in Paragraphs 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.4     The territory of this Agreement shall be the world.

### 7.  PAYMENTS/ROYALTIES

7.1     (a)     Provided that WRESTLER fulfills all obligations and warranties hereunder and provided WRESTLER does not breach this Agreement, PROMOTER shall pay WRESTLER Five Hundred US Dollars ($500.00) per week until such time as PROMOTER decides in its sole discretion to terminate such weekly payments.

7.2     (a)     If WRESTLER appears and performs in any Event in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast for purposes pursuant to paragraph 7.2 (b) and paragraph 7.2 (c) hereof (hereinafter "House Shows"), Wrestler shall be paid by PROMOTER an amount equal to such percentage of the paid receipts for such House Show from the live House Show gate receipts only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such House Show.  However, such amount shall not be less than One Hundred Fifty US Dollars ($150.00) per House Show.

        (b)     If WRESTLER appears and performs in connection with an arena or studio Event which is taped or broadcast for use on PROMOTER's television network ("TV Taping"), WRESTLER shall be paid by PROMOTER an amount not less than Five Hundred US Dollars ($500.00) for each day of TV Taping, if any, on which WRESTLER renders services hereunder in connection with the production of the TV Taping.

        (c)     If Wrestler appears and performs in connection with an arena or studio event which is aired or broadcast via satellite broadcast or pay-per-view distribution technology ("Pay-Per-View"), WRESTLER shall be paid by PROMOTER in accordance with the nature of the match in which WRESTLER performs, ie. preliminary card, midcard, main event, etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3     (a)     Licensed Product Royalties:  In the event that the Original and/or New Intellectual Property are used by PROMOTER and/or licensed, sublicensed, or otherwise assigned to third parties for production, reproduction including without limitation PROMOTER's "900" telephone number and/or sale and distribution, in conjunction with any consumer materials, goods or merchandise, (hereinafter collectively referred to as "Licensed Products"), such that the applicable Licensed Product only features the Original and/or New Intellectual Property , WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by

7

APPENDIX - Page 299

PROMOTER with respect to any such licensing, sublicensing or assignment. Licensed Products' Net Receipts means the gross amount received by PROMOTER less expenses incurred by PROMOTER or its licensing agent for the applicable Licensed Product. WRESTLER acknowledges and agrees that WRESTLER shall not be eligible for any royalties with respect to television license, advertising and distribution fees paid to PROMOTER by any entity in connection with the exploitation of Original and/or New Intellectual Property.

(b)     In the event that the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts, to be paid pro-rata among WRESTLER and all other talent so featured.

7.4     (a)     Direct Sales Royalties: In the event that PROMOTER distributes and sells directly any Licensed Products other than any WWF Pay-Per-Views ,as set forth in paragraph 7.5(c), below or any WWF Video Products, as set forth in Paragraph 7.5(d) below, including without limitation, at the arena, via mail order sales or directly on television, or via the Internet (hereinafter "Direct Sales Products"), such that the applicable product only features the Original and/or New Intellectual Property of the WRESTLER, WRESTLER shall be paid five percent (5%) of the Direct Sales Products' Net Receipts derived by PROMOTER from such exploitation. For purposes of this paragraph, Direct Sales Products' Net Receipts mean the gross amount received by PROMOTER for sales of such products after deduction of local taxes and applicable arena commission(s) allocated for concession sales and cost of goods.

(b)     In the event that the Original and/or New Intellectual Property of the WRESTLER are exploited by PROMOTER, such that Direct Sales Products feature WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate five percent (5%) of the Direct Sales Products Net Receipts to be paid pro-rata among WRESTLER and all other talent so featured.

7.5     (a)     (i) Royalties/Pay-Per-View Videos Sold By Licensees: PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WWF Video Products"), of WWF pay-per-views in their entirety ("WWF Pay-Per-Views") to a talent royalty pool. Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WWF Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view. For purposes of paragraphs 7.5(a)(i) and 7.5(a)(ii), Net Receipts shall mean the gross amount received by PROMOTER from the licensees for the WWF Pay-Per-Views less any and all costs incurred by PROMOTER to produce and/or distribute such WWF Pay-Per-Views.

(ii) In the event that the WWF Video Products are a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety, such as a collection of videos, e.g., a

8

Wrestlemania box set, payment to WRESTLER shall be calculated as follows: twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time that each individual video was first released.

(b)     Royalties/Non-Pay-Per-View Videos Sold By Licensees:   PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell all other WWF Video Products, other than those set forth in paragraphs 7.5(a)(i) and 7.5(a)(ii) above, to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all other talent appearing in such WWF Video Products pro-rata among WRESTLER and all other talent so featured.  For purposes of this paragraph 7.5(b), Net Receipts shall mean the gross amount received by PROMOTER for the WWF Video Products less any and all costs incurred by PROMOTER to produce and/or distribute such WWF Video Products.

(c)     (i) Royalties/Pay-Per-View Videos Sold By Promoter:  PROMOTER shall allocate five percent (5%) of the Net Receipts paid to PROMOTER with respect to the direct sale by PROMOTER of WWF Pay-Per-Views to a talent royalty pool.  Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WWF Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views  For purposes of paragraphs 7.5(c)(i) and 7.5(c)(ii), Net Receipts shall mean the gross amount received by PROMOTER for the WWF Pay-Per-Views.

(ii) In the event that the WWF Video Product is a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: five percent (5%) of the Net Receipts paid to PROMOTER shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time each individual video was first released.

(d)     Royalties/Non Pay-Per-View Videos Sold By Promoter:   PROMOTER shall allocate five percent (5%) of the Net Receipts paid to PROMOTER with respect to the direct sale by PROMOTER of all other WWF Video Products other than those set forth in paragraphs 7.5(c)(i) and 7.5(c)(ii) above, to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all other talent appearing in such WWF Video Products pro-rata among WRESTLER and all other talent so featured.  For purposes of this paragraph 7.5(d), Net Receipts shall mean the gross amount received by PROMOTER for the WWF Video Products.

9

APPENDIX - Page 301

7.6    In the event the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER shall earn an amount to be mutually agreed to by WRESTLER and by PROMOTER of the "Personal Appearance Net Receipts" received by PROMOTER, which amount shall also be credited against WRESTLER'S Minimum Annual Compensation, if any.    Personal Appearance Net Receipts means the amount received by PROMOTER after payment of and provision for all of PROMOTER's costs and expenses, except income taxes.

7.7    If PROMOTER instructs WRESTLER to appear and perform in any Events or Programs as a commentator and/or to participate in post-Event production and/or voice-over activities as a commentator, WRESTLER's commentating shall be deemed work-for-hire and WRESTLER hereby assigns to PROMOTER and PROMOTER shall own all rights, in perpetuity, to all of WRESTLER's commentary and WRESTLER shall not be entitled to receive any royalty payments, or any additional compensation or residual payments whatsoever, as a result of PROMOTER's commercial exploitation of such commentary in any form, whether broadcast programming, cable programming, pay-per-view programming, videotapes, videodiscs, the Internet or other mediums now or hereinafter discovered.

7.8    It is the understanding of the parties that WRESTLER shall not be paid anything for PROMOTER's exploitation of the Original and/or New Intellectual Property in any of PROMOTER's magazines or other publications, which PROMOTER may publish, produce or distribute at arenas, at newsstands and/or by mail or through electronic or any other manner of media or distribution, now known or hereinafter discovered, including, but not limited to, publication or distribution on the Internet or America On Line.

7.9    For the avoidance of doubt and subject to paragraphs 10.4 and 12.2, the non-compete provisions of this Agreement, WRESTLER acknowledges and agrees that WRESTLER shall only be eligible for the payments and royalties set forth in paragraphs 7.1 through 7.6 above in connection with Events or activities conducted by PROMOTER.  WRESTLER acknowledges and agrees that any payments or royalties earned in connection with any wrestling services WRESTLER may perform during the term of this Agreement for any other wrestling/sports entertainment organization and /or entity shall be credited against WRESTLER's Minimum Annual Compensation, if any.

7.10    All payments made to WRESTLER are in full without withholding, except where required by law.  After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.11    (a)    PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of

10

royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

(b)     PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business.     WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations.     WRESTLER shall not audit PROMOTER's books and records more than twice during any calendar year and no such audit shall be conducted later than six (6) months after the last statement of royalties is given, delivered or sent to WRESTLER. Each audit is limited to five (5) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

(c)     WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless a specific objection in writing, stating the basis thereof, is given by WRESTLER to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

(d)     No claim shall be filed pursuant to paragraph 13.8 below against PROMOTER or PROMOTER's affiliates that disputes any statement of royalties or accounting given by PROMOTER hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to paragraph 7.11(b) above.

## 8. PROMOTER'S OBLIGATIONS

8.1     Although under paragraph 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining his licenses, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2     PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

11

(a)     In connection with WRESTLER's appearances and performance at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

(b)     In connection with the production, distribution, and exploitation of the Programs, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication;

(c)     In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3     PROMOTER shall schedule the Events and book WRESTLER for the Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time. If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then PROMOTER may fine, suspend or terminate WRESTLER in its sole discretion.

8.4     Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

## 9. WRESTLER'S OBLIGATIONS

9.1     WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

12

APPENDIX - Page 304

9.2     WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

(a)     WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise.

(b)     WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities.  WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs, which are prohibited by PROMOTER's Drug Policy.

9.3     WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events (except those transportation costs which are covered by PROMOTER's then current Travel Policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events.

9.4     WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5     WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to other wrestlers in any and all Events.  These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match.  In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6     WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this paragraph shall cause a forfeiture of any payment due WRESTLER pursuant to SECTION 7 of this

13

APPENDIX - Page 305

Agreement and all other obligations of PROMOTER to WRESTLER hereunder, shall entitle PROMOTER to terminate this Agreement, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement.

9.7     WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, including without limitation, appearing at and participating in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter discovered, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture and Internet), at times and places designated by PROMOTER, in connection therewith.

9.8     WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Programs and/or the exercise of any other rights respecting Original and/or New Intellectual Property, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to the Original and/or New Intellectual Property are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's written consent. WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.9     WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER's appearance and/or performance in a professional wrestling match.

9.10    WRESTLER, on behalf of himself and his heirs successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, attorney fees, proceedings or expenses, incurred by any of them by reason of WRESTLER's breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of the harmless against any and all claims, demands, liabilities, actions, costs, suits, attorney fees, proceedings or expenses, incurred by any of them, arising out of WRESTLER'S acts, transactions and/or conduct within or around the

14

ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked. Such indemnification shall include all claims arising out of any acts, transactions and/or conduct of WRESTLER or others occurring at Events or in connection with any appearances or performances by WRESTLER not conducted by PROMOTER in accordance with this Agreement.

9.11    WRESTLER shall be responsible for payment of all of WRESTLER's own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon retirement from professional wrestling.

9.12    (a)    WRESTLER shall be responsible for his own commercial general liability insurance, worker's compensation insurance, professional liability insurance, as well as any excess liability insurance, as WRESTLER deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of WRESTLER's own acts, transactions, or conduct.

(b)    WRESTLER acknowledges that the participation and activities required by WRESTLER in connection with WRESTLER's performance in a professional wrestling exhibition may be dangerous and may involve the risk of serious bodily injury. WRESTLER knowingly and freely assumes full responsibility for all such inherent risks as well as those due to the negligence of PROMOTER, other wrestlers or otherwise.

(c)    WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, hereby releases, waives and discharges PROMOTER from all liability to WRESTLER and covenants not to sue PROMOTER for any and all loss or damage on account of injury to any person or property or resulting in serious or permanent injury to WRESTLER or WRESTLER's death, whether caused by the negligence of the PROMOTER, other wrestlers or otherwise.

(d)    WRESTLER acknowledges that the foregoing release, waiver and indemnity is intended to be as broad and inclusive as permitted by the law of the State, Province or Country in which the professional wrestling exhibition or Events are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full force and effect.

9.13    (a)    WRESTLER may at his election obtain health, life and/or disability insurance to provide benefits in the event of physical injury arising out of WRESTLER's professional activities; and WRESTLER acknowledges that PROMOTER shall not have any responsibility for such insurance or payment in the event of physical injury arising out of WRESTLER's professional activities.

(b)    In the event of physical injury arising out of WRESTLER's professional activities, WRESTLER acknowledges that WRESTLER is not entitled to any worker's compensation

15

coverage or similar benefits for injury, disability, death or loss of wages; and WRESTLER shall make no claim against PROMOTER for such coverage or benefit.

9.14    WRESTLER shall act at all times with due regard to public morals and conventions during the term of this Agreement.  If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings WRESTLER into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures WRESTLER's reputation in PROMOTER's sole judgment, or diminishes the value of WRESTLER's professional wrestling services to the public or PROMOTER, then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER; and PROMOTER shall have the right to suspend and/or terminate this Agreement forthwith.

## 10. WARRANTY

10.1    WRESTLER represents, warrants, and agrees that WRESTLER is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; WRESTLER has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no prior or pending claims, administrative proceedings, civil lawsuits, criminal prosecutions or other litigation matters, including without limitation any immigration or athletic commission related matters, affecting WRESTLER which would or might interfere with PROMOTER's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Schedule B, attached hereto.

10.2    (a)    WRESTLER represents, warrants and agrees that WRESTLER is in sound mental and physical condition; that WRESTLER is suffering from no disabilities that would impair or adversely affect WRESTLER's ability to perform professional wrestling services; and that WRESTLER is free from the influence of illegal drugs or controlled substances, which can threaten WRESTLER's well being and pose a risk of injury to WRESTLER or others. To insure compliance with this warranty, WRESTLER shall abide by PROMOTER's Drug Policy for wrestlers, as well as any and all amendments, additions, or modifications to the PROMOTER's Drug Policy implemented during the Term of this Agreement and consents to the sampling and testing of his urine in accordance with such Policy.  In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by PROMOTER. PROMOTER's current Drug Policy, which WRESTLER acknowledges herewith receiving, is annexed hereto and incorporated by reference and made a part hereof.

        (b)    In the event that WRESTLER is unable to wrestle for six (6) consecutive weeks during the Term of this Agreement due to an injury suffered in the ring while performing services

16

APPENDIX - Page 308

at PROMOTER's direction, PROMOTER shall have the right to thereafter terminate this Agreement or suspend WRESTLER without pay. If WRESTLER is unable to wrestle for any other reason during the Term of this Agreement, PROMOTER shall have the right to immediately terminate this Agreement or suspend WRESTLER without pay. PROMOTER can opt in its discretion to extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof. Upon certification by WRESTLER or PROMOTER's physician during any period of suspension that WRESTLER is fully recovered and capable of performing all services as required under this Agreement, PROMOTER can reinstate the Agreement, and it will therefore continue to be of full force and effect throughout the remainder of the Initial Term of this Agreement and any Renewal Term thereof.

10.3   PROMOTER reserves the right to have WRESTLER examined by a physician of its own choosing at its expense at any point during the Term of this Agreement.

10.4   WRESTLER further represents, warrants and agrees that WRESTLER shall not work or perform in any capacity for "World Championship Wrestling", "New World Order", "NWO", or any affiliated or subsidiary company thereof, or any other wrestling organization and/or entity owned or controlled by Turner Broadcasting System, Inc., Time-Warner, Inc. or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-views or other televised events, during the Term of this Agreement and for one (1) year following the termination or expiration thereof.

10.5   WRESTLER further represents, warrants and agrees that this Agreement supersedes all prior agreements between WRESTLER and PROMOTER, whether written or oral, and that he has been fully compensated, where applicable, under such prior agreement(s).

### 11. EARLY TERMINATION

11.1   a) Notwithstanding anything to the contrary herein, this Agreement may be terminated by PROMOTER at any time during the Term by providing WRESTLER thirty (30) days advance written notice.

(b)   This Agreement may also be terminated prior to the end of its Term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either.

(c)   In the event of such early termination, PROMOTER shall pay WRESTLER for all uses of the Intellectual Property in accordance with paragraphs 7.3, 7.4, 7.5 and 7.6.

11.2   This Agreement will be terminated by WRESTLER's death during the Term, with no further compensation due WRESTLER's heirs, successors, personal representatives or assigns.

F:\USERS\Legal Affairs\Booking Contracts\Frazier Nelson.doc
02/05/99

11.3   Upon the termination of this Agreement for any reason, including breach, the parties acknowledge and agree that PROMOTER shall own all right, title and interest in all Works, New Intellectual Property and any registrations thereof and PROMOTER shall have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items (i) produced during the Term of this Agreement incorporating any Original Intellectual Property, and (ii) produced incorporating New Intellectual Property, in perpetuity.

## 12. BREACH

12.1   In addition to those reasons set forth elsewhere in this Agreement, PROMOTER shall have the right, in its sole discretion, to immediately suspend or terminate the operation of this Agreement, both as to services and compensation, if any of the following occurs:

(a)   WRESTLER violates PROMOTER's Drug Policy or fails PROMOTER's pre-contract drug screening;

(b)   WRESTLER is habitually late and/or absent for scheduled Events or appearances as PROMOTER determines in its sole discretion;

(c)   WRESTLER fails any physical examination conducted on behalf of PROMOTER, as required herein;

(d)   WRESTLER fails to maintain physical condition or training such that his weight, and/or his performance is unsatisfactory as determined by PROMOTER in its sole discretion; or

(e)   PROMOTER is unable to obtain any necessary athletic commission licenses or immigration clearances for WRESTLER.

12.2   In the event WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law, as provided in Paragraph 13.8. In addition, in the event of termination pursuant to this Paragraph, WRESTLER shall forfeit any future payments due pursuant to paragraph 7. WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the Original Intellectual Property for the remainder of the Term and the New Intellectual Property forever. Further, at PROMOTER's sole option, the Term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period. Moreover, in the event WRESTLER breaches this Agreement, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity for "World Championship Wrestling", "New World Order", "NWO", or any affiliated or subsidiary company thereof, or any other wrestling organization and/or entity owned or controlled by Turner Broadcasting System, Inc., Time-Warner, Inc. or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-view or other televised events, for one (1) year from the date of the termination of this Agreement as a result of breach of this Agreement by WRESTLER.

18

APPENDIX - Page 310

12.3    The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, Programs, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4    In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

### 13. MISCELLANEOUS

13.1    Nothing contained in this Agreement shall be construed to constitute WRESTLER as an employee, partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect.  WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or any and all of the rights granted to PROMOTER herein.

13.2    This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement including without limitation that certain Booking Contract with WRESTLER dated June 12, 1993, as amended  There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3    This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

13.4    Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

13.5    PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted to and hereunder to any person, firm or corporation, provided that such assignee has the

19

financial ability to meet the Promoter's obligations hereunder, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6    Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows, or as the parties may hereafter in writing otherwise designate:

TO PROMOTER:                                                 TO WRESTLER:
        Titan Sports, Inc.
        Attn:   Linda E. McMahon
                President and Chief Executive Officer        Nelson Frazier
        1241 E. Main Street                                  1301 La Paloma Street
        Stamford, CT  06902                                  Memphis, TN  38114

        The date of mailing shall be deemed to constitute the date of service of any such notice by PROMOTER. The date of receipt shall be deemed to constitute the date of service of any such notice by WRESTLER.

13.7    This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8    The parties agree that if a claim or controversy should arise concerning this Agreement, or the breach of any obligation arising under this Agreement, or the interpretation of this Agreement, such dispute shall be resolved by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association with the arbitration to be held in Stamford, Connecticut. The parties shall each pay one-half (1/2) of the costs of the arbitrator and the arbitrator shall thereafter award costs and attorneys' fees to the prevailing party. The arbitration award shall be binding and non-appealable, and may be entered as a final judgment in any court having jurisdiction over the award.

## 14. CONFIDENTIALITY

14.1    Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that in further consideration of PROMOTER's entering into this Agreement, and continued Agreement, WRESTLER shall not, at any time during this Agreement, or after the termination of this Agreement for any reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of WRESTLER or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees, independent

20

contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances in the Programs, information regarding any contractual relationships maintained by PROMOTER and/or the terms thereof, and/or any and all information regarding wrestlers engaged by PROMOTER.

14.2    WRESTLER acknowledges and agrees that its agreement to be bound by the terms hereof is a material condition of PROMOTER's willingness to use and continue to use WRESTLER's services. Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either.

All of the terms and conditions of any Addenda or Schedules are incorporated herein by reference and made a part hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

TITAN SPORTS, INC.                                         WRESTLER

By:_____                    By:_____
    James Ross                                             Nelson Frazier
Its:    Senior Vice President Talent Relations
        & Wrestling Administration

21

APPENDIX - Page 313

STATE OF CONNECTICUT )
) ss: Stamford
COUNTY OF FAIRFIELD )

On _March 3_ , 1999 before me personally came James Ross, Senior Vice President of Talent Relations & Wrestling Administration., to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of Titan Sports, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this _3rd_ day of _march_ , 1999.

_Karen Shapiro_
Notary Public

My commission expires: KAREN SHAPIRO
NOTARY PUBLIC, STATE OF CT
MY COMMISSION EXPIRES SEP. 30, 2003

STATE OF _TN_ )
) ss:
COUNTY OF _Shelby_ )

I am a Notary Public for said County and State, do hereby certify that Nelson Frazier personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this _22_ day of _Feb_ , 1999.

Notary Public

My commission expires: MY COMMISSION EXPIRES
August 27, 200

F:\USERS\Legal Affairs\Booking Contracts\Frazier Nelson.doc
02/05/99

22

SCHEDULE A
ORIGINAL INTELLECTUAL PROPERTY

NELSON FRAZIER

SCHEDULE B
EXCEPTIONS TO WARRANTY
PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR
CONFLICT WITH
WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS


NONE

F:\USERS\Legal Affairs\Booking Contracts\Frazier Nelson.doc
02/05/99

EXHIBIT C

# WORLD WRESTLING ENTERTAINMENT, INC.
## BOOKING CONTRACT

This World Wrestling Entertainment, Inc. Booking Contract ("Agreement"), made effective as of the date World Wrestling Entertainment, Inc. executes said Agreement ("Effective Date"), by and between World Wrestling Entertainment, Inc., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "PROMOTER"), and Nelson Frazier, an individual residing at 521 Par Drive, #9, Marion, Arkansas 72364 (hereinafter referred to as "WRESTLER").

## PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business throughout the world of organizing, publicizing, arranging, staging, conducting professional wrestling exhibitions and/or Events, as defined below, and representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness and personality; and

WHEREAS, PROMOTER has established a worldwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and/or Events, as defined below, and PROMOTER has established a network of cable, satellite and internet organizations which regularly broadcast, transmit, stream and exhibit PROMOTER's professional wrestling Events on a pay-per-view and subscription basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or Events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and Events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange professional wrestling exhibitions and/or Events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound, do hereby agree as follows:

1

## 1. BOOKING

1.1     WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)     During the Term of this Agreement, the exclusive right to engage WRESTLER's performance in wrestling matches at any professional wrestling exhibitions whatsoever, as well as at appearances at any other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler or which are related to sports entertainment (collectively, the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location or by promotions to whom WRESTLER's services are assigned by PROMOTER for developmental, training or other purposes, or otherwise. Pursuant to Section 13.5 herein and during the Term of this Agreement, WRESTLER acknowledges and agrees that PROMOTER, in its sole discretion, shall have the right to assign WRESTLER's obligations under this Agreement for any period of time as PROMOTER sees fit to other promoters in order to enhance or improve WRESTLER's overall wrestling abilities, in-ring skills, conditioning, or other attributes deemed necessary by PROMOTER.

(b)     During the Term and thereafter as provided for in this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as the right to exhibit, broadcast and transmit the Footage, as defined in Section 2.1, via closed circuit transmission, pay-per-view transmission, subscription transmission (e.g., subscription video on demand), video on demand transmission, video exhibition, or any other medium now known or hereinafter discovered.

(c)     During the Term of this Agreement and thereafter as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of WRESTLER Intellectual Property, as defined herein below, through any means whatsoever including merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2     In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in PROMOTER's sole discretion, in wrestling matches at various Events.

## 2. WORKS

2.1     WRESTLER hereby grants to PROMOTER the exclusive right during the Term to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for or related to the Events or for or related to any and all of the services performed by WRESTLER pursuant to the terms herein. (These recordings by tape, film, photograph, disc, or otherwise are collectively referred to herein as the "Footage").

2.2     Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, or otherwise disseminate the Footage in perpetuity by any form of media, now or hereafter devised (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television, the internet, video on demand, and subscription video on demand).

2.3     WRESTLER's appearance, performance and work product in connection in any way with the Events, Footage, WRESTLER's services and the rights granted herein shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all Footage and all of the rights, results, products and proceeds in and to, or derived from the Events, Footage, WRESTLER's services and the rights granted herein (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with the Events, Footage, WRESTLER's services and the rights granted herein) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of PROMOTER and/or on behalf of PROMOTER's designee.

2.4     If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and PROMOTER shall own such Development. All Footage and Developments referred to in this Agreement are collectively referred to as "Works".

2.5     All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement. To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby irrevocably assigns in perpetuity to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

### 3. INTELLECTUAL PROPERTY

3.1     All service marks, trademarks and other distinctive and identifying indicia used by WRESTLER prior to the Effective Date in connection with the business of professional wrestling, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "WRESTLER Intellectual Property") are described and identified on Exhibit A attached hereto and incorporated herein by reference. WRESTLER hereby grants to PROMOTER a

license and right during the Term and thereafter as provided for in this Agreement including any Sell Off Period set forth in Section 4.3 and PROMOTER hereby accepts all worldwide right, title and interest in and to WRESTLER's Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the WRESTLER Intellectual Property. WRESTLER further acknowledges and agrees that PROMOTER shall own in perpetuity all Footage, as defined in Section 2.1 of the Agreement, and that PROMOTER shall have perpetual rights in the Footage, as set forth in Section 2.2 of this Agreement.

3.2     Except for the WRESTLER Intellectual Property specifically set forth on Exhibit A, any intellectual property rights, including but not limited to trademarks, service marks, copyrighted works, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which were procured, owned or created by PROMOTER prior to the Term which are described and identified on Exhibit B (collectively the "PROMOTER Intellectual Property") shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

3.3     PROMOTER may from time to time during the Term create or develop trademarks, service marks, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which WRESTLER acknowledges shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement. In such event, WRESTLER agrees to immediately execute an amendment to this Agreement to add to Exhibit B any additional intellectual property rights created pursuant to this Section 3.3 as PROMOTER Intellectual Property.

3.4     WRESTLER Intellectual Property and PROMOTER Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

## 4. MERCHANDISING

4.1     WRESTLER hereby agrees that PROMOTER shall have the exclusive right in perpetuity to use and exploit WRESTLER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all copyrighted work incorporating the WRESTLER Intellectual Property. PROMOTER shall own in perpetuity all copyrights in such copyrighted work and PROMOTER shall be entitled to obtain copyright registrations in PROMOTER's name or on behalf of its designee. WRESTLER shall provide all reasonable assistance to PROMOTER in so obtaining such copyright registrations, and WRESTLER

4

authorizes PROMOTER to execute any documents on WRESTLER's behalf as attorney-in-fact that are required by the United States Patent and Trademark Office.

4.2    In addition to the perpetual rights to use and exploit WRESTLER Intellectual Property as set forth in Section 4.1 of this Agreement, WRESTLER agrees that during the Term and any applicable Sell Off Period as provided for in this Agreement, PROMOTER shall have the exclusive right to use, exploit, and license the WRESTER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of goods and merchandise incorporating the WRESTLER Intellectual Property.

4.3    Sell Off Period. Upon the expiration or termination of this Agreement, PROMOTER shall have the right to sell any licensed products in inventory, on hand or manufactured containing WRESTLER Intellectual Property for a period of ninety (90) days immediately following such expiration or termination ("Sell Off Period") provided, however, that there shall be no restriction on PROMOTER's rights to use or exploit WRESTLER Intellectual Property in connection with the perpetual rights granted herein by WRESTLER.

4.4    Book Rights. WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the licensing, sublicensing, manufacture, distribution, publication, and exploitation of WRESTLER's autobiography or authorized biography (collectively "Book Rights").

4.5    Publishing Rights. WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the creation and sale of certain movies, or other forms of media now known or hereinafter discovered, as PROMOTER shall determine in its sole discretion (collectively "Publishing Rights").

4.6.    Auction Sale Rights. WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to sell via the Internet, television or through any other distribution method now known or hereafter created, by an auction method, any item containing WRESTLER Intellectual Property which shall include but not be limited to items containing WRESTLER's signature ("Auction Sale").

## 5. EXCLUSIVITY

5.1    It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER are exclusive to PROMOTER even to the exclusion of WRESTLER.

5.2 In the event WRESTLER desires upon reasonable notice to PROMOTER during the Term of this Agreement either individually or through his authorized representative(s) to participate in movies, films, commercials, product endorsements, videos, television programs or similar activities, whether or not procured by PROMOTER (collectively "Permitted Activities") and promotional events for the Permitted Activities, WRESTLER may do so subject to PROMOTER's approval, which shall not be unreasonably withheld provided a written sublicense is executed between PROMOTER, WRESTLER and any relevant third parties and further provided WRESTLER shall not utilize the Intellectual Property in any manner in connection with such Permitted Activities without PROMOTER's written consent, and that PROMOTER retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term, as defined herein.

## 6. TERM AND TERRITORY

6.1 Unless terminated pursuant to the terms herein, the term of this Agreement shall be for three (3) years from the Effective Date ("Term"). Each consecutive twelve (12) month period during the Term commencing with the Effective Date shall be referred to as a "Contract Year".

6.2 Notwithstanding anything herein to the contrary, termination of this Agreement for any or no reason shall not affect PROMOTER's ownership of and rights in, including but not limited to, any Works, PROMOTER Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in Sections 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.3 The territory of this Agreement shall be the world ("Territory").

## 7. PAYMENTS/ROYALTIES

7.1 (a) Unless terminated pursuant to the terms herein, PROMOTER shall pay WRESTLER each Contract Year the total sum of Seventy-Five Thousand U.S. Dollars ($75,000.00) (referred to hereinafter as "Minimum Annual Compensation"). PROMOTER agrees, commencing with the Effective Date, to pay WRESTLER the Minimum Annual Compensation in fifty-two (52) weekly installments consistent with PROMOTER's regular payment procedures.

(b) PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any fines levied against WRESTLER, as provided for in Sections 8.3, 9.6 or 10.2(b); any costs or expenses paid by PROMOTER on behalf of WRESTLER, as provided for in Sections 8.1 and 9.13(b); or any deductions permitted as set forth in Section 7.13. PROMOTER shall also have the right to credit or deduct from the Minimum Annual Compensation any royalties due WRESTLER or any other payments due WRESTLER pursuant to the terms of this Agreement. For the purposes of this Agreement, any royalty payments due shall be deemed "earned" only at the time they are paid to WRESTLER.

(c) Unless terminated pursuant to the terms herein and subject to Section 7.10, if applicable, and Section 10.2 (b) below, at least one hundred twenty (120) days after each Contract Year, if it is determined that WRESTLER has earned more than the Minimum Annual

6

Compensation for services rendered during that Contract Year, WRESTLER shall be paid subject to any permitted deductions or credits in accordance with Section 7.1(b), in a one lump sum the difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during that Contract Year.

7.2     (a)     If WRESTLER appears and performs in any Event produced by PROMOTER in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast as set forth in Sections 7.2 (b) and 7.2 (c) below (hereinafter "Non-Televised Live Events"), WRESTLER shall be paid by PROMOTER an amount equal, in PROMOTER's sole discretion, to such percentage of the paid receipts for such Non-Televised Live Event from the live Non-Televised Live Event gate receipts only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such Non-Televised Live Event.

        (b)     If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is taped or broadcast for use on PROMOTER's television network ("TV Taping"), WRESTLER shall be paid by PROMOTER, in its sole discretion, an amount only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such TV Taping.

        (c)     If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is aired or broadcast via satellite broadcast or pay-per-view distribution technology for use by PROMOTER ("Pay-Per-View"), WRESTLER shall be paid by PROMOTER an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3     Licensed Product Sale

        (a)     Licensed Product Sale--Sole Performer.     In the event that the WRESTLER Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to the Licensed Product Sale. Licensed Products' Net Receipts means the gross amount received by PROMOTER from a Licensed Product Sale less expenses incurred by PROMOTER or its licensing agent.

        "Licensed Product Sale" shall mean the sale, other than an Auction Sale as defined in Section 7.7, of any product, merchandise, consumer material or good, other than Books as defined in Section 7.8 and Pay Per View DVD/Home Videos as defined in Section 7.6(a), which is made pursuant to a license agreement between PROMOTER and a party wherein a party is granted the contractual right and obligation to manufacture, distribute, and sell the product, merchandise, consumer material or good to wholesale and/or retail customers through designated distribution channels.

        "Other PROMOTER Talent" shall mean a professional wrestler who has an agreement with PROMOTER and to whom PROMOTER is obligated to pay royalties.

7

APPENDIX - Page 324

(b)    Licensed Product Sale---Other Performers.    In the event that the WRESTLER Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, PROMOTER shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.4    Direct Sale and Direct Venue Sale

(a)    Direct Sale---Sole Performer. In the event that the WRESTLER Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Sale, WRESTLER shall be paid five percent (5%) of the Direct Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Sale reduced by returns and a thirty percent (30%) PROMOTER administrative fee. "Direct Sale" shall mean a sale by PROMOTER by any method other than a Licensed Product Sale, Auction Sale, or a Direct Venue Sale, as defined in Section 7.4(c), wherein PROMOTER has or retains the right and/or obligation to manufacture, distribute or sell any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, to an end user and where such sale may be made by any distribution method (e.g., catalog, television or any internet site owned or controlled by PROMOTER).

(b)    Direct Sale---Other Performers. In the event that the WRESTLER Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Sale, PROMOTER shall allocate five percent (5%) of the Direct Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

(c)    Direct Venue Sale---Sole Performer. In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, WRESTLER shall be paid five percent (5%) of the Direct Venue Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Venue Sale reduced by any expenses charged to PROMOTER by the venue for the sale of the product, merchandise, consumer materials or goods. "Direct Venue Sale" shall mean the sale by PROMOTER of any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, which occurs in or about the venue of a PROMOTER live event.

(d)    Direct Venue Sale---Other Performers. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, PROMOTER shall allocate five percent (5%) of the Direct Venue Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.5    Featured Performer

(a)    Licensed Product Sales. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Licensed Product Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.3(b), PROMOTER shall allocate five percent (5%) of the Net Receipts paid to PROMOTER with respect to the Licensed Product Sale of the DVD and/or home videos to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other

PROMOTER Talent appearing in such DVD and/or home videos pro-rata among WRESTLER and all Other PROMOTER Talent so featured. If the aggregate DVD and home video sales pursuant to this Section 7.5(a) exceeds 150,000 units, PROMOTER shall instead allocate ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER with respect to the Licensed Product Sale of DVD and home video units sold retroactive to the first 150,000 units to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such DVD and/or home video pro-rata among WRESTLER and all Other PROMOTER Talent so featured. For the purposes of this Section 7.5, PROMOTER shall determine in its sole discretion whether WRESTLER shall be deemed a "Featured Performer", provided however in no event shall a DVD and/or home video have more than one (1) Featured Performer.

(b)  Direct Sale. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(b), PROMOTER shall allocate five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Sale of the DVD and/or home videos to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such DVD and/or home video pro-rata among WRESTLER and all Other PROMOTER Talent so featured. If the aggregate DVD and home video sales pursuant to this Section 7.5(b) exceeds 150,000 units, PROMOTER shall instead allocate ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER with respect to the Direct Sale of DVD and Home Video units sold retroactive to the first 150,000 units to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such DVD and/or home video pro-rata among WRESTLER and all Other PROMOTER Talent so featured.

(c)  Direct Venue Sale. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Venue Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(d), PROMOTER shall allocate five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Venue Sale of the DVD and/or home video to a talent royalty pool from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such DVD and/or home video pro-rata among WRESTLER and all Other PROMOTER Talent so featured. If the aggregate DVD and home video sales pursuant to this Section 7.5(c) exceeds 150,000 units, PROMOTER shall instead allocate ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER with respect to the Direct Sale of DVD and home video units sold retroactive to the first 150,000 units to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such DVD and/or home video pro-rata among WRESTLER and all Other PROMOTER Talent so featured.

7.6  Pay Per View DVD/Home Video

(a)  Sold By Licensees As A Single Unit. In the event that the WRESTLER Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of "Pay Per View DVD/Home Videos" which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same

9

percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(a) less any and all costs incurred by PROMOTER or its licensing agent. "Pay Per View/DVD Home Videos" shall mean a DVD and/or home video produced by PROMOTER which is a reproduction of an entire live pay per view event, as set forth in Section 7.2(c).

(b)     Sold By Licensees As A Collection Set. In the event that the WRESTLER Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a collection set featuring multiple Pay Per View DVD/Home Videos (e.g., Wrestlemania Box Set") ("Collection Set"), which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the Net Receipts as defined in Section 7.6(a) to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

(c)     Sold By PROMOTER As A Single Unit. In the event that the WRESTLER Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of Pay Per View DVD/Home Videos which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage, as set forth in Section 7.2(c), that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(c) less any and all costs incurred by PROMOTER or its licensing agent.

(d)     Sold By PROMOTER As A Collection Set. In the event that the WRESTLER Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a Collection Set which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the Net Receipts, as defined in Section 7.6(c), to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

7.7     Auction Sale

(a)     Sole Performer. In respect of an Auction Sale pursuant to Section 4.6, if WRESTLER Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent, WRESTLER shall be paid thirty five (35%) percent of the "Net Sales",