such provision shall not thereby be affected and shall be given full effect, without regard to the invalid portion. It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce or modify the duration, area, or matter of such provision, and, in its reduced or modified form, such provision shall then be enforceable and shall be enforced.

13.5    PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted by WRESTLER to PROMOTER pursuant to the terms of this Agreement to any person, firm or corporation, provided that such assignee has the financial ability to meet the PROMOTER's obligations hereunder, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall be released from any liability and shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6    Any notices required or desired hereunder shall be in writing and shall be deemed given when personally delivered or if mailed by certified mail, return receipt requested or registered mail, when deposited in the United States Mail, postage prepaid, or if telecopied, when telecopied, or if sent by courier service, when deposited with such service, or if sent by overnight delivery service, on the next business day following delivery to such service. Notices shall be addressed as follows (unless either party at any time or times designates another address for itself by notifying the other party thereof as provided herein):

TO PROMOTER:                                          TO WRESTLER:

World Wrestling Entertainment, Inc.                   Evan Mitchell Singleton
Attn:   General Counsel                               1115 Wheatland Avenue
1241 E. Main Street                                   Apt. G5
Stamford, Connecticut 06902                           Lancaster, Pennsylvania 17603

13.7    This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8    The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

13.9    WRESTLER understands and acknowledges that, from time to time during the Term, he may request that attorneys employed by or associated with PROMOTER represent WRESTLER's interests in connection with certain contracts and/or other matters relating to WRESTLER's career, including, without limitation, in connection with certain Permitted Activities, whether or not utilizing the Intellectual Property. WRESTLER thus confirms his understanding and acknowledgement that, in connection with such representation, such attorneys (including attorneys who may have previously represented, and who may in the future represent, PROMOTER in a role potentially adverse to WRESTLER) may represent WRESTLER, either individually and/or concurrently with representing PROMOTER. Such representation during the Term may constitute a potential conflict of interest. Accordingly, WRESTLER understands and acknowledges by his execution of this Agreement that, he further waives any such conflict of interest arising from such representation of WRESTLER by PROMOTER's attorneys. WRESTLER further understands and acknowledges that he has been encouraged to seek the advice of and retain independent counsel in connection with all matters relating to his interests, including contract negotiation and any and all other issues relating to his career, as well as advice with respect to the meaning and impact of the consent and waiver set forth in this Section 13.9, and WRESTLER hereby represents and warrants to PROMOTER that he knowingly either has and will retained

19

such independent counsel, or has decided or will decide intentionally not to do so. The consent and waiver set forth in this Section 13.9 shall remain in effect during the Term, unless revoked in writing by WRESTLER and delivered to PROMOTER pursuant to Section 13.6.

## 14. CONFIDENTIALITY

14.1    (a)  Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that in further   consideration of PROMOTER's entering into this Agreement, WRESTLER shall not, at any time during the Term of this Agreement, or after the termination of this Agreement for any or no reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of WRESTLER or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances in the Footage, information regarding any contractual relationships maintained by PROMOTER and/or the terms thereof, and/or any and all information regarding wrestlers engaged by PROMOTER.

(b)  Notwithstanding the foregoing, WRESTLER's obligation of confidentiality shall not include information which:

(i)     at the time of disclosure was in the public domain;

(ii)    after such disclosure becomes generally available to the public other than through any act or omission by WRESTLER; and

(iii)   is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to PROMOTER in a timely manner in order to afford PROMOTER an opportunity to seek a protective order against such disclosure.

14.2    WRESTLER acknowledges and agrees that his agreement to be bound by the terms hereof is a material condition of PROMOTER's willingness to use and continue to use WRESTLER's services. Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either. Notwithstanding the foregoing, WRESTLER shall be free to disclose the terms and conditions of this Agreement to his lawyers, agents, financial advisers and spouse and PROMOTER shall be free to disclose the terms and conditions of this Agreement to its lawyers, accountants and to those employees who have a legitimate need to know such information.

14.3    This Agreement and any amendments thereto may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute the same instrument.   Counterparts may be executed either in original or faxed form and the parties adopt any signatures received by a receiving fax machine as original signatures of the parties.  All of the terms and conditions of any Exhibits shall be incorporated herein by reference and shall be made a part hereof.

APPENDIX - Page 421

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written below.

WORLD WRESTLING
ENTERTAINMENT, INC.
("PROMOTER")

By: _____
      John Laurinaitis
      EVP, Talent Relations

Date: 12/16/11

EVAN MITCHELL SINGLETON
("WRESTLER")

By: _____
      Evan Mitchell Singleton

Social Security No.:

Date: 11/28/11


STATE OF PENNSYLVANIA        )
                             ) ss:
COUNTY OF LANCASTER          )

I am a Notary Public for said County and State, do hereby certify that Evan Mitchell Singleton personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this 28th day of November, 2011.

_____
Notary Public
My commission expires: _____

> COMMONWEALTH OF PENNSYLVANIA
> Notarial Seal
> Richard A. Katz, Notary Public
> City of Lancaster, Lancaster County
> My Commission Expires Sept. 22, 2014
> Member, Pennsylvania Association of Notaries

21

STATE OF CONNECTICUT          )
                              ) ss:  Stamford
COUNTY OF FAIRFIELD           )

On _____ 16, 2011 before me personally came John Laurinaitis, Executive Vice President of Talent Relations, to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of World Wrestling Entertainment, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this 16th day of _____, 2011.

_____
Notary Public
My commission expires: _____

APPROVED
CEO
Legal
Finance

APPENDIX - Page 423

## EXHIBIT A

### WRESTLER INTELLECTUAL PROPERTY

Evan Mitchell Singleton

23

**EXHIBIT B**

PROMOTER INTELLECTUAL PROPERTY

APPENDIX - Page 425

**EXHIBIT C**

EXCEPTIONS TO WARRANTY
PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR
CONFLICT WITH
<u>WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS</u>

None

25

APPENDIX - Page 426

# Exhibit B

# ORIGINAL

## WORLD WRESTLING ENTERTAINMENT, INC.
## BOOKING CONTRACT

This World Wrestling Entertainment, Inc. Booking Contract ("Agreement"), made effective as of the date World Wrestling Entertainment, Inc. executes said Agreement ("Effective Date"), by and between World Wrestling Entertainment, Inc., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "PROMOTER"), and VITO LOGRASSO, an individual residing at 17 Albion Place, Staten Island, New York 10302 (hereinafter referred to as "WRESTLER").

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business throughout the world of organizing, publicizing, arranging, staging, conducting professional wrestling exhibitions and/or Events, as defined below, and representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness and personality; and

WHEREAS, PROMOTER has established a worldwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and/or Events, as defined below, and PROMOTER has established a network of cable, satellite and internet organizations which regularly broadcast, transmit, stream and exhibit PROMOTER's professional wrestling Events on a pay-per-view and subscription basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or Events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and Events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange professional wrestling exhibitions and/or Events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound, do hereby agree as follows:

1

APPENDIX - Page 428

## 1. BOOKING

1.1     WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)     During the Term of this Agreement, the exclusive right to engage WRESTLER's performance in wrestling matches at any professional wrestling exhibitions whatsoever, as well as at appearances at any other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler or which are related to sports entertainment (collectively, the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location or by promotions to whom WRESTLER's services are assigned by PROMOTER for developmental, training or other purposes, or otherwise. Pursuant to Section 13.5 herein and during the Term of this Agreement, WRESTLER acknowledges and agrees that PROMOTER, in its sole discretion, shall have the right to assign WRESTLER's obligations under this Agreement for any period of time as PROMOTER sees fit to other promoters in order to enhance or improve WRESTLER's overall wrestling abilities, in-ring skills, conditioning, or other attributes deemed necessary by PROMOTER.

(b)     During the Term and thereafter as provided for in this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as the right to exhibit, broadcast and transmit the Footage, as defined in Section 2.1, via closed circuit transmission, pay-per-view transmission, subscription transmission (e.g., subscription video on demand), video on demand transmission, video exhibition, or any other medium now known or hereinafter discovered.

(c)     During the Term of this Agreement and thereafter as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of WRESTLER Intellectual Property, as defined herein below, through any means whatsoever including internet websites, merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2     In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in PROMOTER's sole discretion, in wrestling matches at various Events.

## 2. WORKS

2.1     WRESTLER hereby grants to PROMOTER the exclusive right during the Term to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for or related to the Events or for or related to any and all of the services performed by WRESTLER pursuant to the terms herein. (These recordings by tape, film, photograph, disc, or otherwise are collectively referred to herein as the "Footage").

2.2     Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, or otherwise disseminate the Footage in perpetuity by any form of media, now or hereafter devised (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television, the internet, video on demand, and subscription video on demand).

2.3     WRESTLER's appearance, performance and work product in connection in any way with the Events, Footage, WRESTLER's services and the rights granted herein shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all Footage and all of the rights, results, products and proceeds in and to, or derived from the Events, Footage, WRESTLER's services and the rights granted herein (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with the Events, Footage, WRESTLER's services and the rights granted herein) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of PROMOTER and/or on behalf of PROMOTER's designee.

2.4     If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and PROMOTER shall own such Development. All Footage and Developments referred to in this Agreement are collectively referred to as "Works".

2.5     All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement. To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby irrevocably assigns in perpetuity to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

### 3. INTELLECTUAL PROPERTY

3.1     All service marks, trademarks and other distinctive and identifying indicia used by WRESTLER prior to the Effective Date in connection with the business of professional wrestling, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "WRESTLER Intellectual Property") are described and identified on Exhibit A attached hereto and incorporated herein by reference. WRESTLER hereby grants to PROMOTER a

license and right during the Term and thereafter as provided for in this Agreement including any Sell Off Period set forth in Section 4.3 and PROMOTER hereby accepts all worldwide right, title and interest in and to WRESTLER's Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the WRESTLER Intellectual Property. WRESTLER further acknowledges and agrees that PROMOTER shall own in perpetuity all Footage, as defined in Section 2.1 of the Agreement, and that PROMOTER shall have perpetual rights in the Footage, as set forth in Section 2.2 of this Agreement.

3.2     Except for the WRESTLER Intellectual Property specifically set forth on Exhibit A, any intellectual property rights, including but not limited to trademarks, service marks, copyrighted works, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which were procured, owned or created by PROMOTER prior to the Term which are described and identified on Exhibit B attached hereto and incorporated herein by reference (collectively the "PROMOTER Intellectual Property") shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

3.3     PROMOTER may from time to time during the Term create or develop trademarks, service marks, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which WRESTLER acknowledges shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement. In addition, WRESTLER agrees to assign and relinquish to PROMOTER any and all claims of ownership and/or good will that may be acquired by WRESTLER now or in the future to and from such character name and image. With respect to all of the foregoing, WRESTLER agrees to immediately execute an amendment to this Agreement to add to Exhibit B any additional intellectual property rights created pursuant to this Section 3.3 as PROMOTER Intellectual Property.

3.4     WRESTLER Intellectual Property and PROMOTER Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

## 4. MERCHANDISING

4.1     WRESTLER hereby agrees that PROMOTER shall have the exclusive right in perpetuity to use and exploit WRESTLER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all copyrighted work incorporating the WRESTLER Intellectual Property. PROMOTER shall own in perpetuity all copyrights in such copyrighted work and PROMOTER shall be entitled to obtain copyright

registrations in PROMOTER's name or on behalf of its designee. WRESTLER shall provide all reasonable assistance to PROMOTER in so obtaining such copyright registrations, and WRESTLER authorizes PROMOTER to execute any documents on WRESTLER's behalf as attorney-in-fact that are required by the United States Patent and Trademark Office.

4.2     In addition to the perpetual rights to use and exploit WRESTLER Intellectual Property as set forth in Section 4.1 of this Agreement, WRESTLER agrees that during the Term and any applicable Sell Off Period as provided for in this Agreement, PROMOTER shall have the exclusive right to use, exploit, and license the WRESTER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of goods and merchandise incorporating the WRESTLER Intellectual Property.

4.3     Sell Off Period. Upon the expiration or termination of this Agreement, PROMOTER shall have the right to sell any licensed products in inventory, on hand or manufactured containing WRESTLER Intellectual Property for a period of ninety (90) days immediately following such expiration or termination ("Sell Off Period") provided, however, that there shall be no restriction on PROMOTER's rights to use or exploit WRESTLER Intellectual Property in connection with the perpetual rights granted herein by WRESTLER.

4.4     Book Rights. WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the licensing, sublicensing, manufacture, distribution, publication, and exploitation of WRESTLER's autobiography or authorized biography (collectively "Book Rights").

4.5     Publishing Rights. WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the creation and sale of certain movies, or other forms of media now known or hereinafter discovered, as PROMOTER shall determine in its sole discretion (collectively "Publishing Rights").

4.6.    Auction Sale Rights. WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to sell via the Internet, television or through any other distribution method now known or hereafter created, by an auction method, any item containing WRESTLER Intellectual Property which shall include but not be limited to items containing WRESTLER's signature ("Auction Sale").

## 5. EXCLUSIVITY

5.1     It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER are exclusive to PROMOTER

even to the exclusion of WRESTLER.

5.2    In the event WRESTLER desires upon reasonable notice to PROMOTER during the Term of this Agreement either individually or through his authorized representative(s) to participate in movies, films, commercials, product endorsements, videos, television programs or similar activities, whether or not procured by PROMOTER (collectively "Permitted Activities") and promotional events for the Permitted Activities, WRESTLER may do so subject to PROMOTER's approval, which shall not be unreasonably withheld provided a written sublicense is executed between PROMOTER, WRESTLER and any relevant third parties and further provided WRESTLER shall not utilize the Intellectual Property in any manner in connection with such Permitted Activities without PROMOTER's written consent, and that PROMOTER retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term of this Agreement, as defined herein. It is further agreed that PROMOTER shall receive from WRESTLER a management fee to reimburse PROMOTER for its reasonable administrative costs incurred in connection with WRESTLER's participation in each such Permitted Activity, provided that PROMOTER's costs shall not be less than ten percent (10%) of any fees received by WRESTLER for each such Permitted Activity described herein. Additionally, all monies earned by WRESTLER from such Permitted Activities in a specific Contract Year shall be credited against the Minimum Annual Compensation for that Contract Year as set forth in paragraph 7.1 below.

## 6. TERM AND TERRITORY

6.1    Unless terminated pursuant to the terms herein, the term of this Agreement shall be for three (3) year(s) from the Effective Date ("Term"). Each consecutive twelve (12) month period during the Term commencing with the Effective Date shall be referred to as a "Contract Year".

6.2    Notwithstanding anything herein to the contrary, termination of this Agreement for any or no reason shall not affect PROMOTER's ownership of and rights in, including but not limited to, any Works, PROMOTER Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in Sections 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.3    The territory of this Agreement shall be the world ("Territory").

## 7. PAYMENTS/ROYALTIES

7.1    (a)    Unless terminated pursuant to the terms herein, PROMOTER shall pay WRESTLER each Contract Year the total sum of Seventy Five Thousand US Dollars (US$75,000.00) (referred to hereinafter as "Minimum Annual Compensation"). PROMOTER agrees, commencing with the Effective Date, to pay WRESTLER the Minimum Annual Compensation in fifty-two (52) weekly installments consistent with PROMOTER's regular payment procedures.

    (b)    PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any fines levied against WRESTLER, as provided for in Sections 8.3 or 9.6; any costs or expenses paid by PROMOTER on behalf of WRESTLER, as provided for in Sections 8.1 and 9.13(b); or any deductions permitted as set forth in Section 7.13 and 10.2(b). PROMOTER shall also have the right

G:\Department\Legal Affairs\Booking Contracts\LoGrasso, Vito Booking Contract CLEAN 6-15-05.doc
APPENDIX - Page 433

to credit or deduct from the Minimum Annual Compensation: (i) any royalties earned by WRESTLER; (ii) any payments made to WRESTLER by PROMOTER in accordance with Section 7.2; and/or (iii) any other payments due or earned by WRESTLER for the rights granted herein or pursuant to the terms of this Agreement. For the purposes of this Agreement, any royalty payments due shall be deemed "earned" only at the time they are paid to WRESTLER.

(c)     Unless terminated pursuant to the terms herein and subject to Section 7.10, if applicable, and Section 10.2 (b) below, at least one hundred twenty (120) days after each Contract Year, if it is determined that WRESTLER has earned more than the Minimum Annual Compensation for services rendered during that Contract Year, WRESTLER shall be paid subject to any permitted deductions or credits in accordance with Section 7.1(b), in a one lump sum  the difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during that Contract Year.

7.2     (a)     If WRESTLER appears and performs in any Event produced by PROMOTER in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast as set forth in  Sections 7.2 (b) and 7.2 (c) below (hereinafter "Non-Televised Live Events"), WRESTLER shall be paid by PROMOTER an amount equal, in PROMOTER's sole discretion, to such percentage of the paid receipts for such Non-Televised Live Event from the live Non-Televised Live Event gate receipts only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such Non-Televised Live Event.

(b)     If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is taped or broadcast for use on PROMOTER's television network ("TV Taping"), WRESTLER shall be paid by PROMOTER, in its sole discretion, an amount only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such TV Taping.

(c)     If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is aired or broadcast via satellite broadcast or pay-per-view distribution technology for use by PROMOTER ("Pay-Per-View"), WRESTLER shall be paid by PROMOTER an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3     Licensed Product Sale

(a)     Licensed Product Sale--Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to the Licensed Product Sale. Licensed Products' Net Receipts means the gross amount received by PROMOTER from a Licensed Product Sale less expenses incurred by PROMOTER or its licensing agent.

"Licensed Product Sale" shall mean the sale, other than an Auction Sale as defined in Section 7.7, of any product, merchandise, consumer material or good, other than Books as defined

7

APPENDIX - Page 434

in Section 7.8 and Pay Per View DVD/Home Videos as defined in Section 7.6(a), which is made pursuant to a license agreement between PROMOTER and a party wherein a party is granted the contractual right and obligation to manufacture, distribute, and sell the product, merchandise, consumer material or good to wholesale and/or retail customers through designated distribution channels.

"Other PROMOTER Talent" shall mean a professional wrestler who has an agreement with PROMOTER and to whom PROMOTER is obligated to pay royalties.

(b)     Licensed Product Sale---Other Performers. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, PROMOTER shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.4     Direct Sale and Direct Venue Sale

(a)     Direct Sale---Sole Performer. In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Sale, WRESTLER shall be paid five percent (5%) of the Direct Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Sale reduced by returns. "Direct Sale" shall mean a sale by PROMOTER by any method other than a Licensed Product Sale, Auction Sale, or a Direct Venue Sale, as defined in Section 7.4(c), wherein PROMOTER has or retains the right and/or obligation to manufacture, distribute or sell any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, to an end user and where such sale may be made by any distribution method (e.g., catalog, television or any internet site owned or controlled by PROMOTER).

(b)     Direct Sale---Other Performers. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Sale, PROMOTER shall allocate five percent (5%) of the Direct Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

(c)     Direct Venue Sale---Sole Performer. In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, WRESTLER shall be paid five percent (5%) of the Direct Venue Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Venue Sale reduced by any expenses charged to PROMOTER by the venue for the sale of the product, merchandise, consumer materials or goods. "Direct Venue Sale" shall mean the sale by PROMOTER of any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, which occurs in or about the venue of a PROMOTER live event.

(d)     Direct Venue Sale---Other Performers. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, PROMOTER shall allocate five percent (5%) of the Direct Venue Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

8

APPENDIX - Page 435

7.5    Featured Performer

(a)    Licensed Product Sales. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Licensed Product Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.3(b), PROMOTER shall pay five percent (5%) of the Net Receipts paid to PROMOTER with respect to the Licensed Product Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(a) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units. For the purposes of this Section 7.5, PROMOTER shall determine in its sole discretion whether WRESTLER shall be deemed a "Featured Performer".

(b)    Direct Sale. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(b), PROMOTER shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(b) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

(c)    Direct Venue Sale. If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Venue Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(d), PROMOTER shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Venue Sale of the DVD and/or home video to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(c) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

7.6    Pay Per View DVD/Home Video

(a)    Sold By Licensees As A Single Unit. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of "Pay Per View DVD/Home Videos" which is sold by a third party pursuant to a license agreement,

9

PROMOTER shall allocate twenty-five (25%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(a) less any and all costs incurred by PROMOTER or its licensing agent. "Pay Per View/DVD Home Videos" shall mean a DVD and/or home video produced by PROMOTER which is a reproduction of an entire live pay per view event, as set forth in Section 7.2(c).

   (b) <u>Sold By Licensees As A Collection Set</u>. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a collection set featuring multiple Pay Per View DVD/Home Videos (e.g., Wrestlemania Box Set") ("Collection Set"), which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the Net Receipts as defined in Section 7.6(a) to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

   (c)· <u>Sold By PROMOTER As A Single Unit</u>. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of Pay Per View DVD/Home Videos which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage, as set forth in Section 7.2(c), that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(c) less any and all costs incurred by PROMOTER or its licensing agent.

   (d) <u>Sold By PROMOTER As A Collection Set</u>. In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a Collection Set which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the Net Receipts, as defined in Section 7.6(c), to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

7.7    Auction Sale

    (a)    Sole Performer.  In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent, WRESTLER shall be paid thirty five (35%) percent of the "Net Sales", defined as the gross revenue received for an Auction Sale less (i) the cost of goods related to the item sold; (ii) any shipping or freight charges; and (iii) PROMOTER's administrative fee which shall be equal to thirty (30%) percent of the gross revenue received from the Auction Sale of the item sold.

    (b)    Other Performers.  In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used together with intellectual property of Other PROMOTER Talent, PROMOTER shall allocate thirty five (35%) percent of the "Net Sales" defined in Section 7.7 (a) to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such product pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.8    Book Sales.  In the event that pursuant to the rights granted in Section 4.4 above, PROMOTER publishes or grants to a third party the right to publish WRESTLER's autobiography ("Book"), WRESTLER shall be paid an amount which shall be equal to fifty percent (50%) of the "Licensed Products' Net Receipts" less the cost of any photography, illustration and/or writer fees. For the purpose of this Section 7.8, "Licensed Products' Net Receipts" shall mean the gross amount received by PROMOTER from the publication, sale and distribution of the Book less any out of pocket expenses incurred or paid by PROMOTER, other than photography, illustration and/or writer fees which are the sole responsibility of WRESTLER.

7.9    Publishing Rights.  As respects WRESTLER's compensation in connection with PROMOTER's or PROMOTER's designee's exploitation of the Publishing Rights granted to PROMOTER as set forth in Section 4.5, the parties shall negotiate in good faith for a period of thirty (30) days commencing immediately after PROMOTER advises WRESTLER that PROMOTER desires to exploit the Publishing Rights ("Negotiation Period"). However, upon the expiration of the Negotiation Period, if the parties have not agreed on the compensation to be paid WRESTLER for PROMOTER's exploitation of the Publishing Rights, the parties agree that WRESTLER shall be paid an amount that is equal to the lowest compensation paid by PROMOTER within the previous three (3) years to Other PROMOTER Talent who have received payment for PROMOTER's exploitation of such talent's own Publishing Rights.

7.10    Subject to paragraph 12.2, the non-compete provisions of this Agreement, as it relates to WRESTLER's appearance or performance of any services pursuant to this Agreement, including the appearance and or performance of WRESTLER's services at Events or at other activities conducted by PROMOTER, WRESTLER shall be eligible only for the payments and royalties specifically set forth in Sections 7.1 through 7.9.  Any payments or royalties earned in connection with any wrestling services WRESTLER may perform during the Term of this Agreement for any wrestling/sports entertainment or martial arts organization, other than PROMOTER's, and /or entity shall be credited against WRESTLER's Minimum Annual Compensation, as set forth in Section 7.1(b).

7.11   No Royalties Paid to WRESTLER.  Except as specifically set forth in Section 7.1 through 7.9 above, WRESTLER shall not be eligible for any payment or royalties with respect to any other goods, services or otherwise including without limitation to the following:  television license fees; television subscription fees; internet subscription fees; subscription video on demand fees; magazine subscription fees and/or advertising; and/or distribution fees of any kind paid to PROMOTER by any entity in connection with the exploitation of the Intellectual Property.

7.12   All payments made to WRESTLER are in full without withholding, except where required by law.  After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.13   If WRESTLER at any time during the Term is unable to wrestle for six (6) consecutive weeks due to an injury suffered while performing services at PROMOTER's direction, PROMOTER may: (i) for every Non-Televised Live Event or TV Taping, as described in Sections 7.2(a) and (b), reduce the Minimum Annual Compensation by .5%; and/or (ii) for every Pay-Per-View as described in Section 7.2(c), reduce the Minimum Annual Compensation by the average pay received by WRESTLER for the three (3) immediately preceding Pay-Per-Views or, if WRESTLER appeared in fewer than three (3) Pay-Per-Views, then the average WRESTLER receives for such similar events ("Similar Event") or .5% if WRESTLER did not appear in any such Similar Event.

7.14   (a)   PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

(b)   PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business.  WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice.   Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations.  WRESTLER shall not audit PROMOTER's books and records more than twice during any calendar year and no such audit shall be conducted later than six (6) months after the most recent statement of royalties is given, delivered or sent to WRESTLER. Each audit is limited to five (5) days in duration.  Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

(c)   WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless an audit has been conducted by WRESTLER to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

(d)   No claim shall be filed pursuant to Section 13.8 below against PROMOTER or PROMOTER's affiliates that disputes any statement of royalties or accounting given by PROMOTER

hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to Sections 7.13(b) and (c) above.

## 8. PROMOTER'S OBLIGATIONS

8.1    Although under Section 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining such licenses, which shall include any permits, visas, or otherwise, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2    PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

(a)    In connection with WRESTLER's appearances and performance at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

(b)    In connection with the production, distribution, and exploitation of the Footage, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication; and

(c)    In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3    PROMOTER shall schedule the Events and book WRESTLER for the Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time. If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then PROMOTER may fine, suspend or terminate WRESTLER in its sole discretion.

8.4     Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

## 9. WRESTLER'S OBLIGATIONS

9.1     WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2     WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

        (a)     WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise; and

        (b)     WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs.

9.3     WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events (except for those transportation costs which are covered by PROMOTER's then current Travel Policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events.

9.4     WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5     WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to himself and to others in any and all Events. These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match. In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the

match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6     WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this Section 9.6 shall cause a forfeiture of any payments due WRESTLER pursuant to Section 7 and shall entitle PROMOTER to terminate this Agreement, or suspend WRESTLER without pay, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement. If PROMOTER in its discretion suspends this Agreement, when reinstated, PROMOTER may extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof and this Agreement will therefore continue to be of full force and effect throughout the remainder of the Term.

9.7     WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, including without limitation, appearing at and participating in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter discovered, including without limitation free, cable, pay cable, subscription video on demand, video on demand and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture and Internet), at times and places designated by PROMOTER, in connection therewith.

9.8     WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Footage and/or the exercise of any other rights respecting WRESTLER and/or PROMOTER Intellectual Property, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to the WRESTLER and/or PROMOTER Intellectual Property are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's written consent. WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.9     WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER's appearance and/or performance in a professional wrestling match.

9.10    WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them by reason of WRESTLER's breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. WRESTLER, on

behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of the harmless against any and all claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them, arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked. Such indemnification shall include all claims arising out of any acts, transactions and/or conduct of WRESTLER or others occurring at Events or in connection with any appearances or performances by WRESTLER not conducted by PROMOTER in accordance with this Agreement.

9.11    WRESTLER shall be responsible for payment of all of WRESTLER's own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon retirement from professional wrestling.

9.12    (a)    **WRESTLER SHALL BE RESPONSIBLE FOR HIS OWN COMMERCIAL GENERAL LIABILITY INSURANCE, WORKER'S COMPENSATION INSURANCE, PROFESSIONAL LIABILITY INSURANCE, AS WELL AS ANY EXCESS LIABILITY INSURANCE, AS HE DEEMS APPROPRIATE TO INSURE, INDEMNIFY AND DEFEND WRESTLER WITH RESPECT TO ANY AND ALL CLAIMS ARISING OUT OF HIS OWN ACTS, TRANSACTIONS, OR CONDUCT AS A PROFESSIONAL WRESTLER.**

(b)    **WRESTLER ACKNOWLEDGES THAT THE PARTICIPATION AND ACTIVITIES REQUIRED BY WRESTLER IN CONNECTION WITH HIS PERFORMANCE IN A PROFESSIONAL WRESTLING EXHIBITION MAY BE DANGEROUS AND MAY INVOLVE THE RISK OF SERIOUS BODILY INJURY. WRESTLER KNOWINGLY AND FREELY ASSUMES FULL RESPONSIBILITY FOR ALL SUCH INHERENT RISKS AS WELL AS THOSE DUE TO THE NEGLIGENCE OF PROMOTER OR OTHER WRESTLERS.**

(c)    **WRESTLER HEREBY RELEASES, WAIVES AND DISCHARGES PROMOTER FROM ALL LIABILITY TO WRESTLER AND COVENANTS NOT TO SUE PROMOTER FOR ANY AND ALL LOSS OR DAMAGE ON ACCOUNT OF INJURY TO THEIR PERSON OR PROPERTY OR RESULTING IN SERIOUS OR PERMANENT INJURY TO WRESTLER OR IN WRESTLER'S DEATH, WHETHER CAUSED BY NEGLIGENCE OF PROMOTER OR OTHER WRESTLERS UNDER CONTRACT TO PROMOTER.**

(d)    **WRESTLER MAY AT HIS ELECTION OBTAIN HEALTH, LIFE AND/OR DISABILITY INSURANCE TO PROVIDE BENEFITS IN THE EVENT OF PHYSICAL INJURY ARISING OUT OTHER PROFESSIONAL ACTIVITIES; AND WRESTLER ACKNOWLEDGES THAT PROMOTER SHALL NOT HAVE ANY RESPONSIBILLITY FOR SUCH INSURANCE OR PAYMENT IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF HIS PROFESSIONAL ACTIVITIES.**

(e) **IN THE EVENT OF PHYSICAL INJURY ARISING OUT OF WRESTLER'S PROFESSIONAL ACTIVITIES, WRESTLER ACKNOWLEDGES THAT AS AN INDEPENDENT CONTRACTOR HE IS NOT ENTITLED TO ANY WORKERS' COMPENSATION COVERAGE OR SIMILAR BENEFITS FOR INJURY, DISABILITY, DEATH OR LOSS OF WAGES; AND WRESTLER SHALL MAKE NO CLAIM AGAINST PROMOTER FOR SUCH COVERAGE OR BENEFIT.**

9.13 (a) WRESTLER shall act at all times with due regard to public morals and conventions during the Term of this Agreement. If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings WRESTLER into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures WRESTLER's reputation in PROMOTER's sole judgment, or diminishes the value of WRESTLER's professional wrestling services to the public or PROMOTER, then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER; and PROMOTER shall have the right to immediately suspend WRESTLER and/or terminate this Agreement pursuant to Section 12.

(b) Should at any time during the Term, WRESTLER be involved in any way with a criminal or civil legal proceeding or regulatory or administrative hearing (e.g., immigration hearing) or otherwise ("Proceeding"), PROMOTER shall have the right but not the obligation to retain counsel to represent WRESTLER in the Proceeding and PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any and all costs and expense (including attorney's fees) related to the Proceeding. WRESTLER agrees that should PROMOTER retain counsel pursuant to this Section 9.13(b), PROMOTER shall not be admitting that PROMOTER has any obligation, liability, and/or responsibility whatsoever in connection with the Proceeding.

9.14 During the Term, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity for any other martial arts or wrestling organization and/or entity not owned or controlled by PROMOTER or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-view or other televised events.

## 10. WARRANTY

10.1 WRESTLER represents, warrants, and agrees that WRESTLER is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; WRESTLER has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no prior or pending claims, administrative proceedings, civil lawsuits, criminal prosecutions or other litigation matters, including without limitation any immigration or athletic commission related matters, affecting WRESTLER which would or might interfere with PROMOTER's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Exhibit C, attached hereto.

10.2 (a) WRESTLER represents, warrants and agrees that WRESTLER is in sound mental and

17

physical condition; that WRESTLER is suffering from no disabilities or pre-existing conditions or injuries that would impair or adversely affect WRESTLER's ability to perform professional wrestling services; and that WRESTLER is free from the influence of illegal drugs or controlled substances, which can threaten WRESTLER's well being and pose a risk of injury to WRESTLER or others. To insure compliance with this warranty, WRESTLER agrees to abide by any drug policy adopted, amended or modified by WWE during the Term of this Agreement and further consents to the sampling and testing of his urine, if in the sole discretion and judgment of PROMOTER, reasonable cause exists to perform such testing. In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by PROMOTER.

(b)     In the event that WRESTLER is unable to wrestle for six (6) consecutive weeks during the Term of this Agreement for any or no reason including due to an injury suffered in the ring while performing services at PROMOTER's direction, PROMOTER shall have the right to thereafter terminate this Agreement or suspend WRESTLER without pay. PROMOTER can opt in its discretion to extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof. Upon certification by WRESTLER or PROMOTER's physician during any period of suspension that WRESTLER is fully recovered and capable of performing all services as required under this Agreement, PROMOTER can reinstate the Agreement, and it will therefore continue to be of full force and effect throughout the remainder of the Term of this Agreement.

10.3    PROMOTER reserves the right to have WRESTLER examined by a physician of its own choosing at its expense at any point during the Term of this Agreement.

## 11. EARLY TERMINATION

11.1    (a)     This Agreement may be terminated by PROMOTER during the Term for any or no reason whatsoever by providing WRESTLER at least ninety (90) days advance written notice of said termination. The ninetieth (90th) day shall be defined as the "Termination Date".

(b)     This Agreement may be terminated prior to the end of its Term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either party.

(c)     This Agreement may be terminated by PROMOTER immediately due to WRESTLER's breach as set forth in Section 12.1.

(d)     In the event of a termination pursuant to Section 11.1(a) or Section 11.1(b), PROMOTER shall be obligated to pay WRESTLER a pro-rated portion of the Minimum Annual Compensation up until the Termination Date and to pay WRESTLER any royalties which may be due WRESTLER in accordance with Sections 7.3 through 7.9 for the use of the WRESTLER Intellectual Property.

11.2    This Agreement shall automatically and immediately terminate upon WRESTLER's death and PROMOTER shall have no further obligation to WRESTLER or WRESTLER's heirs, successors, personal representatives or assigns pursuant to any of the terms herein including but not limited to any payment obligations as described in Section 7.

11.3    Upon the termination of this Agreement for any reason, including breach, the parties acknowledge and agree that PROMOTER shall own in perpetuity all right, title and interest in all Footage, Works, PROMOTER Intellectual Property and any registrations thereof. PROMOTER shall also have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items as set forth in Section 4.2.

## 12. BREACH

12.1    In addition to those reasons set forth elsewhere in this Agreement, PROMOTER shall have the right, in its sole discretion, to immediately suspend or terminate this Agreement, both as to services and compensation, if any of the following occurs:

(a)    WRESTLER violates any drug policy adopted, amended, or modified by PROMOTER during the Term of this Agreement and/or fails any pre-contract drug test required by PROMOTER and/or fails or refuses to take any drug test directed to be taken by PROMOTER pursuant to Section 10.2(a);

(b)    WRESTLER is habitually late and/or absent for scheduled Events or appearances as PROMOTER determines in its sole discretion;

(c)    WRESTLER fails any physical examination conducted on behalf of PROMOTER, as required herein;

(d)    WRESTLER fails to maintain physical condition or training such that his weight, and/or his performance is unsatisfactory as determined by PROMOTER in its sole discretion;

(e)    PROMOTER, on behalf of WRESTLER, is unable to obtain any necessary athletic commission licenses or immigration documents, including, but not limited to visas; or

(f)    WRESTLER breaches Section 9.13(a).

12.2    In the event that WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law, as provided in Section 13.8.  In addition, in the event of an immediate termination pursuant to Section 12.1, WRESTLER shall forfeit and shall not be entitled to: (i) any remaining Minimum Annual Compensation owed and (ii) any future payments that may have been due WRESTLER pursuant to Section 7.  WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the WRESTLER Intellectual Property for the remainder of the Term and the PROMOTER Intellectual Property forever.    Further, at PROMOTER's sole option, the Term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period.  In the event WRESTLER breaches this Agreement, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity in the United States for any other wrestling organization and/or entity not owned or controlled by PROMOTER or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-view or other televised events, for one (1) year from the date of the termination of this Agreement as a result of breach of this Agreement by WRESTLER.

APPENDIX - Page 446

12.3    The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, Footage, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief  shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4    In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

### 13. MISCELLANEOUS

13.1    Nothing contained in this Agreement shall be construed to constitute WRESTLER as an employee, partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect.  WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or any and all of the rights granted to PROMOTER herein.

13.2    This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement. There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3    This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

13.4    If any provision or clause of this Agreement, or portion thereof, shall be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision shall not thereby be affected and shall be given full effect, without regard to the invalid portion.  It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce or modify the duration, area, or matter of such provision, and, in its reduced or modified form, such provision shall then be enforceable and shall be enforced.

13.5    PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted by WRESTLER to PROMOTER pursuant to the terms of this Agreement to any person, firm or corporation, provided that such assignee has the financial ability to meet the PROMOTER's obligations hereunder, and if any assignee shall assume in writing PROMOTER's obligations

hereunder, PROMOTER shall be released from any liability and shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6 Any notices required or desired hereunder shall be in writing and shall be deemed given when personally delivered or if mailed by certified mail, return receipt requested or registered mail, when deposited in the United States Mail, postage prepaid, or if telecopied, when telecopied, or if sent by courier service, when deposited with such service, or if sent by overnight delivery service, on the next business ay following delivery to such service. Notices shall be addressed as follows (unless either party at any time or times designates another address for itself by notifying the other party thereof as provided herein):

TO PROMOTER:                                    TO WRESTLER:

World Wrestling Entertainment, Inc.             Vito LoGrasso
Attn:   Edward L. Kaufman                       17 Albion Place
Executive Vice President and General Counsel    Staten Island, New York  10302
1241 E. Main Street
Stamford, CT  06902

13.7 This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8 The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

## 14. CONFIDENTIALITY

14.1 (a) Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that in further consideration of PROMOTER's entering into this Agreement, WRESTLER shall not, at any time during the Term of this Agreement, or after the termination of this Agreement for any or no reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of WRESTLER or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances in the Footage, information regarding any contractual relationships maintained by PROMOTER and/or the

terms thereof, and/or any and all information regarding wrestlers engaged by PROMOTER.

(b) Notwithstanding the foregoing, WRESTLER's obligation of confidentiality shall not include information which:

(i)    at the time of disclosure was in the public domain;

(ii)   after such disclosure becomes generally available to the public other than through any act or omission by WRESTLER; and

(iii)  is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to PROMOTER in a timely manner in order to afford PROMOTER an opportunity to seek a protective order against such disclosure.

14.2    WRESTLER acknowledges and agrees that his agreement to be bound by the terms hereof is a material condition of PROMOTER's willingness to use and continue to use WRESTLER's services. Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either. Notwithstanding the foregoing, WRESTLER shall be free to disclose the terms and conditions of this Agreement to his lawyers, agents, financial advisers and spouse and PROMOTER shall be free to disclose the terms and conditions of this Agreement to its lawyers, accountants and to those employees who have a legitimate need to know such information.

14.3    This Agreement and any amendments thereto may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute the same instrument.  Counterparts may be executed either in original or faxed form and the parties adopt any signatures received by a receiving fax machine as original signatures of the parties.  All of the terms and conditions of any Exhibits shall be incorporated herein by reference and shall be made a part hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written below.

WORLD WRESTLING
ENTERTAINMENT, INC.
("PROMOTER")

By: _____
John Laurinaitis
Vice President of Talent Relations

Date: ___6/28/05___

VITO LOGRASSO
("WRESTLER")

By: __Vito LoGrasso__
Vito LoGrasso
Social Security No.:

Date: __June 17th, 2005__

22

STATE OF CONNECTICUT        )
                            ) ss: Stamford
COUNTY OF FAIRFIELD         )

    On ____June 28,____ 2005 before me personally came John Laurinaitis, Vice President of Talent Relations, to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of World Wrestling Entertainment, Inc., and that he executed the same on behalf of said Company.

    WITNESS my hand and notarial seal this 28th day of ____June____, 2005.

_Margaret M. Yuarte_
Notary Public
My commission expires: ___7-31-07___

**MARGARET M. YTUARTE**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2007


STATE OF New York       )
                        ) ss:
COUNTY OF Richmond )

    I am a Notary Public for said County and State, do hereby certify that Vito LoGrasso personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

    WITNESS my hand and notarial seal this 17th day of ____June____, 2005.

_Jason Diamond_
Notary Public
My commission expires: ____

JASON DIAMOND
NOTARY PUBLIC STATE OF NEW YORK
NO. 01DI6077556
QUALIFIED IN RICHMOND COUNTY
COMMISSION EXPIRES 7/15/06

# EXHIBIT A

## WRESTLER INTELLECTUAL PROPERTY

Vito LoGrasso

## EXHIBIT B

## PROMOTER INTELLECTUAL PROPERTY

None

## EXHIBIT C

### EXCEPTIONS TO WARRANTY
PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR
CONFLICT WITH
<u>WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS</u>

None

# TAB 3

**Krasik, Curtis B.**

Begin forwarded message:

> **From:** Charles LaDuca <charles@cuneolaw.com>
> **Date:** February 26, 2015 at 4:37:57 PM EST
> **To:** 'Jerry McDevitt' <jrrymcdv@aol.com>
> **Cc:** "Harris L. Pogust" <hpogust@pbmattorneys.com>, "Robert K. Shelquist"
> <rkshelquist@locklaw.com>, Konstantine Kyros <kon@kyroslaw.com>, Erica Mirabella
> <erica@mirabellallc.com>, Ben Elga <belga@cuneolaw.com>
> **Subject: RE: Improper venue of Singleton v WWE.**
>
> We do not agree with any of your emails. Or, that the contract applies for either of our clients.
> However, we will not oppose a 1404(a) transfer for Lograsso and Singleton. Our clients do not
> waive any rights to challenge the applicability of any alleged contract.
>
> Charles J. LaDuca, Esq.
> Cuneo Gilbert & LaDuca, LLP
> 8120 Woodmont Avenue
> Suite 810
> Bethesda, Maryland 20814
> Tel:  202-789-3960
> Fax:  202-789-1813
> www.cuneolaw.com
>
>
> -----Original Message-----
> From: Jerry McDevitt [mailto:jrrymcdv@aol.com]
> Sent: Thursday, February 26, 2015 4:22 PM
> To: Charles LaDuca
> Cc: Harris L. Pogust; Robert K. Shelquist; Konstantine Kyros; Erica Mirabella; Ben Elga
> Subject: Re: Improper venue of Singleton v WWE.
>
> Its now well past this morning and well past " within the hour", both of which were your
> promised response time. This is not rocket science. Are you going to honor the contract of
> lograsso also or not?
>
> Sent from my iPad

1

On Feb 26, 2015, at 2:58 PM, Charles LaDuca <charles@cuneolaw.com> wrote:

We will get back to you within the hour.

Charles J. LaDuca, Esq.

Cuneo Gilbert & LaDuca, LLP

8120 Woodmont Avenue

Suite 810

Bethesda, Maryland 20814

Tel:  202-789-3960

Fax:  202-789-1813

www.cuneolaw.com

-----Original Message-----

From: Jerry McDevitt [mailto:jrrymcdv@aol.com]

Sent: Thursday, February 26, 2015 9:30 AM

To: Charles LaDuca

Cc: Harris L. Pogust; Robert K. Shelquist; Konstantine Kyros; Erica

Mirabella; Ben Elga

Subject: Re: Improper venue of Singleton v WWE.

Have you reconsidered your position whether you will now also agree to the transfer of the claims of Mr. Lograsso to Connecticut?

Yesterday, you contended that he did not have to honor his contractual agreement because, according to you, he wrestled " for many years of his career " without a contract. This echoes an allegation made in the Complaint that he supposedly wrestled with the WWE " from 1991 to 1998" and from 2005 to 2007.

To the extent you are alleging that he worked consecutively for WWE for 7 years without a contract, that is categorically false. In the 90's , he was a jobber, which is akin to casual and occasional labor. We checked yesterday and it appears he worked 4 times in 1991 and was paid $650, 6 times in 1992 for $900, 3 times in 1993 for $675, and one time in 1997 for $200.

None of this, of course, has anything to do with whether the claims he is making arise out of or relate to the performances he rendered pursuant to the formal contract he later signed with WWE. That contract had a mandatory forum selection clause, and it should be honored without further delay or cost to enforce it.  Please advise as to your position so we know whether motion practice will be necessary.

APPENDIX - Page 456

Sent from my iPad

> On Feb 25, 2015, at 10:05 AM, Charles LaDuca
> <charles@cuneolaw.com> wrote:
>
> Thank you for your courtesies regarding Mr. Singleton. Our
> position on Mr. Singleton was a compromise offer. In fact, we
> believe his permanent physical and mental disabilities would fit
> squarely within the extraordinary circumstances allowed by the
> Sup Ct.
>
> Regardless, we will of course honor your request and reconsider
> our position, and get back to you asap. Please note, a lot of folks
> on my side are traveling from the AAJ meeting in California. I
> might need until first thing tomorrow morning.
>
> Charles J. LaDuca, Esquire
> Cuneo Gilbert & LaDuca, LLP
> 8120 Woodmont Avenue
> Suite 810
> Bethesda, Maryland 20814
> Telephone: 202 789 3960
> www.cuneolaw.com
>
> > On Feb 25, 2015, at 9:50 AM, Jerry McDevitt
> > <jrrymcdv@aol.com> wrote:
> >
> > Although it is certainly premature to be
> > discussing whether this case will get into the
> > discovery phase, or where Mr. Singleton's
> > deposition should take place, we would certainly
> > agree to take his deposition in his hometown if he is
> > unable to travel and would be willing to discuss
> > doing it there even if he is able to travel.
> >
> > I would urge you to reconsider your position re Mr.
> > Lograsso to avoid further additional expenses
> > associated with his breach of the forum selection
> > clause. The fact he performed episodically as a
> > jobber prior to signing the contract with the forum
> > selection clause has no bearing on whether he has

3

agreed to that provision and is obligated to honor it.
Indeed, it is the exact same provision which you
now recognize obligates you to litigate Mr.
Singleton's claims in federal court in Connecticut.

Moreover, it makes exactly no sense to split a
purported class action into two different venues and
,as I have previously advised , the forum selection
clause is in the contracts of most of the class you
seek to represent.

I do not believe your reasons for not honoring that
clause in Mr. Lograsso's case is the requisite
extraordinary circumstances required by the
Supreme Court to avoid complying with his
contractual commitment, and would urge you to
reconsider your position.


Sent from my iPad


On Feb 24, 2015, at 8:28 PM,
Charles LaDuca
<charles@cuneolaw.com> wrote:


If you will agree to take

Mr. Singleton's deposition in his
hometown, if he is mentally and

physically unable to travel at that
time--then will agree to transfer Mr.
Singleton to Conn.


We will resist transfer as to

Mr. Lograsso as he wrestled without
any contract for many years of his
career.


Charles J. LaDuca, Esquire

Cuneo Gilbert & LaDuca, LLP

8120 Woodmont Avenue

Suite 810

Bethesda, Maryland 20814

Telephone: 202 789 3960

www.cuneolaw.com


4

On Feb 23, 2015, at 9:56 AM, Jerry McDevitt <jrrymcdv@aol.com> wrote:

On Jan. 23, 2015, I advised you that Misters Singleton and Lograsso were parties to written contracts by which they agreed to a forum selection clause requiring this litigation to be filed and conducted in federal court in Connecticut. I asked for your advise as to the justification for bringing suit in the Eastern District of Pennsylvania in light of their agreement to litigate exclusively in Connecticut.

Since providing this notice, none of you have responded or offered a justification for breaching the contract and filing suit in the EDPa. I must assume that you have verified the contents of your client's contracts following my notice, and would assume you did so as part of the requisite diligence before filing suit.

In any event, in light of your silence, this is to advise that each of your clients agreed to a mandatory forum selection clause,

5

clause, you bear the
"heavy burden" of
demonstrating
exceptional
circumstances, none
of which are present
here.

Thus, as we see it, we
can proceed in one of
two ways. First, you
can take a voluntary
dismissal without
prejudice under Rule
41 and refile your suit
in federal court in
Connecticut.
Alternatively, we can
move to transfer the
case to the federal
court in Connecticut
and indicate your
concurrence to the
Judge. There is no
substantive difference
between the two
methods to honor the
forum selection
clause, as the
Supreme Court has
made clear that the
law of the state agreed
to be the exclusive
forum is to provide
the choice of law
rules when transfer is
done to effectuate a
forum selection
clause.

Thus, we would
appreciate your advise
by the close of
business on Tuesday,
Feb 24th as to how
you wish to proceed.


Sent from my iPad

7

APPENDIX - Page 460

The information contained in this
message may be attorney-client or
work-product privileged and should
be treated as confidential information
intended only for the use of the
individual or entity named above. If
the reader of this message is not the
intended recipient, or the employee
or agent responsible to deliver it to
the intended recipient, you are
hereby notified that any
dissemination, distribution or
copying of this communication is
strictly prohibited. If you have
received this communication in
error, please immediately notify us
by return e-mail, destroying the
original message and any copies.

8

TAB 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EVAN SINGLETON and VITO** | : | **CIVIL ACTION** |
| **LOGRASSO, individually and on** | : | |
| **behalf of all others similarly situated,** | : | |
| **Plaintiffs,** | : | **No. 15-223** |
| | : | |
| v. | : | |
| | : | |
| **WORLD WRESTLING** | : | |
| **ENTERTAINMENT, INC.,** | : | |
| **Defendant.** | : | |

## O R D E R

**AND NOW**, this 23rd day of March, 2015, upon consideration of the defendant's

motion for transfer of venue (Doc. No. 6) and epistolary correspondence from the parties

to the court, it is hereby **ORDERED** that the motion is **GRANTED**, and this action is

hereby transferred to the United States District Court for the District of Connecticut.[1]

It is further **ORDERED** that:

1) Such order shall be implemented immediately without the 21 day stay

period contemplated by Local Rule 3.2.

---

[1] A court may transfer an action to any other district where an action might have been brought or to any district to which all parties have consented. 28 U.S.C. § 1404(a). Venue is appropriate in "a judicial district in which any defendant resides." 28 U.S.C. § 1391. The defendant is a Delaware corporation with its principal place of business in Connecticut. By all accounts offered, the defendant would be considered a resident of Connecticut. See 28 U.S.C. § 1332(c)(1); Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010). The District of Connecticut is a district in which this action could have been brought.

The plaintiffs do not oppose a transfer of venue and agree the District of Connecticut is an appropriate forum. In addition, a transfer of this action to the District of Connecticut is appropriate "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). The WWE executives, who will likely serve as witnesses in this case, reside in Connecticut. The corporate records and other documentary evidence needed to litigate this action are located in Connecticut. The defendants agree to depose the plaintiffs at locations convenient to them, posing no inconvenience to the plaintiffs in litigating in Connecticut. The plaintiffs can more easily enforce a judgment against WWE in Connecticut.

1

2)   The defendant shall have **fourteen (14) days** from the date on which this

case is transferred to the District of Connecticut to file a response to the

complaint.

BY THE COURT:

/s/Lawrence F. Stengel
LAWRENCE F. STENGEL, J.

2

# *EXHIBIT K*

RPTS JOHNSON

DCMN HOFSTAD


COMMITTEE ON OVERSIGHT AND

GOVERNMENT REFORM,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.




INTERVIEW OF:   STEPHANIE MCMAHON LEVESQUE




Friday, December 14, 2007


Washington, D.C.



The interview in the above matter was held in Room 2157,

Rayburn House Office Building, commencing at 9:10 a.m.

Appearances:


For COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM:


DAVID J. LEVISS, MAJORITY SENIOR INVESTIGATIVE COUNSEL

BRIAN COHEN, MAJORITY SENIOR INVESTIGATIVE COUNSEL

SUSANNE SACHSMAN, MAJORITY COUNSEL

SAM BUFFONE, MAJORITY STAFF ASSISTANT

SARAH DESPRES, MAJORITY SENIOR HEALTH COUNSEL

JENNIFER SAFAVIAN, MINORITY CHIEF COUNSEL

BENJAMIN CHANCE, MINORITY CLERK



For WWE:


STEPHANIE MCMAHON LEVESQUE, EXECUTIVE VICE PRESIDENT OF CREATIVE

WRITING, TALENT RELATIONS AND LIVE EVENTS

GEORGE W. KOCH, ESQ., KIRKPATRICK & LOCKHART PRESTON GATES ELLIS,

LLP

MICHAEL J. O'NEIL, ESQ., KIRKPATRICK & LOCKHART PRESTON GATES

ELLIS, LLP

JERRY S. MCDEVITT, ESQ., KIRKPATRICK & LOCKHART PRESTON GATES

ELLIS, LLP

Mr. <u>Leviss.</u>  Good morning.  This is a transcribed interview of Stephanie McMahon Levesque by the Committee on Oversight and Government Reform.

The Chairman of the committee has sought this interview as part of the committee's investigation into allegations regarding the abuse of steroids and illegal drugs in professional wrestling.

Would you please state your name for the record?

Ms. <u>Levesque.</u>  Stephanie McMahon Levesque.

Mr. <u>Leviss.</u>  On behalf of the Committee on Oversight and Government Reform, I thank you for joining us today.

I am David Leviss.  I am a senior investigative counsel with the majority staff of the committee.

I am going to ask everyone to introduce themselves, since there are so many of us here today.

Mr. <u>Cohen.</u>  I am Brian Cohen.  I am a senior investigator with the committee.

Mr. <u>Buffone.</u>  Sam Buffone, staff, majority.

Ms. <u>Despres.</u>  Sarah Despres, senior health counsel, majority staff.

Mr. <u>Chance.</u>  Benjamin Chance, Republican staff.

Ms. <u>Safavian.</u>  Jennifer Safavian, Republican staff.

Mr. <u>Leviss.</u>  While you know your attorneys, I would ask for the record that they --

Mr. <u>Koch.</u>  George Koch, Kirkpatrick Lockhart & Gates.

Mr. O'Neil.  Mike O'Neil, K & L Gates.

Mr. McDevitt.  Jerry McDevitt, K & L Gates.

Mr. Leviss.  Thank you.

Let me just go over some general ground rules we have for these interviews.  Typically, the majority staff will begin by asking questions.  Several of us may chime in at times, but we will try to only ask you one question at a time.  The minority will also have the opportunity to ask questions.  We try to go by general topic areas to keep some order to it, but, if necessary, we may jump around a little bit.

As you can see, we have an official reporter who is taking down everything we say so that we have a written record of this interview.  So it is very important that you give verbal, audible answers to every question.  Do you understand that?

Ms. Levesque.  Yes.

Mr. Leviss.  Great.

The court reporter may interrupt us if we are talking over each other or if he can't hear an answer or question, and that is because we have asked him to do so so that we have an accurate record.  Please wait until I finish my questions or any questioner finishes a question before beginning your answer.  And we, in turn, will try to wait until you finish your answer before starting a new question.  Understand?

Ms. Levesque.  Yes.

Mr. Leviss.  Great.  You are required by law to answer

questions from Congress truthfully.  If you fail to testify
truthfully, you could be subject to criminal prosecution.  Is
there any reason why you would be unable to testify truthfully
today?

Ms. Levesque.  No.

Mr. Leviss.  Great.

We try to take a short break every hour or so, but let us
know if you need a break earlier.  Our hope is that we can finish
with you in just, you know, a couple, few hours this morning.  So,
just to give you a sense of what is to come.  But, again, if you
feel you need a break, please do let us know.

Ms. Levesque.  Okay.

Mr. Leviss.  Okay.  Do you understand these guidelines,
rules?

Ms. Levesque.  Yes, I do.

Mr. Leviss.  Okay.  Any questions before we begin?

Ms. Levesque.  No.

Mr. Leviss.  Great.

EXAMINATION

BY MR. LEVISS:

Q    I am going to start with just some background questions
about your role at WWE.  I understand that the corporation hasn't
always been known as WWE, that there was some predecessor
corporations.  But if I refer to it as WWE, will you understand
that I am referring to both the present company and its

predecessors?

    A    Yes.

    Q    Okay.  What is your current position with WWE?

    A    My current position is executive vice president of
creative writing, talent relations, and live events.  They are
working on shortening it, but that is what it currently is.

    Q    That is a lot for one business card.  How long have you
held that position?

    A    For the past couple months.

    Q    Okay.  Have you held other positions with the company?

    A    Yes.  I started -- well, not all the way back, but most
recently I was the executive vice president of creative writing.
Then about a year ago I added talent relations, and a couple
months ago I added live events.  And that is live event promotion
and booking.

    Q    Okay.  And prior to that position, did you have any
other positions with the company?

    A    Yes.  Prior to that position, I worked as an account
executive in our New York sales office.  Prior to that, I had a
unique internship with both the chairman and the CEO.  And prior
to that, I held a number of internships, including switchboard
operator when I was 13.  I worked in media relations, dot-com, our
production studio, a variety -- live event marketing.  I have
worked in a variety of assets in our company.

    Mr. McDevitt.  They didn't make her put up rings.

Ms. Levesque.  No, my brother did, though, yes.

　　　BY MR. LEVISS:

Q　Family operation.  How long have you been affiliated or working for WWE?

A　Pretty much all my life, but really, consistently, interning since I was 13, and once I got out of college I became full-time.

Q　Okay.  So around what year did you start consistently?

A　Full-time?

Q　Yeah.

A　'98.

Q　Tell me, if you will, about your present roles and responsibilities in the organization, starting with creative writing.

A　Okay.  Starting with creative writing, I am in charge of -- we have three different shows.  We have Raw, SmackDown and ECW.  It is basically 5 hours of fresh programming every week, 52 weeks a year.  We have no reruns.  And I am in charge of all of the script writing that goes on for every show.

Q　Okay.  I assume you have a staff of writers who work with you?

A　I do.

Q　How many people are on that staff?

A　We are pretty understaffed.  It is about 10 people now.

Q　And if you could just tell me in brief how the

script-writing process works.  I mean, does the staff prepare
drafts?  Are you involved in original drafting?  Are you more of
an editor?

    A   Here is pretty much how it happens.

    Q   Sure.

    A   It is not a real wonderful process, because we don't
have a lot of lead time.  You know, we are week to week.

    Q   Sure.

    A   So my staff, I have a lead writer, and underneath him he
has writers, associate writers, writers' assistants.

    And the team works throughout the week.  What happens is they
bounce ideas off me creatively throughout the week, and then we
have a meeting with Vince, Vince McMahon, who is the chairman and
also the head creator of everything.  The company is his vision in
all aspects, make no mistake.  And so then we present him with our
ideas.  And he gives approval or disapproval.  We discuss, we come
up with what creative work we are going to do, and then we go and
draft the scripts.

    On occasion, we do have drafts of the scripts to present to
Vince at that meeting, but that is not always the best practice
because they change so frequently.

    Q   And then, I guess, how far in advance of production are
the scripts completed?

    A   Literally being processed the day of.  I mean, they are
produced that week, and then they are constantly changing

throughout the day up until the show goes on the air.

Q   When you begin drafting a script, do you know what talent it is going to involve?

A   For the most part, yes.  We know our main-event talent, or the main-event talent that we want to feature.  Because our business is very unique.  We know where we are going for pay-per-views.  We have right now 15 pay-per-views scheduled in '08.  It is either 15 or 14.  We were at 16.  So that is roughly a pay-per-view every 3 weeks.

That is where we make a lot of our money.  So what we do is we gear toward the pay-per-view.  So we know where we are headed for pay-per-views, long term.  And then we back into the story writing to get into those pay-per-views.

So if we know we have a 3-week promotion and we know our main-event match is -- I will just say two superstars.  I am not sure how familiar you guys are.  But say it is Randy Orton versus John Cena.  We know we have 3 weeks to make that match as compelling as possible to hopefully intrigue the buyer to want to pay to see the match.  So that is what we try to do.

Q   And who comes up with the list of talent for a given match?

A   Well, it is not necessarily a list of talent for a match.  The way that it is determined is we have our main-event players, the guys who are the most -- in our business the parlance is "over," which means the most respected, most -- "respected" is

the wrong word because sometimes they are bad guys and they are not respected at all.  But the ones people really want to see.

Mr. McDevitt.  Just for the record, you mean "bad guys," script-wise.

Ms. Levesque.  Yes, yes.  Thank you.  Within our vernacular, we have "babyfaces" and "heels," babyfaces being the good guys, heels being the bad guys.

Mr. McDevitt.  Would you like to guess which side you guys are on?

Mr. Leviss.  I will wait for the script.

Ms. Levesque.  I am not writing this one.

So, yes, so, basically, the main-event players are the ones who draw the most money, the ones the people want to pay to see either win or lose, depending on their role.

Mr. Leviss.  Sure.

Ms. Levesque.  So we try to base our pay-per-views, obviously, around the guys who are going to draw us the most money, around our main-event guys.

BY MR. LEVISS:

Q   Okay.  Are the talent involved in developing the script?

A   They are involved in their individual storylines.  And, again, the main-event talent; not so much the lower-level talent.  But main-event talent are called.  We talk to them about the ideas we have, especially for their program, which is what that 3-week window would be.

Again, I am sorry to use the parlance of our business, but the program would be the 3 weeks leading up to the pay-per-view and sometimes beyond, because we do have so many pay-per-views, we have to book the same match.  And we have to make the stories different within each program, which is challenging in and of itself.  So the talent do like to contribute.

Q    Uh-huh.

A    And quite frankly, it is a better product when they do, because, you know, the talent are engaged and they are involved in the storylines.  Sometimes it is their ideas.  And, inherently, they perform better when it is their idea.

Q    Okay.  Before I get too deep into this -- and it is actually a fascinating process -- I should find out a little bit more about your other responsibilities.

A    Okay.

Q    Talent relations?

A    Yes.  Basically, John Laurinaitis is the ex-VP of Talent Relations, and he now reports to me.  So I now basically oversee John and all of his responsibilities, which include developmental talent, our developmental talent system; they include booking all of the travel for the talent; the third-party appearances for talent, if talent are involved in any marketing or promotion outside our company or within our company.  If talent are doing movies or any outside projects, it all comes through Talent Relations.

Basically, anything and everything talent-oriented -- talent contracts, et cetera -- all comes through Talent Relations.

Q   And before John Laurinaitis was involved, did you oversee that process directly?

A   No.  John oversaw it, and he was the sole person in charge.  And then it was deemed that John needed some management.

Q   I see.

A   So that is where I came into play.

Q   And around when did that happen?

A   That was about a year ago.

Q   And your third area of responsibility was live events?

A   Yes.  Live-event -- it is actually two separate departments.  Live-Event Booking is the actual booking of arenas around the world for our shows, because we have, God, over 300 shows, easy, a year.

Q   Okay.

A   And internationally, globally, everywhere.  So it is the actual physical booking of those buildings.

And the routing is just a nightmare, because we also have not only our televised shows every week, but we also have a lot of nontelevised shows.

So we tour our two different brands.  Raw tours Friday, Saturday, Sunday, Monday in America, domestically.  And when we do international, it is different.  SmackDown/ECW, we combine those two brands for touring.  They tour Saturday, Sunday, Monday,

Tuesday.  The live show for Raw is Monday.  The live show for SmackDown and ECW is Tuesday.  And ECW's live Tuesday; SmackDown airs Friday.  But it is pretty much live to tape.

So there is a lot of arenas, a lot of booking.

And then the Live-Event Marketing portion is the promotion of those buildings, the promotion of the event.

Q   Promotion of the buildings, you said?

A   Yeah, promotion of the event at those buildings.

Q   Okay.  Is that basically a summary of your responsibilities?  Not that it is not enough, but --

A   I would say so.

Q   Okay.  And what aspect of your work changed?  You said that your title changed over the last few months.  Is that because you acquired new responsibility?

A   Yes.  Because the live-event portion is new.  It's a few months old.  And now my title is just so long that they are looking to change it.

Q   And prior to that change, were you working primarily in creative writing and talent relations?

A   Yes.

Q   Okay.  Great.

Outside of those areas, are there any other significant responsibilities you have had in the company in your time since '98?

A   Nothing really significant.  These are my most major

roles.

Q   Okay.

A   I mean, I suppose switchboard operator is vital to the company.

Q   It would break down if people couldn't call.

A   I still have extensions memorized.

Q   I'm sure.

You mentioned Mr. McMahon.  Tell me about how your responsibilities and your decision-making authority are, in relation to Mr. McMahon?

A   I report to Mr. McMahon.  I call him Vince in business, so please don't be deterred by that.  At home he is Dad.  And Linda is the same way; in business she is Linda, and at home she is Mom.

Q   Understood.

A   But so, I do report to Vince.  So a lot of my, you know -- I am certainly free to make decisions, but if it involves a major decision within the company, I will pretty much run it by my boss and get the okay or the nay.  So, in essence, I guess, to answer your question, however normal corporations work, I have to run, you know, my decision-making through my boss.

Q   Do you report to anyone else besides Vince?

A   No.

Q   You spoke a little bit about Raw, SmackDown and ECW. First of all, does ECW stand for something?

A    Extreme Championship Wrestling.  But we are in the process of changing the image.

Initially, before we bought WCW, actually, before it almost went bankrupt, in the '90s, in the end of the '90s, there was a lot of competition within our organization.  There was WWE -- it might have been WWF at the time, I forget -- and there was WCW, and then there was a fledgling group called ECW.  And WCW was sort of the alternative to the big league wrestling.  They used a lot of hardcore tactics, a lot of blood, a lot of thumb tacks and barbwire and all this bizarre stuff.

And we are looking to change that image.  We own the brand. It had a cult following.  We are looking to capitalize on the following but change the product.  So we are in the process of doing that.

Q    Okay.  How did the other divisions differ?  Tell me about Raw and SmackDown.

A    Raw and SmackDown, the main difference between the two is the talent.  You can only see certain talent, for the most part.  There are some caveats to that.  But for the most part, you can only see certain talent on Raw, which airs on the USA Network Monday nights, 9:00 to 11:00, and you can only see certain talent on SmackDown, which airs 8:00 to 10:00 on the CW Network.

Q    And who determines how talent is divided among the divisions?

A    The writing staff and Vince.

16

Q   And how do you make those decisions?

A   Well, it just depends creatively on where we want to go.
A lot of it -- like, for example, if -- I should backtrack for a
second as well.

We have a draft.  And we have had a draft semi-annually, we
have had it biannually, we have had it a number of different ways.
But this draft enables us to have talent cross over to the
different brands.  So it is a creative loophole, if you will, to
get our talent over to the other brands and engage viewer interest
at the same time.

But so, if you are looking at these programs that I was
talking about --

Q   Uh-huh.

A   -- say Randy Orton is a main-event guy who draws a lot
of money.  You know, you want to feature Randy Orton on a certain
show, but he has wrestled against almost all of the other good
guys.  Well, now you have to do something, because Randy either
needs to go to another brand or you need to bring over some new
blood to face Randy.

So that is part of our decision-making process, to keep the
programs fresh and interesting so the viewer will want to keep
seeing them.

Q   And do you need a new draft to bring him over, or can
you bring him over, I guess, mid-season?

A   It depends.  The cleanest way to do is in the draft

show.

Q    Uh-huh.

A    But if we need him, if there is an injury and we need
somebody to make a jump, we certainly creatively get around it.

Q    Are there any other ways that talent are brought between
programs or between divisions?

A    Yes.  Again, at WrestleMania, which is our Super Bowl of
pay-per-views, we often have cross-promoting matches.  So you
might have a guy from Raw versus a guy from SmackDown, or girls.

And when that happens, it actually increases our viewership,
because there is roughly 70 percent -- it might be a little more
now -- are nonduplicated viewers for each brand.  So now if you
have a storyline that is on both brands, you get that much more
audience intrigued in the storyline and wanting to pay to watch
WrestleMania.

Q    Nonduplicated viewers, you mean a unique audience?

A    Yes.

Q    Okay.  What are the, sort of, target audiences for the
brands?

A    Well, it is funny, because Vince has never taken a
stance of we only market to 18 to 49, or we only market to, you
know, whatever it is.  Vince's feeling and his company philosophy
has always been, well, we are a cross-section of Americana.

And if you come to one of our live events, that is what you
see.  You see some teenagers, you see grandfathers with grandsons,

you see grandmothers with granddaughters, you see college kids, you see all different walks of life.  And that is really what our product is.

Our network partners promote to the -- and they sell, because they sell their own advertising -- I believe it is the 18 to 49 demographic.

Q   Uh-huh.  But when you spoke of the viewers, I am blanking on what your phrase was, but sort of the unique audience --

A   Uh-huh.

Q   -- how do you make that assessment?  You must have some criteria to determine, you know, who is watching SmackDown, who is watching Raw.

A   Again, it is unusual.  I would say we pretty much go with what the network wants us to do.  So, for the most part, we target 18- to 49-year-olds, but, really, we listen to our audiences.

Our audiences are like a live question-and-answer period right in front of us.  It is a live focus group every night we have a show.  Our fans tell us what they want, what they like, what they don't like.

And that goes from what the product is in the ring to out of the ring.  They are buying T-shirts, they are buying merchandise. We have people on-site asking questions.  So we have the ability to get a lot of information from our fans.

And, again, we are not only targeting the 18-year-old male when we are asking those questions.  We are asking all of our fans.

Mr. McDevitt.  I think you wanted to ask her how she determines the nonduplicative nature.

Mr. Leviss.  Thank you.  I was thinking --

Ms. Levesque.  That is through our marketing research.

BY MR. LEVISS:

Q    Is there crossover of talent from ECW to Raw or SmackDown?

A    On occasion, because we are trying to make that ECW brand stronger.  It currently airs on SciFi on Tuesday nights, live at 10:00, and that is not a well-watched network.  So if we give the stars from ECW exposure on the other brands, it gives more interest.  Hopefully, we will get some of our bigger audiences to watch the SciFi Network.

Q    So there is crossover, but --

A    There is some.

Q    -- it is less frequent than --

A    It is less frequent.  Actually, right now we have a storyline going where the ECW general manager and the SmackDown general manager have struck a deal, and they are currently cross-promoting.  So it is more SmackDown and ECW cross-promotion.

Q    Okay.

A    But we don't feel that conflicts with our WrestleMania

storylines -- it gets very complicated -- because it is not the main-event guys, for the most part, involved in those stories.

Q    How do talent find out that they are going to move between divisions?

A    Often either myself or the lead writers or Vince will notify them -- or John Laurinaitis will notify the talent.

Q    Do they have any say in the decision?

A    Certainly.  If someone really has a problem with it, you know, you can't force someone to do something that is against their will.

Q    Sure.

A    So they do have a say.

Q    Do the talent typically care about, you know, which division they are featured in?

A    No.  There was only one issue that we had, and that was with a top star who had on Tuesday was his religious day with his family.  He is a born-again, and I am not sure of the right words.  Those are my words.

Q    Sure.

A    So he is very, very religious, and he felt that he could not do the Tuesday show because he needed to be at home with his family.  So we did not make that switch, even though it would have really helped our product.

Q    Is there a financial difference for the talent in appearing in a match for one division versus another?

A    No.

Q    I guess I sort of asked you this, but who is part of the process of determining whether to switch someone over?  It sounded like it was you, Talent Relations, the rest of Creative Writing and Vince?

A    Yeah.

Q    Anybody else?

A    No.  That is it, for the most part.  And talent.

Q    And the talent themselves?

A    Right.

Q    Okay.

A    And it is more of the main-event talent, you know, that speak up and that we solicit more ideas from, in terms of creative, et cetera.

Q    Roughly, what percentage of your talent qualifies as main-event talent, in your view?

A    I would say probably about 30 percent.  Maybe a little less, maybe 25.

Q    And those are sort of the headliners?

A    Yes.

Q    Are there any other ways you have of distinguishing among the remaining 70 percent or so of the talent?

A    What do you mean?

Q    Well, I mean, do you have any other terms for them?  Is it just the main-event talent and the rest of the talent, or are

there other --

     A    You will often hear -- well, you won't, but in my
business you often hear the parlance of there is main-event and
there is mid-card.

     Q    Okay.

     A    And mid-card would be, you know, what it sounds like,
middle of the card.  And then the other -- there is no lower end.
So there is, really, I guess it is like an "other" category.  We
really don't have a term for them.

     Q    How does talent get to become main-event talent?

     A    Basically, hard work and perseverance and overwhelming
the audience.  It is really up to the talent.

     Stone Cold Steve Austin tells this story all the time.  I
don't know if you are familiar with Stone Cold, but he was
probably one of the biggest superstars that we ever had, bigger
than Hulk Hogan.  I am sure you have heard of Hulk Hogan.

     Mr. McDevitt.  Hulk would disagree with that.

     Ms. Levesque.  Of course.  But Stone Cold, I mean, huge.

     At any rate, Austin, when he first came in, was Stunning
Steve Austin, not Stone Cold Steve Austin.  And he was --
actually, when he first came in, he was a character called The
Ringmaster, which was not getting over, as I explained to you
before.  The crowd wasn't into it.  They didn't really care.

          BY MR. LEVISS:

     Q    Is he a good guy or a bad guy?

A    At the time, he was a bad guy.

Q    Okay.

A    But they didn't care to boo him either.  They didn't really care if he lost.  They didn't really want to -- it was our worst-case scenario.

And Steve was sitting in the back, and he was with Vince, and he was watching another match.  And he said, "You know, that kid out there, he has really got something.  You should push him," which is another parlance of our business, which is, you know, putting someone in that main-event spotlight.

And Vince looked at Steve and he said, "Well, I will give him all the opportunity in the world, but it is up to him.  He has to do it on his own."

And Steve always says that that conversation clicked something in his head, because from that moment on, he changed his character.  He knew it was up to him to make the difference, and that is what he did.

Q    Uh-huh.

A    And Austin rose in the ranks.  He was a real self-made superstar.  We gave him opportunity, but he took the ball and he ran with it.

There is oftentimes -- because we need to build talent along the way.  We need more main-event guys.  You know, we are constantly trying to cultivate more main-event guys as part of our developmental system.  We want everybody to be a main-event guy.

It means more money to all of us.

Q   Sure.

A   So we constantly give the opportunity.  It is just, who is able to take the ball and run with it?

Q   What can talent do to improve the character?  I mean, if it helps, you know, you can use Steve Austin as an example.  What does he do that makes him a stronger character?

A   Well, a lot of it has to do with charisma, which is the "it" factor that you can't teach, that you are either born with or you are not born with.  And that is basically the ability to connect with the audience.

When someone walks out on that stage, they either connect with the people or they don't.  If you walk out on stage and nobody cares and you don't have any presence, you are never going to be a main-event guy.  But if you walk out and you make the people notice you, you can be a main-event guy.

You really don't even have to be a good wrestler.  Hulk Hogan was a terrible wrestler, and he still is.

Q   For the record, I am sure he would disagree with that too.

A   I am sure he would disagree with that.  I forget this is all public.  But, you know, he was.  He was a terrible wrestler. But what an incredible psychologist and what an incredible charismatic person.  There is no denying Hulk Hogan is one of the biggest stars in the history of our business and will always be

perceived as such.  But he was not a great wrestler, not a great technician.

Q    What makes a great technician, a great wrestler?

A    The craft of wrestling itself, which is more mechanical than it is showmanship.

Q    How much of that is up to the wrestlers, and how much of it is scripted?

A    The actual mechanics of a match?

Q    Uh-huh.

A    It depends on the situation.  For most main-event talent, they have been around a long time, they understand how to do what they do.  They have honed their craft.  They are masters of it.  There is very little input from anybody else.  For the most part, it is, "Okay, here is who we want to win, and here is how we want you to win."

Because, for the most part, every superstar has a finishing maneuver.  Like, for example, Stone Cold, it was the Stone Cold Stunner.  And, you know, the audience knew if you were hit with the Stone Cold Stunner -- I cannot do the move while I say it -- then you were most likely going to lose.

Q    Okay.

A    So it is a ride that the audience gets taken on.

And the art of wrestling itself is the ability to tell a story in the ring without any words at all, with your body and your face, and to make the people care so much that they want to

either see you win and overcome the odds or they want to see you lose.  And that art, it is truly an art, the ability to take the audience on that ride.

Q   And so, I guess, generally, how much of that ride do you and the creative staff direct for the wrestler?

A   The creative staff, very little.  We have on the road what are called producers.  They have also been called agents. They are one and the same.  And they are former stars in our business and former professional wrestlers.

Q   So are they talent?

A   They are not talent.

Q   Okay.

A   What they do is they help guide a match.  So they speak with the talent ahead of time.  Basically, they are getting the talent to talk, to get their ideas out.

Again, the main-event guys know much more what they are doing than the younger guys.  And they say, "Okay, well, let's help you out here.  And you are stuck in this part of your match." Because, again, there is pretty much a format to a match.  And you can switch it up and change it, but you have a beginning, a middle and an end, like any story.  And it is helping the guys get started, helping them in the middle and helping them get into the big finish, where you want to take people on that last go 'round.

Q   Sure.

A   But the producers are much more involved in the matches

than the writers are.  The writers aren't really involved in that.

Q    And when do the producers get involved in the process?
Just before the match?

A    The producers are e-mailed the shows over the weekend,
but, again, the producers are also working those live events.
This is also where the producers' role come in.  And the producers
also report to Talent Relations.

So the producers, they are still also called agents on the
road, and there is a head agent on the road.  And they are
basically in charge of all the matches, all the story-telling that
happens on the road that is nontelevised.  So they also have the
ability to work with this talent in their matches before --
because, for example, you might have a pay-per-view match and a
live event prior to getting to the pay-per-view to get them to
work their kinks out, what works, what doesn't work, that kind of
thing.

Q    Uh-huh.

A    So producers are involved pretty much at the ground
level.

Q    Now, for talent that needs more direction, could you
actually script all of the moves of a match?  I guess, would the
producer do that?

A    I do not believe that that is feasible.

Q    Okay.

A    I don't know of any situation ever where someone had

every single move scripted in a match.  I suppose anything is
possible.

    Q    Uh-huh.

    A    But I would highly doubt that that would be possible.

    Q    Because?

    A    Because it is a lot to remember.  And because the
audience tells you what is working and what is not working.  And
if I grab Jerry and I put him in a headlock and the people aren't
responding, I have to change on the fly.

    Q    He would probably respond if you did that.

    Mr. McDevitt.  They would probably root for that.

    Ms. Levesque.  But, you know, we have to change on the fly.

    And that is the art that I am talking about, in terms of the
match.  If you were following a formula and the people weren't
with it, they don't care to watch it, you know.  And we never want
someone who doesn't care.  We want you to care one way or the
other.  Either you love it or you hate it.  Great.  But don't be
ambivalent.  That is the worst.

    Mr. Leviss.  Okay.  Makes sense.

    Mr. Cohen.  Could I just ask a quick question?

EXAMINATION

    BY MR. COHEN:

    Q    This conversation you described between Stone Cold Steve
Austin and Mr. McMahon, when did that conversation take place?

    A    You would have to ask Vince.  But I really can't venture

a guess.  I mean, I would say right before Stone Cold really
started to take off.

Q    And that was?  When did he start taking off?

A    Late '90s.  So I would guess that conversation was
around '96.  But, again, that is a pure guess on my part.

Q    Okay.  Thank you.

I am sorry, one more follow-up here.  Can you walk us through
a very quick description of a schedule of a typical wrestler?  You
alluded to it, but, I think, in a little bit of detail, can you
sort of give us a Sunday-to-Sunday perspective on a typical
wrestler's schedule?

A    Sure.  Our shows tour, although not every wrestler
performs on every show.  So that is important to know.

But the basic touring schedule when we are domestic is Raw
tours Friday, Saturday, Sunday, with the live show on Monday.
SmackDown and ECW tour together.  They tour Saturday, Sunday,
Monday, with the live show on Tuesday.

Now, when we go internationally, there is a period of time
off prior and there is a period of time off after, but we try to
extend our international tours, obviously, so we can stay further
away for a longer period of time.

Q    And on the 3 off days, do they also have
responsibilities to the company?  Do they make promotional
appearances or --

A    On occasion they make promotional appearances, but it is

all looked at to make sure that no one works too much.

For example, John Cena, our top superstar, who is booked the majority out of anybody, last year worked 161 days.  So when you look at that in the grand scheme of things, it doesn't seem like too hard of a schedule.  But it definitely is, you know, a tough schedule.

Q   Do you have informal guidelines on how many days talent can work in a month or a year?  Do you have formal guidelines?

A   Informally, some talent, they have dates that they cannot work more than.  But we always look at that, and we never really hit that barometer.  So certain talent do have a limit, a cap on the number of days they can work a year in their contract.

And other talent -- again, we actually -- some talent wish they could work more, because the more they work, the more money they make.  But with the roster the size we have, we just can't feature everybody all the time.

EXAMINATION

BY MR. BUFFONE:

Q   Do you have a running count in your creative meetings of how many days talent has worked?

A   Well, it is not the Creative, because storyline-wise someone might be on TV, but if they have had a particularly hard run, you might give them the live events off that week.  So it is really more of a Talent Relations call.

And yes, if someone -- for example, Chris Benoit came to us

and said that he was having a very difficult time and he needed time off for home.  And so Talent Relations made the call, and Talent Relations told Creative Writing we are not going to have Benoit for 4 months.  So no problem.

    Q   Does Talent Relations track each wrestler, how many days they have worked that year?

    A   Yes.

      BY MR. LEVISS:

    Q   How do you determine which of the talent to put in a pay-per-view event?

    A   Well, again, we always want to have our main-event money players.  And then primarily it is who are we building, you know, who are we building to hopefully have in that main-event spot in years to come.  We want to make sure we feature the people that we believe have it and start the building process.

    Q   And "it" is, sort of, charisma?

    A   It is the total package, yes.  It is the charisma.  It the ability to take the audience on a ride.  It is hopefully some wrestling ability, because you can't -- again, to use the parlance of our business -- shit the bed when you are out there.  Excuse me.

    Q   It is a business term, I understand.

    A   It actually is, believe it or not.

    But if you have a terrible match out there, you know, basically that is not good for your career either.  You have to

have some wrestling ability.

Q   Okay.  And, again, does it make a financial difference to the talent whether they appear in a pay-per-view versus another match?

A   Absolutely.  Absolutely.  I am sorry, let me -- I answered before you finished speaking.

Q   No, I was finished.

A   If they wrestle a pay-per-view versus a TV?

Q   Yeah.

A   Yes, they make more money on a pay-per-view.

Q   Can you quantify that?

A   It depends on the spot.  If you are a main-event talent, you make significantly more.

And it all depends on what the company makes.  And the talent make a percentage off of that.  So it depends on what the buy rate is.  There is no fixed amount of -- because you don't know what the pay-per-view is going to draw.

Q   Sure.

A   We always hope it is going to draw a lot, but it doesn't necessarily.

Q   Can you just give me an example for comparison purposes?

A   Of what?

Q   Of the difference in what a talent makes on a pay-per-view versus a TV event?

A   Sure.  A top-level talent could make anywhere from 150-

to 200- on a pay-per-view.  And then on a TV, it is significantly
lower.  It would be more like 10-.

Q    Okay.

A    And, again, those figures are very rough.

Q    Sure.  I understand.

A    And WrestleMania, our Super Bowl, talent can make even
more than that.

Q    How high can that go?

A    Again, it depends on the buy rate.

Q    Uh-huh.

A    But it can go as high as, I think, a million.  But,
again, I don't have those figures in front of me.

Q    Okay.  It is the Super Bowl, after all.

A    Right.  And that is the top top that I am giving you.

Q    Sure.  No, I understand.

Sort of moving to a slightly different topic -- is there
anything you wanted to cover?

Ms. Safavian.  No.

Ms. Despres.  I actually have just one.

EXAMINATION

BY MS. DESPRES:

Q    What is the average professional life span of someone
who is a main-event wrestler?  You know, how long do most people
last as main-event?  Ten years, 5 years?

A    It all depends.  Again, like, for example, Ric Flair is,

I think, 54 years old and he is still wrestling.  But the average
life span, I know we did this research, I just honestly can't
remember.

    Q   And by "life span," I mean professional life span.

    A   I know what you meant, career span.  And we did that
research, and I just don't want to misspeak.  But it does vary.

    Q   Okay.

    A   And I can get that data to you.  I just really don't
want to misspeak.

    Q   That would be great.  Thanks.

      BY MR. LEVISS:

    Q   Are you familiar with what a typical contract looks like
for talent?

    A   Yes.

    Q   Can you describe the main provisions in a typical
contract?

    A   Sure.  It would be, you know, the money.

    Q   Uh-huh.

    A   A lot of times it is the number of days that you work.

    Q   Okay.

    A   It would be your merch ratio, what the split is, which
our standard is -- I just did this the other day.  25-10-10, I
think, is our standard.  But, again, don't quote me on that.  I
have to get that.

    Q   And what would those numbers mean?

A    It is 25 -- the three categories:   One category is

licensing, one category is merchandise, and the other category is,

you know, WWE merchandise.

Q    Uh-huh.

A    And, again, I could get you much more specific

information.   I might be misspeaking a little bit, but that is in

general the split.

Q    But the numbers you gave in that example would be the

percentage that the talent receives?

A    Yes.   And let me just backtrack for a second, because I

think I can get to a bigger question.

Q    Okay.

A    The talent participate in all sources of revenue in the

company.   So a talent contract reflects a lot of that.

Q    Okay.

A    And it will reflect their participation in each of the

streams of revenue.   And that was something that Vince implemented

since, you know, way before my time.

And it was one of the things that was very different than

what promoters did at that time.   Our business, if you go back,

used to be regional.   There was the northeast territory, there was

the southeast territory, the midwest, the northwest.   You know, it

was all over the place.

Q    Uh-huh.

A    And with all of these different territories, my father,

Vince -- sorry -- had a vision -- I can call him my father -- but he had a vision.  And his vision was to have one company and make it global and get sponsorship.  And so what he did, much to my grandfather's chagrin -- because my grandfather didn't like to rock the boat, but my father had a vision.

So, ultimately, when my dad bought the company from my grandfather, that is what he did.  He went into each individual territory and basically invaded.  And he wound up buying out all of the other territories and creating one big global brand.

Now, we did have one major rival, again, more in the late '90s, which was WCW, to a much smaller scale ECW, but WCW was a part of the AWA, which was a territory in the past.  And they held onto their name.  It was the one territory that Vince didn't buy or couldn't buy, whatever the story is.

Q    Okay.

A    And so, at any rate, when Vince took the company global and made one big company, he wanted to make sure that all the talent were treated as fairly as possible.  So he said, okay, all of these streams of revenue that we have, we are going to have the talent participate in it, those streams that they are involved in.

Q    Okay.

A    DVDs they receive royalties from for their appearances. Merchandise, whether it is WWE-produced or whether it is a licensed good, which is what I was referring to with the split --

Q    Uh-huh.

A   -- they receive a portion of the income.

Q   Can you give me an example of licensed or WWE-produced?

A   Sure.  We have various licensees that produce a lot of T-shirts that you will see.

Q   Okay.

A   Like the T-shirts when you walk into K-Mart and you see a lot of WWE merchandise, a lot of that is licensed products.  And you can tell by the tag that it is not a WWE product.  It is a Hybrid T's product, or it is a Fruit of the Loom product, which -- we don't have a deal with Fruit of the Loom, but I am just saying that would be a licensed deal.

Q   And WWE would receive a portion of that or a fee?

A   WWE receives a portion.  The talent receives a portion, as well.

Q   How about the Hulk Hogan action figures?

A   Action figures, as well, they receive royalties.  Hulk Hogan is a little different.  His deal is a little different.  He has been around a long time.  I think Hulk owns all of his rights.

Q   Do contracts for talent differ generally, or is it just an individual superstar can negotiate his own terms?

A   We have standards that really are prevalent in the majority of the contracts.  But, again, that top-level superstar, they will vary little bits.  Not very much.

Q   Okay.

A   There are no big, huge variances between the contracts.

Q   Are there other, sort of, main provisions in the typical contract?  You talked about money, number of days, merch ratio.

A   Travel.

Q   What would it say about travel?

A   If someone wanted to be a first-class traveler versus a coach traveler.  I mean, that is not a major provision.  It is just one that comes to mind.

Q   Anything else?

A   Those are really the main ones.  I would say the money, first and foremost.  I am sure I am forgetting some.

BY MR. COHEN:

Q   Are there other contracts for other talent, for referees or managers?  Do those differ in any significant --

A   Dramatically, yes.  Referees don't participate in the revenue, for example, of a T-shirt because they don't have a T-shirt.  Referees have a booking contract, which is similar in terms of it protects the company should something happen to them in the ring, but is different in terms of the monetary.

I would say mainly the money is the biggest difference in their contracts.  But, again, I am not legal, and I do look at things from, you know, 50,000 feet.  So I don't want to misspeak in terms of the details.

Q   Sure.

BY MR. LEVISS:

Q   Are contracts negotiated or renewed annually?

A    No, it depends on the term of the contract.  For example, if we have a 3-year contract, we will start renegotiating a year out.  If it is a 5-year contract, depending on where they are at 3 years in, they are doing gangbusters and that talent really wants to, you know, up their minimum guarantee, then we will certainly look at that.  If, 3 years in of a 5-year contract, we say, God, we really want this guy longer, we might negotiate at that point too.

Q    What is the typical term, or is there one?

A    Three to 5 years.

And talent also receive a minimum guarantee.  So basically, their contract, the money is based on a minimum, but that is just, "You are guaranteed to make this amount."  But they can participate in revenue with no ceiling.  So they can make significantly more than what their downside guarantee is, and most of them do.  So I just wanted to explain that that is the money that is negotiated.  It is the minimum.  There is no ceiling at all on what they can make.

Q    Okay.  Are any of the talent employees, or are they all independent contractors?

A    They are all independent contractors.

Q    And that covers the referees?

A    Yes.

Q    The producers?

A    The producers are employees.

Q   Okay.  Because they are not talent.  Okay.

We talked a little bit about, sort of, which talent are promoted, and I have some other questions about that.  What are the characteristics, generally, that you look for in determining which talent to promote?  I understand you talked about sort of the "it" factor.  How do you make a determination about whether somebody is ready to be pushed, to use Steve Austin's term?

A   Basically, it is when they start engaging the audience. I mean, when somebody walks out and engages the audience, we know we want to hire that person or we want to push that person or we want to give them the ball, so to speak.  Because that charisma, that it factor is such a rare thing.  That is why there is such a small amount of main-event guys.

And it is unfortunate.  We wish everybody had this kind of charisma.  I mean, The Rock had this engaging charisma.  He is Duane Johnson.  He has done other movies now.

Q   Sure.

A   He is Duane "The Rock" Johnson.

Q   I know The Rock.

A   Yes, okay.  But he has this just unbridled charisma, and people just want to see him.

And so, really, I believe charisma is the biggest factor in determining who gets the ball and who doesn't.

Q   And how often do you evaluate this?  I mean, is it constant?  Is it ongoing?

A    It is constant.  We even have developmental talent come
up to our TVs, what we call "coming up."  Every week, different
talent rotate through.  We will have a period of, you know, a few
months where we are evaluating a small number of talent,
developmental talent, and they wrestle before our television show.
So they get to wrestle in front of the live audience that night.
We are seeing how they handle the crowd, seeing what kind of
charisma they have, how they handle themselves in the ring.  And,
you know, we can get a good feel for whether or not they are ready
to come up.

Q    Uh-huh.

A    We also have those talent on the live events with the
producers, who are, again, not necessarily grading them, but
looking at them and making certain determinations and helping them
along the way.

Look, you have this -- we have a kid right now in our
developmental system who is doing an excellent job.  He has this
charisma, and it is great.  And we want him on TV so badly, but he
is just not ready yet.  He just doesn't quite have the total
package all together.  But we have our eye on him.

Q    Uh-huh.

A    So he is honing his craft in the ring.  Again, like I
said, you can't throw a punch and have it wildly miss and, just
because you have great charisma, people are going to like you.  I
mean, you have to still be at least decent in the ring.

So that is someone who has it that we are anxiously waiting to get our hands on.

Q    And who, again, is the "we" in "we have"?

A    The Writing Department.  And the producers are involved in terms of the Creative, as well in terms of the wrestling portion of it.  And if they have other ideas, it is great.  They have been around the business a long time, and a lot of them know what works and what doesn't work fundamentally.

Q    Do you meet as a group to talk about how a show went or talk about how particular talent is doing?

A    We do.  Once we get to -- I am sorry, were you done with your question?

Q    No, that is all right.

A    Once we get to a show -- like, say, Monday we are in Huntsville, Alabama.

Q    Okay.

A    So we meet and we have what is called the producers meeting.  And we run through -- the writers and Vince and myself, John Laurinaitis, and Kevin Dunn, who is our executive producer, we all meet with all of the producers, and we run through the actual script of the show.

Q    You do that on the road, or you do that locally?

A    That is at the building we are going to be performing at that night.  It is a run-through of the show before we do the show.

Q    Uh-huh.

A    And we basically work out the kinks.  The producers will talk about what they want to see in the match, who goes over -- which means who wins -- what the finish is -- which is the same thing --

Q    Okay.

A    -- and how we get there.  We will discuss the pretapes backstage.  We discuss the promos that are the in the ring.  The promos are basically the in-ring monologues, where they might involve other people.  And we go through all the details of the show.

And after the producers have said their piece and given their feedback, then the writing team, Vince and Kevin and myself and John, all meet.  And we go through any questions that might have arisen, what changes we want to make, if we want to put a graphic in, if we don't want to put a graphic in, if there are too many graphics, if there is too much footage, if there is not enough action, whatever.  We look at the total picture as a whole and make the necessary changes.

Q    Okay.  And what about after the match?  Is there any sort of --

A    There is.  The producer meets with the talent after the match.  The producer who is responsible for that match meets with the talent after the match and goes through what worked, what didn't work, what were you feeling out there, you know, all those

kinds of things -- or congratulating them if they had a great
match.

      Q    Okay.  When Creative is meeting collectively to talk
about, you know, which talent to promote, are there ever any
discussions about the use of steroids or prescription drugs or
illegal drugs?  Do those topics ever play a role in the
discussions about who to promote and who not to promote?

      A    No.  The only time that it is ever an issue is when the
writing team is notified by Talent Relations that a person is
suspended.  We know we have to get that person off television.

      Q    How is the writing team notified of that?

      A    They are notified by me or by John Laurinaitis.

      Q    How do you learn that somebody is being suspended?

      A    Well, in my new role now, as the head of Talent
Relations, I am notified by Legal at the same time that John
Laurinaitis is.

      Q    Uh-huh.

      A    So I find out that a talent is suspended.  And that
talent will either be suspended right that day, or if they are a
champion, say, and we have to get the title off of them, we have
to wait until the next TV, which is normally just a few days.  It
is never more than a week to get that title off of that person.

      Q    What do you mean by that?

      A    So, say, we had an example when --

      Mr. McDevitt.  Don't use names on drug tests.  Hypotheticals.

Ms. Levesque.  Okay.  Thank you.

So we had an example where someone was going to be suspended, and they were a champion.  And we found out I think it was on a Wednesday.  Well, our shows were done Monday and Tuesday.  So now we have this person we need to suspend for 30 days, but he has a title.  And so what we did is, the next TV that we had, we had that person compete on TV so he could lose the title and then be gone.

There is certain cases where we are forced to do that because we are not professional sport; we are entertainment, and we have to continue our storylines.  Even though it is a major change in direction for us, that is fine.  But we at least have to get a title off of somebody.

Q    Okay.  Because whoever has the title is going to continue to compete in the story arc?

A    Exactly.  I mean, a lot of -- and it is not only with regards to the championship.  That is just the best example I could give to you, since I am not sure that you are a fan of the product.

But when someone is involved in a major storyline, then, you know, we have to end the storyline.  So we have to have that -- in some cases, we have that person compete on the next available TV, and then they are off TV after that.

The best-case scenario I can give you is when you have a champion and you need to get the title off of them, because a lot

of our programs and stories are written around being a champion, because, obviously, that is what everyone aspires to be.

    Q   Sure.  Are there other scenarios where talent will continue to perform even though there has been a suspension imposed?

    A   There has been in the past, but where we are now, as of November 1, we started making the names public of those wrestlers who have been suspended.  And since then, we are no longer having them compete after they do whatever they need to do for TV, if they need to do anything for TV.

    Q   And what about prior to November 1?

    A   Prior to November 1, we had I believe it was a few different periods of time.  When this new policy was implemented in February '06, originally -- and, again, my facts might be a little vague, but this is how I remember it.

    Q   Sure.

    A   Originally, talent were suspended, and, you know, again, if they needed to be on TV the next day or the next week, then they were, but never longer than a week's time, and then they were gone.

Then there was a period of time where we allowed talent to work pay-per-views and TVs and not work live events.  And they still had their 30-day suspension in terms of their pay was still suspended, but they were allowed to appear on TV at that time.

    Q   Uh-huh.

A    Then we added live events, because we said, well, why should the product suffer just because this one person screwed up?

Q    Right.

A    They won't make any money.  We would give them a per diem so they could, you know, get food and what not, $200 a day, which is minimal compared to what they could make if they were working a live event.  So they would, they worked the live event and TVs and pay-per-views.  We continued to use them as a talent, but they just wouldn't be getting paid.

Q    Uh-huh.

A    And then, most recently, we said, okay, well, once these names become public, you know, we need to rechange our policy.  We need to make sure that, okay, they are not going to be on TV.  They might do the necessary program again the week after, but they won't be on TV now or pay-per-view or live events for the next 30 days.

        BY MR. COHEN:

Q    So, is the policy now, is it that -- if they have a positive test done and their name is going to be made public, and let's say they are a champion --

A    Right.

Q    -- you need to have them get rid of the title, do you hold that name, have them make the appearance necessary to get rid of the title, and then announce the suspension?

A    I am not sure, because we haven't had the situation yet.

And it is something we need to determine.  But we have not -- I am not sure.

Q   So, in the past, can you give us a sense how many times have wrestlers who have been suspended appeared on shows?

A   It is not a large number of talent.  And I am not sure of the exact number.  But I would say there is definitely a few.

Q   And these involved cases where they were champions who --

A   No, in that case, they were -- in that case, it was any talent that -- during that time, when we said why should the company be penalized for the actions of one person, during that time we had the discretion of whomever we wanted to use.  So it was definitely more than one person.  In that case, it was not a champion, because we were continuing to use that person.

That being said, during that period of time, we were not rewarding that person at all.  They were not winning on TV.  They were in losing efforts.  Because, certainly, you don't want to reward that kind of behavior.  And, again, they were not getting paid during that time.

Q   Can you give us just a ballpark, I mean, how many times this has happened?

A   During that period of time when we did allow talent?

Q   Yes.

A   I would say, ballpark, five, maybe less.

Q   Okay.  And what was the longest or the most frequent,